# EXHIBIT A
# TO DECLARATION OF F. CAMILO VÁZQUEZ LÓPEZ

ARBITRATION LCIA NO. 215145

## LONDON COURT OF INTERNATIONAL ARBITRATION
### LCIA ARBITRATION NO. 215145

**GREENFIELD SPV I, S.A.P.I. DE C.V.**
(Mexico)

**Claimant 1 or Greenfield**

**TERMINALES PORTUARIAS DEL PACÍFICO, S.A.P.I. DE C.V.**
(Mexico)

**Claimant 2 or TPP**

**TERMINAL MARÍTIMA DE CARBÓN, S.A. DE C.V.**
(Mexico)
**Claimant 3 or TMC Claimants and Counterclaim Defendants**

c.

**FEDERAL ELECTRICITY COMMISSION**
(*Comisión Federal de Electricidad*)
(Mexico)

**CFE GENERACIÓN II EPS**
(Mexico)

**Defendants and Counterclaimants**

hereinafter collectively referred to as the **Parties**

---

## FINAL AWARD

---

ARBITRAL TRIBUNAL

David Arias
Oscar Vásquez Del Mercado Cordero Christian Albanesi



ARBITRATION LCIA NO. 215145

## TABLE OF CONTENTS

**1.    INTRODUCTION**..........................................................................3

**1.1    Claimants and Counterclaim Defendants**...........................................3

**1.2    Defendants and Counterclaimants**.....................................................4

**1.3    The Arbitral Tribunal**......................................................................6

**2.    RELEVANT PROVEN FACTS**.......................................................6

**3.    SUMMARY OF ARBITRATION PROCEEDINGS**...........................21

**4.    RELIEF SOUGHT BY THE PARTIES**............................................29

**4.1    Relief sought by Greenfield**...........................................................29

**4.2    Relief sought by TPP and TMC**.....................................................33

**4.3    Relief sought by the Defendants**....................................................37

**5.    ANALYSIS OF THE ARBITRAL TRIBUNAL**................................39

**5.1    On the legal position of TPP and TMC under the Contract, and whether they have standing to bring claims against the Defendants**....................................41
5.1.1    CFE Position........................................................................41
5.1.2    Greenfield Position...............................................................43
5.1.3    Position of TPP and TMC.......................................................43
5.1.4    Analysis of the Arbitral Tribunal...............................................44

**5.2    About the payment of the CSP based on the CFA**............................51
5.2.1    Greenfield Position...............................................................51
5.2.2    Position of TPP and TMC.......................................................53
5.2.3    Defendants' Position.............................................................
54
5.2.4    Analysis of the Arbitral Tribunal...............................................55

**5.3    Regarding penalties for demurrage of vessels and refund of amounts drawn on the Operational Guarantee for USD 6,911,333, plus VAT and interest**............................
80
5.3.1    Greenfield Position...............................................................80
5.3.2    Position of TPP and TMC.......................................................84
5.3.3    Defendants' Position.............................................................
87
5.3.4    Analysis of the Arbitral Tribunal...............................................91

**5.4    Regarding demurrage at the TPP Terminal for a period exceeding the free storage period, in the amount of USD 6,919,636, plus VAT and interest**............................
5.4.1    Greenfield Position...............................................................
5.4.2    Position of TPP and TMC.......................................................133
5.4.3    Defendants' Position.............................................................

1

ARBITRATION LCIA NO. 215145

    5.4.4    Analysis of the Arbitral Tribunal....................................................... 135

**5.5   Regarding arbitration costs..................................................................... 142**
    5.5.1    Greenfield Position.................................................................... 142
    5.5.2    Position of TPP and TMC............................................................ 142
    5.5.3    Defendants' Position.....................................................................
    143
    5.5.4    Arbitral Tribunal Decision........................................................... 143

**6.    DECISIONS...................................................................................... 145**



2

## 1. INTRODUCTION

1. This Arbitration No. 215145 heard by the London Court of International Arbitration ("**LCIA**") has been conducted in accordance with the Arbitration Rules of the London Court of International Arbitration ("**Rules**"), and involves the following parties:

### 1.1 Claimants and Counterclaim Defendants

2. The Claimants and Counterclaimants in this arbitration are:

   (i) **GREENFIELD SPV I, S.A.P.I. DE C.V.**; a company legally incorporated and existing under the laws of the United Mexican States, with Federal Taxpayers Registry GSI160202MA7, registered in the Public Registry of Property and Commerce under commercial folio number 551967-1, with address at Avenida Pedregal 24, Floor 5, Colonia Molino del Rey, Delegación Miguel Hidalgo, Zip Code 11040, Mexico City, Mexico ("**Greenfield**").

   (ii) **TERMINALES PORTUARIAS DEL PACÍFICO, S.A.P.I. DE C.V.**; a company incorporated under the laws of the United Mexican States, with address at Recinto Portuario, Canal Oriente, s/n, Av. Los Ríos, Apartado Postal 83, Lázaro Cárdenas, Michoacán, Mexico ("**TPP**").

   (iii) **TERMINAL MARÍTIMA DE CARBÓN, S.A. DE C.V.**; a business corporation incorporated under the laws of the United Mexican States, with address at Recinto Portuario, Canal Oriente, s/n, Av. Los Ríos, Apartado Postal 83, Lázaro Cárdenas, Michoacán, Mexico ("**TMC**").

3. Greenfield is represented in this arbitration by the following counsels, with the following contact information:

   - Fernando del Castillo Elorza fdelcastillo@dc-ca.mx
   - Favio Camilo Vázquez López cvazquez@dc-ca.mx
   - Linda María García de Alba lgarcia@dc-ca.mx
   - Renata Arellano Perez Vela rarellano@dc-ca.mx

4. This Final Award shall be served on Greenfield at the following address:

   Del Castillo y Castro Attorneys-at-Law
   Av. Santa Fe, number 428, Torre III, 16th Floor -1601

3



ARBITRATION LCIA NO. 215145

Col. Desarrollo Santa Fe, Cuajimalpa, Mexico City
C.P. 05348, CDMX
Mexico

5.    TPP and TMC are represented in this arbitration by the following counsels with the following

contact details:

- Luis Asali Harfuch luis.asali@bufeteasali.com
- Jorge Asali Harfuch jorge.asali@bufeteasali.com
- Santiago Escobar Magaña santiago.escobar@bufeteasali.com
- Omar Colomé Menéndez omar.colomé@bufeteasali.com
- José Dante Nader Delgado dante.nader@bufeteasali.com

This Final Award shall be served upon TPP and TMC at the following address:

Bufete Asali, S.C.
Juan Salvador Agraz 73, 17th floor
Alcaldía Cuajimalpa, Colonia Santa Fe, C.P. 05348 Mexico City, Mexico

**1.2    Defendants and Counterclaimants**

7.    The Defendants and Counterclaimants in this arbitration are:

(i)    **FEDERAL ELECTRICITY COMMISSION** (*Comisión Federal de Electricidad*); has
Mexican nationality and is a state-owned productive enterprise exclusively owned by the Mexican
Federal Government, with legal capacity and its own assets, with technical, operational and
management autonomy, as provided by Article 2 of the Federal Electricity Commission Law (*Ley
de la Comisión Federal de Electricidad*), published on August 11, 2014 in the [Mexican] Federal
Official Gazette, with address at the Office of the General Counsel of the Federal Electricity
Commission, in Paseo de la Reforma 164, 11th floor, Colonia Juárez, Alcaldía Cuauhtémoc, Zip
Code 06600, Mexico City, Mexico ("**CFE**"). Throughout the events described in this Award, CFE
acted directly or through other related companies, such as, for example, CFE Generación IV. The
Tribunal will refer to CFE or CFE Generación IV interchangeably.

(ii)    **CFE GENERACIÓN II EPS**; is a Mexican company and is a state-owned
productive enterprise with legal capacity and its own assets pursuant to Article 58 of the Federal
Electricity Commission Law,



4

with address at the Office of the General Counsel of the Federal Electricity Commission, Paseo de la Reforma 164, 11th floor, Colonia Juárez, Alcaldía Cuauhtémoc, Zip Code 06600, Mexico City, Mexico (**"CFE Generación"**).

8.    CFE is represented in this arbitration by CFE´s Office of the General Counsel:

Office of the General Counsel of CFE Paseo de la Reforma No. 164, 11th floor Colonia Juárez, Alcaldía Cuauhtémoc Mexico City, 06600 Mexico

9.    CFE Generación is represented in this arbitration by the following counsel:

- Francisco Javier Orozco Torres francisco.orozcot@cfe.mx

10.   In addition, a copy of any communication sent to the Defendants and Counterclaimants shall be sent to the following persons:

- Dr. Raúl Armando Jiménez Vázquez raul.jimenezva@cfe.mx
- Raúl Otero raul.otero@cfe.mx
- Antonio Grayeb Cervantes antonio.grayeb@cfe.mx
- Olimpia de los Ángeles Castro Barreto Madrigal olimpia.castro@cfe.mx
- Lic. Martha Alicia Magdaleno Medina martha.magdaleno@cfe.mx
- Lic. Atenas Sebastián Zepeda atenas.sebastian@cfe.mx
- Lic. Norma Mireles Fragoso norma.mirelesf@cfe.mx
- Carlos Alberto Bejarano Torres carlos.bejarano@cfe.mx
- Lic. María Fernanda Gaminio Reyes maria.gaminio@cfe.mx
- Luis Rodolfo Vázquez Rubí luis.vazquezr@cfe.mx
- Lic. Rosa del Carmen Nieto Ornelas rosa.nieto@cfe.mx

11.   This Final Award shall be served on the Defendants and Counterclaimants at the addresses of their counsel and persons indicated above.



5

ARBITRATION LCIA NO. 215145

**1.3   The Arbitral Tribunal**

12.   Pursuant to Article 5 of the Rules, on July 20, 2021, the LCIA Court appointed the following persons as members of the Arbitral Tribunal:

**DAVID ARIAS**
Arias SLP Gurtubay 4, 3D
28001 Madrid Spain
david.arias@ariasslp.com

**OSCAR VÁSQUEZ DEL MERCADO CORDERO**
Bosque De Yuriria 82 Fraccionamiento La Herradura Segunda Sección Huixquilucan Mexico City
Mexico oscarvmc@gmail.com

**CHRISTIAN ALBANESI (Chairman)**
Linklaters LLP
601 Thirteenth Street N.W., Suite 400 South Washington D.C.
United States of America christian.albanesi@linklaters.com

**2.   RELEVANT PROVEN FACTS[1]**

13.   The Presidente Plutarco Elías Calles Central is a coal or fuel oil-fired thermoelectric Central built on the coast of the State of Guerrero, Mexico, comprising seven generating units, owned by CFE ("**Central**").

14.   On November 22, 1996, Carbonser, S.A. de C.V. ("**Carbonser**") entered into an agreement with CFE, which subject matter is to provide Carbonser with the services of reception, unloading, storage, blending, transportation and delivery of coal to CFE, through its port terminal located in the Port of Lázaro Cárdenas ("**Carbonser Terminal**") for six generation units that are part of the Central through the internal coal handling system of the Central ("**SIMC**").

---

[1]   This chapter summarizes the main proven facts that serve as the factual background to this arbitration. The facts included in this chapter have been alleged by the Parties, which the Arbitral Tribunal considers to be supported by documentary evidence in the file, or which have been alleged by one Party without having been contested by the other Party. Notwithstanding the foregoing, the Arbitral Tribunal shall consider other relevant facts, as deemed appropriate, in analyzing the arguments of the Parties.



15.   On December 21, 2006, TPP entered into a partial assignment of rights agreement with Administración Portuaria Integral Lázaro Cárdenas ("**APILAC**"), for the construction and operation of a specialized terminal for public use, intended for the operation of bulk minerals and steel products, located at the Port of Lázaro Cárdenas ("**TPP Terminal**").[2]

16.   On December 15, 2016, through Official Communication No. 241.02-2120/2016, CFE awarded Greenfield, TPP and Carbonser, under direct award procedure No. CFE- 001-ADSAN-0009-2016, the services for the expansion of coal supply to the Central for 1,300,000 tons per year.[3]

17.   On December 23, 2016, CFE and Greenfield, with the appearance of TPP and Carbonser, entered into the "*Contract for the Provision of Coal Transportation and Storage Services*" ("**Contract**")[4], which subject matter is (i) the construction by Greenfield of a coal transportation and storage system with a capacity of up to 1.300,000 metric tons per year from the TPP Terminal to the Central using a belt system ("**Transportation and Storage System**")[5] , including the repowering of the SIMC, and (ii) the provision by Greenfield of the services of reception, unloading, storage, blending, transportation, and delivery of coal from the TPP Terminal to the Central for a minimum volume equivalent to the Annual Fixed Amount.[6]

18.   The Annual Fixed Amount corresponds to the amount of coal that Greenfield is required to unload, transport, and store as part of the Transportation and Storage Services, and that CFE is required to receive and pay, or pay if not received, according to the terms of the Contract, on an annual basis. The Annual Fixed Amount is equal to 1,300,000 tons of coal ("**CFA**").[7]

19.   Pursuant to clauses 5.6(a) and 6.1 of the Contract, for the availability and for the provision of the Transportation and Storage Services required by the CFA, if applicable, CFE was required to pay a consideration under the terms and concepts detailed in the

---

[2]    Exhibit D-TPP-1.

[3]    Official Communication No. 241.02-2120/2016, Exhibit D-TPP-16.

[4]    Exhibit D-GF-1.

[5]    Exhibit D-CFE-3, Exhibit 7 of the Contract.

[6]    Exhibit D-CFE-8, Exhibit 6 of the Contract.

[7]    Clause 1 of the Contract, Definitions.



Exhibit 2 of the Contract ("**Consideration**")[8] , which includes a port service charge of USD 6.50 per ton of coal ("**CSP**"). [9]

20. The contract term is 172 months from the date of commercial operation.

21. The commercial operation date corresponds to the date on which Greenfield complies with the requirements set forth in Exhibit 3 of the Contract, which was committed to be achieved within 23 months from the commencement date, as defined in the Contract ("**FOC**").[10]

22. On December 23, 2016, Greenfield and Carbonser entered into the *"Operation and Maintenance Agreement in connection with the SIMC"* ("**Carbonser Agreement**"), the purpose of which is to operate and maintain the SIMC.[11]

23. On December 23, 2016, Greenfield and TMC, with the appearance of TPP as joint obligor, entered into the *"Operation and Maintenance Agreement"* ("**O&M Agreement**"), which has as its object the operation of the Transportation and Storage Service and the maintenance of the Transportation and Storage System.[12]

24. On June 21, 2017, CFE and Greenfield, with the appearance of TPP and Carbonser, entered into the Amendment Agreement to the Contract ("**Amendment Agreement**"), pursuant to which they agreed to amend clause 3.1(c) of the Contract, agreeing that the commencement date should be met no later than August 21, 2017. Also, notwithstanding the amendment to clause 3.1(c), the Parties maintained their commitment to achieve the FOC no later than May 21, 2019.[13]

25. By meeting minutes of April 25, 2019, CFE Generación IV presented to Greenfield the vessel receipt schedule for 2019 and requested information from Greenfield regarding preparations for the reception of the first vessel, which was scheduled

---

8    Clause 5.6(a) of the Contract states that *"for the availability and, provision of the Transportation and Storage Services required by the Annual Fixed Amount, if applicable, the Commission shall pay the Supplier the Consideration set forth in Clause 6"*.

Clause 6.1 of the Contract sets forth that *"As of the Commercial Operation Date and during the term of this Contract, the Commission shall pay to the Supplier the consideration for the charges and the items detailed in Exhibit III of the Proposal, which is attached hereto as Exhibit 2 (the "Consideration")"*.

9    Exhibit D-CFE-2.

10   Clause 1 of the Contract, Definitions, and Exhibit 2 of the Contract.

11   Exhibit D-GF-22.

12   Exhibit D-GF-23.

13   Exhibit D-TPP-20.

8



for May 5, 2019. Greenfield continued with the FOC for May 21, 2019.[14]

26. On April 25, 2019, CFE Generación IV and Glencore International AG ("Glencore") entered into the "*Mineral Coal Purchase Agreement No. 700499290*" ("**Glencore Agreement**").[15]

27. On April 30, 2019, CFE Generación IV informed Greenfield of the characteristics, stowage plan and unloading plan for the W-ACE vessel, with an estimated time of arrival ("**ETA**") for May 2, 2019.[16]

28. On May 2, 2019, CFE sent Greenfield the quality and weight certificates of the W-ACE vessel.[17]

29. On May 3, 2019, TMC informed Greenfield that it decided to provide unloading services for the W-ACE vessel to prevent the disruption of the services requested by CFE. In addition, TMC indicated that it would make its best efforts to meet the established unloading times, but since the operation would be performed under different conditions, the charge for not meeting the unloading times was not applicable or attributable to TMC or TPP.[18]

30. On May 10, 2019, CFE required Greenfield the payment for the delay in unloading of the vessel W-ACE, for not complying with the unloading times provided by paragraph 5 of clause A of Exhibit 6 of the Contract[19] ("**Contract Laytime**").[20]

31. On May 13, 2019, TMC informed Greenfield that the decision to provide unloading services for the vessel ANNA MARIA was made to prevent any disruption in the services requested by CFE, indicating that TMC would make its best efforts to meet the convened unloading times, but since the operation would be performed under different conditions,

---

[14]  Minutes of the meeting held on April 25, 2019, Exhibit D-GF-55.

[15]  Exhibit D-CFE-13.

[16]  Official Communication HECC3-O-0068/2019, Exhibit D-CFE-14.

[17]  Official Communication HECC0-0-0070/2019, Exhibit D-CFE-110.

[18]  Official Communication GG-M-006, Exhibit D-TPP-23.

[19]  Sub-paragraph 5, paragraph A of Exhibit 6 of the Contract provides *"the TPP Terminal is equipped with two mobile cranes designed for unloading ships, which allow unloading times as shown in the following table"*.

| Vessel capacity / deadweight tonnage (DWT) | Laytime |
|---|---|
| More than or equal to 50000 to less than or equal to 70 000 | 53 |
| More than or equal to 70000 to less than or equal to 100 000 | 80 |
| More than or equal to 100 000 to less than or equal to 150 000 | 90 |

[20]  Official Communication HECC0-0-0622/2019, Exhibit D-GF-85

9



the charge for failing to comply with the unloading times was not applicable or attributable to TMC or TPP. Also, TMC informed Greenfield that the storage capacity in the TPP Terminal yards was reaching its limit of 140,000 tons.[21]

32.  Per meeting minutes dated May 16, 2019, Greenfield informed the Defendants that the new potential date for the FOC was July 4, 2019. Furthermore, the Defendants requested Greenfield to take the necessary measures to decrease the vessel unloading times considering that the unloading of the first vessel meant an additional 48 hours to the Contract Laytime.[22]

33.  On May 17, 2019, the Defendants informed Greenfield of the characteristics and stowage plan for the vessel ANNA MARIA, with ETA for May 22, 2019.[23]

34.  On May 17, 2019, the Defendants informed Greenfield of the unloading plan for the vessel ANNA MARIA.[24]

35.  On May 21, 2019, CFE informed Greenfield that it would apply the liquidated damages set forth in clause 8.1(b) of the Contract[25] until effective compliance with the FOC.[26]

36.  On May 29, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessel ANNA MARIA, for failure to unload in compliance with the Contract Laytime.[27]

37.  On May 29, 2019, the Defendants requested Greenfield to schedule berthing and unloading for the vessel SARTORI, which had ETA for May 31, 2019.[28]

---

[21]  GG-M-010-19, Exhibit D-TPP-25.

[22]  Minutes of the meeting held on May 16, 2019, Exhibit D-GF-56.

[23]  Official Communication HECC3-0-0080/2019, Exhibit D-GF-101.

[24]  Official Communication HECC3-0-0079/2019, Exhibit D-CFE-21.

[25]  Clause 8.1(b) of the Contract provides that *"if the Supplier fails to carry out the construction of the Transportation and Storage System in accordance with and within the times provided in Schedule 3 of this Contract, and fails to achieve the Commercial Operation Date within 90 (ninety) Days from the Commercial Operation Date established for such purposes in Schedule 3, provided that, regardless of whether the delay in question is still not considered an Event of Default, the Supplier shall pay to the Commission a liquidated damages in the amount of US$50,000.00 Dollars (fifty thousand 00/100 United States Dollars) for each Day of delay of the Commercial Operation Date until reaching the 90 (ninety) Days mentioned and that, for the sake of clarity, only as of Day 91 (ninety-one) shall the delay in question be considered an Event of Default of the Supplier, and the Commission may terminate this Contract pursuant to Clause 8.3 below"*.

[26]  Official Communication HECC0-0-0663/2019, Exhibit D-GF-61.

[27]  Official Communication HECC0-0-0699/2019, Exhibit D-GF-86.

[28]  Official Communication HECC0-0-0699/2019, Exhibit D-GF-87.



38.    On June 4, 2019, Greenfield requested the Defendants to divert the vessel SARTORI due to safety issues at the TPP Terminal. Furthermore, Greenfield informed that the TPP Terminal was not in a position to receive vessels until safety conditions were reestablished, which, it estimated, would occur as of June 25, 2019.[29]

39.    On June 4, 2019, CFE requested Glencore to perform the unloading of the vessel SARTORI at the Carbonser Terminal.[30]

40.    On June 5, 2019, CFE communicated to Greenfield that the necessary arrangements would be made to carry out the unloading operation of the vessel SARTORI in an alternate port, noting that Greenfield should cover the additional costs derived from the delay in unloading the vessel since its arrival on May 30, 2019. Likewise, CFE pointed out that the demurrage charge for the GRIZZLY 2V vessel, which was scheduled to start unloading on June 18, 2019, would be applied.[31]

41.    On June 7, 2019, CFE required Greenfield a payment for defaulting on the FOC on May 21, 2019 for USD 550,000; corresponding to the liquidated damages set forth in the Contract from May 21 to May 31, 2019. [32]

42.    On June 18, 2019, CFE required Greenfield to pay for failing to comply with the FOC on May 21, 2019 for USD 750,000; corresponding to the liquidated damages set forth in the Contract from June 1 to June 15, 2019.[33]

43.    On June 20, 2019, Greenfield informed the Defendants that the TPP Terminal was not in a position to receive vessels until the safety conditions were reestablished, requesting the diversion of scheduled vessels to an alternate port. Greenfield further estimated that, as of July 8, 2019, the TPP Terminal would be operating on a regular basis to receive vessels.[34]

44.    On June 20, 2019, the Defendants informed Greenfield of the characteristics and stowage plan for the vessel GRIZZLY 2V, which arrived on June 4, 2019.[35]

---

[29]    Official Communication LCPL-OPS-CFE-0007, Exhibit D-GF-81.
[30]    E-mail from CFE to Glencore, Exhibit D-CFE-120.
[31]    Official Communication HECC0-0-0757/2019, Exhibit D-CFE-27.
[32]    Official Communication HECC0-0-0753/2019, Exhibit D-GF-57.I.
[33]    Official Communication HECC0-0-0837/2019, Exhibit D-GF-57.II.
[34]    Official Communication LCPL-CFE-OPS-0008, Exhibit D-GF-82.
[35]    Official Communication HECC3-0-0115/2019, Exhibit D-GF-102.

45.    On June 20, 2019, the Defendants informed Greenfield of the plan to unload the vessel GRIZZLY 2V.[36]

46.    On June 21, 2019, CFE communicated to Greenfield that it was not possible to divert to an alternate dock the vessels GRIZZLY 2V and ANNA MARIA, which were already anchored, noting that these vessels should remain anchored until the TPP Terminal was in a position to begin unloading, considering the costs associated with demurrage.[37]

47.    On June 21, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessel SARTORI, for failing to perform the unloading in compliance with the Contract Laytime.[38]

48.    Per meeting minutes dated June 26, 2019, the Defendants ratified to Greenfield the vessel reception schedule for 2019. Likewise, the Defendants requested to be informed of the date on which the unloading maneuvers of the vessels that arrived on June 4 and 15, 2019 would begin. On the other hand, Greenfield informed CFE that, on July 1, 2019, the maneuvers to move the coal stored in the dock yard would commence, and the options to carry out the unloading of one of the waiting vessels would be analyzed. In addition, Greenfield informed the Defendants that the safety conditions of the TPP Terminal did not allow the unloading of vessels until July 8, 2019.[39]

49.    On July 2, 2019, Greenfield informed the Defendants that safety conditions, due to the construction, operation and unloading of the TPP Terminal, did not permit the unloading of vessels. Greenfield also informed the Defendants that they estimated the unloading of new vessels by July 10, 2019.[40]

50.    On July 3, 2019, CFE required Greenfield to pay for defaulting on the FOC on May 21, 2019 for USD 750,000, corresponding to the liquidated damages set forth in the Contract from June 16 to June 30, 2019.[41]

[36]    Official Communication HECC3-0-0114/2019, Exhibit D-CFE-31.
[37]    Official Communication HECC0-0-0860/2019, Exhibit D-CFE-33.
[38]    Official Communication HECC0-0-0848/2019, Exhibit D-GF-88.
[39]    Minutes of the meeting held on June 26, 2019, Exhibit D-GF-114.
[40]    Official Communication LCPL-OPS-CFE-0010, Exhibit D-CFE-35.
[41]    Official Communication HECC0-0-0943/2019, Exhibit D-GF-57.III.



51. On July 5, 2019, the Defendants informed Greenfield of the characteristics and stowage plan of the vessel ANANGEL ASTRONOMER 3V, which arrived on June 30, 2019.[42]

52. On July 5, 2019, the Defendants informed Greenfield of the unloading plan for the vessel ANANGEL ASTRONOMER 3V, which arrived on June 30, 2019.[43]

53. On July 5, 2019, the Defendants informed Greenfield of the characteristics and stowage plan of the vessel ANNA MARIA 2V, which arrived on June 15, 2019.[44]

54. On July 5, 2019, the Defendants informed Greenfield of the unloading plan for the vessel ANNA MARIA 2V.[45]

55. On July 11, 2019, TMC informed Greenfield that the decision to provide unloading services for the vessel MV GRIZZLY was made to prevent the interruption of the services requested by CFE, indicating that the Variable Demurrage Charge was not applicable or attributable to TMC or TPP, given that the operation would be carried out under different conditions.[46]

56. On July 18, 2019, CFE required Greenfield to pay for defaulting on the FOC on May 21, 2019 for USD 750,000, corresponding to the liquidated damages set forth in the Contract from July 1 to July 15, 2019.[47]

57. On July 18, 2019, Greenfield informed CFE the payment of USD 1,500,000 corresponding to the application of the liquidated damages set forth in the Contract from June 1 to June 30, 2019 for not achieving the FOC on May 21, 2019.[48]

58. On July 18, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessel GRIZZLY 2V, for failing to unload under the Contract Laytime.[49]

---

[42]   Official Communication HECC3-0-0129/2019, Exhibit D-GF-103.
[43]   Official Communication HECC0-0-0130/2019, Exhibit D-CFE-43.
[44]   Official Communication HECC3-0-0132/2019, Exhibit D-GF-104.
[45]   Official Communication HECC3-0-0133/2019, Exhibit D-CFE-39.
[46]   GG-M-012-19, Exhibit D-TPP-31.
[47]   Official Communication HECC0-0-1009/2019, Exhibit D-GF-57.IV.
[48]   Official Communication LCPL-OPS-CFE-0011, Exhibit D-GF-58.
[49]   Official Communication HECC0-0-1016/2019, Exhibit D-CFE-37.



59.  On July 19, 2019, Greenfield informed CFE the payment of USD 550,000, amount corresponding to the application of the liquidated damages set forth in the Contract from May 21 to May 31, 2019 for not achieving the FOC on May 21, 2019.[50]

60.  On July 20, 2019, TMC informed Greenfield that the decision to provide unloading services for the vessel ANANGEL ASTRONOMER V3 was made to prevent the interruption of the services requested by CFE, indicating that the Variable Demurrage Charge was not applicable or attributable to TMC or TPP, given that the operation would be performed under different conditions.[51]

61.  On July 29, 2019, the Defendants informed Greenfield of the characteristics and stowage plan for the vessel NAVIOS ANTARES 2V with ETA for July 30, 2019.[52]

62.  On July 29, 2019, the Defendants informed Greenfield of the plan to unload the vessel NAVIOS ANTARES 2V.[53]

63.  On July 30, 2019, the Defendants informed Greenfield of the characteristics and stowage plan of the CL TAIZHOU vessel, which arrived on July 13, 2019.[54]

64.  On July 30, 2019, the Defendants informed Greenfield of the unloading plan for the vessel CL TAIZHOU, which arrived on July 13, 2019.[55]

65.  On July 31, 2019, TMC informed Greenfield that the decision to provide the unloading services of the vessel ANNA MARIA V2 was made to prevent the interruption of services requested by CFE, indicating that the Variable Demurrage Charge was not applicable or attributable to TMC or TPP, given that the operation would be carried out under different conditions. Likewise, TMC informed that after unloading the vessel ANNA MARIA, the storage capacity of the yards in zone two of the TPP Terminal would reach its limit with 364,847 tons.[56]

---

[50]  Official Communication LCPL-OPS-CFE-0012, Exhibit D-GF-58.
[51]  GG-M-013-19, Exhibit D-TPP-31.
[52]  Official Communication HECC3-0-0157/2019, Exhibit D-GF-105.
[53]  Official Communication HECC3-0-0158/2019, Exhibit D-CFE-51.
[54]  Official Communication HECCH3-0-0159/2019, Exhibit D-GF-106.
[55]  Official Communication HECC3-0-0160/2019, Exhibit D-CFE-47.
[56]  GG-M-016-19, Exhibit D-TPP-31.



AUTHORIZED BY THE MEXICAN FEDERAL JUDICIARY
GERALDINA CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021

66. On August 8, 2019, CFE required Greenfield to pay for defaulting on the FOC on May 21, 2019 for USD 800,000, corresponding to the liquidated damages from July 16 to July 31, 2019.[57]

67. On August 8, 2019, CFE Generación and Glencore entered into an amendment agreement to the Glencore Agreement, whereby three deliveries of items 10 and 11 at the Carbonser Terminal were modified, which were considered between August 22 and November 16, and were rescheduled for between November 10 and December 16. The above, because the stock in the storage yards of the Central reached the maximum capacity due to the low consumption of the units, as a result of (i) generation dispatch by the National Energy Control Center ("**CENACE**"), (ii) failures presented in certain units, and (iii) the extension of the maintenance periods of other units ("**Glencore Agreement Amendment**").[58]

68. On August 16, 2019, Greenfield informed the Defendants that the TPP Terminal was able to safely provide the services and that the requirements set forth in Schedule 3 of the Contract necessary to achieve the FOC had been met.[59]

69. On August 23, 2019, Greenfield informed CFE the payment of USD 750,000, corresponding to the application of the liquidated damages set forth in the Contract from July 1 to July 15, 2019 for not achieving the FOC on May 21, 2019.[60]

70. On August 23, 2019, Greenfield informed CFE of the payment of USD 800,000, corresponding to the application of the liquidated damages set forth in the Contract from July 16 to July 31, 2019 for failing to achieve the FOC on May 21, 2019.[61]

71. On August 26, 2019, CFE required Greenfield to pay for defaulting on the FOC on May 21, 2019 for USD 750,000, amount corresponding to the liquidated damages set forth in the Contract from August 1 to August 15, 2019.[62]

---

[57] Official Communication HECC0-0-1151/2019, Exhibit D-GF-57.V.
[58] Exhibit D-CFE-216 and Exhibit D-TPP-63.
[59] Official Communication LCPL-OPS-CFE-0016, Exhibit D-GF-83.
[60] Official Communication LCPL-OPS-CFE-0017, Exhibit D-GF-58.III.
[61] Official Communication LCPL-OPS-CFE-0018, Exhibit D-GF-58.IV.
[62] Official Communication HECC0-0-1276/2019, Exhibit D-GF-57.VI.

72.    On August 27, 2019, CFE again required Greenfield to pay for the delay in the unloading of the vessel GRIZZLY 2V for USD 406,250.00, for failing to unload under the Contract Laytime.[63]

73.    On August 27, 2019, CFE required Greenfield to pay for the delayed unloading of the vessels ANNA MARIA 2V[64], ANANGEL ASTRONOMER 3V[65], and CL TAIZHOU[66] , for failing to unload under the Contract Laytime.

74.    On September 2, 2019, CFE informed Greenfield of the provisional acceptance of the FOC, dated August 16, 2029.[67]

75.    On September 12, 2019, the Defendants informed Greenfield of the characteristics and stowage plan of the vessel W-ARCTURUS, which arrived on August 31, 2019.[68]

76.    On September 12, 2019, the Defendants informed Greenfield of the unloading plan for the W-ARCTURUS vessel.[69]

77.    On September 13, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessel NAVIOS ANTARES 2V, for failing to perform the unloading under the Contract Laytime.[70]

78.    On September 17, 2019, the Defendants informed Greenfield of the characteristics and stowage plan for the HARROW vessel, which arrived on August 2, 2019.[71]

79.    On September 17, 2019, the Defendants informed Greenfield of the unloading plan for the vessel HARROW.[72]

80.    On September 19, 2019, the Defendants informed Greenfield of the characteristics and stowage plan for the HARVEST RAIN 3V vessel, with ETA for September 18, 2019.[73]

---

[63]    Official Communication HECCH0-0-1275/2019, Exhibit D-GF-43.
[64]    Official Communication HECC0-0-1286/2019, Exhibit D-GF-41.
[65]    Official Communication HECC0-0-1285/2019, Exhibit D-GF-42.
[66]    Official Communication HECC0-0-1287/2019, Exhibit D-GF-91.
[67]    Official Communication CFE HECC0-O-1236/2019, Exhibit D-GF-40.
[68]    Official Communication HECC3-0-0197/2019, Exhibit D-GF-107.
[69]    Official Communication HECC3-0-0198/2019, Exhibit D-CFE-63.
[70]    Official Communication HECC0-0-1397/2019, Exhibit D-GF-92.
[71]    Official Communication HECC3-0-0200/2019, Exhibit D-CFE-55.
[72]    Official Communication HECC3-0-0202/2019, Exhibit D-CFE-56.
[73]    Official Communication HECC3-0-0209/2019, Exhibit D-GF-108.



81. On September 19, 2019, the Defendants informed Greenfield of the plan to unload the HARVEST RAIN 3V vessel.[74]

82. On September 25, 2019, CFE required Greenfield to pay for the delayed unloading of the vessels HARROW[75] and W-ARCTURUS[76], for failing to unload under the Contract Laytime.

83. On September 20, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessels for USD 3,083,548.11.[77]

84. On October 3, 2019, the Defendants informed Greenfield of the characteristics and stowage plan of the CL TAIZHOU 3V vessel, which arrived on October 2, 2019.[78]

85. On October 3, 2019, the Defendants informed Greenfield of the unloading plan for the CL TAIZHOU 3V vessel.[79]

86. On October 11, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessel HARVEST RAIN 3V, for failure to unload under the Contract Laytime.[80]

87. On October 23, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessel CL TAIZHOU 3V, for failure to unload under the Contract Laytime.[81]

88. On October 25, 2019, the Defendants informed Greenfield of the characteristics and stowage plan of the MINERAL NINGBO 2V vessel, which arrived on October 21, 2019.[82]

89. On October 25, 2019, the Defendants informed Greenfield of the unloading plan for the MINERAL NINGBO 2V vessel.[83]

---

[74]  Official Communication HECC3-0-0210/2019, Exhibit D-CFE-67.
[75]  Official Communication HECC0-0-1456/2019, Exhibit D-GF-93.
[76]  Official Communication HECC0-0-1461/2019, Exhibit D-GF-94.
[77]  Official Communication HECC0-0-1429/2019, Exhibit D-CFE-59.
[78]  Official Communication HECC3-0-0220/2019, Exhibit D-GF-109.
[79]  Official Communication HECC3-0-0221/2019, Exhibit D-CFE-71.
[80]  Official Communication HECC0-0-1564/2019, Exhibit D-GF-95.
[81]  Official Communication HECC0-0-1639/2019, Exhibit D-GF-96.
[82]  Official Communication HECC3-0-0240/2019, Exhibit D-GF-110.
[83]  Official Communication HECC3-0-0241/2019, Exhibit D-CFE-75.



17

90.     On November 5, 2019, the Defendants informed Greenfield of the characteristics and stowage plan of the vessel NAVIOS ANTARES 4V, which arrived on November 5, 2019.[84]

91.     On November 5, 2019, the Defendants informed Greenfield of the plan to unload the vessel NAVIOS ANTARES 4V.[85]

92.     On November 14, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessel MINERAL NINGBO 2V, for failure to unload under the Contract Laytime.[86]

93.     On November 20, 2019, the Defendants informed Greenfield of the characteristics and stowage plan for the vessel LMZ FRANCISCO, with ETA for November 22, 2019.[87]

94.     On November 20, 2019, the Defendants informed Greenfield of the unloading plan for the vessel LMZ FRANCISCO.[88]

95.     On November 21, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessel NAVIO ANTARES 4V, for failing to perform the unloading under the Contract Laytime.[89]

96.     On December 3, 2019, CFE required Greenfield to pay for the delay in the unloading of the vessel LMZ FRANCISCO, for failing to unload under the Contract Laytime.[90]

97.     On December 9, 2019, CFE required Greenfield to pay for the delay in the unloading of fifteen vessels totaling USD 6,310,256.60.[91]

98.     On March 28, 2020, CFE reiterated the payment request to Greenfield for the delay in the unloading of fifteen vessels for an aggregate amount of USD 6,310,256.60.[92]

---

[84]    Official Communication HECC3-0-0251/2019, Exhibit D-GF-111.
[85]    Official Communication HECC3-0-0250/2019, Exhibit D-CFE-79.
[86]    Official Communication HECC0-0-1729/2019, Exhibit D-GF-97.
[87]    Official Communication HECC3-0-0264/2019, Exhibit D-GF-112.
[88]    Official Communication HECC3-0-0263/2019, Exhibit D-CFE-83.
[89]    Official Communication HECC0-0-1779/2019, Exhibit D-GF-99.
[90]    Official Communication HFCC0-0-1835/2019, Exhibit D-GF-99.
[91]    Official Communication HECC0-0-1904/2019, Exhibit D-CFE-86.
[92]    Official Communication CFE HECC0-O-0233/2020, Exhibit D-GF-39.



18

99.  On July 23, 2020, CFE again reiterated the demand for payment to Greenfield for the delay in the unloading of fifteen vessels for a total of USD 6,310,256.60.[93]

100. On September 1, 2020, Greenfield informed the Defendants that there was an outstanding charge corresponding to the CSP for USD 4,039,727.10 plus VAT, corresponding to 586,058 tons, differential to reach the CFA.[94]

101. On September 8, 2020, CFE responded to the request for payment to Greenfield, stating that it was under analysis, and reiterated to Greenfield its request for payment of the costs associated with the demurrage of the vessels for not discharging under the Contract Laytime.[95]

102. On September 10, 2020, Greenfield informed the Defendants that the payment of the amounts claimed for breaching the Contract Laytimes was inadmissible, since the delays were not attributable to it, and, in addition, the requirements set forth in clause 10.2(b) of the Contract were not satisfied.[96]

103. On September 17, 2020, Greenfield requested again the payment to CFE for an amount of USD 4,039,727.10, reiterating that, as pf that date, there was no event of default by Greenfield under the Contract.[97]

104. On October 13, 2020, CFE sent Greenfield supporting documentation of payments made to Glencore due to vessel demurrage.[98]

105. On October 29, 2019, Greenfield, notified the Defendants a dispute regarding the admissibility of the demurrage payments claimed by the Defendants, and requested that the Parties attempted to resolve the dispute amicably within 30 days pursuant to clause 17.2 of the Contract.[99]

---

[93]  Official Communication HECC0-0-0584/2019, Exhibit D-CFE-90.
[94]  Official Communication LCPL-OPS-CFE-0058, Exhibit D-GF-30.
[95]  Official Communication HECC0-O-0700/2020, Exhibit D-GF-31.
[96]  Official Communication LCPL-OPS-CFE-0057, Exhibit D-GF-29.
[97]  Official Communication LCPL-OPS-CFE-0060, Exhibit D-GF-32.
[98]  Official Communication HECC0-O-0839/2020, Exhibit D-CFE-94.
[99]  Official Communication LCPL-OPS-CFE-0061, Exhibit D-CFE-95.



106.    On November 23, 2020, the Defendants informed Greenfield of the temporary suspension until further notice of the Transportation and Storage Services under the Contract effective as of November 24, 2020.[100]

107.    On December 4, 2020, Greenfield reiterated the payment requirement to CFE for an amount of USD 4,039,727.10, corresponding to the CSP based on the CFA for the period 2019-2020.[101]

108.    On April 23, 2021, Greenfield reiterated to CFE the payment requirement for an amount of USD 4,039,727.10, corresponding to the CSP based on the period 2019-2020 CFA.[102]

109.    On April 23, 2021, CFE requested Banco Nacional de México S.A. to pay USD 6,911,333.11, against Irrevocable Standby Letter of Credit No. 5608601449 ("**Operational Guarantee**"), for the incurred vessel demurrage and financial costs.[103]

110.    On April 24, 2021, Banco Nacional de México S.A. paid USD 6,911,333.11, against the Operational Guarantee, per the Defendants' request.[104]

111.    On May 3, 2021, CFE communicated to Greenfield that, in accordance with this arbitration and the CFA being the subject matter of the arbitration, the Arbitral Tribunal would indicate whether the payment of the CSP based on the CFA was appropriate or not.[105]

112.    On September 3, 2021, Greenfield required CFE to pay an amount of USD 9,632,084.80 plus VAT, corresponding to the CSP based on the CFA for the period 2020-2021.[106]

113.    On January 6, 2022, CFE communicated to Greenfield that the operation of the Transportation and Storage Services would be resumed, indicating that the vessel CAPE PEREGRINE with ETA for January 10, 2022 was expected to arrive.[107]

---

[100]    Official Communication HECC0-O-0961/2020, Exhibit D-GF-90.
[101]    Official Communication LCPL-OPS-CFE-0064, Exhibit D-GF-33.
[102]    Official Communication LCPL-OPS-CFE-0078, Exhibit D-GF-34.
[103]    Letter of Credit Execution Request, Exhibit D-GF-7.
[104]    Citibanamex payment email, Exhibit D-CFE-100.
[105]    Official Communication HECC0-O-0298/2021, Exhibit D-GF-35.
[106]    Official Communication LCPL-OPS-CFE-0088, Exhibit D-GF-37.
[107]    Official Communication HECC0-O-0018/2022, Exhibit D-TPP-41.



20

114. On January 26, 2022, CFE required Greenfield to pay for the delay in the unloading of the vessel CAPE PEREGRINE, under the Contract Laytimes.[108]

115. On September 1, 2022, TMC required Greenfield to pay an amount of USD 9,603,492.13, corresponding to the CSP based on the CFA for the period 2021-2022.[109]

116. On September 1, 2022, Greenfield required payment to CFE for an amount of USD 9,603,492.13 plus VAT, corresponding to the CSP based on the CFA for the period 2021-2022.[110]

117. On January 17, 2023, the Defendants informed Greenfield of the characteristics and stowage plan for the vessel NAVIOS STELLAS, with ETA for January 18, 2023.[111]

## 3.    SUMMARY OF ARBITRATION PROCEEDINGS

118. On April 12, 2021, Greenfield filed a Request for Arbitration ("**Request**") with the Secretariat of the London Court of International Arbitration ("**LCIA Secretariat**") identifying CFE as Defendants. In the Request, Greenfield nominated Mr. David Arias as co-arbitrator.

119. This Request is legally grounded on the following arbitration agreement contained in clause 17.5 of the Contract:

> *17.5 Arbitration*
>
> *(a)  All disputes arising out of or relating to this Agreement, its breach, termination or validity, except for disputes of a technical, operational or economic nature to be resolved pursuant to Section 17.4 above, shall be settled exclusively and finally by arbitration in accordance with the LCIA Rules, which are incorporated by reference herein.*
>
> *(b)  The place of arbitration shall be Mexico City, Federal District, and the arbitration shall be conducted in Spanish.*
>
> *(c)  The law applicable to the merits of the arbitration shall be the law of Mexico.*
>
> *(d)  The arbitral tribunal shall be composed of 3 (three) arbitrators, one appointed by the Supplier and one by the Commission in the Request for Arbitration and in the Answer or request for extension thereof, respectively, and the third, who shall be the chairman, shall be appointed by agreement of the 2 (two) arbitrators appointed by the Supplier and the Commission; within 30 (thirty) Days following the confirmation of the first two arbitrators by the LCIA.*

---

[108]    Official Communication HECC0-O-0106/2022, Exhibit D-TPP-42.
[109]    Official Communication GG-TMC-027-22, Exhibit D-TPP-50.
[110]    LCPL-OPS-CFE-0126, Exhibit D-GF-143.
[111]    Official Communication HECC30-O-0013/2023, Exhibit D-TPP-53.



(e)     *If either Party fails to appoint an arbitrator as provided in this Clause or if the 2 (two) arbitrators appointed by the Parties fail to agree on the appointment of the third arbitrator within the time limit specified, such arbitrator shall be appointed by the Secretary of the LCIA.*

(f)     *The arbitration award shall be final and binding upon the Supplier and the Commission.*

(g)     *The arbitration proceedings shall be confidential and any Person participating therein shall keep confidentiality, including, without limitation, regarding the arbitral proceedings and any documents filed in the arbitration, except and to the extent that disclosure is required from a Party in the exercise of its right to protect any right or to enforce or challenge any award before a court with competent jurisdiction or any other authority.*

(h)     *The arbitral tribunal shall accept as final and binding any Expert's opinion, if any, regarding technical, operational, or economic aspects pursuant to Clause 17.4, except in case of (i) irregularities in the appointment of the Expert, or (ii) evident error, fraud or bad faith in its opinion.*

(i)     *If either Party wishes to challenge the Expert's opinion, such Party shall commence an arbitration in accordance with this Clause within 30 (thirty) Days following the notification of the opinion and shall state in the Request for Arbitration the grounds of such challenge (of those listed in this paragraph). In the event that the Party claims evident error as ground, the Tribunal shall determine that it substantially affects the outcome of the disagreement or dispute and shall find the existence of such ground only on the basis of the text of the Expert's determination.*

(j)     *Notwithstanding the submission of a dispute to arbitration, the Parties shall continue to perform their obligations under this Agreement, unless a provisional remedy is ordered by the arbitral tribunal.*

120.    On May 10, 2021, the Defendants filed their Response to the Request. In the Response, the Defendants appointed Dr. Oscar Vásquez del Mercado Cordero as co-arbitrator;

121.    On July 20, 2021, the LCIA Court appointed Christian Albanesi as President of the Arbitral Tribunal, following the joint appointment of the co-arbitrators, and David Arias and Oscar Vásquez del Mercado Cordero as co-arbitrators. On the same date, the LCIA Secretariat notified the Parties of the constitution of the Arbitral Tribunal.

122.    On July 29, 2021, Greenfield filed a consolidation request of TPP and TMC to this arbitration ("**Consolidation Request**"), in terms of Article 22.1(x) of the Rules. Greenfield also requested that the deadline for filing the Statement of Case be suspended and that the discussion on the conduct of the proceedings be resumed once the Arbitral Tribunal has ruled on the Consolidation Request.

123.    On August 1, 2021, Greenfield submitted to the Arbitral Tribunal and the Defendants a document signed by TPP and TMC on July 30, 2021, in which they expressed their consent to be joined in this arbitration.

GERALDINA
CHÁVEZ LOZANO

CERTIFIED TRANSLATOR
P. 0193-2021

124.    On August 5, 2021, the Defendants submitted their comments to the Consolidation Request. In such communication, the Defendants indicated that they had no objection to the suspension of the deadline for the filing of the Statement of Case provided for in Art. 15.2 of the Regulations.

125.    On August 6, 2021, Greenfield requested a reasonable period to comment on the Defendants' statements regarding the Consolidation Request.

126.    On August 6, 2021, the Arbitral Tribunal confirmed the suspension of the deadline for filing the Statement of Case until the Consolidation Request is resolved. In addition, the Arbitral Tribunal: (i) invited Greenfield to submit its comments, exclusively regarding the statements made by the Defendants in their previous written submission, on or before August 12, 2021; and (ii) invited the Defendants to submit their comments, exclusively, regarding the representations made by Greenfield in the next written submission, on or before August 19, 2021.

127.    On August 12, 2021, Greenfield submitted additional comments regarding the statements made by the Defendants in their communication dated August 5, 2021.

128.    On August 19, 2021, the Defendants submitted their additional comments regarding the representations made by Greenfield in its communication of August 12, 2021.

129.    On September 13, 2021, the Arbitral Tribunal informed Greenfield and the Defendants that, after carefully analyzing their respective submissions with respect to the Consolidation Request, it considered it appropriate to invite them to comment on the following issues:

a.        *"The Parties have discussed at length whether or not TPP and TMC are parties to the Contract for the Provision of Coal Transportation and Storage Services ("Contract"). If the Arbitral Tribunal were to conclude that TPP and TMC are not parties to the Contract, the Arbitral Tribunal would have to decide that TPP and TMC are not parties to the Contract, what would be the effect of such a finding on the Consolidation Request, in light of Art. 22.1(x) of the LCIA Regulations?*

b.        *In connection with the preceding question, the Arbitral Tribunal has been able to consult three doctrinal articles (in English) that analyze the mechanism of incorporation of third parties provided by Art. 22.1(x) of the LCIA Regulations. Unfortunately, the Arbitral Tribunal has not found Spanish translations of these articles, nor has it been able to find other articles on this subject. Notwithstanding the foregoing, the Arbitral Tribunal invites the Parties to make any statements they deem appropriate on the content of these articles, as they relate to the mechanism of incorporation of third parties under the LCIA Rules. Of course, the Parties are free to provide any other source of doctrine they deem relevant on this issue.*

23

*c.        Considering that the Defendant has stated that it has not addressed any claim against TPP or TMC (see, e.g., §34 of the Defendant's August 5 submission), and in light of the provisions of Clause 4.6(f) of the Contract, if the Arbitral Tribunal were to decide to bring TPP and TMC into the arbitration, what would be the specific role that TPP and TMC would play in the arbitration? For example, what would be the procedural role of TPP and TMC in the written phase of the proceedings or in the hearing, including during the examination of witnesses and experts? In answering this question, the Parties should bear in mind that a potential (and yet unresolved) incorporation of TPP and TMC into the arbitration should not cause any procedural imbalance to the detriment of the Defendant."*

130.    To this effect, the Arbitral Tribunal invited Greenfield and the Defendants to a virtual conference to hear them on these issues, to be held on September 23, 2021, without prejudice to request their written comments on the issues raised on September 20, 2021.

131.    Furthermore, the Arbitral Tribunal held that it would have no objection to have TPP and TMC participating in the conference, but only if both Greenfield and the Defendants deemed it appropriate and expressly accepted their participation, noting that if TPP and TMC were to participate in the conference, it would only be to clarify any concerns that the Arbitral Tribunal might have once after receiving the written statements from Greenfield and the Defendants, and in the understanding that their participation in the conference would be as third parties to the arbitration.

132.    On September 21, 2021, Greenfield and the Defendants submitted their comments to the issues raised by the Arbitral Tribunal, confirming their participation in the conference convened for September 23, 2021. In such communication, the Defendants expressed their opposition to the participation of TPP and TMC in the conference.

133.    On September 23, 2021, Greenfield, the Defendants and the Arbitral Tribunal held a conference to clarify certain doubts of the Arbitral Tribunal.

134.    On October 5, 2021, the Arbitral Tribunal received a direct communication from TPP and TMC. In such communication, TPP and TMC attached a written Expression of Consent, with their respective Exhibits.

135.    On October 7, 2021, the Arbitral Tribunal responded to the communication from TPP and TMC, stating that such communication is not part of the file since TPP and TMC were not parties to this arbitration.

136.    On the same date, the Arbitral Tribunal brought to the attention of Greenfield and the Defendants the communication from TPP and TMC, forwarding to Greenfield and the Defendants

24

such communication and the Tribunal's response. At the same time, the Arbitral Tribunal informed Greenfield and the Defendants that the submission of TPP and TMC would not be considered by the Arbitral Tribunal for the purpose of deciding on the pending consolidation request.

137. In response, also on October 7, 2021, the Defendants commented on the communication from TPP and TMC, stating that such communication showed that TPP and TMC were improperly aware of the arbitration proceedings, which, according to Defendants, would constitute a violation of the confidentiality obligations set forth in Article 30 of the Rules.

138. On October 8, 2021, Greenfield informed the Arbitral Tribunal that it had not been aware of the contents of TPP's and TMC's brief, nor of their sending the same, acknowledging receipt of the Defendants' communication dated October 7, 2021, and reserving its right to respond.

139. On October 12, 2021, Greenfield sent a communication to the Arbitral Tribunal, expressing its rejection of the Defendants' assertions regarding the alleged violation of confidentiality duties, and providing its arguments in this regard.

140. On the same day, October 12, 2021, the Defendants sent a communication to the Arbitral Tribunal and Greenfield endorsing their position.

141. On October 21, 2021, the Arbitral Tribunal issued Procedural Order No. 1, in which Greenfield's Consolidation Request of TPP and TMC was admitted subject to certain terms and conditions.

142. On October 27, 2021, TPP and TMC communicated their acceptance to appear in this arbitration under the terms and conditions set by the Arbitral Tribunal in Procedural Order No. 1, including, among others, the express acceptance of TPP and TMC to the integration of the Arbitral Tribunal.

143. On November 30, 2021 at 11:00 a.m. Mexico City time, a procedural conference was held between the Parties and the Arbitral Tribunal, at which the Parties presented their positions on the rules applicable to this arbitration and made their proposals on the procedural calendar.

25



144.    On February 3, 2022, the Arbitral Tribunal issued Procedural Order No. 2, which set the procedural calendar governing the conduct of the arbitration. The procedural schedule did not provide a specific date for the Hearing.

145.    On February 13, 2022, after consultation with the Parties, the Arbitral Tribunal set the Hearing for the week of July 10, 2023 in Mexico City, at a venue to be confirmed.

146.    On April 6, 2022, the Claimants filed their Statement of Case, together with documentary evidence, witness statements and expert reports.

147.    On April 6, 2022, the Defendants filed their Statement of Counterclaim, together with documentary evidence, witness statements and expert reports.

148.    On June 10, 2022, the Claimants filed their Statement of Reply to Counterclaim, together with documentary evidence, witness statements and expert reports.

149.    On August 7, 2022, the Defendants requested an extension of at least 30 days to the period set forth in the Procedural Calendar for the filing of their Statement of Reply.

150.    On August 8, 2022, the Claimants submitted their comments on the Defendants' request.

151.    On August 9, 2022, the Arbitral Tribunal issued Procedural Order No.3, whereby it decided (i) to grant an extension to the Defendants until August 15, 2022 for filing of their Statement of Reply to Counterclaim; (ii) that the 6-day extension granted to the Defendants for the filing of the Statement of Reply would be deducted from the corresponding deadline for the filing of the Statement of Defense to Counterclaim; and (iii) to adjust the Procedural Calendar as set forth in Exhibit 1 of Procedural Order No. 3.

152.    On August 11, 2022, TPP and TMC filed a Request for a Provisional Remedy of Interim Payment, together with an expert opinion and related documents (**"Request for Provisional Remedy"**) and on the same date Greenfield informed the Arbitral Tribunal that it subscribed to TPP's and TMC's prior communication.

153.    On August 12, 2022, the Arbitral Tribunal acknowledged receipt of the Request, and provided a copy for the information of the Defendants. Given the length of the Request for Provisional Remedy and the submission of an expert opinion, the Arbitral Tribunal invited the Defendants to submit a copy of the Request for Provisional Remedy to the

Defendants for them to file a response within 6 weeks, i.e. no later than September 23, 2022.

154.   Furthermore, given the presentation of the expert opinion by the Claimants, the Arbitral Tribunal invited the Parties to indicate whether they would request a hearing for the Request for Provisional Measures, in order to reserve dates as soon as possible if it is the case.

155.   On August 15, 2022, the Defendants filed their Statement of Reply, together with documentary evidence, witness statements and expert reports.

156.   On August 17, 2022, TPP and TMC indicated that the holding of a hearing related to the Request for Provisional Remedy would not be necessary, as the facts, arguments and evidence supporting its merits were thoroughly explained in the Request for Provisional Remedy. They also pointed out that a hearing would delay the decision on a request that was essentially urgent. Notwithstanding the foregoing, TPP and TMC pointed out that a hearing might become necessary in view of the evidence presented by CFE, if any. On the same day, Greenfield agreed with TPP and TMC's communication.

157.   On August 24, 2022, CFE indicated that, since the beginning of the arbitration, it opposed to the incorporation of TPP and TMC as parties, declaring that their participation, far from contributing to the clarification of the facts, would hinder the proceedings.

158.   On August 25, 2022, the Arbitral Tribunal informed the Parties that, in view of their respective positions, considered that it was advisable to reserve a tentative hearing date for the Request for Provisional Remedy, whether or not it would later be confirmed.

159.   On August 26, 2022, the Parties informed the Tribunal that they had agreed to set October 6, 2022 as a tentative date for the hearing on the Request for Provisional Remedy, which would be confirmed or not at a later date.

160.   On September 23, 2022, the Defendants filed their response to the Request for Provisional Remedy.

161.   On September 30, 2022, the Claimants indicated that, following the filing of the Request for Provisional Remedy and its respective Answer by CFE, they considered that the evidence submitted by the Parties did not warrant the holding of a hearing for the analysis and development of the evidence provided.

27

ARBITRATION LCIA NO. 215145

162. On the same day, the Arbitral Tribunal invited the Defendants to submit their comments on the Claimants' submission by Monday, October 3, 2022. The Arbitral Tribunal also informed the Parties that, notwithstanding the Defendants' comments, the Arbitral Tribunal did not consider that holding a hearing is necessary.

163. Also on the same day, the Defendants indicated that they did not consider it appropriate to hold a hearing on the Request for Provisional Remedy.

164. On October 3, 2022, the Arbitral Tribunal noted that the Parties agreed that the evidence presented did not warrant a hearing.

165. On October 17, 2022, the Parties simultaneously exchanged Requests for Production of Documents ("**Document Requests**").

166. On November 7, 2022, the Arbitral Tribunal issued Procedural Order No. 4, dismissing the Request for Provisional Remedy.

167. On November 7, 2022, the Arbitral Tribunal issued Procedural Order No. 5, resolving the Document Requests.

168. On January 30, 2023, the Claimants filed their Statement of Defense to Counterclaim, together with documentary evidence, witness statements and expert reports.

169. On February 21, 2023, the Claimants filed their Statement of Defense to Counterclaim, together with documentary evidence, witness statements and expert reports;

170. On April 24, 2023, the Claimants filed their Rejoinder Statement to the Reply to the Counterclaim, together with documentary evidence, witness statements and expert reports.

171. On April 27, 2023, after consultation with the Parties, the Arbitral Tribunal decided that the Hearing will be held at the DoubleTree by Hilton Mexico City Santa Fe Hotel.

172. On May 10, 2023, the Defendants filed their Rejoinder Statement to the Defense of the Principal Claim, together with documentary evidence, witness statements and expert reports.



28

173.  On June 12 and 13, 2023, the Parties communicated to the Arbitral Tribunal the names of the witnesses and experts they wish to call to the Hearing.

174.  On June 19, 2023, the Parties and the Arbitral Tribunal held the Pre-Hearing Conference, where the aspects related to the organization of the Hearing were discussed.

175.  On July 3, 2023, the Arbitral Tribunal issued Procedural Order No. 6 on the organization of the Hearing.

176.  The Hearing was held in person between July 10 and 14, 2023 in Mexico City, at the DoubleTree by Hilton Mexico City Santa Fe Hotel.

177.  On July 19, 2023, the Arbitral Tribunal issued Procedural Order No. 7, which summarized the agreements reached by the Parties and the Arbitral Tribunal. The Arbitral Tribunal also invited the Parties to identify in their conclusions the applicable clauses of the Contract, their interpretation, and the factual documents supporting their positions concerning each of the disputed issues.

178.  On August 22, 2023, the Parties submitted the conciliated version of the transcripts of the Hearing, and informed the Arbitral Tribunal of the date of submission of the Briefs of Conclusions and Costs.

179.  On September 26, 2023, the Parties submitted their Briefs of Conclusions.

180.  On October 4, 2023, the Parties filed their Cost Briefs.

## 4.    RELIEF SOUGHT BY THE PARTIES

181.  The reliefs sought by Greenfield (**Section 4.1**), TPP and TMC (**Section 4.2**) and the Defendants (**Section 4.3**) are the following:

### 4.1    Relief sought by Greenfield

182.  In its Statement of Reply Greenfield requests the Arbitral Tribunal the following:

*"a. Declare that Greenfield is not liable for the payment of compensation for the "Vessel Demurrage": (i) because the demurrage was due to the lack of planning by CFE, regarding the purchase and consumption of coal; (ii) since Greenfield had no obligation to unload vessels prior to the Commercial Operation Date; (iii) since it was impossible for Greenfield to unload the vessels that arrived after the Commercial Operation Date within the laytime due to the situation caused by CFE; (iv) since the calculation of laytime did not begin in any case; and (v) since the legal assumptions of clause 10.2B of the TSA Contract were not satisfied*

29

to the detriment of Greenfield. Therefore, the Defendants lack standing to claim payment from Greenfield;

b.          Declare the collection of the Operational Guarantee exercised by the Defendants to be improper, and consequently;

c.          The Defendants be ordered to reimburse Greenfield in full for the amounts they exercised in respect of the Operational Guarantee, in the amount of USD $6'911,333.11 plus VAT.

d.          The Defendants be ordered to pay the interest on the financial expense for the undue collection of the Operational Guarantee related to the "Vessel Demurrage", within 5 business days following the arbitration award, in terms of Clause 4.8(b)(iii) of the Contract and in terms of the quantifications to be made by the expert in this arbitration;

e.          Order the Defendants to pay the amounts for the Port Services Charge based on the Annual Fixed Amount, in the following amounts:

i.          USD $4'039,727.10 plus VAT, corresponding to the first operating year (which ran from August 16, 2019 to August 15, 2020),

ii.          USD $9'632,084.80 plus VAT, corresponding to the second operating year (from August 16, 2020 to August 15, 2021), and

iii.          USD $9'603,492.13 plus VAT, corresponding to the third operating year (from August 16, 2021 to August 15, 2022).

The foregoing, pursuant to the Clauses use or pay and hell or high water and Exhibit 2 of the TSA Contract, ordering that such payment be made directly to TPP with Greenfield's consent to do so;

f.          The Defendants be ordered to pay the amounts for late payment interest, due to the non-payment of the Port Services Charge by CFE, in terms of Clause 7.3 of the TSA Contract and the quantifications made by the expert in this arbitration;

g.          CFE be ordered to pay in due time and form the Port Services Charge for the subsequent operating years during the term of the TSA Contract, considering it as a minimum charge to be calculated based on the Annual Fixed Amount to which shall be added, if applicable, any tons unloaded in addition to such Annual Fixed Amount. The foregoing, ordering that such payment be made directly to TPP with Greenfield's consent to do so;

h.          The CFE is ordered to pay the liquidated damages set forth in Exhibit 2 of the TSA Contract, and its correlative Exhibit 7 of the O&M Contract, regarding the demurrage of CFE's coal at the Terminal for a period exceeding the free storage period, in the amount of USD $6,919,636.00 plus VAT;

i.          Dismiss each and every relief sought by the Commission and CFE Generación regarding the incorporation/permanence of TPP and TMC and confirm such incorporation, based on the arguments set forth in the Consolidation Request, in the Declaration regarding the Statements of CFE, in Procedural Order 1 and in this Statement.

30

j.  Order the Defendants to pay the expenses and costs incurred in connection with these arbitration proceedings, including the payment of attorneys' fees incurred by the Claimants, considering, inter alia, the bad faith with which the Defendants have conducted themselves."

183.  In its Rejoinder Statement to Counterclaim, Greenfield requests the Arbitral Tribunal the following:

"A. Consider that this Rejoinder Statement has been filed;

B. Dismiss each and every relief sought contained in in CFE's Statement of Defense;

C. Order CFE to pay Greenfield the costs and expenses of this arbitration, as well as, declare admissible the relief sought by Greenfield against CFE in this arbitration.

D. Release Greenfield from the relief sought asserted in the Statement of Counterclaim;"

184.  In its Brief of Conclusions, Greenfield requests the Arbitral Tribunal the following:

"1. Declaratory relief sought for the purpose of issuance a declaration in connection with the demurrage of vessels.

(i)  That Greenfield is not liable for the claimed payment of damages in connection with the demurrage of the fifteen vessels since it does not meet the requirements of Clause 10.2 B of the TSA Contract.

(a)  By considering that the demurrage was due to the lack of planning on the part of CFE with respect to the purchase and consumption of coal; (b) Greenfield was not obligated to unload vessels prior to the Commercial Operation Date; (c) Greenfield was not obligated to unload vessels prior to the Commercial Operation Date; (iii) since it was impossible for Greenfield to unload the vessels that arrived after the Commercial Operation Date within the laytime due to the situation caused by CFE; (iv) since the computation of laytime did not begin in any case; and (v) in any case, the indemnity for damages for not having reached the Commercial Operation Date on May 21, 2019 has been compensated by reason of the payment of the Liquidated damages by Greenfield.

(ii)  That the Commission, pursuant to Clause 10.2 B of the TSA Contract, contributed to the generation of the demurrage of the fifteen vessels for which it claims damages from Greenfield.

(iii)  The collection of the Operational Guarantee by the Commission is declared incorrect.

(iv)  Therefore, release Greenfield from any and all declaratory and resolutions against Greenfield claimed by the Defendants in their counterclaim and declare that TPP and TMC have legal standing to make claims directly to the Commission.

2. Monetary relief sought against the Defendants in connection with demurrage of vessels.

(i)  As a consequence of the Commission's undue collection of the Operational Guarantee, the Defendants are ordered to refund in full to Greenfield the amounts they exercised with respect to the Operational Guarantee, of USD $6'911,333.11 dollars, plus the respective VAT.

31



(ii)    The Defendants be ordered to pay the interest on the financial expense due to the undue collection of the Operational Guarantee related to the "Demurrage", within 5 business days following the arbitration award, in terms of Clause 4.8(b)(iii) of the TSA Contract, which as of the date of this statement has been quantified at US$537,350.15, plus the respective VAT.

3. Declarative relief sought in connection with the Port Service Charge.

(i)    Declare that the Defendants have breached the TSA Contract by failing to pay the Port Services Charge for a minimum annual volume of 1.3 million metric tons of coal for the first, second, third and fourth operational years.

4. Monetary relief sought in connection with the Port Service Charge.

(i)    Order the Defendants to pay the amounts for the Annual Fixed Amount and specifically the Port Services Charge, in terms of the Clauses use or pay and hell or high water and Exhibit 2 of the TSA Contract, for the following amounts:

   a.    USD 4'039,727.10 corresponding to the first operating year, from August 16, 2019 to August 15, 2020, plus VAT.

   b.    USD 9,632,084.80 corresponding to the second operating year, from August 16, 2020 to August 15, 2021, plus VAT.

   c.    USD 9,603,492.13 corresponding to the third operating year, from August 16, 2021 to August 15, 2022, plus VAT.

   d.    USD 8'561,715.85 corresponding to the fourth operating year, from August 16, 2022 to August 15, 2023, plus VAT.

Ordering that such payment shall be for periods to be generated during the term of the TSA Contract, and that such payment shall be made directly to TPP with Greenfield's consent thereto.

(ii)    Order the Defendants to pay in a timely manner the Port Services Charge for the subsequent operating years during the term of the TSA Contract, considering it as a minimum charge to be calculated based on the Annual Fixed Amount to which shall be added, if any, any unloaded tons in addition to such Annual Fixed Amount. The foregoing, ordering that such payment shall be made directly to TPP with Greenfield's consent;

(iii)    Order the Defendants to pay the amounts for late payment interest for the non-payment of the Port Service Charge, until the date of its full payment, in terms of Clause 7.3 of the TSA Contract, and make payment directly or through Greenfield, to TPP of the following amounts, calculated as of the date of this brief:

      (i)    USD 398,383.47, corresponding to the first year of operation, plus VAT

      (ii)    USD 610,582.21, corresponding to the second year of operations, plus VAT

      (iii)    USD 691,581.41, corresponding to the third operating year, plus VAT

      (iv)    USD 7,949.80, corresponding to the fourth operating year, plus VAT

32

ARBITRATION LCIA NO. 215145

5.     *Declaratory and monetary relief sought for the liquidated damages caused by coal demurrage at the TPP Terminal.*

*(i)   Declare that the Defendants are obliged to pay the liquidated damages for coal demurrage at the Terminal for a period of time exceeding the free storage period, as provided by Exhibit 2 of the TSA Contract, and its correlative Exhibit 7 of the O&M Contract, for which Greenfield requests the Tribunal to incorporate it by reference herein, the amounts and quantifications claimed directly by TPP and TMC in its Brief of Conclusions, both for principal and default interest and/or accessories, until the date of their total payment, and to make the payment directly or through Greenfield, to TPP.*

6.     *Relief sought related to the costs of the arbitration and any other remedy that the Arbitral Tribunal may consider.*

*(ii)  Order the Commission to pay the costs and expenses incurred by Greenfield in the Arbitration, in terms of Procedural Order number 7, and order any other declaratory or monetary relief that the Arbitral Tribunal deems appropriate to preserve and protect the position and rights of Greenfield in pursuance of the full relief sought in this arbitration from the Defendants".*

## 4.2    Relief sought by TPP and TMC

185.    In their Statement of Defense, TPP and TMC request the Arbitral Tribunal the following:

*"(i)  Declare that TPP and TMC are parties to the TSA Contract and that they have efficiently participated as parties to this arbitration, and therefore did not exceed the terms and scope of their incorporation.*

*(ii)  Declare that TPP and TMC have standing to make claims directly to the Commission.*

*(iii) Declare that the use-or-pay agreement, provided, by way of example in clauses, 4.4, 5.5, 5.6, 6.1, 6.2 and Exhibit 2 of the TSA Contract, includes the consideration identified as Port Services Charge, to be calculated and paid together with the corresponding Value Added Tax, for the past and subsequent operating years during the term of the TSA Contract, based on a minimum volume equivalent to the Annual Fixed Amount to which shall be added, if applicable, any tons unloaded in excess of such Annual Fixed Amount for each operating year.*

*(iv)  Declare that the position adopted by the Defendants, regarding the exclusion of the Port Services Charge from the use-or-pay modality and subject to the condition that there are tons actually unloaded, lacks legal and/or contractual support.*

*(v)  Order the Defendants to pay to TPP, directly or through Greenfield, the Port Services Charge based on the Annual Fixed Amount, in the following amounts, to which the default interest shall be added, calculated under the TSA Contract and the corresponding Value Added Tax:*

*(a)   USD $4,039,727.10 corresponding to the first operating year, which ran from August 16, 2019 to August 15, 2020,*

33



ARBITRATION LCIA NO. 215145

*(b)   USD $9,632,084.80 corresponding to the second operating year, which ran from August 16, 2020 to August 15, 2021; and*

*(c)   USD $9,603,492.13 corresponding to the third operating year, which ran from August 16, 2021 to August 15, 2022.*

*(vi) Declare that the coal demurrage at the Terminal for a period longer than the free storage period is attributable to CFE.*

*(vii) Order the Defendants to pay to TPP, directly or through Greenfield, the Variable Demurrage Charge, in terms of section 2.3.1 of Exhibit 2 of the TSA Contract and its correlative Exhibit 7 of the O&M Contract, in an amount of no less than USD $6,919,636 plus the corresponding Value Added Tax".*

186.   In their Rejoinder Statement to the Defense of to the Counterclaim, TPP and TMC request the
Arbitral Tribunal the following:

*"(i) Declare admissible each and every relief sought by TPP and TMC in their Statement of Reply to Counterclaim.*

*(ii)   Declare that the participation of TPP and TMC in the counterclaim stage of this arbitration is appropriate and justified.*

*(iii)  Reject any claim, argument or interpretation proposed by CFE in the counterclaim.*

*(iv)  Declare that the positions, arguments, and interpretations presented by TPP and TMC in the counterclaim stage are valid.*

*(v)   Order CFE to pay all costs and expenses arising from the processing of this arbitration."*

187.   In their Brief of Conclusions, TPP and TMC request the Arbitral Tribunal the following:

*"Declaratory relief related to the payment of the Port Services Charge for a minimum amount equivalent to the Annual Fixed Amount.*

*TPP and TMC request the Court to:*

*1.1.   Declare that the TSA Contract obligates the Commission to pay to TPP, directly or through Greenfield, the Port Services Charge for a minimum annual volume of 1.3 million metric tons of coal, under the use-or-pay modality provided for in (i) the definition of Annual Fixed Amount, (ii) clauses 4.4, 5.5, 5.6, 6.1, 6.2 and (iii) Exhibit 2 of the TSA Contract.*

*1.2.   Declare that the Commission has breached the TSA Contract by failing to pay TPP and/or Greenfield the Port Services Charge for a minimum annual volume of 1.3 million metric tons of coal at the conclusion of the first, second, third and fourth operating years.*

*1.3.   Declare that the Commission is obligated to pay TPP, directly or through Greenfield, the Port Services Charge for a minimum annual volume of 1.3 million metric tons of coal, under the use-or-pay modality and in terms of the TSA Contract, until the conclusion of its term.*

34



ARBITRATION LCIA NO. 215145

1.4.    *Declare that the positions and interpretations adopted by the Defendants that the Port Services Charge (i) should only be paid for the amount equivalent to the tons unloaded at the Terminal and (ii) is excluded from the use-or-pay modality and, therefore, should not be paid for a minimum amount equivalent to the Annual Fixed Amount, lack legal and/or contractual support. In other words, declare that CFE's interpretation of the TSA Contract in this arbitration regarding the payment of the Port Service Charge and its consequent refraining from paying it at the end of each operating year are incorrect and/or illegal.*

2.    *Claims for payment of the Port Services Charge for a minimum amount equivalent to the Annual Fixed Amount.*

*TPP and TMC request the Court to:*

2.1.    *Order the Defendants to pay to TPP, directly or through Greenfield, the Port Service Charge based on the Annual Fixed Amount in the following amounts:*

(i)    *USD 4'039,727.10 corresponding to the first operating year, which ran from August 16, 2019 to August 15, 2020.*

(ii)    *USD 9,632,084.80 corresponding to the second operating year, which ran from August 16, 2020 to August 15, 2021.*

(iii)    *USD 9'603,492.13 corresponding to the third operating year, which ran from August 16, 2021 to August 15, 2022.*

(iv)    *USD 8'561,715.85 corresponding to the fourth operating year, which elapsed from August 16, 2022 to August 15, 2023.376*

2.2.    *Order the Defendants to pay to TPP, directly or through Greenfield, the default interest accrued as of the date of filing of this writ, on the amounts referred to in claim 2.1 above and amounting to the following amounts:*

(i)    *USD 398,383.47, corresponding to the first operating year.*

(ii)    *USD 610,582.21, corresponding to the second operating year.*

(iii)    *USD 691,581.41, corresponding to the third operating year.*

(iv)    *USD 7,949.80, corresponding to the fourth operating year.*

2.3.    *Order the Defendants, directly or through Greenfield, to pay to TPP the default interest (i) accrued between the date of filing of this brief and the final award and (ii) accrued after the final award, until the total liquidation of the debt, on the amounts referred to in claim 2.1 above, at the rate provided in clause 7.3 of the TSA Contract.*

2.4.    *Order Defendants to pay to TPP, directly or through Greenfield, the Value Added Tax on the amounts referred to in claims 2.1 and 2.2 above, at the applicable rate of 16%, resulting in the following amounts:*

(i) *USD 710,097.69 corresponding to the first operating year.*



35

*(ii)    USD 1'638,826.72 corresponding to the second operating year.*

*(iii)    USD 1'647,211.76 corresponding to the third operating year.*

*(iv)    USD 1'371,146.50 corresponding to the fourth operating year.*

3.    *Declaratory and monetary relief regarding the liquidated damages caused by coal demurrage at the TPP Terminal.*

*TPP and TMC request the Tribunal to:*

*3.1.    Declare that CFE is obliged to pay the liquidated damages for the coal demurrage that occurred at the Terminal for a period longer than the free storage period.*

*3.2.    Order the Defendants to pay to TPP, directly or through Greenfield, the Variable Demurrage Charge, in terms of section 2.3.1 of Exhibit 2 of the TSA Contract and its correlative Exhibit 7 of the O&M Contract, for an amount of USD 6'919,636 dollars.*

*3.3.    Order the Defendants to pay to TPP, directly or through Greenfield, the default interest caused since the date on which CFE claimed the coal from the TPP Terminal, on the amounts referred to in Claim 3.2 above, at the rate provided in Clause 7.3 of the TSA Contract.*

*3.4.    Order the Defendants, directly or through Greenfield, to pay TPP default interest on the amounts referred to in Claim 3.2 above, at the rate provided in clause 7.3 of the TSA Contract, after the date of the final award and until the total liquidation of the debt.*

*3.5.    Order the Defendants, directly or through Greenfield, to pay TPP default interest on the amounts referred to in Claim 3.2 above, at the rate provided in clause 7.3 of the TSA Contract, after the date of the final award and until the total liquidation of the debt.*

4.    *Claims related to the standing of TPP and TMC. TPP and TMC request the Tribunal to:*

*4.1.    Declare that TPP and TMC are parties to the TSA Contract and that they have participated effectively as parties to this arbitration and have not exceeded the terms and scope of their incorporation.*

*4.2.    Declare that TPP and TMC have standing to make claims directly to the Commission. Alternatively, declare that all claims made by TPP and TMC were incorporated and adopted by Greenfield, who has standing and express authorization from TPP and TMC for these purposes.*

5.    *Relief sought in connection with the costs of arbitration and other remedies.*

*TPP and TMC request the Tribunal to:*

*5.1.    Order any other declaration or sentence that the Arbitral Tribunal deems appropriate to protect the rights of TPP and TMC, as well as to grant them an integral remedy.*

36



ARBITRATION LCIA NO. 215145

with respect to all the damages suffered by TPP and TMC as a result of the acts and omissions attributed to the Commission.

5.2.    Order the Commission to pay the costs and expenses incurred by TPP and TMC in the arbitration, according to the Costs Brief submitted by them in due course in terms of Procedural Order number 7".

### 4.3    Relief sought by the Defendants

188.    In their Rejoinder Statement, the Defendants request the Arbitral Tribunal the following:

"SECOND - Declare that the claims made by Greenfield, TPP and TMC are groundless and inadmissible;

THIRD - Release CFE and CFE Generación II from the relief sought by the Claimants;

FOURTH - Declare that CFE and CFE Generación II have not breached their obligations under the Contract;

FIFTH - Declare admissible the interpretation presented by CFE and CFE Generación II of the concept of Annual Fixed Amount, the use-or-pay and hell-or-highwater clauses, the Port Services Charge and the payment mechanism contained in Exhibit 2 of the Contract;

SIXTH - Release CFE and CFE Generación II from any responsibility for the demurrage of the fifteen vessels that unloaded coal in 2019;

SEVENTH - Release CFE and CFE Generación II from the payment of demurrage due to the longer stay of coal in the TPP Terminal;

EIGHTH - Declare that TPP and TMC have acted beyond their right to join the Arbitration under Procedural Order No. 1 and against the principle of procedural efficiency and economy;

NINTH - Take the pertinent procedural measures to preserve the balance and due process in the Arbitration; and

TENTH - Order Greenfield, TPP and TMC to pay all costs and expenses arising from the Arbitration".

189.    In their Statement of Counterclaim and Statement of Defense to Counterclaim, the Defendants request the Arbitral Tribunal the following:

"SECOND - Declare Greenfield's arguments and defenses unfounded and inadmissible;

THIRD - Declare that Greenfield was obliged to achieve the Commercial Operation Date on May 21, 2019, as well as its compliance with such obligation;

FOURTH - Declare that Greenfield was obliged to provide the Transportation and Storage Services as of the Commencement Date;

37



*FIFTH - Declare that Greenfield failed to comply with its obligation to provide the Transportation and Storage Services for the coal unloaded in 2019 under the terms established in Exhibit 6 of the Contract;*

*SIXTH - Declare that Greenfield should have paid compensation for the fifteen vessels demurrages that were unloaded outside the laytime foreseen in the Contract;*

*SEVENTH - Declare that CFE executed the Operational Guarantee correctly;*

*EIGHTH: -Declare that the collection claimed by CFE with respect to the financial expenses generated up to April 14, 2021 is in order;*

*NINTH - Dismiss the Answer to the Counterclaim filed by TPP and TMC, as well as any argument, allegation, claim and evidence offered by them in such Answer;*

*TENTH - Declare that, in any case, the claims of TPP and TMC regarding the calculation mechanism of the Port Services Charge are inadmissible;*

*ELEVENTH - Take the pertinent procedural measures to preserve the balance and due process in the Arbitration; and*

*TWELFTH - Order Greenfield, TPP and TMC to pay all costs and expenses derived from the Arbitration".*

190.    In their Brief of Conclusions, the Defendants and Counterclaimants request the Arbitral Tribunal the following:

*"FIRST - Consider that the Defendants' Brief of Conclusions has been filed;*

*SECOND - Declare the claims of Greenfield, TPP and TMC unfounded and without merit;*

*THIRD - Absolve CFE and CFE Generación II of each and every one of the Claimants' claims;*

*FOURTH - Declare that CFE and CFE Generación II have not breached their obligations under the TSA Contract;*

*FIFTH - Declare that the literal, teleological and historical interpretations offered by the Defendants of the concept of Annual Fixed Amount, the use-or-pay and hell-or-highwater clauses, the Port Services Charge and the payment mechanism contained in Exhibit 2 of the Contract are admissible;*

*SIXTH - Declare that the Defendants have not contravened their own acts;*

*SEVENTH - Release CFE and CFE Generación II from any responsibility for the demurrage of the fifteen vessels that unloaded coal in 2019;*

*EIGHTH - Declare that Greenfield is solely responsible for the demurrage of the fifteen vessels that unloaded coal in 2019, since it was the result of its fault, willful misconduct and negligence;*



38

ARBITRATION LCIA NO. 215145

*NINTH - Declare that the collection of the Operational Guarantee made by the Defendants is admissible;*

*TENTH - Absolve CFE and CFE Generación II from the payment of demurrage due to the longer permanence of coal in the TPP Terminal;*

*ELEVENTH - Declare that TPP and TMC are not parties to the TSA Contract;*

*TWELFTH - Declare that TPP and TMC lack standing to file claims against CFE and CFE Generación II under the TSA Contract;*

*THIRTEENTH - Declare that TPP and TMC have acted beyond their right to join the Arbitration under Procedural Order No. 1 and against the principle of procedural efficiency and economy;*

*EIGHTEENTH - Order Greenfield, TPP and TMC to pay all costs and expenses arising from the Arbitration".*

## 5.    ANALYSIS OF THE ARBITRAL TRIBUNAL

191.    From the above-transcribed claims, it appears that the Parties allege reciprocal breaches of contract. However, before determining whether the alleged breaches actually existed, the Arbitral Tribunal shall first resolve on the legal standing of TPP and TMC under the Contract and, if applicable, whether they have standing to bring claims against the Defendants under the Contract, which has been subject to discussion between the Parties **(Section 5.1)**.

192.    Once this issue is resolved, the Arbitral Tribunal shall examine and decide whether the Claimants, on the one hand, and the Defendants, on the other hand, have breached the Contract, as each of them alleges regarding the other.

193.    First, the Arbitral Tribunal will analyze the Claimants' claim regarding the payment of the CSP based on the CFA **(Section 5.2)**.

194.    Subsequently, the Arbitral Tribunal will analyze the Claimants' and Counterclaimants' claims regarding the penalties applied by CFE for demurrage of vessels through the execution of the Operational Guarantee for USD 6,911,333, plus VAT and interest. In this regard, since the main claims and the counterclaims relate to the same concepts, for the sake of clarity, and in order to avoid a duplication of analysis, the Arbitral Tribunal will analyze both claims jointly **(Section 5.3)**.



195. Subsequently, the Arbitral Tribunal will analyze the Claimants' claim regarding coal demurrage at the TPP Terminal for a period of time exceeding the free storage period, in the amount of USD 6,919,636, plus VAT and interest (**Section 5.4**).

196. Finally, the Arbitral Tribunal shall decide on the costs of the arbitration (**Section 5.5**).

197. In analyzing the Parties' claims, the Arbitral Tribunal shall apply the Contract provisions and Mexican law, as provided in clause 17.5 of the Contract:

*"17.5 Arbitration*

*(c) The law applicable to the merits of the arbitration shall be the Mexican law".*

198. In this regard, the Arbitral Tribunal shall be governed by the rules of interpretation set forth in the Mexican Federal Civil Code (*Código Civil Federal*).

199. Thus, the first criterion of interpretation under the Mexican Federal Civil Code is literal rule:

*"If the terms of a contract are clear and leave no doubt as to the intention of the contracting parties, the literal meaning of its clauses shall prevail. If the words appear contrary to the evident intention of the contracting parties, the latter shall prevail over the former."*

200. The Mexican Federal Civil Code also includes, among others, the interpretation criteria based on the intention of the Parties, the practical effect, the systematic interpretation, the interpretation in accordance with the nature and subject matter of the contract, and the common use and customs:

> *"**Article 1852**.- Whatever the generality of the terms of a contract, it shall not be understood to include things different and cases different from those on which the interested parties intended to contract.*
>
> ***Article 1853**.- If any clause in a contract admits different meanings, it shall be understood in the most appropriate one for it to be effective.*
>
> ***Article 1854**.- The clauses of contracts shall be interpreted one by the other, attributing to the doubtful ones the meaning resulting from all of them.*
>
> ***Article 1855**.- Words that may have different meanings shall be understood in that which is more in conformity with the nature and subject matter of the contract.*

40



*Article 1856.- The common use or custom of the country shall be considered in interpreting ambiguities in contracts.*"

### 5.1 On the legal position of TPP and TMC under the Contract, and whether they have standing to bring claims against the Defendants.

#### 5.1.1 CFE Position[112]

201. Defendants allege that the incorporation of TPP and TMC has caused the duplication of arbitration proceedings, and that the claims presented by TPP and TMC are unrelated to the mechanisms for calculating the CSP, which grounded their incorporation into the arbitration.

202. Furthermore, the Defendants allege that, instead of establishing a defense of their rights associated with the Contract and which origin should be the performance of the O&M Contract for the provision of the services provided therein, TPP and TMC have pronounced regarding events in which they have not participated, such as the delay incurred by the companies contracted by Greenfield for the construction of the Transportation and Storage System.

203. Defendants claim that TPP and TMC have sought to justify their incorporation in the arbitration and their standing to bring claims under the incorrect argument that TPP and TMC are parties to the Contract. In particular, the Defendants allege that the inclusion of TPP in the Contract was not intended to make it a party to the Contract, but merely to bind it vis-à-vis Defendants in the portion corresponding to the performance of its obligations and responsibilities under the O&M Contract, as provided in clause 4.6 of the Contract.

204. The Defendants allege that, taking into account the scope of TPP's and TMC's participation as defined under the Contract concerning the performance of the project, TPP and TMC only acquired rights and obligations with respect to the O&M Contract and, therefore, their participation in the arbitration proceeding should, at most, be limited to establishing a defense with respect to the alleged rights and obligations actually acquired in the so-called *pass through* with the Contract.

205. Furthermore, the Defendants state that TPP and TMC lack standing. Defendants allege that the Contract itself recognizes TPP as a subcontractor of

---

[112] Section IV.A of the Statement of Reply, Section II of the Rejoinder Statement and Section V. of the Brief of Conclusions.

41

Greenfield in the execution of the Project. In particular, the Defendants allege that clause 4.6(f) of the Contract[113] provides that the subcontractors have no cause of action to assert directly against Defendants, rather they shall assert it directly against Greenfield, given the latter's immediate contractual relation with the O&M Contract.

206.     Defendants claim that the alleged decision to grant TPP a right of action under the Contract pursuant to clause 4.6(f) thereof was related to the contingent payment obligation in the event of termination or early termination of the Contract pursuant to clause 8.3(e)[114], and considering that in the facts, none of the events contemplated in such clause occurred, such direct right of action is inadmissible; therefore, TPP has distorted the reason behind the alleged right of action it would have under the Contract.

207.     Finally, the Defendants allege that the Counterclaim was filed only against Greenfield and that no claim was filed against TPP and TMC. The Defendants point out that Greenfield is responsible with the Defendants for the performance of the Contract, regardless of whether there are subcontractors.

---

[113] Clause 4.6(f) of the Contract states that *"Subcontractors shall not have any action or right to assert against the Commission, however, in the performance of their obligations they shall have the same defenses that they could assert against the Supplier, under their respective Carbonser Contract or TPP Agreement, as applicable. Therefore, subject to the terms and conditions set forth in Clause 10.2, the Supplier agrees to indemnify and hold harmless the Commission from any lawsuit or claim of any kind, including labor claims, which could be filed by the Subcontractors for the execution of the Transportation and Storage Services, unless such lawsuit or claim is for causes attributable to the Commission".*

[114] Clause 8.3(e) of the Contract provides that *"The Parties agree that, in the event of early termination or termination of this Agreement after the Commencement Date as a result of an Event of Default by the Commission, and such termination or termination impacts or results in a termination of the TPP Agreement, the Commission and the Supplier shall use their best efforts either among themselves and/or with respect to third parties to mitigate the impact and/or economic loss resulting from such termination or termination. In addition to the Termination Payments, the Commission shall pay to TPP, through the Supplier, or directly to TPP, as instructed in writing by the Supplier, the reasonable, duly documented, non-recoverable expenses directly related to the provision of the Port Services, and the Commission shall remain obligated to pay the Port Services Charge (as defined in Exhibit 2 of this Agreement) for the Annual Fixed Amount, for a maximum term of up to 2 (two) calendar years from the month following the effective date of the termination of the Contract referred to in this subsection (e), in the express understanding that, if at any time during the referred 2 (two) year term, TPP obtains, through a long-term contract, any third party user to use the TPP Terminal and/or its assets for the purposes of this Contract, the Commission's obligation to pay the Port Services Charge shall terminate immediately and shall be automatically released. The referred Port Services Charges shall be paid by the Commission on a monthly basis, within the first 7 (seven) Days of each month, within the aforementioned term of 2 (two) years. All of the foregoing, in the understanding that, even without being obliged to do so, if the Supplier or any of its Subcontractors recovers any of the amortized expenses, the Supplier shall notify such circumstance and promptly return to the Commission the amounts corresponding to any profits obtained".*

42

### 5.1.2    Greenfield Position[115]

208.    Greenfield claims that there is a relationship between CFE and TPP, which led to the execution of the O&M Contract, which, according to Greenfield, is a reflection of the Contract. In particular, Greenfield alleges that the Project was originally conceived by CFE and TPP, and that it was due to financing issues that Greenfield was incorporated; however, the parties who materially provide the Transportation and Storage Service of the Contract are TPP and TMC under the O&M Contract.

209.    Likewise, Greenfield indicates that TPP's participation in the Project is indispensable, since TPP is the operator of the TPP Terminal under the assignment of rights agreement entered with APILAC.

210.    Greenfield states that the dispute in this arbitration is mainly about the payment of the CSP based on the CFA; an issue that impacts directly TPP and TMC, since the payment of the CSP is made under a *pass-through* scheme between the Contract and the O&M Contract.

211.    Finally, Greenfield states that while clause 4.6(f) of the Contract establishes that subcontractors shall not have any action or right to assert against CFE, such clause includes an exception in the event that the complaint or claim is for causes attributable to CFE. Consequently, Greenfield alleges that the exception has been satisfied, since TPP and TMC's claim arises from causes attributable to CFE, who has refused to be obliged to pay the CSP; consequently, TPP and TMC have standing under the Contract.

### 5.1.3    Position of TPP and TMC[116]

212.    TPP and TMC allege that they are party to the Contract because there is meeting of the minds between TPP and CFE creating rights and obligations. Pursuant to Article 1803 section I of the Mexican Federal Civil Code, TPP claims that it is a party to the Contract as it signed the Contract and expressly agreed to all the clauses that comprise it, thus creating rights and obligations for TPP.

213.    Likewise, TPP and TMC base their position on the Amendment Agreement, which corrects the name originally given to TPP in the Contract, qualifying it as

---

[115]    Section IV.D of the Statement of Reply and Section V. of the Brief of Conclusions.
[116]    Section IV.1 of the Statement of Case, Section III.1 of the Statement of Reply and Section IV. of the Brief of Conclusions.

43

"Party". If TPP were a mere appearing party, there would have been no reason to change its name; on the contrary, the Amendment Agreement corrected the name to adjust to the reality that TPP is a party to the Contract.

214.   In particular, TPP and TMC allege that the negotiation and execution of the Contract reveal that TPP and TMC are parties, as is evident from the background of the Contract. The active and decisive conduct of TPP and TMC in the negotiation, execution, and performance of the Contract, mainly for the benefit of CFE, evidences the existence of a contractual relationship between them, and an implied consent between TPP and CFE to be contractually bound.

215.   TPP and TMC allege that their involvement in the development of the Project is clearly distinguishable from the participation that a subcontractor would ordinarily have in an infrastructure project. Ordinarily, subcontractors do not participate in the management of the project directly with the owner of the work, do not own assets or facilities essential for the development of the work and are not expressly mentioned in the main contract, nor do they undertake obligations therein; therefore, it is clear that the conduct deployed by TPP and TMC is different from the conduct of a subcontractor.

216.   Finally, TPP and TMC indicate that they have standing under clause 4.6(f) of the Contract. In particular, they allege that this clause should be read in its entirety, since, although it states that the subcontractors will not have any action or right to assert against CFE, such clause also provides an exception to this prohibition in the event that the complaint or claim is for causes attributable to CFE.

217.   In this case, TPP and TMC point out that since CFE caused TPP's and TMC's claim for non-payment of the CSP based on the CFA, CFE shall respond directly to TPP and TMC.

**5.1.4   Analysis of the Arbitral Tribunal**

218.   The Arbitral Tribunal shall first analyze whether or not TPP and TMC are Parties to the Contract (**Section 5.1.4.1**). Subsequently, the Arbitral Tribunal will analyze whether or not they have standing to claim in this arbitration (**Section 5.1.4.1**).

**5.1.4.1   *On the position of TPP and TMC as Parties***



44

219. The Arbitral Tribunal considers that there are sufficient elements to conclude that TPP is a Party to the Contract, yet this is not the case for TMC, which does not undertake any rights or obligations under the Contract and did not even execute it.

220. It is true, as Defendants allege, that TPP signed the Contract as an "appearing party". Also, TPP and TMC fall into the definition of Subcontractor in the Contract.[117]

221. However, the position of a party to a contractual relationship is not determined exclusively by its formal denomination in the relevant contract. In fact, pursuant to Article 1792 of the Mexican Civil Code, *"an agreement [convenio] is the agreement of two or more persons to create, transfer, modify or extinguish obligations."* In turn, Article 1793 of the Federal Civil Code provides that *"agreements that create or transfer obligations and rights, take the name of contracts [contratos]."*

222. As it has been explained, the basis to determine whether TPP and TMC are parties to the Contract is to analyze whether the Contract creates, transfers, modifies, or extinguishes any right or obligation on their behalf, regardless of their status as signatories. The Arbitral Tribunal considers that the answer is affirmative with respect to TPP, and negative with respect to TMC as it will be explained in detail below.

223. First, Clause 4.6(iii) of the Contract (Subcontractors; Joint and Several Liability and Severability),[118] in its relevant part, expressly provides as follows:

*"TPP, expressly acknowledges and agrees to be jointly and severally obliged with the Provider with the Commission with respect to any and all of its obligations and liabilities under the TPP Agreement and the terms thereof.*

*It is understood that the foregoing is without prejudice to and independent of any assumption of several liability that the Supplier and the Subcontractors may have agreed between them, and in addition, that the Supplier is and remains primarily liable to the Commission for the performance of the Transportation and Storage System and for providing the Transportation and Storage Services, and shall also maintain the direction and control of all the obligations imposed under this Contract, being optional for the Commission to resort at any time either to the Supplier, so that the latter in turn resorts to the corresponding Subcontractor, or to resort directly to the Subcontractor to demand the performance of the respective obligation and that it was established*

---

[117] Exhibit D-GF-1. ""*Subcontractors*" means any Person (other than the Commission or the Provider), engaged by the Provider to (i) perform or supply all or any part of the Transportation and Storage System, or (ii) the availability or provision of the Transportation and Storage Services.""

[118] Exhibit D-GF-1.



45

*under this Contract or under the Carbonser Agreement and/or the TPP Agreement, as applicable."*

224.  Thus, TPP expressly acknowledges and agrees to be jointly and severally liable with Greenfield to CFE for all obligations and liabilities undertaken under the Contract. In the opinion of the Arbitral Tribunal, the express undertaking of these obligations makes TPP a party to the Contract.

225.  The Arbitral Tribunal's conclusion is not altered by the last paragraph of clause 4.6(iii) of the Contract. Actually, while the purpose of this provision is to confirm that Greenfield remains primarily liable to CFE under the Contract, and to allow CFE to have recourse directly, and at its option, to Greenfield or TPP, precisely the fact that CFE may have such recourse directly to TPP "to *demand the performance of the respective obligation that was established under this Contract or under the Contract* [...] *TPP*", only reaffirms TPP's status as a party under the Contract.

226.  Second, clause 8.3(e) (Effects of an Event of Default, Termination) of the Contract confirms the conclusion above. In fact, such clause provides TPP's right to collect directly from CFE, as instructed by Greenfield, the reasonable, duly documented, non-recoverable expenses directly related to the provision of the Port Services in the event of early termination or recission of the Contract as a result of an Event of Default by CFE, which impacts or results in a termination of the TPP Agreement.[119] Regardless of whether the payment instruction comes from Greenfield, the fact that TPP is recognized as being entitled to receive such payment for the expenses incurred in the provision of the Port Services as a result of the termination of the TPP Agreement

---

[119] Exhibit D-GF-1, Section 8.3(e): "*The Parties agree that, in the event of early termination or rescission of this Agreement after the Commencement Date as a result of an Event of Default by the Commission, and such termination or rescission impacts or results in a termination of the TPP Agreement, the Commission and Supplier shall use their best efforts either with each other and/or with third parties to mitigate the impact and/or economic loss resulting from such termination or rescission. In addition to the Termination Payments, the Commission shall pay to TPP, through the Supplier, or directly to TPP, as instructed in writing by the Supplier, the reasonable, duly documented, non-recoverable expenses directly related to the provision of the Port Services, and in addition the Commission shall remain obliged to pay the Port Services Charge (as defined in Schedule 2 of this Agreement) for the Annual Fixed Amount, for a maximum term of up to 2 (two) calendar years counted from the month following the effective date of the termination of the Contract referred to in this subsection (e), it being expressly understood that, if at any time during the referred 2 (two) year term, TPP obtains, through a long-term contract, any third party user to use the TPP Terminal and/or its assets for the purposes of this Contract, the Commission's obligation to pay the Port Services Charge shall terminate immediately and shall be automatically released. The referred Port Services Charges shall be paid by the Commission on a monthly basis, within the first 7 (seven) Days of each month, within the aforementioned term of 2 (two) months. All of the foregoing, in the understanding that, even without being obliged to do so, if the Supplier or any of its Subcontractors recovers any of the amortized expenses, the Supplier shall notify such circumstance and promptly return to the Commission the amounts corresponding to any profits obtained.*"



46

"*related to the provision of Port Services*", only confirms the fundamental role played by TPP in the provision of such services.

227. In addition to the rights and obligations assumed by TPP under the Contract, its status as a Party is based on three additional circumstances.

228. *First*, the Preamble of the Amendment Agreement to the Contract, signed on June 21, 2017, expressly recognizes TPP as a "Party to the Contract": [120]

> **FIRST AMENDMENT AGREEMENT ("AMENDMENT AGREEMENT") TO THE COAL TRANSPORTATION STORAGE AND SERVICES AGREEMENT NUMBER 800803052 ENTERED INTO BY COMISIÓN FEDERAL DE ELECTRICIDAD [*MEXICAN FEDERAL ELECTRICITY COMMISSION*] (HEREINAFTER REFERRED TO AS THE "COMMISSION") AND BETWEEN GREENFIELD SPV I, S.A.P.I. DE C.V. (THE "SUPPLIER" WITH THE APPEARANCE OF CARBONSER, S.A. DE C.V. ("CARBONSER") AND TERMINALES PORTUARIAS DEL PACÍFICO, S.A.P.I. DE C.V. ("TPP" AND JOINTLY WITH CARBONSER, THE SUPPLIER AND THE COMMISSION THE "PARTIES TO THE AGREEMENT") UNDER THE FOLLOWING RECITALS, REPRESENTATIONS AND CLAUSES:**

229. In this regard, clause SIXTH (Entire Agreement and Validity of Provisions) of the Agreement provides that it "*includes all the modifications made to the Contract as of the date of this Amendment Agreement*". Likewise, said clause adds that "[*t*]he *Parties, therefore, acknowledge and agree that the Agreement shall only be deemed to be modified in the terms expressly and exclusively agreed upon in this Amendment Agreement, whereby all other provisions and terms of the Agreement are deemed to be ratified and in full force and effect. In the event of any discrepancy between the terms of the Contract that were expressly modified in terms of this Amendment Agreement, the terms of this Amendment Agreement shall prevail.*"

230. Therefore, even following a literal interpretation of the capacity in which TPP signed the Agreement (i.e., as an appearing party), having been defined as a "Party" in the Agreement, and being that said Agreement "*includes all the amendments made to the Contract*", and that, furthermore, "[*i*]*n case of any discrepancy between the terms of the Agreement that were expressly modified in terms of this Amendment Agreement, the terms of this Amendment Agreement shall prevail*", there is no doubt regarding TPP's capacity as a Party.

---

[120] Exhibit D-TPP-20.

231.  In turn, the Agreement provides for several obligations on the "Parties", including TPP, such as, for example, the application of the cure period of the Suspensive Conditions of the Contract[121] and the efforts to achieve the Suspensive Conditions.[122]

232.  *Second*, the CFE itself named TPP as the addressee of the Award Letter for the Project and instructed it to formalize the Contract:[123]

GREENFIELD SPV I, S.A.P.I. DE C.V.
TERMINALES PORTUARIAS DEL PACÍFICO, S.A.P.I. DE C.V.
AND CARBONSER, S.A. DE C.V.
Paseo de los Tamarindos 90
Torre 2, Floor 4, Col. Bosques de las Lomas
Delegación Cuajimalpa, Zip Code 11700
Mexico City, Tel: (55) 5413-5925

Official communication 241.02-2120/2016
Mexico City, December 15, 2016.

BLACKROCK

DEC 15 2016

233.  This is logical, because the TPP Terminal is a necessary and indispensable element for the development of the Project, which use corresponds exclusively to TPP.

234.  In this regard, it was TPP who designed fundamental aspects of the Project, for example, the *Term Sheets*, which were negotiated exclusively between TPP and CFE[124], and, as declared by Armando Zapién at the Hearing, such aspects were the basis of what eventually became the Contract.[125]

235.  *In the third place*, TPP and TMC are the ones who materially perform the Port Services and the Transportation and Storage Services Phase.[126] In this regard, Recital VII of the Agreement clearly establishes the need for Greenfield to enter into contracts with TPP and Carbonser for the operation and maintenance of the infrastructure to be built in order to comply with the obligations under the Agreement.[127]

236.  Likewise, Recital VIII of the Agreement provides that *"for purposes of the provisions of the Proposal and the appearance of Carbonser and TPP at the signing of this Agreement, the Supplier, Carbonser and TPP signed a Joint Participation Agreement and under which*

---

[121]  Clause SECOND (Modifications and Agreement), Exhibit D-TPP-20.
[122]  Clause FOURTH (Modifications and Agreement), Exhibit D-TPP-20.
[123]  Exhibit D-TPP-60.
[124]  Exhibit D-GF-13 and Exhibit D-GF-14.
[125]  Hearing Transcript Day 4, p.9, I.327-334.
[126]  Operation and Maintenance Contract, Exhibit D-GF-23.
[127]  Recital VII of the Contract: *"For the performance of this Contract and as agreed in the Proposal, the Supplier entered on this same date operation and maintenance contracts to operate and maintain the SIMC and the Transportation and Storage System, according to the terms subsequently defined (the "Carbonser Contract" and the "TPP Agreement")".*

48

*they agreed to contribute to the adequate development and completion of the project set forth in the Proposal.*"

237.    On the other hand, regarding TMC the Arbitral Tribunal did not find any provision in the Contract that creates, modifies or extinguishes rights or obligations in its favor, nor that it had a significant role in the negotiation of the Contract. Although TMC has a preponderant role in the execution of the O&M Contract, in the opinion of the Arbitral Tribunal, this is not sufficient to consider it as a Party under the main contract.

238.    Therefore, the Arbitral Tribunal considers that TPP is a Party to the Contract, yet, this is not the case for TMC.

### 5.1.4.2   *Regarding TPP and TMC's right to sue.*

239.    The Arbitral Tribunal considers that TPP and TMC have right to sue CFE under the Contract.

240.    In fact, pursuant to Clause 4.6(f) of the Contract (Subcontractor, Joint and Several Liability and Severability): "[*t]he Subcontractors shall not have any action or right to assert against the Commission, but in the performance of their obligations they shall have the same defenses that they may have against the Supplier, under their respective Carbonser Contract or TPP Agreement, as the case may be. In such virtue, subject to the terms and conditions provided in Clause 10.2, the Supplier agrees to indemnify and hold harmless the Commission from any lawsuit or claim of any kind, including labor claims, that could be filed by the Subcontractors for the execution of the Transportation and Storage Services, unless such lawsuit or claim is due to causes attributable to the Commission.*" (emphasis added)

241.    As detailed in the preceding section, it is clear that TPP and TMC are covered by the definition of Subcontractor provided in the Contract.[128] Even the Defendants themselves have recognized TPP and TMC as Subcontractors.[129]

---

[128] Exhibit D-GF-1. ""*Subcontractors*" means any Person (other than the Commission or the Provider), engaged by the Provider to (i) perform or supply all or any part of the Transportation and Storage System, or (ii) the availability or provision of the Transportation and Storage Services."

[129] CFE's declarations regarding the Consolidation Request concerning the Arbitration dated August 5, 2021:
"*27. Contrary to Claimant's assertion in paragraph 19 of its Request, it is not CFE's intention to disregard any intervention that TPP and/or TMC may have had as Subcontractors and as parties to the "O&M Contract". However, this does not mean that TMC can or should be considered as a Party to the Contract.*" (emphasis added)

Defendants' Statement of Reply:

242.   In this regard, the fact that TMC is not a Party to the Contract does not necessarily mean that it would lack standing to claim under the Contract. In fact, according to Article 1868 of the Mexican Federal Civil Code:

*"Contracts may contain third party beneficiary agreements in accordance with the following articles."*

243.   In turn, Article 1869 of the same Code provides as follows:

*"Third party beneficiary agreements shall, except as otherwise agreed upon, vest the third party with the right to demand performance from the promisor.*

*Such agreements also vest the third party with the right to demand performance of such obligation from the promisor."*

244.   On the other hand, clause 4.6(f) of the Contract expressly provides that the Subcontractors would not have any action or right to assert claims against CFE, and Greenfield is obliged to indemnify and hold CFE harmless from any complaint or claim that the Subcontractors may file, *"unless such claim or demand is for causes attributable to the Commission."*

245.   Therefore, in order to determine whether TPP and/or TMC have standing to sue CFE, the Arbitral Tribunal shall analyze, at this stage, only whether TPP and TMC's claim is grounded on *"causes attributable to the Commission"*, regardless of whether the cause attributable to CFE is justified or not.

246.   In this case, the two main claims of TPP and TMC are based on causes attributable to CFE.

247.   In fact, the first relief sought by TPP and TMC is that CFE pays the consideration for the CSP based on the CFA. According to TPP and TMC, *"unless a Greenfield's Event of Default occurs and continues, CFE would be obligated to pay consideration for Greenfield's availability - through TPP and TMC- to provide the Port Services for a minimum volume of 1.3 million*

*"148. As the Arbitral Tribunal and the Parties are aware, the Consolidation Request of TPP and TMC filed by Greenfield gave rise to an extensive debate as to whether and under what conditions TPP and TMC could be incorporated into the arbitration. Said discussion culminated with the issuance of Procedural Order No. 1, where the parameters and details on the decision to incorporate the Subcontractors into the arbitration proceedings were established."* (emphasis added)

*"182. It is also noted that, at the time of issuing Procedural Order No. 1, the Arbitral Tribunal expressed its interest in hearing the positions of TPP and TMC on CFE's objections to their incorporation; however, the latter failed to make reference to the limitation contained in the TSA Contract that causes a lack of legal standing of the subcontractors and that was alleged on multiple occasions by CFE in the respective proceeding."* (emphasis added)

*tons of coal per year, unconditionally.* [...] *In short, the CFE had to comply with its payment obligation unconditionally, and it has failed to do so.*"[130] (emphasis added)

248.    The second claim of TPP and TMC is based on "*negligent handling of coal by* CFE"[131] at the TPP Terminal.

249.    As it has been explained, both TPP and TMC´s claims are based on alleged breaches by CFE, thus, falling under the exception provided by clause 4.6(f) of the Contract.

250.    Therefore, since TPP and TMC´s claims are based on "*causes attributable to the Commission*", the Arbitral Tribunal concludes that TPP and TMC have standing to sue in this arbitration.

### 5.2    *About the payment of the CSP based on the CFA*

#### 5.2.1    **Greenfield Position**[132]

251.    Greenfield alleges that the Defendants breached their obligation to pay Greenfield the CSP based on the CFA, derived from the use-or-pay clause of the Contract. According to Greenfield, as of September 25, 2023, the Defendants had accrued an unpaid principal amount of USD 31,837,019.88 plus VAT for the first three operating years of the Contract.

252.    Greenfield alleges that the Contract was conditioned to the execution of the O&M Contract, since the latter was indispensable for the performance of the Contract. As a consequence of the foregoing, in view of the Defendants' failure to pay the CSP based on the CFA, Greenfield was unable to pay TPP and TMC the full amounts due for port services under the terms of the O&M Contract. In particular, Greenfield points out that Schedule 2 of the Contract provides for the payment of the CSP, which sole and full beneficiary is TPP, under the *pass-through* scheme of the contracts, which is the reason why Schedule 7 was included in the O&M Contract, which is an accurate copy of Schedule 2 of the Contract.

253.    According to Greenfield, an indispensable condition for TPP to participate in the Project was that CFE guaranteed to Greenfield, and, thus to TPP, the receipt of revenues for the provision of port services for at least 1.3 million tons of coal per year.

---

[130]    Section II.2 of the TPP and TMC Statement of Case.
[131]    Section II.10 of the TPP and TMC Statement of Case.
[132]    Section V.B of the Statement of Case, Section IV.B of the Reply Brief and Section III. of the Brief of Conclusions.

AUTHORIZED BY THE MEXICAN
GERALDINA
CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021
FEDERAL JUDICIARY COUNCIL

The reason of the foregoing is that, in order to carry out the Project, TPP had to undertake additional payment obligations with APILAC.

254.    Greenfield also supports its position on clauses 4.4 and 5.5 of the Contract, which state that, as of the FOC and during the term of the Contract, CFE was obliged to receive and pay the CFA, or pay the CFA in the event that it does not receive or is unable to receive it. In particular, Greenfield states that the wording included in the Contract clearly and unequivocally reflects the agreements reached between the Parties regarding the minimum volume of coal to be guaranteed to arrive at the TPP Terminal.

255.    Greenfield adds that the *use-or-pay* clauses have a double purpose, on the one hand, to provide the seller with a stable and constant flow of money, independent of fluctuations and variations in the actual demand for the respective goods in the market where the buyer operates, and, on the other hand, to guarantee the buyer a regular and constant supply of the respective goods or services to meet the corresponding market demand, without the need to negotiate the conditions with the seller from time to time. From the above, according to Greenfield, it is evident that the purpose of such clause is to guarantee, on the one hand, that the seller makes available to the buyer, in this case, the exclusive availability of the TPP Terminal, and, on the other hand, that the buyer pays the agreed price, in this case, the CSP calculated based on the CFA, regardless of whether or not it decides to take the referred services.

256.    Greenfield alleges that CFE has breached its obligations by avoiding the payment under the excuse that the Fixed Charges remunerate Greenfield under the *use-or-pay* and *hell-or-highwater* clause, since even if the TPP Terminal ceased to receive vessels, Greenfield would continue to receive all the Fixed Charges for the mere availability of the Transportation and Storage Service, which is completely incorrect.

257.    Greenfield claims that, under Defendants' erroneous interpretation, the Defendants have refrained from nominating vessels to the TPP Terminal during the last operating years of the Contract, thereby failing to pay the CSP based on the CFA, thus causing severe prejudice to Greenfield and, consequently, to TPP and TMC.

258.    The specific breach attributable to the Defendants is the failure to pay the CSP based on the CFA, without having a justified cause, regardless of not having received such amount of coal due to the *use-or-pay* clause.

52



259.  Greenfield insists that the Defendants misrepresent the concepts that make up the Consideration, its nature, the calculation method, and the business justification.

260.  Finally, Greenfield alleges that, contrary to the Defendants' suggestions, it is clear from Exhibit 2 of the Contract that, for each phase and type of service, a scheme is established to have a fixed portion in some cases, and a minimum in others, to cover the availability of the port infrastructure for CFE, and, thus, guarantee the financial viability of the project for Greenfield and TPP. Consequently, in order to be able to count on the availability of the TPP Terminal and thus guarantee the provision of unloading services for the Defendants, the payment of a minimum non-fixed and non-variable amount had to be guaranteed. Such minimum amount was established between the Parties based on the number of tons per year that CFE estimated to unload, and it was indicated that it was not fixed because in the event that additional tons were unloaded in addition to the 1.3 million tons, these would have to be paid additionally.

### 5.2.2  Position of TPP and TMC[133]

261.  TPP and TMC allege that CFE breached its obligations under the Contract because it failed to pay Greenfield the CSP for a volume equivalent to the CFA under the *use-or-pay* clause and, upon CFE's failure to pay, Greenfield, in turn, failed to pay TPP and TMC the full amounts due for port services under the O&M Contract.

262.  TPP and TMC point out that, in terms of the Contract and the O&M Contract, the payment scheme provided that CFE had to pay Greenfield the consideration set forth in Exhibit 2 of the Contract, and then Greenfield had to pay TPP and TMC the consideration set forth in Exhibit 7 of the O&M Contract, which are identical. Thus, even though the right of TPP and TMC to collect the consideration provided in the O&M Contract is independent of the Contract, the way the Project was structured made the payments of all the parties involved dependent on CFE honoring its obligations under the Contract.

263.  TPP and TMC allege that CFE unilaterally notified the temporary suspension of the Transportation and Storage Services for an indefinite period of time, which led to the fact that for more than two years there was no coal to unload and transport. TPP and TMC point out that, precisely for these types of scenarios, they had been emphatic in pointing out that

---

[133]  Section III.7, III.8, III.9, IV.2, IV.3 of the Statement of Case, Section III.2 of the Reply Brief and Section II. of the Brief of Conclusions.

it was essential that the consideration they would receive in exchange for the provision of port services was conditioned only to the availability of the TPP Terminal and not to the actual provision of the services.

264. TPP and TMC allege that, during the first operating year, which ran from August 16, 2019 to August 15, 2020, CFE failed to pay Greenfield the differential between the volume of 713,942, for which services were actually rendered, and the fixed minimum amount of 1.3 million tons, according to the mechanism agreed by the Parties for the application of the *use-or-pay* clause. With respect to the second operating year, which ran from August 16, 2020 to August 15, 2021, where there was no operation due to the lack of nominated vessels, CFE refrained from paying Greenfield any amount under the Contract in connection with the *use-or-pay* clause.

265. Furthermore, TPP and TMC allege that CFE's failure to comply with the commitment under the *use-or-pay* clauses constitutes a profound disregard of the way in which, for almost two years, the Parties conceived and structured the Project, as well as a frontal transgression of the agreement reached between them that led to the execution of the Contract and the O&M Contract.

266. Finally, TPP and TMC point out that the lack of payment by CFE and the consequent non-payment by Greenfield seriously jeopardizes the viability of the entire Project, given the inability of TPP and TMC to comply with their obligations with third parties, such as APILAC, which is essential for the operation of the Project, since the minimum volumes to which TPP and TMC are obliged under the contract with APILAC is equal to the 1,300,000 tons of coal per year that CFE shall pay under the *use-or-pay* clause of the Contract. In addition, TPP and TMC claim that, according to the contract with APILAC, APILAC can terminate the contract if TPP incurs in two consecutive years of default; therefore, as of this date, there is a risk that APILAC can validly terminate the contract.

### 5.2.3 Defendants' Position[134]

267. The Defendants allege that they have complied with the obligation of the CSP payment based on the CFA through the periodic payment of fixed amounts that the Defendants have paid to Greenfield.

---

[134] Sections Q and IV.C of the Statement of Reply, Section III of the Rejoinder Statement and Section IV. of the Brief of Conclusions.

AUTHORIZED BY THE MEXICAN
GERALDINA
CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021
FEDERAL JUDICIARY

268.    Furthermore, the Defendants point out that the Claimants fail to mention a series of Fixed Charges paid by Defendants to Greenfield, which are precisely intended to ensure a sufficient flow of income to guarantee the economic viability of the project even when there is no coal unload.

269.    Defendants claim that, since the Fixed Charges are paid with a certain periodicity that does not depend on vessel arrivals, they remunerate Greenfield on a *use-or-pay* and *hell-or-highwater basis*, since, even if the TPP Terminal were to stop receiving vessels, Greenfield would continue to receive all Fixed Charges for the mere availability of the Transportation and Storage Service under the CFA.

270.    The Defendants also point out that Exhibit 2 of the Contract, which was prepared by the Claimants, describes in sufficient detail the items to be paid to Greenfield, including, explicitly, charges that are generated by the mere availability of the Transportation and Storage System and paid with certain periodicity, as well as items that shall be calculated and paid according to the quantities of coal that have been unloaded and transported.

271.    Furthermore, the Defendants allege that the Claimants themselves structured the CSP as a variable charge calculated and paid exclusively on the basis of the tons actually unloaded in the billing month, and whose composition is not compatible with the Claimants' claims, since, if that had been their intention, they would have so provided in Exhibit 2 of the Contract.

272.    Finally, the Defendants allege that Claimants are attempting to claim payment of an annualized charge for the CSP based on the CFA that completely distorts the agreed methodology for the calculation of the charge and bears no relation to the calculation mechanics provided for in Section 2.3.1 of Exhibit 2 of the Contract.

### 5.2.4    Analysis of the Arbitral Tribunal

273.    The Arbitral Tribunal considers that there are sufficient elements to conclude that the CSP is a minimum charge that shall be calculated based on the CFA, to which shall be added, if applicable, any additional amount of coal that has been effectively unloaded at the TPP Terminal. That is, if the tons of coal unloaded at the TPP Terminal are less than the CFA, CFE shall pay Greenfield the amounts actually unloaded, plus the outstanding balance until the CFA is covered. If, on the other hand, the quantities unloaded are less than the CFA.

are higher than the CFA, CFE is only required to pay Greenfield for the amounts actually unloaded.

274. The Arbitral Tribunal has reached this conclusion based on a systematic interpretation of various contractual clauses (**Section 5.2.4.1**), the prior negotiations between the Parties (**Section 5.2.4.2**), the business reason for the transaction (**Section 5.2.4.3**), and the contemporaneous conduct of the Parties (**Section 5.2.4.4**). We will now discuss each of these elements, before setting out the Arbitral Tribunal's conclusion (**Section 5.2.4.5**).

### 5.2.4.1  *Contractual clauses*

275. Clause 1 of the Contract defines "Annual Fixed Amount" as "*the quantity of Coal which, on an annual basis, the Supplier is obligated to unload, transport and store as part of the Transportation and Storage Services, and the Commission is obligated to receive and pay, or pay if not received, pursuant to the terms and subject to the conditions of this Contract.*" In turn, Clause 1 provides that "[...] *the Annual Fixed Amount is equal to 1,300,000 (one million three hundred) tons of Coal.*"

276. From the literal application of this clause, it is clear that according to its terms, Greenfield is obligated to unload, transport and store 1,300,000 tons of coal, which CFE is obligated to receive and pay for, "*or pay if it does not receive*".

277. Greenfield's obligation to provide services for a minimum volume of 1,300,000 tons of coal is reinforced by the provisions of Clause 2, which provides that the purpose of the Contract "*is to establish the obligation of the Supplier to make available to the Commission the Transportation and Storage System under the terms set forth in Exhibit 7 and to provide the Commission with Transportation and Storage Services for a minimum volume equivalent to the Annual Fixed Amount under the terms set forth in Exhibit 6, for which the Commission agrees to pay the Supplier the Consideration, in accordance with the terms and subject to the conditions set forth in this Agreement.*"

278. That is to say, the very object of the Contract consists of Greenfield's obligation to make available the Transportation and Storage System and provide the services of such system for "*a minimum volume equivalent to [1,300,000 tons of coal]* under *the terms set forth in Exhibit 6.*"

279. In this regard, Exhibit 6 of the Contract governs coal unloading, transportation, and storage services. Specifically, section A.9. provides that "*from the Commencement Date*

56

AUTHORIZED BY THE<br>GERALDINA<br>CHÁVEZ LOZANO<br>CERTIFIED TRANSLATOR<br>P. 0193-2021<br>FEDERAL JUDICIARY COUNCIL MEXICO

*of the Commercial, the Supplier shall have available, operate, maintain, and repair the TPP Terminal, systems and equipment in the Terminal's storage yard, at all times, up to 300,000 tons of capacity, in accordance with Prudent Industry Practices, for the Supplier is able to supply the Central with up to 5,500 metric tons in one day.*" Therefore, Greenfield shall be able to supply up to 5,500 metric tons in a day, which, yearly, exceeds the minimum annual volume of 1,300,000 tons of coal.

280.  Clauses 4.4 and 5.5 refer to the CFA, which they expressly qualify as "*Use-or-Pay*". On the other hand, clause 4.4, included within the section of the Contract relating to Greenfield's obligations, provides that "[*a*]*s of the Commercial Operation Date and during the term of the Contract, and provided that the Supplier was not in default of any of its obligations under this Contract, the Commission undertakes to receive and pay, or, in the event that it does not receive or is unable to receive, to pay, the Annual Fixed Amount.*"

281.  Clause 5.5, included in the section of the Contract concerning CFE's obligations, is consistent with the above, as it reiterates that "[...] *provided that there is no Event of Default of the Supplier, the Commission is obliged to receive and pay, or to pay in case it does not receive or is unable to receive, the Annual Fixed Amount*".

282.  The literal wording of these clauses is clear regarding CFE's obligation to "*receive and pay*", or "*pay in case it does not receive*", the CFA, i.e., 1,300,000 tons of coal.

283.  The literal wording of CFE's obligation is compounded by the fact that the Parties have qualified the CFA as "*Use-or-Pay*", which reinforces the Parties' intent that CFE pay Greenfield for 1,300,000 tons of coal, regardless of whether it receives it, or not.

284.  In this regard, the Arbitral Tribunal shares Greenfield's position that the purpose of the "Use-or-Pay" clause is to ensure that the seller, i.e., Greenfield, makes available to the buyer, i.e., CFE, a minimum volume of convened services, i.e., the exclusive availability of the TPP Terminal, and that the buyer, i.e., CFE, pays the agreed price for the TPP Terminal, and that the buyer, i.e., CFE, pays the agreed price for the TPP Terminal to the buyer, i.e., CFE, and that the buyer, i.e., CFE, pays the agreed volume of services, i.e., the exclusive availability of the convened TPP Terminal



i.e., the CSP based on the CFA, regardless of whether it decides to take the agreed services.[135]

285.  As if the foregoing were not enough, the Parties had the anticipation to clarify that the payment to be made by CFE under clause 6 is "*Unconditional*", which they also qualified as "*Hell-or-Highwater*". Indeed, under clause 6.2, Unconditional Payment (*Hell-or-Highwater*), the Parties stipulated that "[...] *the Commission's obligation to pay the Consideration to the Supplier for the availability or provision of the Transportation and Storage Services shall be absolute and unconditional except in the case of an Event of Default of the Supplier,* [...]". In turn, the Parties clarified that such absolute and unconditional obligation, "[...] *shall not be affected by any act or event, including, without limitation: (i) the total or partial loss or impairment of the TPP Terminal or the SIMC; (v) the failure of the Commission to deliver the Coal at the Point of Origin.*"[136]

286.  In other words, CFE's obligation to pay Greenfield for a minimum annual volume of 1,300,000 tons of coal, i.e., the CFA, is "*absolute and unconditional*", and will not be affected by the loss of, even a total loss of, the TPP Terminal or the SIMC, nor by CFE's failure to deliver coal. This is precisely the purpose of the *Hell-or-Highwater* clauses, which are intended to guarantee the performance of an obligation under any circumstance, without further contractual defenses from the counterparty.[137]

287.  In this regard, the Defendants do not dispute the meaning of the *Use-or-Pay* or *Hell-or-Highwater* clauses, but rather allege that the payment obligations on the CFA were satisfied with the payment by CFE of a series of Fixed Charges that are precisely intended to guarantee a sufficient flow of income to ensure the economic viability of the Project, even in the absence of coal unloads.[138] In fact, the Defendants claim that "[*t*]*he Fixed Charges remunerate Greenfield under the use-or-pay and hell-or-*

---

[135] Greenfield's Statement of Case, paragraph 252 *"It is evident that the purpose of the take or pay clause (or use or pay), is to guarantee, on the one hand, that the seller (as the principal obligation) makes available to the buyer a minimum volume of agreed goods or services (in this case, the exclusive availability of the TPP Terminal) and, on the other hand, that the buyer (as the principal obligation) pays the agreed price (Port Services Charge calculated based on the Annual Fixed Amount) regardless of whether or not it decides to take the goods or services referred to above."*

[136] Clause 6.2 (i) and (v) of the Contract, Exhibit D-GF-1.

[137] Exhibit F-GF-4 *"In project financing this type of provision represents an absolute commitment by a party to perform an action or obligation under an agreement, without any contractual defense."* (free translation).

[138] CFE's Statement of Reply, paragraph 232 *"The foregoing implies that, under the terms of the TSA Contract, Greenfield would receive a remuneration comprised of four fixed charges associated with the Annual Fixed Amount, leaving the Port Services Charge as the only variable charge. Hence, it is inexplicable that the Claimants allege the existence of a risk to the economic viability of the Project due to the payment of the CSP for amounts lower than the CFA".*

AUTHORIZED BY THE MEXICAN FEDERAL JUDICIARY COUNCIL
GERALDINA CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021

*highwater since, even if the TPP Terminal ceased to receive vessels nominated for unloading, it would continue to receive all Fixed Charges for the mere availability of the STA to unload coal in accordance with the agreed Annual Fixed Amount."*[139]

288.  Below, an analysis of the payment mechanism under the Contract.

289.  Pursuant to Clause 5.6 of the Contract, "*[f]or the availability and, if applicable, provision of the Transportation and Storage Services required by the Annual Fixed Amount, the Commission shall pay the Supplier the Consideration in accordance with Clause 6.*"[140] In this regard, Clause 6.1 specifies that CFE shall pay Greenfield the Consideration "*for the charges and with respect to the concepts detailed in Exhibit III of the* [Binding] *Proposal, which is attached hereto as Exhibit 2.*"[141]

290.  Exhibit 2 of the contract provides that, "*[a]s of the Commercial Operation Date, the charges associated with the Annual Fixed Amount shall be: the Port Services Charge, the Fixed Charge USD Phase I, the Fixed Charge MXN Phase I, the Fixed Charge USD Phase II and the Financing Charge, which shall be subject to the provisions of Section 2.3 of this Exhibit 2*".

291.  Thus, Exhibit 2 expressly states that the CSP is associated with the CFA, without distinguishing between the different elements comprised in the CFA.

292.  Section 2.3 of Exhibit 2 contains the following formula for the CSP:

---

[139] CFE Statement of Reply, paragraph 218 *"It should be noted that, since they are paid with a certain periodicity that does not depend on vessel arrivals, the Fixed Charges remunerate Greenfield under the use-or-pay and hell-or-highwater modalities since, even if the TPP Terminal ceased to receive vessels nominated for unloading, it would continue to receive all the Fixed Charges for the mere availability of the STA to unload coal in accordance with the convened Annual Fixed Amount, the latter would continue to receive all the Fixed Charges for the mere availability of the STA to unload coal according to the agreed Annual Fixed Amount and which amounts -calculated by Greenfield and TPP- used for the performance of the obligations, maintenance and availability of the TPP Terminal.".*

[140] Contract Clause 5.6(a), Exhibit D-GF-1.

[141] Contract Clause 6.1, Exhibit D-GF-1.

GERALDINA CHÁVEZ LOZANO
AUTHORIZED BY THE MEXICAN FEDERAL JUDICIARY
CERTIFIED TRANSLATOR
P. 0193-2021

### 2.3.1 PORT SERVICES CHARGE
### PORT SERVICES CHARGE (CSP)

Payment in month n:
$$CSP_n = (\text{Variable Fee Rate in USD}) = (TM_n) \left( \frac{PPI_{t-1}}{PPI_0} \right)$$

Where:
Ton per month n: $TM_n$
Variable Fee Rate in USD: USD$6.50/metric ton
$PPI_{t+1}$: Producer Price Index in the United States of America at the end of the latest operating semester
$PPI_0$: Producer Price Index in the United States of America as of July 2016

293.  Thus, concerting the tons per month "n", the formula does not contain a specific amount.

294.  Also, Section 2.1 of Exhibit 2 breaks down the base rates for the CSP as follows:

### 2.1 BASE RATES SUMMARY

Port Services Charge:

| | Amount | Unit /Frequency | Currency | Increase Index |
|---|---|---|---|---|
| | $6.50 | Accrued ton / monthly | US Dollars | Biannual increase US Producer Price Index |

295.  Thus, it is clear that, as Defendants claim, Section 2.1 provides that the unit of measurement for calculating the CSP is per ton accrued monthly. On this basis, the Defendants allege that the CSP is not a fixed charge, contrary to Claimants' argument.[142] On the other hand, the Claimants disagree with the Defendants' interpretation, and claim that the reason for using the term "*accrued ton*" was that the amount to be unloaded monthly would hardly be equivalent, and making the calculation on an annual basis would imply a financial challenge for TPP because it would have to assume the costs associated with the unloads if several vessels were operated in the same month, since this would imply a lower income than the monthly expense. Therefore, according to the Claimants, the CSP

---

[142] CFE Statement of Reply, paragraph 241 *"This situation implies that it was the Claimants who structured the Port Services Charge as a variable charge calculated and paid exclusively on the basis of the tons actually unloaded in the billing month and whose composition is not compatible with the Claimants' claims since, had it been the Parties' intention that the CSP be paid for an amount equivalent to the CFA, this would have been provided for in Exhibit 2 of the Contract.*



60

was not established on a monthly basis but would be paid for the tons accrued or unloaded in each month, and it would be at the end of each year of operation that an adjustment would be made, and the difference would be paid in the event that the monthly amounts added together did not achieve the CFA.[143]

296. We will return to the discussion between the Parties on the reference to *"accrued tons"* in Section 2.1 of Exhibit 2 when analyzing the Contract negotiations between the Parties subsequent to the Binding Proposal.[144] However, from the point of view of a systematic interpretation of the Contract, the provisions of the summary base rates in Section 2.1 contradicts the last paragraph of the same section, which states that the CSP is one of the charges associated with the CFA. In fact, although Exhibit 2 includes several variable charges (see, for example, Sections 2.3.2.2 and 2.3.3.3.2), these charges are not associated with the CFA, unlike the CSP, which reinforces the interpretation that the CSP is, in fact, a fixed charge.

297. On the other hand, clause 8.3, when regulating the effects of an Event of Default and Termination that has consequences or results in a termination of the TPP Agreement, provides that "[...] the Commission shall remain obligated to the payment of the Port Services Charge (as defined in Exhibit 2 of this Contract) for the Annual Fixed Amount, for a maximum term of three years. *The Commission shall remain obligated to pay the Port Services Charge (as defined in Exhibit 2 of this Contract) for the Annual Fixed Amount, for a maximum term of up to 2 (two) calendar years counted as of the month following the effective date of the termination of the Contract referred to in this subsection (e), with the express understanding that, if at any time during the referred period of 2 (two) years, TPP obtains, through a long-term contract, any third party user to use the TPP Terminal and/or its assets for the purposes of this Contract, the obligation to pay the Commission's Port Services Charges shall terminate immediately and shall be automatically released. The aforementioned Port Service Charges shall be*

---

[143] Greenfield Statement of Case, paragraph 242 *"This is confirmed by Galo Macias in his testimony: "Although CFE had already agreed to include the take or pay clause, a first scheme that was proposed was that CFE would make monthly payments, without considering the amount of coal actually unloaded. This concerned TPP because there was a possibility that in a given month a large amount of coal would be unloaded (which raises operating costs considerably) and the monthly payments would be insufficient to amortize those costs, generating possible cash flow problems. It is for this reason that I requested CFE, with the agreement of Carlos Alvarez of BlackRock, that the monthly payments were made on an "accrued ton" basis, which implies that CFE would pay a fee for each ton unloaded in a given month. Even with this adjustment, TPP, Greenfield and CFE always agreed and understood perfectly well that at the end of each year of operation there would be a "cut-off" and that CFE would pay any missing amount, and that TPP at the end of the year would receive a Port Services Charge for a volume of 1.3 million tons of coal.*
[144] See paragraphs 327-337 of this Award.

*paid by the Commission on a monthly basis, within the first 7 (seven) days of each month, within the aforementioned period of 2 (two) years. [...]".[145] (emphasis added)*

298. Clause 8.3. leads to three conclusions. *First*, if CFE "*remains*" obliged, it is because it was already obliged before, so the obligation to pay the CSP based on the CFA does not seem to be linked to the actual unload of coal. *Second*, in this case, CFE remains obliged to pay the CSP based on the CFA for a period of up to two years, without any coal unload, since the contract will have terminated. *Third*, CFE's obligation to pay the CSP based on the CFA ceases from the moment in which TPP obtains a third party to use the TPP Terminal, which reinforces the understanding that the CSP for the CFA precisely intends to compensate the unavailability of the TPP Terminal during the term of the Contract.

299. In view of the foregoing, and although the Contract is not free from certain ambiguity, the Arbitral Tribunal concludes that a systematic interpretation of the diverse contractual provisions leads to accept the Claimants´ position regarding CFE´s obligation to pay the CSP based on the CFA.

#### 5.2.4.2   *Previous negotiations between the Parties*

300. The analysis of the previous negotiations between the Parties reinforces the Arbitral Tribunal's conclusion that the CSP is a minimum charge that shall be calculated based on the CFA, to which shall be added, if applicable, any additional amount of coal that has been effectively unloaded at the TPP Terminal in excess of the CFA.

301. Specifically, the Arbitral Tribunal relies on the analysis of the *Term Sheets*, the TPP Economic Proposal dated November 25, 2015, the Binding Proposal dated May 27, 2016 and the negotiation between the Parties in September and October 2016. While the Arbitral Tribunal shares the Defendants' position that the executed version of the Contract constitutes the entire agreement between the Parties, superseding any prior agreements, the fact remains that, in the face of the Parties' dissimilar interpretations of certain contractual clauses, the analysis of prior and preparatory agreements to the Contract are useful to understand the intent of the Parties in entering into such clauses.

---

[145]   Clause 8.3(e) of the Contract, Exhibit D-GF-1.



302.  *First*, on August 4, 2015, CFE, TPP and Carbonser agreed that TPP and Carbonser would receive a first version of *Term Sheets* setting forth the essential aspects of the Project.[146]

303.  Subsequently, on November 19, 2015, by means of Official Communication No. 00746, CFE sent to TPP two *Term Sheets* related to the Project, on the basis of which it invited TPP to submit, no later than November 25 of that year, technical and economic offers including, among others, the service of "*loading, storage, claims, and blending of coal in the port owned by that company for 1.3 million tons*".[147] Likewise, CFE requested TPP, when submitting its technical and economic proposals, "to *do so together with the aforementioned Term and Conditions Sheets, duly signed on each page, by the person having power of attorney with sufficient powers to do so.*"[148]

304.  On November 25, 2015, TPP sent the corresponding *Term Sheets*, duly signed on each page, as requested by CFE. Thus, the Arbitral Tribunal considers it is appropriate to dismiss the Defendants' allegations during the Hearing that the *Term Sheets* were not signed by CFE.[149]

305.  The *Term Sheets* included the essential points of the engineering, procurement and construction contracts,[150] as well as the operation and maintenance contract necessary for the implementation of the Project.[151] Now, with respect to this point, the Claimants clarify that the *Term* refers to the TSA Contract as the "O&M Contract", which served as the basis for the Project as a whole, even though it was eventually split into two contracts and one of them was named the O&M Contract.[152]

306.  In this regard, the Arbitral Tribunal concurs with the Claimants' position, since it is sufficient to read the description of the Project in each of the *Term Sheets* to note that one refers only to the "*construction of infrastructure and auxiliary and necessary works for the transportation of coal from the Contractor's Terminal [...] to the Central [...] for the repowering of the supply and delivery system of coal and*

---

[146]  Exhibit D-TPP-5.
[147]  Exhibit D-TPP-7.
[148]  Exhibit D-TPP-7.
[149]  Tr. D4, P.32-34, L.1267-1352.
[150]  Exhibit D-TPP-8.
[151]  Exhibit D-TPP-9.
[152]  TPP and TMC Conclusions, paragraph 65.



ARBITRATION LCIA NO. 215145

associated facilities in the Central*,[153] while the other refers to the [r]ealization of the work and provision of operation and maintenance ("O&M") services to the equipment and infrastructure built by the IPC Contractors necessary for the transportation of coal to the Central [...]".[154] In other words, both *Term Sheets* served as the basis for the object of the Contract, which includes both the provision of the Transportation and Storage System, as well as the provision of the Transportation and Storage Services for a minimum volume equivalent to the CFA.[155]

307.    When analyzing the *Term Sheet* related to the operation and maintenance of the equipment, it is clear that a distinction is made between the so-called O&M Services and Port Services.[156] According to Appendix 1, O&M Services *"shall include all management, operation, maintenance, administration, labor, fuel materials [...], water, supervision and other goods and services necessary for the safe, efficient and reliable day-to-day management, operation and maintenance of the Infrastructure."*[157] The operation services include, among others, the storage, handling, and transportation of coal by means of the conveyor system to the Central, and from there to the interconnection point with the SIMC.[158] Port Services *"shall include all coal unloading, handling and storage services within the Port Terminal."*[159]

308.    The *Term Sheet* in question sets forth that, from the start of the transportation and storage services, the Port Services would be provided for a minimum annual tonnage equivalent to 1.3 million tons of coal:[160]

---

[153]    Exhibit D-GF-13.
[154]    Exhibit D-GF-14.
[155]    Clause 2 of the Contract, Exhibit D-GF-1.
[156]    Exhibit D-GF-14.
[157]    Exhibit D-GF-14.
[158]    Exhibit D-GF-14.
[159]    Exhibit D-GF-14.
[160]    Exhibit D-GF-14.

64



AUTHORIZED BY THE MEXICAN
GERALDINA
CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021
FEDERAL JUDICIAL COUNCIL

ARBITRATION LCIA NO. 215145

PORT SERVICES    The Operator shall provide Port Services, as defined in Appendix 1. The parties recognize and agree that the Port Services shall be provided in the public terminal operated by the Operator under market terms and conditions for a 14-year term from the execution of the O&M Contract. During the construction stage of the Infrastructure, the Services shall be invoiced to the Owner on a monthly basis based on the unloaded tonnage in the immediately preceding month. From the commencement of the O&M Services, the Port Services shall be provided for an annual minimum tonnage of mineral coal ("Annual Minimum Tonnage").

309.    On the other hand, the *Term Sheets* also provided that when CFE decided to unilaterally suspend services after the start-up of the Transportation and Storage System, both the CSP and the fixed costs should continue to be paid. In other words, the payment of both considerations did not depend on the actual unloading of coal at the TPP Terminal:

SUSPENSION    Suspension. The Operator may suspend the O&M Services for the period and I the manner deemed appropriate per instructions of the Owner, or the person designated by the Owner for such purposes, and such suspension shall protect and secure the Project appropriately, until there is an instruction to resume the provision of O&M Services. The suspension of O&M Services will not release the Owner from the obligation to pay the fees corresponding to fixed costs of the O&M Services or the Port Services.

310.    Thus, it is clear that the *Term Sheets* distinguish between the CSP and the "*fixed costs*", which strengthens Claimants' position that the CSP is intended to cover TPP's opportunity cost and recurring expenses in order to ensure the availability of the TPP Terminal, while the "fixed costs" would compensate TPP for the expenses necessary to maintain the availability of Phase I of the Transportation and Storage System.

311.    *Second*, as stated above, on November 25, 2015, TPP sent its economic proposal together with the *Term Sheets* proposed by CFE, as requested in Official Communication 00746.[161]

---

[161]    Transcript of Hearing, Day 4, p.32-34, l.1267-1352



ARBITRATION LCIA NO. 215145

312.    TPP's economic proposal regarding operation and maintenance services, which, as it has been explained, include coal storage and transportation, contemplates a minimum unloading volume of between 1,300,000 and 1,800,000 metric tons of coal per year:

- Yearly unloading volume
Between 1,300,000 metric tons (minimum) and up to 1,800,000 metric tons of mineral coal on a yearly basis.

313.    In addition, TPP's economic proposal provides that the consideration would be calculated annually as follows:

**V. Fee of Port Services to TPP**
It is calculated on a yearly basis as follows:

- Negative balance = Annual Minimum Volume – Operated amount

    Negative balance in metric tons

    Annual Minimum Volume.-

    1,300,000 (one million three hundred) from the start-up of the operation of the conveyance system of yard belts of TPP to the Central Storage Yard until the expiration of the Term of the Agreement.

    Operated Quantity.-
    Corresponds to the number of metric tons of mineral coal that were subject matter of the Services of the Terminal TPP (unloaded tons) in the corresponding contract year during the Term of the Agreement.

    There will not be negative balance for the period corresponding to the commencement of the O&M Contract and until the termination of the IPC Contract (start of operations of the conveyance system in belts of the yards of TPP to the Central Storage Yard).

- TPP's Fee = negative balance x cost for Terminal Services

    TPP's Fee in US Dollars

    Invoiced within the 5 (five) days following the end of the corresponding contract year and paid within the 15 (fifteen) days following the delivery of the corresponding invoice by TPP.



66

314. As shown above, CFE would pay TPP a fee for the Operated Quantity, understood as the tons of unloaded coal, and then pay the Negative Balance, understood as the difference between the minimum annual volume of 1,300,000 tons of coal minus the tons actually unloaded throughout the year.

315. In this same vein, the witness Armando Zapién Tapia acknowledged at the Hearing that, from TPP's economic proposal, it was evident that its intention was to collect at least 1,300,000 tons of coal per year.[162]

316. On the other hand, the rates included in TPP's economic proposal were incorporated in Exhibit 2, as shown in the following comparative table prepared by the Claimants:

| Technical and economic proposal (D-TPP-10) | | Exhibit 2 of the TSA Contract (D-TPP-18) | |
|---|---|---|---|
| Cost of terminal services | $6.50 | Port Services Charge | $6.50 |
| Operations and maintenance fixed cost in USD | $4,005,000.00 | Fixed Charge USD Stage I | $4,005,000.00 |
| Operations and maintenance fixed cost in MXN | $25,850,000.00 | Fixed Charge MXN Stage I | $25,850,000.00 |
| Operations and maintenance variable cost in USD | $0.2575 | Variable Charge USD Stage I | $0.2575 |
| Operations and maintenance variable cost in MXN | $21.6180 | Variable Charge MXN Stage I | $21.6180 |

317. Finally, TPP's economic proposal includes the same criteria proposed by CFE in the *Term Sheets regarding the* distinction between CSP and *"fixed costs"*, and the impact on them derived from the suspension of O&M Services:

**XI. Suspension of Services**

The Operator may suspend the O&M Services for the period and I the manner deemed appropriate per instructions of the Owner or the person designated by the Owner for such purposes.

During such suspension, the Operator shall protect and guard the equipment appropriately, until there is an instruction to resume the provision of O&M Services.

The suspension of O&M Services will not release the Owner from the obligation to pay the fees corresponding to fixed costs of the Port Services or the O&M Services.

---

[162] Hearing Transcript, Day 4, p.16, l.630-638.



318.    *Third*, on May 27, 2016, TPP, Greenfield and Carbonser submitted to Binding Proposal to the CFE for the development of the Project.[163] The reason for the joint proposal was due, among other reasons, to the fact that it was not feasible for every party to submit a separate proposal to CFE that would comprehensively cover all the scopes and services required by CFE for the Project.[164]

319.    The Binding Proposal essentially involved carrying out the Project through the execution of a service contract between CFE and a subsidiary of BlackRock, which would be "*solely liable with CFE for the provision of the services under the Service Contract, as well as for the full development, performance, operation and maintenance of the Project. The Parties will enter into the respective contracts with each other and with the Project Company as may be required and/or deemed convenient to satisfy the needs of CFE and those of the Project, under the terms and conditions contained in this Proposal*".[165]

320.    Exhibit III of the Binding Proposal contains the pricing scheme and payment mechanism for the services. However, it is clear that there is a concept called Excess Port Volume Charge, which is quoted at USD 6.50, whose unit of measurement is "*per each ton over 1.3 MM*", with an annual frequency:

| Charge for exceeding Port Volume | 6.50 | per each ton in excess of 1.3 million per year | | USD | US PPI |
|---|---|---|---|---|---|

321.    On the other hand, Exhibit 5 of the Binding Proposal, referred to a Price List of the Services to be rendered, describes the surplus port volume charge as the "[c]*ontractual variable surplus charge for port services of unloading, storage and handling of coal at the Specialized Terminal. This charge will only be applicable for metric tons in excess of the lower limit of 1.3 million units per year.*"[166]

| Charge for exceeding Port Volume | Variable fee for exceeding for coal unloading, storage, and handling port services in the Specialized Terminal. This charge shall only apply to metric tons exceeding the inferior cap of 1.3 million units per year. | 600431295 | Ton exceeding 1.3 million per year. | $6.50 | $1.04 | Mexico | USD | USD PPI |
|---|---|---|---|---|---|---|---|---|

---

[163]   Exhibit D-TPP-14 and D-TPP-60.

[164]   Exhibit D-TPP-14 and D-TPP-60, clause I, ix).

[165]   Exhibit D-TPP-14 and D-TPP-60, clause II, a) and b).

[166]   Exhibit D-TPP-60, Exhibit 5.



322.   Thus, that the Binding Proposal is based on the premise that there would be a minimum unload of 1,300,000 tons of coal; a figure, which, is consistent with the CFA foreseen in the Contract.

323.   Likewise, Exhibit III of the Binding Proposal provided for a monthly "*USD Fixed Charge*" in the amount of USD 3,340,000, which, necessarily, shall include the CSP for up to 1,300,000 tons of coal, since, otherwise, the pricing of a "*Surplus Port Volume Charge*" of 1,300,000 tons of coal would not make sense (emphasis added).

324.   Therefore, the Arbitral Tribunal concurs with the Claimants' interpretation that the USD Fixed Charge provided for in Exhibit III of the Binding Proposal was later disaggregated in Exhibit 2 of the Contract into four components: (i) Financing Charge; (ii) Phase I USD Fixed Charge; (iii) Phase II USD Fixed Charge; and (iv) the CSP per the CFA. Proof of this is that, if we compare the amount of the Fixed Charge USD under Exhibit III of the Binding Proposal (i.e., USD 3,340,000 monthly), with the fixed charges and the CSP included in Exhibit 2 of the Contract, it is clear that there is a total coincidence between the monthly amounts that CFE shall pay to Greenfield under both Exhibits, although they are organized under different concepts. The identity between both formulations is clear if we consider that the CSP is paid necessarily and unconditionally for a minimum annual volume of 1,300,000 tons of coal. This can be clearly shown in the following comparative table prepared by the Claimants:



| Proposal Exhibit 2 of the TSA Contract | | Exhibit 2 of the TSA Contract | |
| Based on Exhibit III of the Binding Proposal | | Executed version | |
| Charge | Monthly Amount | Charge | Monthly Amount |
| Fixed USD Charge | USD $3,340,000.00 | Charge for port services | (1.3 million /12)* USD 6.50 = 108.333.33 x USD 6.50 = USD$704,166.66 |
| | | Fixed Charge USD Stage I | $4,005,000/12 = USD$333,750 |
| | | Fixed Charge USD Stage II | $585,000/12 = USD$48,750 |
| | | Financing charge | USD $2,253,333.33 |
| Total | USD$3,340,000.00 | Total | USD$3,340,000.00 |

325.   The Binding Proposal was accepted by CFE, who stated that it "*technically meets the requirements of the Project*", and that "*it is considered reasonable and competitive in terms of the cost to CFE not having the ability to contribute 678 MW to the SEN*".[167]

326.   On the other hand, it is worth reiterating that clause 6.1 of the Contract provides that CFE will pay Greenfield the consideration "*for the charges and with respect to the concepts that were detailed in Exhibit III of the* [Binding] *Proposal, which is attached hereto as Exhibit 2*."[168] In other words, the Contract itself confirms that Exhibit 2 contains the same terms as Exhibit III of the Binding Proposal.

327.   *Fourth*, the Contract negotiations between the Parties after the Binding Proposal support the conclusion of the Arbitral Tribunal.

328.   The first version of Exhibit 2 of the Contract proposed by BlackRock is based on Exhibit III of the Binding Proposal, according to which the CSP was included in the concept of

---

[167]   Exhibit D-TPP-61, page 11.

[168]   Contract Clause 6.1, Exhibit D-GF-1.

70



Fixed Charge in USD, together with the Fixed Charges in USD Phase I and Phase II and the Financing Charge that would later be disaggregated in the final version of Exhibit 2:[169]

## EXHIBIT 2
## CONSIDERATION

### 2.1 SUMMARY

|  | Amount | Unit/Frequency | Currency | Increase Index |
|---|---|---|---|---|
| **Fixed charge MXN** | $25,850,000.00 | Per year / monthly | Mexican Pesos | National Producer Price Index |
| **Variable Charge USD** | $1,1275 | Per ton/ monthly | USD Dollars | US Producer Price Index |
| **Variable Charge MXN** | $21,6180 | Per ton/ monthly | Mexican Pesos | 25% National Producer Price Index / 75% CFE Fee resulting from dividing the average fee H-S of the last six months by the average fee before such six months |
| **Charge for exceeding Port Volume** | $6.50 | Per ton exceeding 1.3 million/ monthly | USD Dollars | US Producer Price Index |
| **Fixed Charge USD** | See table below | Per month/monthly | USD Dollars | US Producer Price Index |

| Operating month 1 | 3,340,000.00 | Operating month 21 | 3,340,000.00 | Operating month 41 | 3,340,000.00 |
|---|---|---|---|---|---|
| Operating month 2 | 3,340,000.00 | Operating month 22 | 3,340,000.00 | Operating month 42 | 3,340,000.00 |
| Operating month 3 | 3,340,000.00 | Operating month 23 | 3,340,000.00 | Operating month 43 | 3,340,000.00 |
| Operating month 4 | 3,340,000.00 | Operating month 24 | 3,340,000.00 | Operating month 44 | 3,340,000.00 |
| Operating month 5 | 3,340,000.00 | Operating month 25 | 3,340,000.00 | Operating month 45 | 3,340,000.00 |
| Operating month 6 | 3,340,000.00 | Operating month 26 | 3,340,000.00 | Operating month 46 | 3,340,000.00 |
| Operating month 7 | 3,340,000.00 | Operating month 27 | 3,340,000.00 | Operating month 47 | 3,340,000.00 |

329.    On September 30, 2016, CFE provided the following comments to the first version of Exhibit 2:[170]

---

[169]    Exhibit D-CFE-222.

[170]    Exhibit D-CFE-224.

71



ARBITRATION LCIA NO. 215145

CFE Comments 09-30-16

### Exhibit 2

CONTRACT FOR THE PROVISION OF COAL TRANSPORTATION AND STORAGE SERVICES

**2.2 Regarding the collection for the provision of services of the SIMC during the period between the Commencement Date and the Commercial Operation, the following Fixed Charges USD, Fixed Charges MXN, Variable Charges USD, Variable Charges MXN, Charges for Exceeding Port Volume USD are proposed:**

- **Fixed Charges USD**

The proposed monthly fee of USD$3,340,000.00 for the whole project, this is, for unloading the vessel, coal storage, blending, put away to the central yard and transport through the SIMC to Unit 7, when the concept is only the use of the SIMC and in accordance with the breakdown presented by BlackRock of the fixed and variable costs, it should be of USD 48,750.00.

- **Fixed Charges MXN**

Considering the breakdown of fixed and variable costs, this concept does not apply to the SIMC.

- **Variable Charges USD**

Accepted.

- **Variable Charges MXN**

Considering the breakdown of fixed and variable costs, this concept does not apply to the SIMC.

- **Charges for Exceeding Port Volume USD**

We do not agree with the concept of guaranteed tons, because we depend on the availability of the SIMC, without affecting the supply of coal to units 1 to 6; "only unloaded tons would be paid in accordance with the fee of $6.5 USD/unloaded ton with the corresponding adjustment. On the other hand

330.  On the one hand, the Claimants allege that CFE's disagreement with the concept of "guaranteed ton" refers to the application of this concept prior to the FOC, this is, during the construction of the Transportation and Storage System. The Claimants add that, however, CFE did not comment on the fact that, as of the FOC, the amount of USD 3,340,000 would be paid on a fixed monthly basis to pay the Claimants for the unloading of the vessels and the transportation and storage of coal, which corresponds to the amount of the USD Fixed Charge that at that time included the CSP.[171]

331.  On the other hand, the Defendants allege that BlackRock's proposal does not distinguish the timing of payment of the listed items and that, in addition, there was an item called "USD Exceeding Port Volume Charge" that would be paid if the

---

[171]    Exhibit D-CFE-224.



72

amount of coal unloaded in a year was less than 1,300,000 million tons of coal. The Defendants add that, in its comments to this draft, CFE referred to Section 2.2 and, although it included the phrase "*accepted*" with respect to the USD Variable Charges and MXN Variable Charges, CFE clarified that it "*disagreed with the concept of guaranteed tons*", without distinguishing the time frame to which it referred. Moreover, the Defendants allege that CFE never accepted explicitly the application of the surplus port volume charge, which was not incorporated in Exhibit 2 of the Contract.[172]

332.    Beyond the contradictory position of the Parties, the Arbitral Tribunal notes that the comments made by CFE, in fact refer to Section 2.2, which expressly refers to the "*charge for the provision of SIMC services <u>in the period between the Commencement Date and Commercial Operation</u>*" (emphasis added). In this regard, CFE's disagreement with the concept of guaranteed tons is justified by the fact that it "*depends[] on the availability of the SIMC*," which reinforces the idea that CFE's comments refer to the period between the Commencement Date and the Commercial Operation Date.

333.    Now, the reality is that the formula contained in Exhibit III of the Binding Proposal was not exactly reflected in Exhibit 2 of the Contract, which could support the Defendants' position that this was due to CFE's refusal to agree to pay the CSP based on the CFA. However, the Arbitral Tribunal is not convinced of such position. On the contrary, the Arbitral Tribunal considers that the reason for which the Parties decided to disaggregate the CSP from the USD Fixed Charge is explained in TPP's emails to Greenfield dated October 3 and 13, 2016. The foregoing will be explained in more detail below.

334.    Per e-mail dated October 3, 2016, TPP details to Greenfield the mechanism by which CFE would pay Greenfield the CSP on a monthly basis based on the tons of coal actually unloaded, making a final cut-off at the end of the year on the CFA, in order to avoid an operating deficit for TPP if it receives unloads greater than 108,333.33 tons per month:[173]

*"The payment is not made for 1.3 million divided by 12 + a surplus, if any. The monthly payment for the port service shall be for the tons unloaded every month. At the end of the year, the amount paid is compared with the 1.3 million tons and if the amount paid is less, the difference corresponding to the deficit amount is paid, in a*

---

[172]    Defendants' Brief of Conclusions, paragraph 316.
[173]    Exhibit D-TPP-58.



*separate invoice. TPP is obliged to report to Central Customs the orders and invoices of the consideration, therefore, the invoiced amounts shall match with the customs declaration."*

335.  Per e-mail dated October 13, 2016, TPP complained about the Availability Adjustment Factor of the port service, which, according to TPP, would consist of a double penalty and would not be acceptable.[174] According to the Claimants, as such penalty was calculated based on the USD Fixed Charge, the unavailability of the Transportation and Storage System would be affecting the rate payable for the availability of the TPP Terminal, even though they were independent facilities.

336.  This was explained by witness Claudia Rachadell at the Hearing:

*"What happened was that the charge that appeared in the binding proposal, which included all the charges, the CFE established, later in the contract negotiations, that there should be a penalty for non-availability of the transportation and storage system. And as TPP we considered that this non-availability could not be applied to the port services charge and that is why the considerations were divided and the port services charge was separated from the charges related to the transportation and storage system. Therefore, this is the source of the diverse charges that exist today in the contract."[175]*

337.  Thus, in Exhibit 2 of the Contract, the CSP was separated from the USD Fixed Charge so that the CSP would not be affected by a penalty related to the unavailability of the Transportation and Storage System. Thus, this led to the four charges indicated in Exhibit 2, which are (i) Port Services Charge; (ii) Phase I USD Fixed Charges; (iii) Phase II USD Fixed Charges; and (iv) Financing Charge, all of which were expressly associated to the CSP.

### 5.2.4.3    *Commercial reasons*

338.  As it has been explained, on December 21, 2006, TPP entered into a partial assignment of rights agreement with APILAC for the construction and operation of a specialized terminal for public use, intended for the operation of bulk minerals and steel products, located at the Port of Lázaro Cárdenas. Per Agreement CA-CXI-2 (21-III-17), the Board of

---

[174]    Exhibit D-TPP-58.
[175]    Hearing Transcript, Day 3, p.67, l.2633-2644.



Directors of APILAC approved the execution of an amendment agreement "*to adjust the area convened for the second stage of the terminal to accommodate the development of a coal conveyor belt to supply the thermoelectric Central "Presidente Plutarco Elias Calles", located in Petacalco, State of Guerrero, owned by the Federal Electricity Commission*"[176]

339.    Thus, on August 23, 2018, TPP and APILAC entered into Amendment Agreement No. 4, whereby the area of the Terminal assigned to TPP was modified,[177] precisely, in order to meet the requirement of the additional 1,300,000 tons of coal derived from the Contract.[178] It is noteworthy that in the description of the "*Current Situation*", the Amendment Agreement No. 4 states that TPP has achieved "*the assignment of a contract with the Federal Electricity Commission for the reception, handling and shipment to Thermoelectrical Plutarco Elias Calles of 1,300,000 tons of coal per year.*"[179]

340.    Subsequently, on January 9, 2020, TPP and APILAC entered into Amendment Agreement No. 5, whereby TPP increased its payment obligations with APILAC, undertaking the obligation to pay a consideration for a minimum annual unloading volume of 1,300,000 tons of coal:[180]

> "TWENTY EIGHTH.- OFFERED VOLUMES. Except for Acts of God or force majeure and during the initial term of this agreement, the ASSIGNEE offers to handle the following yearly volumes (number of tons) of PRODUCTS in the TERMINAL, for which the assignee undertakes the obligation of paying the variable portion of the CONSIDERATION set forth in **section III** of **clause fifty-sixth** of this agreement:

> "...For the eighth year of operation of the TERMINAL, and during the remainder of the initial term of this CONTRACT, 1,300,000.00 (one million three hundred thousand) tons yearly."

341.    In this regard, it should be noted that, when describing the "*Problem*" that gave rise to the amendment agreement, TPP and APILAC stated that "*the operation of the TERMINAL and the financial viability of [] [TPP] will depend on the COAL PROJECT*",[181] in other words, on the Project that is the subject of this dispute. They even stated that "*the COAL PROJECT*

---

[176]    Exhibit D-TPP-21, page 4.
[177]    Exhibit D-TPP-21, page 3, last paragraph.
[178]    Exhibit D-TPP-21.
[179]    Exhibit D-TPP-21, pages 3 and 4.
[180]    Exhibit D-TPP-39.
[181]    Exhibit D-TPP-39.



*will represent 1,300,000 tons per year*",[182] which is consistent with the CFA set forth in the Contract.

342.    In this regard, under the Assignment Agreement entered into between TPP and APILAC, the latter may apply penalties or even terminate such agreement "*[f]or failing to handle, without justified cause, the annual OFFERED VOLUME of PRODUCTS at the TERMINAL, in the corresponding year, of those indicated in clause twenty-eight of this agreement* [...]".[183] Therefore, it is not reasonable to consider that a sophisticated trader such as TPP would undertake the obligation with APILAC to handle 1,300,000 tons of coal per year without having the certainty that CFE would have committed under the Contract to unload at the TPP Terminal, or pay if it is not unloaded, the same amount of coal.

343.    Likewise, if it were not for the certainty that CFE would pay an unconditional consideration that would remunerate its opportunity cost for the unavailability of the TPP Terminal, TPP would hardly have declined other alternative business projects, such as a hydrocarbon project derived from the energy reform passed on December 2013 concerning the expansion of public and private terminals for the handling of hydrocarbons. Despite having obtained the necessary permit and registration certificate,[184] TPP decided not to proceed with the corresponding bidding process in order to favor the Project, on the understanding that the Project would ensure a minimum profit for TPP.[185]

344.    In other words, it would be difficult for a reasonable trader to accept to compromise the total availability of his terminal, with the opportunity cost that this entails, leaving to the mere discretion of his counterpart the use that would be made of it, without the certainty of a predetermined minimum compensation. Undoubtedly, maintaining the total availability of the TPP Terminal has an economic value.

### 5.2.4.4  *Contemporary conduct of the CFE*

345.    CFE's Official Communication HECCO-0-0700/2020, in response to Greenfield's request for payment dated August 27, 2020, does not question the amount

---

[182]    Exhibit D-TPP-39.
[183]    Exhibit D-TPP-1, clauses sixty-sixth and seventy-third.
[184]    Exhibit D-TPP-55 and Exhibit D-TPP-56.
[185]    T-TPP-7, paragraph 14, and T-TPP-8, paragraph 9.



ARBITRATION LCIA NO. 215145

applied by Greenfield on the CFA, rather it subjects such payment to a prior payment by Greenfield of costs derived from vessel demurrage:[186]

CFE / Generación II

CFE Generación II EPS
T.C. Presidente Plutarco Elías Calles
General Superintendence
*"2020, Year of Leona Vicario, Distinguished Mother of the Homeland"*
**Official communication – HECC0-O-0700/2020**
Petacalco, Guerrero, September 8, 2020.

the actions deemed convenient to prevent potential damages to the Commission, as well as mitigate them, including the engagement and/or provision of Transport and Storage Services by alternative means, undertaking all the costs and expenses derived from such alternative.

Therefore, we hereby reiterate the request made per official communication HECC0-O-058/2020, in which we requested the performance of the Contract in connection with the costs incurred due to the vessel demurrage and, thus, apply the payment of the "Fixed Amount".

Yours faithfully,
[*signature*]
Eng. Alejandro Hernández Melgoza
Head of General Superintendence
T.C. Presidente Plutarco Elías Calles

346.    CFE's failure to object the CFA claimed by Greenfield is relevant considering the provisions of clause 7.4(g) of the Contract, which provides that "[e]*ach invoice and its corresponding statement shall be deemed final when the Commission fails to notify the Supplier of any objection within 3 (three) months after the month in which such statements or invoices were delivered to the Commission* [...]".

347.    In this case, it was not until May 3, 2021, eight months after the invoice was presented, by means of Official Communication HECCO-0-0298/2021, that CFE indicated that Greenfield and CFE had contradicting opinions regarding the CFA.[187]

---

[186]    Exhibit D-TPP-44.
[187]    Exhibit D-GF-35.



77

##### 5.2.4.5 *Conclusion of the Arbitral Tribunal*

348. Based on the foregoing, the Arbitral Tribunal finds that the Defendants shall pay Greenfield the amounts corresponding to the CSP that did not achieve the CFA in the period corresponding to the years 2019-2020, 2020-2021, 2021-2022 and 2022-2023, considering the following breakdown:

- USD 4,039,727.10, corresponding to the first operating year from August 16, 2019 to August 15, 2020;

- USD $9,632,084.80, corresponding to the second operating year from August 16, 2020 to August 15, 2021;

- USD $9,603,492.13, corresponding to the third operating year from August 16, 2021 to August 15, 2022; and

- USD $8,561,715.85, corresponding to the fourth operating year from August 16, 2022 to August 15, 2023.

349. Regarding the payment of the value added tax established in the LIVA [*Mexican Value Added Tax Law*], the Arbitral Tribunal considers that the VAT applicable to the amounts determined in this Award shall be paid.

350. The VAT will be calculated by applying the rate of 16% to the amounts indicated in this Award.

351. The VAT will be transferred, expressly and separately, in pursuant to article one of the LIVA; being understood as transfer of the tax the collection or charge that the Parties shall make in an amount equivalent to the tax established in the LIVA, including the cases in which it shall be withheld under articles 1-A, 3, third paragraph or 18-J, section II, paragraph a) of the LIVA.

352. The LIVA establishes that the decentralized agencies of the federal government, such as the CFE, even while they do not cause federal taxes or are exempt from them pursuant to other laws or executive orders, such agencies shall accept the transfer referred to in article one of the LIVA and, if applicable, pay the value added tax and transfer it, according to under such Law.

353. The Arbitral Tribunal also finds that the Defendants shall pay the CSP for subsequent operating years during the term of the Contract, considering it as a minimum charge to be calculated based on the CFA, to which any tons unloaded in addition to such CFA, if any, shall be added.

78

354.    On the other hand, the Claimants request that the Defendants be ordered to pay the amount of USD 1,708,496.61, plus VAT, as default interest for non-payment of the CSP based on the CFA, according to the following breakdown:

- USD 398,383.47 plus VAT, corresponding to the default interest for the first operative year from September 21, 2020 to September 25, 2023;

- USD $610,582.21 plus VAT, corresponding to the default interest for the second operative year from September 21, 2021 to September 25, 2023;

- USD $691,581.13 plus VAT, corresponding to the default interest for the third operative year from September 21, 2022 to September 25, 2023; and

- USD $7,949.80 plus VAT, corresponding to the default interest for the fourth operative year from September 21, 2023 to September 25, 2023.

355.    On the other hand, while the Defendants objected the admissibility of the payment of any amount corresponding to the CSP based on the CFA, they do not specifically challenge the calculation made by the Claimants.

356.    Pursuant to clause 7.2 of the Contract, CFE should pay the invoices it receives from the Claimants within 20 days of receipt of the invoice.[188]

357.    On the other hand, clause 7.3 of the Contract provides that, "[i]n the event *that the Commission fails to make any payment under this Contract, the Commission shall pay the Supplier default interest on any amount payable, which shall be computed daily from the date on which such amounts became due until it has been paid in full.* [...] *The aforementioned default interest shall be calculated by applying the applicable Financial Expense Interest Rate.*"

358.    The Contract defines the Interest Rate for financial expenses, with respect to amounts in dollars, as "*the interbank offered interest rate (London Interbank Offered Rate) for operations of deposits in Dollars for periods of 6 (six) months, which appears in the following table*

---

[188] Exhibit D-TPP-18: "*7.2 Date of Payment*

*From the Commencement Date, the Commission shall pay the invoices it receives pursuant to Section 7.1 on the 20th day of each month. In the event that the Supplier delivers invoices for additional items pursuant to Clause 7.1(b) and Clause 7.1(c), the Commission shall pay such amounts to the Supplier within 20 days of receipt of the invoice, provided that such amounts are duly documented.*

*In the event that the Day scheduled for payment is not a Business Day, the Party required to make payment shall make payment on the immediately following Business Day.*"

79

*published on the "Libor 01" page of the Reuters information system (or, if applicable, on any other page that may replace the "Libor 01" page for the purpose of publishing such interbank rates), at 11:00 a.m. London, England time, 2 (two) Business Days prior to the respective payment date, plus 300 (three hundred) basis points."*

359.    In this present case, the Arbitral Tribunal considers that the interest calculation made by the Claimants, including the use of the "SOFR" (Secured Overnight Financing Rate) for the period from September 21, 2023 to September 25, 2023, due to the fact that such rate replaced Libor 01, is correct:[189]

| Concept | Claimed amount in USD | Date of Invoice | Date of commencement of Interests | Date of the Statement | Days | Applicable date for Libor | Libor rate for, USD | +300 base points (construct) | Interest Rate (yearly) | Interest Rate (daily) | Financial Interests |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CSP 2019-2020 | $4,039,725.10 | 09/01/2020 | 09/21/2020 | 09/25/2023 | 1099 | 09/19/2020 | 0.27721% | 3.00% | 3.27721% | 0.000897% | $398,583.47 |
| CSP 2020-2021 | $9,632,044.80 | 09/01/2021 | 09/21/2021 | 09/25/2023 | 734 | 09/19/2021 | 0.15322% | 3.00% | 3.15322% | 0.0864% | $610,582.21 |
| CSP 2021-2022 | $9,603,492.13 | 09/01/2022 | 09/21/2022 | 09/25/2023 | 369 | 09/19/2022 | 4.12339% | 3.00% | 7.12339% | 0.01952% | $691,581.41 |
| CSP 2021-2023 | $8,561,715.85 | 09/01/2023 | 09/21/2023 | 09/25/2023 | 4 | 09/19/2023 | 5.47193% | 3.00% | 8.47193% | 0.02321% | $7,949.80 |

360.    In the same regard, the Defendants shall continue to pay interest at the rates applied to each of the periods from September 25, 2023, until the date of actual payment.

### 5.3    *Regarding penalties for demurrage of vessels and refund of amounts exercised on the Operational Guarantee for USD 6,911,333, plus VAT and interest.*

361.    Below, the Arbitral Tribunal will analyze the Claimants' and Counterclaimants' claims regarding the penalties applied by CFE for demurrage of vessels through the execution of the Operational Guarantee for USD 6,911,333, plus VAT and interest. As specified in paragraph 195 of this Award, since the main claims and the counterclaims refer to the same concepts, for the sake of clarity, and in order to avoid duplication of analysis, the Arbitral Tribunal will analyze both claims together.

### 5.3.1    Greenfield Position[190]

362.    Greenfield alleges that the amounts derived from vessel demurrage that Defendants paid to Glencore are not attributable to Greenfield and, therefore, it is not liable for the payment of a

---

[189]   In accordance with the calculation contained in paragraph 132 of Greenfield's Brief for Conclusions.
[190]   Section V.A of the Statement of Case, Section IV.A of the Reply Brief, Section V and VI of the Statement of Counterclaim and Section IV of the Rejoinder Statement.



AUTHORIZED BY THE MEXICAN
GERALDINA
CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021
FEDERAL JUDICIARY

compensation for demurrage. Greenfield also alleges that the requirements of clause 10.2(b) of the Agreement are not satisfied and that Defendants' collection of the Operational Guarantee is inadmissible.

363.    Greenfield states that the claim of vessels demurrage for failure to comply with the Contract Laytime is incorrect. In this regard, Greenfield alleges that since Greenfield's obligations commenced as of the FOC, and not before, clause 10.2(b) of the Contract does not apply to the unload of vessels that arrived prior to the FOC. With respect to vessels arriving after the FOC, Greenfield claims that the requirements of Clause 10.2(b) of the Contract were not satisfied.

364.    Furthermore, Greenfield alleges that it is illogical for Defendants to claim that the same terms and conditions apply to services that would be provided before or after the FOC.

365.    Greenfield alleges that, prior to the FOC, Greenfield could only receive coal if it was possible and safe to do so. In this regard, Greenfield claims that it had the authority but not the obligation to receive coal before the FOC. Consequently, in the event that Greenfield opted, as it did, to unload coal prior to the FOC, it is not reasonable to claim that the Laytimes set forth in Exhibit 6 of the Contract were applicable, since such unloading was made without being obligated to do so, without having the Transportation and Storage System that represents the necessary infrastructure, and without the optimal conditions to carry out the unloading and transportation under the contract.

366.    Greenfield also claims that, with respect to the first vessel "W-ACE", it arrived even before the initially estimated FOC, so that the coal had to be unloaded at the dock, thus, causing a further delay in the construction of the Transportation and Storage System, producing an impact on the unloading of subsequent vessels.

367.    Greenfield alleges that, if the Defendants chose to nominate vessels to the TPP Terminal prior to the FOC, CFE should have assumed this and taken the necessary measures to avoid damages or, at least, undertake the liability for the demurrage that its supplier could charge.

368.    Greenfield claims that any unload Greenfield chose to make prior to the FOC was to be understood on a "best efforts" basis, to the best of Greenfield's ability, and considering the safety of the project and the people involved.

81



369.    Likewise, Greenfield alleges that the delay in achieving the FOC as of May 21, 2019 was duly covered with the liquidated damages for delay in the construction of the Transportation and Storage System, as agreed in the Contract, which was duly paid to CFE.

370.    Greenfield alleges that, regardless of the delay in the construction of the Transportation and Storage System, the lack of planning and scheduling in the purchase and consumption of coal by CFE had a material impact on the vessels demurrage. Greenfield alleges that the yards where the coal was stored were full, so there was no place for the coal to be unloaded, making it impossible to unload the vessels arriving at the TPP Terminal.

371.    Greenfield alleges that the Defendants proceeded with the execution of the Operational Guarantee breaching the Contract, not only because the payment of demurrage is inadmissible because it is not attributable to Greenfield, but also because a large part of the claim asserted by CFE corresponds to events that occurred prior to the FOC, while the Operational Guarantee guarantees the performance of Greenfield's obligations as of the FOC.

372.    Consequently, the purpose of the Operational Guarantee is to guarantee Greenfield's performance of its obligations after the FOC. However, vessel unloads were made at CFE's request prior to the FOC, without being Greenfield's obligation and without having the complete infrastructure to do so; therefore, the execution of the Operational Guarantee by CFE is incorrect.

373.    Finally, Greenfield alleges that it is not liable for demurrage, but even if it were liable for the delay in the construction of the Transportation and Storage System, any damage or harm caused by such delay was fully covered by the payment of the liquidated damages.

374.    Regarding the Defendants' Counterclaim in connection with Greenfield's delay in achieving the FOC within the Initial Term, Greenfield alleges that it achieved the FOC within the Maximum Term; therefore, no Event of Default occurred under the Contract.

375.    While it is true that Greenfield should have achieved the FOC on May 21, 2019, it is also true that the Parties agreed to an additional period for Greenfield to achieve the FOC without incurring in an Event of Default, and Greenfield was to pay a contractual penalty

82



to cover any loss or damage arising from the failure to achieve the FOC within the period initially foreseen for this purpose.

376. Thus, Greenfield alleges that, because it reached the FOC during the Maximum Term, but after May 21, 2019, it paid CFE the liquidated damages set forth in the Contract for each day after May 21, 2019 until August 16, 2019, the date on which the FOC was reached. In particular, Greenfield claims that the liquidated damages paid to CFE were intended to cover the damages suffered by CFE arising from the Transportation and Storage System being ready in the Maximum Term for the FOC instead of the Initial Term.

377. Greenfield also alleges that, before the FOC, it was only obliged to operate the SIMC, which did not imply that Greenfield was obliged to receive coal at the TPP Terminal; however, in support of CFE and in good faith, it made reasonable efforts with TPP and TMC to unload, store and transport coal prior to the FOC, even when it was not safe to do so, requesting CFE to refrain from sending vessels to the TPP Terminal or diverting those that had already been nominated.

378. Greenfield alleges that, considering the foregoing, it is clear that Defendants are not right in alleging that Greenfield did not provide the Transportation and Storage Services in connection with the vessels that arrived prior to the FOC adequately, since Greenfield had no obligation to provide such services.

379. In connection with the vessels that arrived after the FOC, Greenfield alleges that the situation caused by CFE was such that it was impossible for Greenfield and TPP to unload the vessels within the Contract Laytime, since, at the time of achieving the FOC, the TPP Terminal yards were already full, there were vessels waiting to be unloaded, there was very little time difference between the nominated vessels, and there was little coal consumption by CFE.

380. In addition, Greenfield alleges that it is not liable for the demurrage charged to CFE by the coal supplier since the assumptions and requirements set forth in clause 10.2(b) of the Contract were not satisfied.

381. Greenfield alleges that any unloading it chose to make prior to the FOC could not be subject to the Laytime set forth in the Contract since it was unreasonable to think that it could be unloaded in the same timeframes without the Transportation and Storage System. Nevertheless, Greenfield alleges, assuming without granting, that the Laytime

were applicable, such Laytime would only commence with respect to vessels duly notified and having complied with several requirements that were not complied by CFE.

382.    Due to the foregoing, Greenfield alleges that the execution of the Operational Guarantee is incorrect because the demurrage is not Greenfield's liability, because the events on which CFE executed the Operational Guarantee occurred prior to the FOC.

383.    In addition, Greenfield alleges that CFE contributed to the generation of demurrage by causing the damage attributed to Greenfield. In this regard, Greenfield claims that the oversaturation of the yards was the result of deficient planning of coal purchase and consumption, which is totally unrelated to Greenfield.

384.    Finally, Greenfield alleges that Article 88 of the Mexican Commercial Code (*Código de Comercio*) provides that, in a commercial contract in which a penalty of indemnity is set against the party that breaches such agreement, the injured party may demand the specific performance of the contract or execute such penalty; but by executing one of these two options, the other will be barred. In other words, although Greenfield is not liable for demurrage, even if it were liable for the delay in the construction of the Transportation and Storage System, any damage or harm caused by such delay was fully covered by the payment of the liquidated damages.

### 5.3.2    TPP and TMC´s position[191]

385.    TPP and TMC claim that they participated in several meetings with the Defendants and no commitment was ever made in those meetings regarding the compliance of contractual vessel unloading times prior to the FOC, considering that, at that time, the Transportation and Storage System was not operating.

386.    TPP and TMC claim that the premature shipment of vessels to the TPP Terminal caused the Terminal to become saturated, and even when the Transportation and Storage System was already in operation, the excessive volume of coal in the TPP Terminal caused great difficulties in the operation.

387.    TPP and TMC claim that CFE had knowledge of the project delays since March 2019 because of the supervisions it was carrying out on the progress of the Works. However, TPP

---

[191] Section III.6 of the Statement of Case, Section II. 2 and 3 of the Statement of Reply to Counterclaim, Section II of the and Section I.2 of the Rejoinder Statement.

and TMC claim that, notwithstanding the fact that the conditions of the construction of the Transportation and Storage System revealed the impossibility of using the system in May 2019, CFE did not modify its plan for the sequence of vessels that were projected to arrive at the TPP Terminal.

388.    TPP and TMC claim that, since the FOC had not occurred, the obligations of TPP and TMC under the O&M Contract have not been created. TMC and TPP claim that they were extremely clear that they would proceed to unload of the W-ACE in good faith to support CFE, and that they would make an effort to achieve such unload in the time provided by the Contract. However, since the Transportation and Storage System was not ready and, thus, the unloading would be done under different operating conditions, TMC and TPP indicated that they would not be liable for any demurrage in case the unloading times were larger than those provided by the Contract and the O&M Contract.

389.    TPP and TMC allege that the unloading of the third vessel coincided with the transshipment of coal from the first two vessels to zone two of the TPP Terminal, the same coal that was still stored and for which there were no instructions from CFE to move it by alternative means such as the use of trailer trucks. Consequently, CFE's inactivity in connection with the treatment of the coal that was unloaded from these first vessels by Greenfield, TPP and TMC caused the TPP Terminal to begin to approach the limit of its design capacity of 300,000 tons.

390.    Finally, TPP and TMC allege that, after achieving the FOC, the TPP Terminal's storage yard and the dock in zone one, which was never intended to be used as a storage site, were already saturated, but CFE continued to send large capacity vessels to the TPP Terminal. In particular, TPP and TMC claim that, by September 2019, the TPP Terminal was already storing more than 420,000 tons of coal from the first six vessels to arrive at the TPP Terminal.

391.    In connection with Defendants' Counterclaims, TPP and TMC claim that the services to be provided between the period from the Commencement Date to the FOC were limited in scope to those that could be provided in the SIMC. In particular, the fact that Schedule 2 establishes a differentiated regime regarding the consideration payable by CFE and, specifically, states that the consideration for the CSP would be paid as of the FOC update, reveals that the provision of services was not mandatory prior to the FOC. If Greenfield and, ultimately, TPP and/or TMC had been obligated to provide the services as of the Commencement Date, there would be no reason



to exclude the CSP from those considerations that would be generated from that moment on, according to section 2.2 of Exhibit 2.

392.   TPP and TMC claim that an additional element that confirms that Greenfield and, ultimately, TPP and/or TMC, had no obligation to provide such services before the FOC is the O&M Contract entered into between Greenfield and TMC, which expressly specifies that the obligations of TPP and/or TMC would commence upon the occurrence of the FOC.

393.   In addition, TPP and TMC claim that the term "Commencement Date" does not appear in the O&M Contract, which content was known by CFE, because it made certain comments or suggestions regarding its content. Thus, TPP and TMC allege that, if CFE was really in the understanding that the Transportation and Storage Services were to be rendered as of the Commencement Date, it would have requested the corresponding modification of the O&M Contract prior to its execution. The fact that it did not do so reveals that, in fact, CFE was well aware that the Transportation and Storage Services would only be mandatory as of the FOC.

394.   TPP and TMC also allege that the Defendants lack any cause of action and right to collect compensation for the vessel demurrage.

395.   TPPC and TMC allege that any damages derived from the delay in the Transportation and Storage System, including the delay in unloading times, were remedied when Greenfield made the payment of penalties in accordance with clause 8.1 of the Contract.

396.   TPP and TMC claim that the demurrage is not the result of willful misconduct, fault or negligence of Greenfield or its subcontractors and, moreover, CFE contributed to its occurrence; however, even if this had not been the case, CFE intends to make a double recovery. In fact, TPP and TMC claim that CFE has already benefited from the liquidated damages paid for the delay of the FOC and, additionally, CFE intends to collect a compensation for the damages suffered due to the demurrage that CFE alleges is a consequence of the delay in the construction.

397.   Likewise, TPP and TMC claim that, given the results experienced with the W- ACE and ANNA MARÍA vessels, a reasonably diligent person in CFE's position should have stopped, or at least rescheduled, the arrival and unloading plan of the subsequent vessels. The failure to do so denotes a negligent attitude by CFE, who disregarded the existing conditions of the Transportation and Storage System, as well as

86

the problems experienced at the TPP Terminal due to the need to unload coal directly "on the ground" at the berth and store it for a long period inside zone one of the TPP Terminal, which caused a ripple effect that adversely affected and inevitably slowed down the unloading times of subsequent vessels.

### 5.3.3    Defendants' Position[192]

398.    In connection with Plaintiffs' Claims, the Defendants allege that the demurrage and the consequent payment that CFE had to make are attributable to Greenfield's sole responsibility, as the same were cause by the unavailability of the Transportation and Storage System by May 21, 2019, the date scheduled for the FOC.

399.    Defendants claim that pursuant to clause 4.3(a) of the Contract, Greenfield was required to provide the Transportation and Storage Services from the Commencement Date and not only from the FOC, so that Greenfield's partial interpretation of clause 4.3 is incorrect. In particular, the Defendants allege that, after reading together the subparagraphs of clause 4.3, there is no doubt that the provision of the Transportation and Storage Services as of the Commencement Date, beyond being an entitlement, a mere "best efforts" obligation or a demonstration of good faith, constitutes an obligation with full binding effect on Greenfield. In this regard, the Defendants claim that the inclusion of the formulation "*may/shall*" in clause 4.3(b) in no way modifies the mandatory nature of its content.

400.    Furthermore, the Defendants allege that, less than one month before the date agreed to achieve the FOC, Greenfield confirmed to CFE during the follow-up meetings that the FOC would be effectively achieved on May 21, 2019, without expressing any reservation about any delay that could pose a risk to the fulfillment of such obligation. Accordingly, the Defendants allege that, under such understanding and trusting that Greenfield would honor the commitments confirmed by its representatives, the Defendants confirmed to Glencore the unloading dates for the vessels that would take the coal to the TPP Terminal.

---

[192]    Section III.P and IV.B of the Statement of Reply, Section IV of the Rejoinder Statement, Sections IV.A, IV.B, IV.C and IV. D of the Statement of Counterclaim and Section III, IV, V and VI of the Statement of Defense to Counterclaim.

401.    Defendants claim that it is incorrect to assert that the demurrage was caused by the alleged poor scheduling of the arrival of vessels at the TPP Terminal for the supply of coal of the U7 of the Central under the argument of the apparent low consumption of the U7. Likewise, even with the Transportation and Storage System completed and operating at 100% of its capacity, Greenfield continued breaching the Contract Laytime.

402.    Likewise, the Defendants claim that Greenfield actually covered the liquidated damages to which they were entitled due to the delay in the compliance of the FOC, thus, acknowledging that it failed to comply with the date originally convened in the Contract; however, the fact is that the demurrage for exceeding the laytime for unloading the vessels had additional causes, different from the delay in the fulfillment of the FOC, such as, for example, machinery failures and downtime, therefore, the compensation thereof does is not comprised in the penalty covered due to the delay in the completion of the Transportation and Storage System.

403.    The Defendants allege that the facts of the case satisfy all the requirements provided by clause 10.2(b) of the Contract for the payment of compensation on account of the fifteen vessel demurrage events in 2019. First, the Defendants claim that the fact that the demurrage of the vessels that unloaded coal up to August 16, 2019 was caused by the delay in the construction of the Transportation and Storage System does not nullify *per se* the Defendants' right to receive the corresponding compensation. Second, the Defendants allege that they proved the damages suffered due to demurrage in each communication in which they informed Greenfield of the time and amount of demurrage incurred with the endorsement of the Statement of Facts of the corresponding vessel. Third, the Defendants claim that there is a clear causal link between the fifteen demurrage events and Greenfield's conduct, which can only be categorized as fault, willful and negligence. Fourth, the Defendants allege that they did not contribute to the demurrage, as they complied with the minimum advance confirmation and notice required by the Contract.

404.    Finally, the Defendants claim that the claim of the Operational Guarantee was justified due to Greenfield breach of the obligation to cover the compensation for the demurrage for having exceeded the Laytime in unloading the vessels that were scheduled for the originally agreed date on which the Transportation and Storage System would be in operation, i.e., as of May 21, 2019. Thus, the Defendants allege that, contrary to the claims,



the execution of the Operational Guarantee was not incorrect, since at the time of its execution it was the guarantee in force to secure the obligations breached by Greenfield, and the Defendants had standing to claim Greenfield's breach of its obligation under clause 10.2(b).

405. On the other hand, in their Counterclaim, the Defendants allege that Greenfield did not achieve the FOC on the established date, i.e. May 21, 2019, rather on August 16, 2019, in breach of its obligation.

406. Defendants allege that Greenfield's malicious act ratifying that the Transportation and Storage System would be in operation by May 21, 2019, even knowing that it would not be complete it, hindered the coal supply chain required for the operation of the Central and the fulfillment of CFE's contractual obligations with the coal supplier.

407. Furthermore, the Defendants allege that Greenfield was obliged to achieve the FOC by May 21, 2019; therefore Greenfield breached an obligation by failing to meet such deadline, which is independent of the consequences provided for Events of Default in clause 8.1 of the Contract.

408. The Defendants acknowledge that Schedule 3 of the Contract contains the requirements for achieving the FOC and that it does not contain a deadline for the fulfillment of these requirements, however, they claim that May 21, 2019 was convened as the deadline for achieving the FOC in accordance with clause 3.1(b) of the Amendment Agreement.

409. Defendants allege that, during the monthly meeting for the months of February, March and April 2019, Greenfield assured that, despite the existing delay, this did not represent a risk in the progress of the construction of the Transportation and Storage System, and maintained the FOC for May 21, 2019.

410. In particular, Greenfield's conduct and statements caused that the Defendants understood that the FOC would materialize by May 21, 2019 and it was on that basis that on April 25, 2019 CFE Generación entered into the coal purchase agreement with Glencore.

411. Defendants also allege that the failure to achieve the FOC on May 21, 2019 had implications on the vessel unloading schedule that CFE had designed, planned and agreed with Greenfield since the meeting held on April 25, 2019.



412.    The Defendants allege that Greenfield had the obligation to provide the Transportation and Storage Services from the Commencement Date as stated in clause 4.3(a) of the Contract by using the word "shall", which implies a mandatory nature.

413.    The Defendants allege that, with respect to the W-ACE vessel, the only vessel that arrived before May 21, 2019, Greenfield never mentioned any safety or other issues that would prevent it from complying with its obligation; on the contrary, according to the Defendants, Greenfield always assured that it was ready for operation, ratifying the commitment to achieve the FOC on May 21, 2019.

414.    With respect to the 14 vessels that arrived after May 21, 2019, Greenfield's obligation was clear: upon notification of vessel arrival, cargo stowage and proposed unloading sequence, Greenfield was obliged to unload the coal at the Laytime set forth in Exhibit 6 of the Contract.

415.    The Defendants allege that Greenfield exceeded the Laytime on each and every vessel that arrived after May 21, 2019, being that the estimated arrival date was communicated in advance to its general manager in each of the cases and the vessel arrival schedule was presented to them at the meetings held on April 25, 2019, and June 27, 2019.

416.    Thus, Greenfield failed to comply with its obligation to provide Transportation and Storage Services in accordance with the terms set forth in Exhibit 6 of the Contract, which resulted in demurrage of the vessels whose costs had to be covered by CFE.

417.    The Defendants also allege that Greenfield breached its obligation to pay them compensation for the demurrage of the vessels by not complying with the laytime established in Exhibit 6 of the Contract in the amount of USD 6,310,256.60, plus the amount of USD 601,077.05 for default interest in accordance with the Interest Rate for Financial Expenses.

418.    Defendants allege that the demurrage caused on the 15 vessels is directly attributable to Greenfield's fault, willful misconduct, and negligence and, as provided in the Contract, in the event that a vessel incurs in demurrage caused by Greenfield's fault, willful misconduct or negligence, Greenfield is obliged to indemnify CFE.

419.    The Claimants allege that the only reason of the delays in unloading the vessels was Greenfield's conduct. First, for its failure to achieve the agreed FOC for

90



on May 21, 2019, and, secondly, for having exceeded the hours established in the Laytime Exhibit 6 of the Contract. Consequently, the demurrage of the vessels is directly attributable to Greenfield's fault and negligence, which creates its obligation to indemnify CFE for the cost of the entire demurrage.

420. The Claimants allege that, despite their multiple demands for payment made to Greenfield, they were forced to execute the Operational Guarantee for the aggregate amount of USD 6,911,333.11, due to Greenfield's unjustified refusal to cover the amount for the indemnification derived from the unloading of the vessels outside the Laytime, thus, Greenfield's argument of the undue collection of the Operational Guarantee is completely unjustified.

421. The Defendants allege that, acting in bad faith, Greenfield attempts to ignore conveniently for its benefit the Official Communication No. HECC0-O-0839/2020 sent by the Defendants on October 13, 2020, which sent to the Defendants information verifying the payments made to Glencore for demurrage; therefore, the requirement of proof of the damage suffered by the Defendants is verified.

422. Finally, the Defendants claim that they were fully entitled to claim payment of demurrage costs arising from the delay in the unloading of the vessels, since CFE, prior to the arrivals, scheduled the arrival of the vessels and complied with all the necessary notices, notifications, and reports timely, for Greenfield to provide the Coal Transportation and Storage Services.

### 5.3.4 Analysis of the Arbitral Tribunal

423. As explained above, the main claims and the counterclaims regarding the penalties applied for demurrage and the refund of the amounts executed in respect of the Operational Guarantee address the same issues. While the Claimants request the return of the penalties applied by CFE for demurrage through the execution of the Operational Guarantee for USD 6,911,333, plus VAT and interest, the Defendants defend the application of the penalty based on Greenfield's breaches.

424. According to the Claimants, CFE was responsible for the vessel demurrage due to, among other things, deficient planning. According to the Defendants, Greenfield failed to comply with the Laytime under the Contract by, among other things, failing to achieve the FOC on

91



May 21, 2019, and for failure to provide Transportation and Warehousing Services prior to the FOC.

425.    Clause 10.2(B) of the Contract regulates the compensation to which CFE would be entitled in case of damages resulting from the demurrage of the vessels. However, in order to be entitled to such compensation, the damages shall be attributable to Greenfield's fault, willful misconduct, or negligence, and CFE shall not have contributed to it:

*"The Supplier shall indemnify the Commission with respect to any damages suffered and duly proven by the Commission, derived from the demurrage of the vessels contracted by the Commission for the maritime transportation of the Coal that is attributable to the fault, willful misconduct or negligence of the Supplier or its Subcontractors, to the extent that the Commission has not contributed thereto; the foregoing, in the understanding that the Supplier, shall have the right but not the obligation, to carry out those actions it considers pertinent to avoid possible damages to the Commission, as well as to mitigate them, as the case may be, including the contracting and/or provision of the Transportation and Storage Services by alternative means, assuming the totality of the costs and expenses derived from this option."* (emphasis added)

426.    The Operational Guarantee is regulated by clause 4.8(b) of the Contract, which provides that Greenfield *"shall deliver to the Commission an unconditional and irrevocable stand-by letter of credit in its favor"*, *"[t]o guarantee the performance of its obligations after the Commercial Operation Date."*

427.    In case of undue collection of the Operational Guarantee by CFE, *"the Commission shall return such amount to the Supplier within 5 (five) Business Days following that Day in which it is determined, by means of a final judgment or arbitration award, that the amount made effective was improperly collected, plus interest on such amount, from the Day in which it was improperly collected until the Day in which it is effectively returned, at the Interest Rate of Financial Expenses".*[193]

428.    Finally, paragraph 5 of Exhibit 6 of the Contract establishes the vessel unloading times to which Greenfield shall adhere:

---

[193]    Contract Clause 4.8(b)(iii), Exhibit D-GF-1.

92



5. The TPP Terminal is equipped with two mobile cranes designed to unload vessels, which allow to have the following unloading periods:

| Vessel capacity, deadweight tonnage (DWT) | Laytime (Hours) |
|---|---|
| More than or equal to 50 000 to less than or equal to 70 000 | 53 |
| More than or equal to 70 000 to less than or equal to 100 000 | 60 |
| More than 100 000 to less than or equal to 150 000 | 90 |

429.    As it has been explained, clause 10.2(B) of the Contract provides that Greenfield shall indemnify CFE for damages resulting from demurrage of the vessels that is attributable to its fault, willful misconduct, or negligence, or that of its subcontractors, "*to the extent that the Commission has not contributed thereto.*"

430.    Having carefully analyzed the claims and evidence offered by the Parties, the Arbitral Tribunal considers that there are sufficient elements to conclude that the demurrage of the vessels derived from a shared responsibility between Greenfield and CFE. In this scenario, and given that CFE executed the Operational Guarantee, the Arbitral Tribunal will order the reimbursement of the amounts collected by CFE, except for the amount of USD 15,312 corresponding to the demurrage of the vessel ANNA MARIA, with the corresponding interest pursuant to the provisions of clauses 10.2(B) and 4.8(b)(iii) of the Contract.

431.    Subsequently, the Arbitral Tribunal will analyze the causes of vessel demurrage attributable to Greenfield (**Section 5.3.4.1**), followed by the analysis of the causes attributable to CFE (**Section 5.3.4.2**), and then the Arbitral Tribunal will make its conclusion (**Section 5.3.4.3**).

#### 5.3.4.1   *Causes attributable to Greenfield*

432.    The Contract was executed on December 23, 2016, therefore, in accordance with clause 3.1(c), the latest date to achieve the Commencement Date was June 21, 2017 (i.e. 180 days from the signing of the Contract).[194]

---

[194] Exhibit D-GF-1, clause 3.1(c) of the Contract: "*Unless the Parties agree on a different date, the Conditions Precedent shall be fulfilled (or waived in writing by the applicable Party) within 120 (one hundred and twenty) Days from the signing of this Contract. After 60 (sixty) Days from the expiration of the term mentioned herein, if the Conditions Precedent have not been fully complied, either Party may terminate this Agreement immediately, by simple written notice to the other Party and without the need for any judicial declaration or any formality whatsoever. Such termination shall be without prejudice to any rights that either Party may have acquired prior to the termination of the Contract*".

ARBITRATION LCIA NO. 215145

433.    Pursuant to the provisions of Schedule 3 and Clause 8.1(b) of the Contract, the FOC should have
been achieved by May 21, 2019 (i.e. 23 months from the Commencement Date)[195] or, at the latest,
by August 21, 2019 (i.e. 90 days from May 21, 2019):

*"If the Supplier [...] fails to achieve the Commercial Operation Date within 90 (ninety) Days from
the Commercial Operation Date established for these purposes in Exhibit 3, in the understanding
that, regardless of the fact that the delay in question is not yet considered an Event of Default, the
Supplier shall pay to the Commission liquidated damages for the amount of US$50,000.00
Dollars (fifty thousand 00/100 United States Dollars) for each Day of delay of the Commercial
Operation Date until the abovementioned 90 (ninety) Days and that, for the sake of clarity, only
as of Day 91 (ninety-one) shall the delay in question be considered an Event of Default of the
Supplier, and the Commission may terminate this Contract pursuant to Clause 8.3 below".*

434.    In other words, Greenfield had the obligation to achieve the FOC on May 21, 2019, having to pay
liquidated damages for each day of delay until August 21, 2019. Only as of August 21, 2019, CFE
could terminate the Contract because the delay in achieving the FOC was an Event of Default.

435.    On June 21, 2017, the Parties amended clause 3.1(c) of the Contract, extending the maximum
date for achieving the Commencement Date to August 21, 2017 (instead of June 21, 2017).[196]
Notwithstanding the modification of the Commencement Date, Greenfield reiterated its
commitment to achieve the FOC on May 21, 2019, as originally planned:

*"Further, notwithstanding the modification to the deadline set forth in Section 3.1(c), as such
Section has been modified pursuant to Section Two above, Supplier acknowledges and reiterates
its commitment to achieve the Operations Date*

---

[195] Exhibit D-GF-1, Schedule 2, page 3, of the Contract: *"According to the Proposal, the Commercial Operation Date is
committed to be achieved within 23 (twenty-three) months from the Commencement Date."*

[196] Exhibit D-TPP-20, Amendment Agreement, clause 3.1(c) of the amended Contract *"Unless the Parties agree on a different
date, the Conditions Precedent shall be satisfied (or waived in writing by the applicable Party) within 120 (one hundred
twenty) Days from the date of execution of this Contract. After 120 (one hundred and twenty) Days from the expiration
of the first period of 120 (one hundred and twenty) Days mentioned herein, i.e. no later than August 21, 2017, without
full performance of the Conditions Precedent, either Party may terminate this Agreement immediately, by simple
written notice to the other Party and without the need for any judicial declaration or, formality whatsoever. Such
termination shall be without prejudice to any rights that either Party may have acquired prior to the termination of the
Contract.".*

94



*Commercial, no later than May 21, 2019, in terms as provided by the Proposal, Exhibit 2 to the Contract and subject to the terms of the Contract.*"[197]

436.    In other words, notwithstanding the modification of the Commencement Date, Greenfield maintained its obligation to achieve the FOC on May 21, 2019.

437.    Since Greenfield did not achieve the FOC on May 21, 2019, the Defendants proceeded to apply the liquidated damages provided by clause 8.1(b) of the Contract from May 21 to August 16, 2019, the date on which the FOC was achieved.[198]

438.    Thus, Greenfield proceeded to pay the Defendants the amount of USD 4,350,000 as liquidated damages pursuant to clause 8.1(b) of the Contract.[199]

439.    Based on Greenfield's delay in achieving the FOC on May 21, 2019, and the liquidated damages paid, the Arbitral Tribunal shall determine whether Greenfield had an obligation to provide the coal transportation and storage services before the FOC, and, if so, whether the liquidated damages paid by Greenfield under clause 8.1(b) of the Contract releases Greenfield from any obligation related with the delay in the FOC, including the demurrage of vessels, assuming, in the latter case, that the reason for the demurrage of vessels was precisely the delay in achieving the FOC. The Arbitral Tribunal will analyze both issues below.

   a.    *Delay in achieving the FOC on May 21, 2019.*

440.    The Parties have discussed at length whether or not Greenfield had an obligation to provide coal transportation and storage services between the Commencement Date and the Commercial Operation Date. The Contract is not exempt of ambiguity on this point.

441.    In fact, Clause 4.3(a) of the Contract provides that "*[t]he Supplier shall provide the required Transportation and Warehousing Services as of the Commencement Date and during the term of this Contract, either directly or through Subcontractors*." (emphasis added)

442.    However, paragraph (b) of the same clause clarifies "*[t]he foregoing, in the understanding that during the period between the Commencement Date and the Commercial Operation Date,*

---

[197]    Exhibit D-TPP-20, clause THIRD Amendment Agreement.
[198]    Exhibit D-GF-57.
[199]    Exhibit D-GF-58.



95

*the Supplier may/shall provide Transportation and Storage Services at the SIMC and if possible and safe may receive Coal by means other than the Transportation and Storage System, including without limitation by trailer trucks.*" (emphasis added)

443.    Undoubtedly, the reference to the fact that, prior to the FOC, Greenfield "*may/shall*" provide the services in the SIMC is highly ambiguous and open to conflicting interpretations. Therefore, the Arbitral Tribunal will analyze pre-contractual documents, other contractual clauses, and the contemporary conduct of the Parties to interpret this issue.

444.    On the one hand, the O&M *Term Sheet* includes the provision of services during the construction stage, this is, between the Commencement Date and the FOC:[200]

**PORT AND TRANSPORT SERVICES OF MINERAL COAL WITH TPP'S TRAILER TRUCKS TO THERMOELECTRIC CENTRAL PETACALCO:**
The operator shall provide all the services required for unloading, handling, and storing mineral coal and transport services of mineral coal with trailer trucks from TTP to the Thermoelectric Central temporarily during the term of the IPC Contracts or up to 15 days following the date in which the IPC Contracts have achieved the Substantial Completion of the Works (as such term is defined in the IPC Contracts). The scope of the Port and transport Services with trailer trucks provided by the Operator shall include, but will not be limited to:

ii) Ground transportation services

As an immediate solution of transport of mineral coal from the Storage Yard of TTP to the Central, the provision of ground transportation services in trailer trucks is proposed on a temporary basis:

| PROPOSAL FOR GROUND TRANSPORTATION SERVICES | |
|---|---|
| $MXN (MEXICAN PESOS) / Metric ton | |
| Cost of ground transportation services | $152.00 |

445.    In this regard, witness Claudia Elena Rachadell Montero testified at the Hearing that TPP had anticipated a scenario in which port services would be provided during the

---

[200]    Exhibit D-TPP-11.

96



construction.[201] She added that CFE asked TPP to be ready to ship coal by other means during construction.[202]

446.   Consistent with the foregoing, Schedule 2 of the Agreement provides that, if Greenfield provided services related to the operation of the SIMC after the Commencement Date, but prior to the FOC pursuant to clause 4.3(b), CFE shall pay monthly fees only in connection with the services provided in such period.[203]

447.   Thus, Exhibit 2 expressly contemplates the possibility of Greenfield providing services related to the operation of the SIMC prior to the FOC. In this regard, it is reiterated that clause 4.3(b) of the Contract expressly allowed Greenfield to use trailer trucks, without requiring prior authorization from CFE.

448.   Likewise, section II.c of the Binding Proposal provided that, at CFE's option, TPP should manage the transportation of coal by land in trailer trucks to the Central.[204]

449.   On the other hand, there are several clauses in the Contract that refer to Greenfield's obligation to provide the services as of the FOC. For example, clause 4.7 of the Contract provides that "[a]s of the Commercial Operation Date, the Supplier shall be obliged to operate and maintain the Transportation and Storage System, at its own expense, during the term of the FOC, and the Supplier shall be obliged to operate and maintain the Transportation and Storage System at its own expense during the term of the

---

[201]   Hearing Transcript, day 3, p.26, l.1008-1019:
"Raúl Quintero Uribe: Thank you.
So according to this 2015 Term Sheet, TPP had anticipated a scenario where port services would be provided during the construction phase of the project, correct?
Claudia Elena Rachadell Montero: Yes.
Raúl Quintero Uribe: That is, before the commercial operation date, correct?
Claudia Elena Rachadell Montero: Correct".

[202]   Hearing Transcript Day 3, p.27 l. 1042-1044:
"Then the Commission asked us at TPP that during construction, that is, before the commercial operation date, we should be in a position to be able to ship this material by other means."

[203]   Exhibit D-GF-1, Schedule 2, clause 2.1 of the Contract "Notwithstanding the foregoing, if the Provider provides services related to the operation of the SIMC to the Commission after the Commencement Date, but prior to the Commercial Operation Date, pursuant to Clause 4.3(b) of the Agreement, the Commission shall pay monthly to the Provider or the Provider shall pass-through to the Commission the fees related only to the services rendered by the Provider during such period, without this being understood as the occurrence of the Commercial Operation Date, which shall continue to be subject to the provisions of Schedule 3 of this Contract. According to the Proposal, the Commercial Operation Date is committed to be reached within 23 (twenty-three) months from the Commencement Date".

[204]   Exhibit D-TPP-14: "While the construction of the Project is being carried out, at CFE's option, and provided that CFE states with due anticipation the respective quantities, qualities, terms, and conditions of delivery, TPP shall be obliged to arrange for the transportation of coal by land in trailers trucks to the Thermoelectric Central. Such obligation shall be exclusive to TPP and shall be so acknowledged in the Services Contract and/or any separate contracts or agreements between the Parties. For these purposes, attached to this Proposal as Exhibit II, is a letter of commitment in which TPP describes the generalities and scope of the service that TPP will provide to CFE upon request from time to time".

97

*Contract* [...] *in order to be available to provide the required Transportation and Storage Services to the Commission*." (emphasis added)

450. Similarly, clause 5.3 of the Contract provides that "[*a*]*s of the Commercial Operation Date and during the term of this Contract, the Commission, at its own expense, shall deliver Coal at the Point of Origin to the Supplier, for its transportation and storage in accordance with the terms and subject to the conditions set forth in this Contract*". (emphasis added)

451. Paragraph 9 of Exhibit 6 of the Contract provides that "[*a*]*t all times and from the Commercial Operation Commencement Date, the Supplier shall have available, operate, maintain and repair the TPP Terminal* [...]" (emphasis added).

452. Clauses 3.2 and 5.3 of the O&M Contract are consistent with the above, since they provide that the services were to be rendered once the FOC had been achieved, which is relevant considering that TPP/TMC are the parties performing the services.[205]

    "From the *Commercial Operation Date and during the term of this Agreement, the Operator shall receive the vessels with Coal at the Point of Origin; perform the Port Services required for the unloading of the Coal and transport and store the Coal in accordance with the terms and conditions stipulated in this Agreement.*" (emphasis added)

    "*Commercial Operation. The Operator shall commence the provision of the Services referred to in this Agreement, with the exception of the services provided by Clause 5.2 above, on the date on which the Commercial Operation actually occurs, in accordance with the terms of the Coal Transportation Agreement.*" (emphasis added)

453. Disregarding the ambiguity of clause 4.3 of the Contract and the other contractual clauses, the fact is that, in practice, Greenfield accepted the unloading of the vessels before the FOC, repeatedly modifying the date on which the FOC was supposed to be achieved.

---

[205]   Exhibit D-GF-23.



454.    Thus, on April 25, 2019, Greenfield confirmed to CFE that it would achieve the FOC on May 21, 2019, and indicated that it was ready to unload the first vessel.[206]

455.    Then, on May 16, 2019, Greenfield notified CFE that the probable date for the FOC would be July 4, 2019, with no indication from Greenfield that it would not receive vessels until the FOC was achieved.[207]

456.    Subsequently, on June 4, 2019, Greenfield requested CFE to divert the vessel SARTORI, mentioning that safety conditions to unload the vessel were not satisfied and that the TPP Terminal would be operational on June 25, 2019.[208]

457.    Again, on June 20, 2019, Greenfield informed CFE that the TPP Terminal was not in condition to receive vessels until safety conditions were reestablished, requesting the diversion of scheduled vessels to an alternate port, estimating that the TPP Terminal would be operating on a regular basis to receive vessels as of July 8, 2019.[209]

458.    However, on July 2, 2019, Greenfield informed CFE that the safety conditions of the TPP Terminal, due to construction, operation and unloading, did not allow the unloading of vessels, estimating the unloading of new vessels for July 10, 2019.[210]

459.    Finally, after discharging six vessels, only on August 16, 2019, Greenfield confirmed to CFE that Schedule 3 requirements for the FOC were met.[211]

460.    The foregoing allows the Arbitral Tribunal to draw the following conclusions:

461.    *First*, it is undoubtedly true that Greenfield's constant changes to the estimated FOC date made planning by CFE extremely difficult.

462.    *Second*, there is no record that Greenfield informed CFE that, although it would proceed to unload the vessels before achieving the FOC, it would not be responsible for the demurrage of the vessels since the conditions for this were not yet in place; unlike TPP, which notified Greenfield that it would proceed to unload the vessels

---

[206]    Exhibit D-GF-55.
[207]    Exhibit D-GF-56.
[208]    Exhibit D-GF-81.
[209]    Official Communication LCPL-CFE-OPS-0008, Exhibit D-GF-82.
[210]    Official Communication LCPL-OPS-CFE-0010, Exhibit D-CFE-35.



although the FOC was not yet achieved, while it expressly indicated that it would not be responsible for the laytime because the contractual conditions have not been satisfied.[212]

463. Therefore, the Arbitral Tribunal concludes that, regardless of whether Greenfield had the power or the obligation to provide the coal unloading, transportation and storage services prior to the FOC, what is certain is that Greenfield assumed such commitment without making any reservation, and that its constant changes in the FOC estimate made planning by CFE difficult, contributing to the demurrage of the vessels.

    b. *Penalty for failure to achieve the FOC by May 21, 2019.*

464. The Parties disagree regarding the scope of the liquidated damages paid by Greenfield pursuant to clause 8.1(b) of the Contract for USD 4,350,000. While Greenfield alleges that such penalty has the effect of covering any damages suffered by CFE for the delay of the FOC, including damages arising from vessel demurrage, the Defendants allege that such penalty is different and independent from the penalty for vessel demurrage.

465. As explained before, clause 8.1(b) of the Contract refers the application of liquidated damages *"for each Day of delay of the Commercial Operation Date."* In other words, this is a penalty which scope is limited to compensating CFE for Greenfield's delay in achieving the FOC. Clause 8.1(b) does not provide that this penalty is intended to compensate CFE for damages resulting from the delay in achieving the FOC, such as vessel demurrage, assuming that such delay was the main cause.

466. On the other hand, clauses 4.8(a) and (b) of the Agreement refer, respectively, to the Pre-Operative and Operational Guarantees, which purpose is to *"guarantee the performance of its obligations under this Agreement from the Commencement Date until the Commercial Operation Date"*, in the case of the Pre-Operational Guarantee, and to *"guarantee the performance of its obligations after the Commercial Operation Date"*, in the case of the Operational Guarantee.

467. Thus, the Pre-Operational Guarantee covers Greenfield's obligations between the Commencement Date and the Commercial Operation Date. In this regard, Greenfield's main obligation during this period is, precisely, to achieve the FOC

---

[212]    Exhibit D-TPP-23 and D-TPP-31.



in accordance with terms set forth in Exhibit III of the Contract. In other words, the completion of the engineering, procurement and construction works, for "*the project to be in a condition to provide services safely*"[213] of the transportation and storage system. Therefore, the objective of the Pre-Operational Guarantee cannot be the same as the liquidated damages, which, as it has been explained, penalizes Greenfield for each day of delay in achieving the FOC.

468.    The same reasoning applies to the Operational Guarantee, which, by definition, has a broader scope than the liquidated damages provided by clause 8.1(b), which, as stated before, are limited to a penalty for each day of delay in achieving the FOC.

469.    Therefore, the Arbitral Tribunal concludes that the liquidated damages provided by clause 8.1(b) of the Contract cover only each day of delay in achieving the FOC on May 21, 2019, but not any other damages or harm that CFE may have suffered as a consequence of the delay in achieving the FOC.

470.    Thus, the Arbitral Tribunal concludes that the damages claimed by the Defendants due to the vessel demurrage under clause 10.2(b) of the Contract are not covered by the liquidated damages paid by Greenfield under clause 8.1(b).

### 5.3.4.2   *Causes attributable to CFE*

471.    The Claimants attribute to CFE the liability for the demurrage of the vessels, mainly due to the following causes: (i) failure to comply with the vessel's nomination requirements to start the Laytime period; (ii) failure to reschedule the berth windows; and (iii) deficient planning. Below, an individual analysis of such allegations.

    a.    *Vessel's nomination requirements to begin the Laytime period*

472.    The requirements for the nomination of vessels by CFE are provided in four stipulations of Exhibit 6 of the Contract.

473.    Firstly, as provided herein above, paragraph A.5 details the Laytime as follows:

---

[213]    Exhibit D-GF-1, Exhibit III of the Contract.



101

5.  The TPP Terminal is equipped with two mobile cranes designed to unload vessels, which allow to have the following unloading periods:

| Vessel capacity, deadweight tonnage (DWT) | Laytime (Hours) |
|---|---|
| More than or equal to 50 000 to less than or equal to 70 000 | 53 |
| More than or equal to 70 000 to less than or equal to 100 000 | 60 |
| More than 100 000 to less than or equal to 150 000 | 90 |

474.  Secondly, paragraph A.6 provides further details about how the Laytime hours shall be calculated:

> The hours mentioned in the column labeled "Laytime" shall be calculated from the time in
> which the vessel whose arrival has been duly notified to the Supplier, is berthed, in free
> pratique, with the initial draught and inspection of the holds and cargo performed, and
> with the holds open to verify the vessel's cargo. Once the aforementioned actions have been
> carried out and the receipt of the vessel has been executed by the Supplier, the Commission
> or its representative and the personnel in charge of the vessel, the notice of Clearance to
> Unload will be served, and the Laytime shall commence, and the operations may begin."

475.  Thirdly, Exhibit 6, paragraph A.14 of the Contract, governs the requirements that the notification of nomination by CFE shall contain:

> "The Commission shall inform to the Supplier, as soon as possible, the vessel's departure
> from the port of origin, estimated time of arrival, characteristics, the type and quality of
> the Coal ,and the unloading sequence prior to the arrival of the vessel."

476.  Finally, paragraph A.15 of Exhibit 6 of the Contract sets forth the requirements that the notice of arrival of vessels shall contain, which shall be served at least 72 hours prior to the arrival:

> "The arrival of the vessel at the TPP Terminal shall be confirmed by the Commission and
> notified to the Supplier in writing at least 72 hours prior to the arrival of the vessel,
> including the stowage of the cargo and the proposed unloading sequence; also, the
> Commission shall provide to the Supplier a copy of the general diagram of the vessel,
> including holds, with its configurations and dimensions, regarding any vessel arriving at
> the TPP Terminal pier."



477. The Parties disagree as to whether or not CFE complied with the requirements set forth in Exhibit 6 of the Contract. Below, further analysis of this statement.

478. As mentioned herein above, Laytime commences when the vessel, whose notification should have been duly served upon Greenfield, is *"berthed, in free pratique, with the initial draught and inspection of the holds and cargo performed, and with the holds open to verify the vessel's cargo."*

479. Thus, the first requirement is that the arrival of the vessel had been *"duly notified"*, which refers to the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, regarding the nomination and arrival of vessels, respectively.

480. As hereinbefore mentioned, the notification of nomination shall be served *"as soon as possible"*, and shall contain (i) the vessel's departure from the port of origin; (ii) the vessel's estimated time of arrival; (iii) the vessel's characteristics; (iv) the type and quality of the Coal; and (v) the sequence of unloading prior to the ship's arrival.

481. The arrival notice shall be served *"at least 72 hours prior to the vessel's arrival"* and shall contain (i) confirmation of the vessel's arrival at the TPP Terminal; (ii) the stowage of the cargo; (iii) the proposed unloading sequence; and (iv) a copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

482. Below, an analysis on whether CFE complied with these requirements with respect to each of the vessels.

    (i)  <u>W-ACE</u>

483. On April 13, 2019, CFE sent the *"CTPPEC Vessel Schedule updated as of April 13, 2019."*[214]

484. The information contained in such schedule includes the type of coal and the vessel's estimated time of arrival ("ETA") expected on May 5, 2019.

---

[214] Exhibit 5 of the Testimonial of Arturo Cortes Alvarado.

103



| No | EMB | WINDOW START | FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETR/START | ETCD/END | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 949 | apr-05-2018 | apr-20-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN CALYUS 4+ | Apr/03/2019 16:42 | Apr/06/2019 0:00 | Apr/09/2019 8:00 | 120,000 | TRMC |
| 15 | 950 | apr-05-2018 | apr-20-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN CUMULUS 3+ | Apr/05/2019 9:52 | Apr/10/2019 5:30 | Apr/13/2019 7:00 | 119,916 | TRMC |
| 16 | 951 | apr-05-2018 | apr-20-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH | Apr/10/2019 18:00 | Apr/19/2019 12:00 | Apr/23/2019 4:00 | 58,000 | TRMC |
| 17 | 952 | apr-05-2018 | apr-20-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | MINERAL BELDIUM 4+ | Apr/18/2019 22:00 | Apr/23/2019 16:00 | Apr/27/2019 10:00 | 118,000 | TRMC |
| 18 | 1 | may-05-2019 | may-14-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE | May/05/2019 8:00 | May/05/2019 14:00 | May/08/2019 2:00 | 71,500 | TPP |

485.  On April 30, 2019, CFE issued Official Communications HECC3-0-0068/2019 and HECC3-0-0069/2019, including the vessel's characteristics and stowage plan (and indicating that it maintained its ETA on May 2, 2019) and the vessel's unloading plan, respectively.[215]

486.  On May 2, 2019, CFE issued Official Communications HECC3-0-0070/2019, including the quality and weight certificates of the coal seized on vessel W-ACE, and the port of departure (Ciénaga, Colombia).[216]

487.  According to the information included in the Statement of Facts, the vessel W-ACE arrived at the Port of Lázaro Cárdenas on May 3, 2019, with 71,500 tons of coal.[217]

488.  On May 3, 2019, an operational meeting took place between TPP and CFE personnel to coordinate the unloading of the vessel.[218]

489.  Finally, the ship was berthed on May 4, 2019, and unloading began on May 5, 2019.[219]

490.  From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

491.  As for the required notification, vessel W-ACE arrived at the port on May 3 and was berthed at the TPP Terminal on May 4, 2019, but the quality and weight certifications of the coal seized on vessel W-ACE, and the port of departure were notified on May 2, 2019, thus, failing to comply with the 72-hour prior notice period.

    (ii) ANNA MARIA

---

215     Exhibit 7 to the Testimonial of Arturo Cortes Alvarado.
216     Exhibit 7 to the Testimonial of Arturo Cortes Alvarado.
217     Exhibit 8 to the Testimonial of Arturo Cortes Alvarado.
218     Exhibit 9 to the Testimonial of Arturo Cortes Alvarado.
219     Exhibit 8 to the Testimonial of Arturo Cortes Alvarado.



AUTHORIZED BY THE MEXICAN FEDERAL JUDICIARY
GERALDINA CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021

492.     On April 22, 2019, CFE sent the *"CTPPEC Vessel Schedule updated as of April 13, 2019."*[220]

493.     The information contained in such program includes the type of coal and its ETA scheduled for May 15, 2019.

| No | EMB | WINDOW START | FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETR/START | ETCD/END | TONNAGE | PORT OF DISCHARGE |
|----|-----|--------------|--------|----------|------|----------|--------------|--------|--------|---------|-----------|----------|---------|-------------------|
| 14 | 949 | apr-05-2018 | apr-20-2019 | 700497015 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN CALVUS 4v | Apr/03/2019 18:42 | Apr/04/2019 0:00 | Apr/09/2019 6:00 | 120,000 | TRMC |
| 15 | 950 | apr-05-2018 | apr-20-2019 | 700497015 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN CUMULUS 2v | Apr/09/2019 9:50 | Apr/10/2019 9:30 | Apr/13/2019 7:00 | 119,016 | TRMC |
| 16 | 951 | apr-05-2018 apr-20-2019 | | 700497015 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH | Apr/18/2019 18:00 | Apr/19/2019 12:00 | Apr/23/2019 6:00 | 58,000 | TRMC |
| 17 | 952 | apr-05-2018 apr-20-2019 | | 700497015 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | MINERAL BELGIUM 4v | Apr/18/2019 22:00 | Apr/21/2019 16:00 | Apr/27/2019 10:00 | 118,000 | TRMC |
| 18 | 1 | may-05-2019 may-16-2019 | | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE | May/03/2019 0:00 | May/05/2019 14:00 | May/08/2019 2:00 | 71,500 | TPP |
| 19 | 953 | may-12-2019 may-28-2019 | | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GRIZZLY | May/11/2019 8:00 | May/12/2019 14:00 | May/15/2019 2:00 | 71,500 | TRMC |
| 20 | 954 | may-12-2019 may-28-2019 | | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH 3v | May/09/2019 8:00 | May/22/2019 14:00 | May/24/2019 8:00 | 120,000 | TRMC |
| 21 | 955 | may-12-2019 may-28-2019 | | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANANGEL STRONGMER 3v | May/21/2019 8:00 | May/24/2019 18:00 | May/28/2019 12:00 | 120,000 | TRMC |
| 22 | 956 | may-12-2019 may-28-2019 | | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SURABAYA | May/26/2019 8:00 | May/28/2019 22:00 | Jun/01/2019 16:00 | 120,000 | TRMC |
| 23 | 2 | may-13-2019 may-24-2019 | | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANNA MARIA | May/21/2019 0:00 | May/15/2019 14:00 | May/18/2019 2:00 | 71,500 | TPP |

494.     On May 16, 2019, CFE issued Official Communication HECC3-0-0076/2019, including the quality and weight certificates of the coal seized on the vessel ANNA MARIA, and the port of departure (Ciénaga, Colombia).[221]

495.     On May 17, 2019, CFE issued Official Communications HECC3-0-0080/2019 and HECC3-0-0079/2019, including the vessel's characteristics and stowage plan (and indicating that it maintained its ETA on May 22, 2019) and the vessel's unloading plan, respectively.[222]

496.     According to the information included in the Statement of Facts, the vessel ANNA MARIA arrived at the Port of Lázaro Cárdenas on May 22, 2019, with 71,500 tons of coal.[223]

497.     On May 21, 2019, an operational meeting took place between TPP and CFE personnel to coordinate the unloading of the vessel.[224]

498.     Finally, unloading began on May 22, 2019, at 8:30 a.m. [225]

499.     From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

---

220   Exhibit 12 to the Testimonial of Arturo Cortes Alvarado.
221   Exhibit 12 to the Testimonial of Arturo Cortes Alvarado.
222   Exhibit 12 to the Testimonial of Arturo Cortes Alvarado.
223   Exhibit 15 to the Testimonial of Arturo Cortes Alvarado.
224   Exhibit 16 to the Testimonial of Arturo Cortes Alvarado.
225   Exhibit 15 to the Testimonial of Arturo Cortes Alvarado.



500. Regarding the required notification, the vessel ANNA MARIA arrived at the port and was berthed at the TPP Terminal on May 22, 2019, and the notification was served between May 16 and 17, thus, complying with the required 72-hour prior notice period.[226]

### (iii) SARTORI

501. On May 7, 2019, CFE sent the "*CTPPEC Vessel Schedule updated as of May 7, 2019.*"[227]

502. The information contained in such schedule includes the type of coal and its ETA scheduled for May 30, 2019.

| No | ENR | WINDOW START | FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA NOR | ETB START | ETCD/END | TONNAGE | PORT OF DISCHARGE |
|----|-----|------|------|----------|------|----------|--------------|--------|--------|---------|-----------|----------|---------|-------------------|
| 14 | 949 | apr-01-2019 | apr-26-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | GOLDEN CALVUS 4v | Apr/03/2019 16:42 | Apr/06/2019 8:00 | Apr/06/2019 8:00 | 120,000 | TRMC |
| 15 | 950 | apr-05-2019 | apr-26-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | GOLDEN CUMULUS 2v | Apr/06/2019 9:30 | Apr/16/2019 5:30 | Apr/13/2019 7:00 | 119,916 | TRMC |
| 16 | 951 | apr-05-2019 | apr-26-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH | Apr/18/2019 18:00 | Apr/16/2019 12:00 | Apr/23/2019 6:00 | 56,000 | TRMC |
| 17 | 952 | apr-05-2019 | apr-26-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | MINERAL BELGIUM 4v | Apr/18/2019 22:00 | Apr/23/2019 16:00 | Apr/27/2019 10:00 | 118,000 | TRMC |
| 18 | 1 | may-05-2019 | may-16-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE | May/05/2019 8:00 | May/05/2019 14:00 | May/08/2019 2:00 | 71,500 | TPP |
| 19 | 953 | may-12-2019 | may-28-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GRIZZLY | May/12/2019 8:00 | May/12/2019 14:00 | May/15/2019 2:00 | 71,500 | TRMC |
| 20 | 2 | may-15-2019 | may-24-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANNA MARIA | May/15/2019 8:00 | May/15/2019 14:00 | May/18/2019 2:00 | 71,500 | TPP |
| 21 | 954 | may-12-2019 | may-28-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH 2v | May/20/2019 8:00 | May/20/2019 14:00 | May/24/2019 8:00 | 120,000 | TRMC |
| 22 | 955 | may-12-2019 | may-28-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANANGEL STRONOMER 2v | May/23/2019 8:00 | May/24/2019 18:00 | May/28/2019 12:00 | 120,000 | TRMC |
| 23 | 956 | may-12-2019 | may-28-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SURABAYA | May/24/2019 8:00 | May/28/2019 22:00 | Jun/01/2019 16:00 | 120,000 | TRMC |
| 24 | 957 | may-29-2019 | jun-09-2019 | 700499290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GOLDEN CALVUS 5v | May/27/2019 14:00 | Jun/02/2019 2:00 | Jun/05/2019 20:00 | 142,000 | TRMC |
| 25 | 3 | may-25-2019 | jun-03-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | SATORI | May/30/2019 8:00 | May/30/2019 14:00 | Jun/03/2019 8:00 | 140,730 | TPP |

503. On May 28, 2019, Glencore informed CFE that "[a]*fter noting the delays in the unloading of the vessels "W-ACE" and "Anna Maria" at TPP, we greatly appreciate your confirmation that the vessel "Satori" with 140,730t of coal will be berthed upon arrival.*"[228]

504. On May 29, 2019, CFE informed Greenfield of Glencore's communication, and requested Greenfield to inform the date on which they could start the unloading operations, along with the estimated time of unloading.[229]

505. On June 4, 2019, Greenfield requested CFE to divert the vessel SARTORI to an alternate port "*for safety reasons,*" informing that "*as of June 25, 2019, the terminal will already be operating on a regular basis and in a position to receive vessels again.*"[230]

---

[226]  Exhibit 15 to the Testimonial of Arturo Cortes Alvarado.
[227]  Exhibit 20 to the Testimonial of Arturo Cortes Alvarado.
[228]  D-CFE 24.
[229]  D-CFE 25.
[230]  D-CFE 26.



506. On June 5, 2019, CFE informed Greenfield that the corresponding arrangements would be made to carry out the unloading of the vessel at an alternate terminal, noting that Greenfield *"shall cover the additional costs generated by the delay in the operation of the vessel."*[231]

507. Finally, the vessel SARTORI arrived at the port Lázaro Cárdenas on May 30, 2019, at 20h30, to be then diverted to the Terminal Marítima de Recibo de Carbón ("TMRC"), where it was unloaded on June 11 at 24h00. [232]

508. The Defendants' submissions, as well as the witness statements and expert reports filed, focused on the interaction with Glencore and TMRC; therefore, this Arbitral Tribunal finds no record of the notification served by CFE upon Greenfield, regarding the other requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, except for those included in the notification of May 7, 2019.

### (iv) GRIZZLY

509. On May 27, 2019, CFE sent the *"CTPPEC Vessel Schedule updated as of May 27, 2019."*[233]

510. The information contained in such schedule includes the type of coal and its ETA scheduled for June 10, 2019.

| No | EMD | WINDOW START | FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETB/START | ETC/END | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 949 | apr-05-2018 | apr-20-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN CALVUS 4v | Apr/05/2019 18:42 | Apr/06/2019 2:00 | Apr/09/2019 8:00 | 120,000 | TRMC |
| 15 | 910 | apr-05-2018 | apr-20-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN CUMULUS 2v | Apr/09/2019 9:10 | Apr/10/2019 2:30 | Apr/13/2019 2:00 | 110,916 | TRMC |
| 16 | 911 | apr-05-2018 | apr-20-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | MINERAL BELGIUM 4v | Apr/19/2019 19:30 | Apr/19/2019 1:30 | Apr/21/2019 5:00 | 84,730 | TRMC |
| 17 | 952 | apr-05-2018 | apr-20-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GOLDEN SAVANNAH | Apr/19/2019 16:30 | Apr/23/2019 16:50 | Apr/25/2019 22:00 | 84,789 | TRMC |
| 18 | 1 | mar-05-2019 | mar-16-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE | May/05/2019 6:08 | May/05/2019 8:00 | May/09/2019 12:00 | 71,500 | TPP |
| 19 | 953 | mar-13-2019 | may-28-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GRIZZLY | May/14/2019 7:00 | May/16/2019 16:00 | May/16/2019 14:00 | 68,610 | TRMC |
| 20 | 954 | mar-12-2019 | mar-28-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH 2v | May/20/2019 11:00 | May/20/2019 19:00 | May/25/2019 21:00 | 113,152 | TRMC |
| 21 | 2 | mar-17-2019 | mar-24-2019 | 700490290 | 2 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANNA MARIA | May/23/2019 3:00 | May/23/2019 8:30 | May/25/2019 21:00 | 68,470 | TPP |
| 22 | 955 | mar-12-2019 | may-28-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SURABAYA | May/23/2019 3:00 | May/23/2019 9:00 | May/26/2019 3:00 | 113,600 | TRMC |
| 23 | 956 | may-25-2019 | jun-09-2019 | 700490290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | W-ACE 2v | May/28/2019 23:00 | May/29/2019 11:00 | Jun/01/2019 3:00 | 73,640 | TRMC |
| 24 | 3 | may-25-2019 | jun-03-2019 | 700490290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | SATORI | May/31/2019 2:30 | May/31/2019 14:00 | Jun/04/2019 8:00 | 140,730 | TPP |
| 25 | 957 | may-29-2019 | jun-09-2019 | 700490290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GOLDEN CALVUS 5v | May/30/2019 11:00 | Jun/01/2019 11:00 | Jun/05/2019 5:00 | 142,800 | TRMC |
| 26 | 958 | may-11-2019 | may-26-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANANGEL ASTRONOMER 2v | May/26/2019 22:24 | Jun/05/2019 13:00 | Jun/06/2019 9:00 | 114,410 | TRMC |
| 27 | 959 | may-28-2019 | jun-09-2019 | 700490290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | SBI LYNX | May/31/2019 16:00 | Jun/09/2019 19:00 | Jun/12/2019 7:00 | 68,190 | TRMC |
| 28 | 960 | jun-16-2019 | jun-14-2019 | 700490290 | 10 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | MINERAL BELGIUM 5v | Jun/15/2019 20:00 | Jun/12/2019 17:00 | Jun/16/2019 11:00 | 143,000 | TRMC |
| 29 | 4 | jun-16-2019 | jun-27-2019 | 700490290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GRIZZLY 2v | Jun/14/2019 8:08 | Jun/16/2019 9:08 | Jun/14/2019 8:08 | 67,960 | TPP |

511. On June 20, 2019, CFE issued Official Communications HECC3-0-0114/2019, HECC3-0-0115/2019 and HECC3-0-0116/2019, including the vessel's unloading plan, the vessel's characteristics and stowage plan,

---

231  D-CFE 27.
232  Exhibit 22 to the Testimonial of Arturo Cortes Alvarado.
233  Exhibit 31 to the Testimonial of Arturo Cortes Alvarado.



the quality and weight certificates of the coal seized on the vessel GRIZZLY and the port of departure (Ciénaga, Colombia), respectively.[234]

512.    According to the information included in the Statement of Facts, the vessel SARTORI arrived at the Port of Lázaro Cárdenas on June 4, 2019, with 68,007 tons of coal.[235]

513.    On June 20, 2019, Greenfield informed CFE that safety conditions did not allow the unloading of vessels, requesting the diversion of scheduled vessels to an alternate port.[236]

514.    On June 21, 2019, CFE informed Greenfield that it was not possible to divert the anchored vessels GRIZZLY and ANNA MARIA.[237]

515.    On July 2, 2019, Greenfield reiterated to CFE that safety conditions did not allow the unloading of vessel, which could take place as of July 10, 2019.

516.    Finally, the vessel GRIZZLY was berthed at the TPP Terminal on July 12, 2019, and began unloading on July 14, 2019, at 00h00.[238]

517.    From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

518.    Regarding the notification of the vessel's arrival, the notification dated May 29, 2019, indicated an ETA as of June 10, 2019, but the vessel GRIZZLY arrived at the port at 13h30 on June 4, 2019.

519.    Meanwhile, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, the quality and weight certificates of coal seized on the vessel GRIZZLY and the port of departure, was served on June 20, 2019, while the vessel arrived at the port on June 4, 2019, and docked at the TPP Terminal on July 12, 2019.

520.    In this regard, while it is true that paragraph A.15 of Exhibit 6 requires CFE to notify the arrival of the vessel at least 72 hours prior to its arrival

---

[234]    Exhibit 32 to the Testimonial of Arturo Cortes Alvarado.
[235]    Exhibit 33 to the Testimonial of Arturo Cortes Alvarado.
[236]    D-CFE 32.
[237]    D-CFE 33.
[238]    Exhibit 33 to the Testimonial of Arturo Cortes Alvarado.

108



AUTHORIZED BY THE MEXICAN FEDERAL JUDICIAL
GERALDINA CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021

to the TPP Terminal, the Arbitral Tribunal considers that this stipulation presupposes that the delay between the arrival at the port and the arrival at the TPP Terminal should be minimal, as it was, for example, in the case of vessels W-ACE and ANNA MARIA, in which the arrival at the port and at the terminal took place on the same day.

521.    Likewise, the Defendants compute the Laytime claimed herein from the arrival of the vessels at the port; therefore, they could not take as a reference for the computation of the 72-hour prior notice period, the arrival of the vessel at the TPP Terminal, and, at the same time, compute the Laytime from the arrival of the vessel at the Port of Lázaro Cárdenas.

522.    Therefore, for the purposes of the notification due by CFE, the Arbitral Tribunal shall compute the 72 hours prior notice period, from the moment the vessel arrived at the port.

523.    Thus, given that the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, the quality and weight certificates of the coal seized on the vessel GRIZZLY, and the port of departure was served on June 20, 2019, and that the vessel GRIZZLY arrived at the port on June 4, 2019, CFE failed to comply with the required 72-hour prior notice period.

(v)    ANANGEL ASTRONOMER

524.    On June 28, 2019, CFE sent the "*CTPPEC Vessel Schedule updated as of June 28, 2019.*"[239]

525.    The information contained in such schedule includes the type of coal and its ETA expected by June 30, 2019.

| No. | EMB | WINDOW START | WINDOW FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETB/START | ETCD/END | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | 960 | may-22-2019 | jun-03-2019 | 7004W0290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | SATOSI | May-30/2019 20:30 | Jun/12/2019 0:00 | Jun/15/2019 12:00 | 140,730 | TRMC |
| 28 | 961 | jun-03-2019 | jun-14-2019 | 7004W0290 | 10 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | MINERAL BELGIUM 3e | Jun/14/2019 23:00 | Jun/16/2019 0:00 | Jun/20/2019 3:00 | 143,900 | TRMC |
| 29 | 962 | jun-15-2019 | jun-26-2019 | 7004W0290 | 5 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | GOLDEN SAVANNAH 3e | Jun/13/2019 5:18 | Jun/20/2019 18:00 | Jun/23/2019 17:00 | 113,700 | TRMC |
| 30 | 963 | jun-15-2019 | jun-26-2019 | 7004W0290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE 3e | Jun/18/2019 19:30 | Jun/24/2019 22:00 | Jun/27/2019 3:00 | 76,531 | TRMC |
| 31 | 964 | jun-15-2019 | jun-26-2019 | 7004W0290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | NAVIOS ANTARES | Jun/23/2019 11:36 | Jun/27/2019 23:06 | Jul/01/2019 14:00 | 113,328 | TRMC |
| JULY 01, 2019 TO JULY 08, 2019 MAINTENANCE TO TRMC | | | | | | | | | | | | | | |
| 32 | 3 | jun-18-2019 | jun-27-2019 | 7004W0290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GRIZZLY 3V | Jun/04/2019 15:48 | Jul/06/2019 0:00 | Jul/10/2019 12:00 | 68,007 | TPP |
| 33 | 965 | jul-04-2019 | jul-19-2019 | 7004W0290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | EBIT LYNX 3V | Jul/05/2019 19:00 | Jul/09/2019 0:00 | Jul/13/2019 11:00 | 67,500 | TRMC |
| 34 | 4 | jun-29-2019 | jul-08-2019 | 7004W0290 | 6 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANNA MARIA 3V | Jun/16/2019 1:58 | Jul/10/2019 12:00 | Jul/13/2019 0:00 | 68,870 | TPP |
| 30 | 966 | jul-04-2019 | jul-19-2019 | 7004W0290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | EM RTOGAB | Jul/10/2019 8:00 | Jul/11/2019 22:00 | Jul/14/2019 10:00 | 67,500 | TRMC |
| 34 | 5 | jun-29-2019 | jul-08-2019 | 7004W0290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANANGEL ASTRONOMER 3V | Jun/30/2019 18:00 | Jul/11/2019 0:00 | Jul/16/2019 18:00 | 68,000 | TPP |

526.    On July 8, 2019, CFE issued Official Communications HECC3-0-0129/2019, HECC3-0-0130/2019, and HECC3-0-0131/2019, including the vessel's characteristics and stowage plan, the vessel's unloading plan,

---

239    Exhibit 37 to the Testimonial of Arturo Cortes Alvarado.



109

and the quality and weight certificates of coal seized on the vessel ANANGEL ASTRONOMER and the port of departure (Ciénaga, Colombia), respectively.[240]

527.   According to the information included in the Statement of Facts, the vessel ANANGEL ASTRONOMER arrived at the Port of Lázaro Cárdenas on June 30, 2019, with 88,000 tons of coal.[241]

528.   Finally, the vessel ANANGEL ASTRONOMER berthed at the TPP Terminal on July 18, 2019, unloading started on July 22, 2019, at 08h00.[242]

529.   From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

530.   Regarding the notification of the vessel's arrival "*as soon as practicable*", the notification of June 28, 2019, indicated an ETA as of June 30, 2019, the date on which the vessel ANANGEL ASTRONOMER arrived at the port; this, despite the fact that Glencore had informed CFE of the nomination of the vessel ANANGEL ASTRONOMER since June 12, 2019.[243] Thus, the notification was not served "*as soon as practicable*".

531.   On the other hand, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, the quality and weight certificates of the coal seized on the vessel ANANGEL ASTRONOMER and the port of departure, was served on July 8, 2019, while the vessel arrived at the port on June 30, 2019, thus failing to comply with the required 72-hour prior notice period.

         (vi)   ANNA MARIA (second voyage)

532.   On May 27, 2019, CFE sent the "*CTPPEC Vessel Schedule updated as of May 27, 2019.*"[244]

533.   The information contained in such schedule includes the type of coal and its ETA scheduled for June 15, 2019.

---

[240]   Exhibit 38 to the Testimonial of Arturo Cortes Alvarado.
[241]   Exhibit 39 to the Testimonial of Arturo Cortes Alvarado.
[242]   Exhibit 39 to the Testimonial of Arturo Cortes Alvarado.
[243]   Exhibit 36 to the Testimonial of Arturo Cortes Alvarado.
[244]   Exhibit 44 to the Testimonial of Arturo Cortes Alvarado.



ARBITRATION LCIA NO. 215145

| No | EMB | WINDOW START | WINDOW FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETANOR | ETRSTART | ETCD/END | TONNAGE | PORT OF DISCHARGE |
|----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 14 | 949 | apr-05-2018 | apr-20-2019 | 700493015 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN CALVUS 4v | Apr/03/2019 16:42 | Apr/04/2019 0:00 | Apr/09/2019 6:00 | 130,000 | TRMC |
| 15 | 950 | apr-05-2018 | apr-20-2019 | 700493015 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN CUMULUS 3v | Apr/06/2019 0:50 | Apr/10/2019 0:30 | Apr/13/2019 7:00 | 119,916 | TRMC |
| 16 | 951 | apr-05-2018 | apr-20-2019 | 700493015 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | MINERAL BELGIUM 4v | Apr/15/2019 19:50 | Apr/19/2019 1:30 | Apr/21/2019 5:00 | 84,730 | TRMC |
| 17 | 952 | apr-05-2018 | apr-20-2019 | 700493015 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH | Apr/19/2019 16:30 | Apr/23/2019 16:30 | Apr/25/2019 22:00 | 84,789 | TRMC |
| 18 | 1 | may-05-2019 | may-14-2019 | 700490290 | 7 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE | May/03/2019 0:06 | May/05/2019 0:00 | May/09/2019 12:00 | 71,500 | TPP |
| 19 | 953 | may-12-2019 | may-28-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GRIZZLY | May/14/2019 7:00 | May/14/2019 14:00 | May/16/2019 14:00 | 68,859 | TRMC |
| 20 | 954 | may-12-2019 | may-28-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH 2v | May/20/2019 11:06 | May/20/2019 19:00 | May/23/2019 23:00 | 112,132 | TRMC |
| 21 | 2 | may-15-2019 | may-24-2019 | 700490290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANNA MARIA | May/22/2019 3:00 | May/25/2019 8:30 | May/27/2019 21:00 | 68,470 | TPP |
| 22 | 955 | may-12-2019 | may-28-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GOLDEN SURABAYA | May/25/2019 3:00 | May/29/2019 9:00 | May/29/2019 3:00 | 113,600 | TRMC |
| 23 | 956 | may-29-2019 | jun-09-2019 | 700490290 | 5 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | W-ACE 3v | May/28/2019 23:00 | May/29/2019 13:00 | Jun/01/2019 1:00 | 71,649 | TRMC |
| 24 | 3 | may-25-2019 | jun-03-2019 | 700490290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | SATURI | May/31/2019 2:00 | May/31/2019 14:00 | Jun/04/2019 8:00 | 140,732 | TPP |
| 25 | 957 | may-29-2019 | jun-09-2019 | 700490290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GOLDEN CALVUS 5v | May/30/2019 11:00 | Jun/01/2019 11:00 | Jun/05/2019 5:00 | 142,900 | TRMC |
| 26 | 958 | may-12-2019 | may-28-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANANGEL ASTRONOMER 3v | May/26/2019 22:28 | Jun/05/2019 15:00 | Jun/09/2019 9:00 | 114,438 | TRMC |
| 27 | 959 | may-29-2019 | jun-09-2019 | 700490290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | SH LYNX | May/31/2019 16:00 | Jun/06/2019 19:00 | Jun/12/2019 7:00 | 69,190 | TRMC |
| 28 | 960 | jun-10-2019 | jun-14-2019 | 700490290 | 10 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | MINERAL BELGIUM 5v | Jun/13/2019 20:00 | Jun/12/2019 17:00 | Jun/15/2019 11:00 | 143,000 | TRMC |
| 29 | 4 | jun-16-2019 | jun-27-2019 | 700490290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GRIZZLY 2v | Jun/16/2019 8:30 | Jun/10/2019 14:00 | Jun/14/2019 13:00 | 67,300 | TPP |
| 30 | 961 | jun-15-2019 | jun-26-2019 | 700490290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH 3v | Jun/15/2019 8:00 | Jun/18/2019 19:00 | Jun/23/2019 13:00 | 110,000 | TRMC |
| 31 | 962 | jun-15-2019 | jun-26-2019 | 700490290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | NAVIOS ANTARES | Jun/20/2019 8:00 | Jun/23/2019 13:00 | Jun/27/2019 13:00 | 108,000 | TRMC |
| 32 | 963 | jun-15-2019 | jun-26-2019 | 700490290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE 3v | Jun/24/2019 8:00 | Jun/16/2019 20:00 | Jun/30/2019 15:00 | 76,000 | TRMC |
| | | | | | | JUNE 15, 2019 TO JULY 03, 2019 MAINTENANCE TO TRMC | | | | | | | | |
| 33 | 5 | jun-29-2019 | jul-08-2019 | 700490290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANNA MARIA 2v | Jun/15/2019 8:00 | Jun/29/2019 0:00 | Jul/01/2019 12:00 | 71,500 | TPP |

534.    On July 8, 2019, CFE issued Official Communications HECC3-0-0132/2019 and HECC3-0-0133/2019, including the vessel´s characteristics and stowage plan and the vessel´s unloading plan, respectively.[245]

535.    On July 17, 2019, CFE issued Official Communication HECC3-0-0145/2019, including the quality and weight certificates of the seized coal on the vessel ANNA MARIA (second voyage), and the port of departure (Ciénaga, Colombia).[246]

536.    According to the information included in the Statement of Facts, the vessel ANNA MARIA (second voyage) arrived at the Port of Lázaro Cárdenas on June 15, 2019, with 68,870 tons of coal.[247]

537.    Finally, the vessel ANNA MARIA (second voyage) berthed at the TPP Terminal on July 27, 2019, and unloading began on July 30, 2019 at 08h00.[248]

538.    From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

539.    On the other hand, the notification of the vessel's unloading plan, the vessel´s characteristics and stowage plan, the quality and weight certificates of the coal seized on the vessel ANNA MARIA (second voyage) and the port of departure, was served between July 8 and 17, 2019, while the vessel arrived at the port on June 15, 2019, thus failing to comply with the required 72-hour prior notice period.

---

245    Exhibit 45 to the Testimonial of Arturo Cortes Alvarado.
246    Exhibit 45 to the Testimonial of Arturo Cortes Alvarado.
247    Exhibit 46 to the Testimonial of Arturo Cortes Alvarado.
248    Exhibit 46 to the Testimonial of Arturo Cortes Alvarado.



GERALDINA CHÁVEZ LOZANO

CERTIFIED TRANSLATOR
P. 0193-2021

### (vii) CL TAIZHOU

540.    On June 28, 2019, CFE sent the *"CTPPEC Vessel Schedule updated as of June 28, 2019."*[249]

541.    The information contained in such schedule includes the type of coal and its ETA scheduled for July 8, 2019.

| No. | EMR | WINDOW START | WINDOW FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETB/START | ETC/END | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | 960 | nov-22-2019 | jan-03-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | SATORI | May/30/2019 20:30 | Jun/13/2019 0:00 | Jun/15/2019 12:00 | 140,730 | TRMC |
| 28 | 961 | jan-10-2019 | jan-14-2019 | 700499290 | 10 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | MINERAL BELGIUM Iv | Jun/14/2019 23:00 | Jun/16/2019 8:00 | Jun/20/2019 3:00 | 145,000 | TRMC |
| 29 | 962 | jan-13-2019 | jan-26-2019 | 700499290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | GOLDEN SAVANNAH Iv | Jun/13/2019 5:18 | Jun/25/2019 18:00 | Jun/28/2019 17:00 | 113,700 | TRMC |
| 30 | 963 | jan-15-2019 | jan-26-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE Iv | Jun/18/2019 19:20 | Jun/24/2019 22:00 | Jun/27/2019 3:00 | 76,253 | TRMC |
| 31 | 964 | jan-15-2019 | jan-26-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | NAVIOS ANTARES | Jun/23/2019 11:20 | Jun/27/2019 20:00 | Jul/01/2019 14:00 | 112,328 | TRMC |
| JULY 05, 2019 TO JULY 08, 2019 MAINTENANCE TO TRMC | | | | | | | | | | | | | | |
| 32 | 3 | jun-16-2019 | jun-27-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | GRIZZLY 2V | Jun/06/2019 15:48 | Jul/08/2019 8:00 | Jul/10/2019 12:00 | 68,007 | TPP |
| 33 | 363 | jul-04-2019 | jul-10-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | SHI LYNX 2V | Jul/03/2019 19:00 | Jul/09/2019 0:00 | Jul/11/2019 12:00 | 67,500 | TRMC |
| 33 | 4 | jun-20-2019 | jul-08-2019 | 700499290 | 6 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | ANNA MARIA 2V | Jun/16/2019 1:30 | Jul/10/2019 12:00 | Jul/13/2019 0:00 | 68,870 | TPP |
| 36 | 966 | jul-06-2019 | jul-16-2019 | 700499290 | 6 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | SBI REGGAE | Jul/10/2019 8:00 | Jul/11/2019 22:00 | Jul/14/2019 10:00 | 67,500 | TRMC |
| 34 | 5 | jun-29-2019 | jul-08-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANANGEL ASTRONOMER 3V | Jun/30/2019 18:00 | Jul/13/2019 0:00 | Jul/16/2019 18:00 | 88,000 | TPP |
| 38 | 966 | jul-11-2019 | jul-17-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | MINERAL BELGIUM 4V | Jul/13/2019 8:00 | Jul/14/2019 20:00 | Jul/18/2019 14:00 | 107,019 | TRMC |
| 37 | 6 | jul-06-2019 | jul-18-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | CL TAIZHOU | Jul/08/2019 8:00 | Jul/16/2019 18:00 | Jul/19/2019 6:00 | 67,500 | TPP |

542.    On July 18, 2019, CFE issued Official Communication HECC3-0-0146/2019, including the quality and weight certificates of the coal seized on the vessel CL TAIZHOU, and the port of departure (Ciénaga, Colombia).[250]

543.    On July 31, 2019, CFE issued Official Communications HECC3-0-0159/2019 and HECC3-0-0160/2019, including the vessel's stowage plan and characteristics and the vessel's unloading plan, respectively.[251]

544.    According to the information in the Statement of Facts, the vessel CL TAIZHOU arrived at the Port of Lázaro Cárdenas on July 13, 2019, with 69,308 tons of coal.[252]

545.    Finally, the vessel CL TAIZHOU berthed at TPP Terminal on August 3, 2019, and unloading started on August 14, 2019, at 00h00.[253]

546.    From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

---

[249]    Exhibit 51 to the Testimonial of Arturo Cortes Alvarado.
[250]    Exhibit 52 to the Testimonial of Arturo Cortes Alvarado.
[251]    Exhibit 52 to the Testimonial of Arturo Cortes Alvarado.
[252]    Exhibit 53 to the Testimonial of Arturo Cortes Alvarado.
[253]    Exhibit 53 to the Testimonial of Arturo Cortes Alvarado.



AUTHORIZED BY THE MEXICAN
GERALDINA
CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021
FEDERAL JUDICIARY

547.   On the other hand, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, the quality and weight certificates of the coal seized on the vessel CL TAIZHOU and the port of departure, was served between July 18 and 31, 2019, while the vessel arrived at the port on July 13, 2019, thus failing to comply with the required 72-hour prior notice period.

### (viii) NAVIOS ANTARES

548.   On June 28, 2019, CFE sent the "*CTPPEC Vessel Schedule updated as of June 28, 2019.*"[254]

549.   The information contained in such schedule includes the type of coal and its ETA scheduled for July 27, 2019.

| No. | EMB | WINDOW START | FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETB/START | ETC/END | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | 960 | may-25-2019 | jun-23-2019 | 700492290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | SATORI | May/30/2019 20:30 | Jun/12/2019 0:00 | Jun/15/2019 12:00 | 140,750 | TRMC |
| 28 | 961 | jun-10-2019 | jun-16-2019 | 700492290 | 10 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | MINERAL BELGIUM Iv | Jun/14/2019 23:00 | Jun/16/2019 8:00 | Jun/20/2019 3:00 | 143,000 | TRMC |
| 29 | 962 | jun-15-2019 | jun-26-2019 | 700492290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN SAVANNAH Iv | Jun/13/2019 5:10 | Jun/20/2019 18:00 | Jun/23/2019 17:00 | 115,700 | TRMC |
| 30 | 963 | jun-15-2019 | jun-26-2019 | 700492290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE Iv | Jun/18/2019 19:30 | Jun/24/2019 22:00 | Jun/27/2019 3:00 | 76,253 | TRMC |
| 31 | 964 | jun-15-2019 | jun-26-2019 | 700492290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | NAVIOS ANTARES | Jun/23/2019 11:20 | Jun/27/2019 20:00 | Jul/01/2019 14:00 | 112,328 | TRMC |
| JULY 01, 2019, TO JULY 08, 2019, MAINTENANCE TO TRMC | | | | | | | | | | | | | | |
| 32 | 3 | jun-18-2019 | jun-27-2019 | 700498290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | GRIZZLY IV | Jun/04/2019 15:48 | Jul/08/2019 0:00 | Jul/10/2019 12:00 | 68,007 | TPP |
| 33 | 965 | jul-04-2019 | jul-16-2019 | 700498290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | SM LYNX IV | Jul/03/2019 19:00 | Jul/08/2019 9:00 | Jul/11/2019 12:00 | 67,500 | TRMC |
| 33 | 4 | jun-29-2019 | jul-06-2019 | 700498290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANNA MARIA 2V | Jun/16/2019 1:30 | Jul/10/2019 12:00 | Jul/13/2019 0:00 | 68,870 | TPP |
| 36 | 966 | jul-06-2019 | jul-16-2019 | 700498290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | SBI RIGGIAE | Jul/10/2019 6:00 | Jul/11/2019 22:00 | Jul/14/2019 19:00 | 67,500 | TRMC |
| 34 | 5 | jun-29-2019 | jul-06-2019 | 700498290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANANGEL ASTRONOMER IV | Jun/30/2019 18:00 | Jul/13/2019 0:00 | Jul/16/2019 18:00 | 88,000 | TPP |
| 36 | 966 | jul-11-2019 | jul-17-2019 | 700498290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | MINERAL BELGIUM 6V | Jul/12/2019 8:00 | Jul/14/2019 20:00 | Jul/18/2019 14:00 | 107,019 | TRMC |
| 37 | 6 | jul-09-2019 | jul-16-2019 | 700498290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | CL TAIZHOU | Jul/08/2019 8:00 | Jul/16/2019 18:00 | Jul/19/2019 6:00 | 67,500 | TPP |
| 38 | 967 | jul-18-2019 | jul-24-2019 | 700498290 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ACE 4V | Jul/16/2019 8:00 | Jul/19/2019 0:00 | Jul/21/2019 12:00 | 73,500 | TRMC |
| | | jul-18-2019 | jul-24-2019 | 700498290 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | HARVEST RAIN | Jul/12/2019 8:00 | Jul/21/2019 22:00 | Jul/24/2019 10:00 | 85,000 | TRMC |
| 40 | 7 | jul-30-2019 | aug-08-2019 | 700498290 | 2 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | NAVIOS ANTARES 2V | Jul/27/2019 8:00 | Jul/27/2019 14:00 | Jul/31/2019 8:00 | 88,000 | TPP |

550.   On July 29, 2019, CFE issued Official Communications HECC3-0-0157/2019 and HECC3-0-0158/2019, including the vessel's stowage plan and characteristics and the vessel's unloading plan, respectively.[255]

551.   On July 31, 2019, CFE issued Official Communication HECC3-0-0153/2019, including the quality and weight certificates of coal shipped on the vessel NAVIOS ANTARES, and the port of departure (Ciénaga, Colombia).[256]

552.   According to the information included in the Statement of Facts, the vessel NAVIOS ANTARES arrived at the Port of Lázaro Cárdenas on July 30, 2019, with 108,017 tons of coal.[257]

---

254   Exhibit 59 to the Testimonial of Arturo Cortes Alvarado.
255   Exhibit 61 to the Testimonial of Arturo Cortes Alvarado.
256   Exhibit 61 to the Testimonial of Arturo Cortes Alvarado.
257   Exhibit 61 to the Testimonial of Arturo Cortes Alvarado.



553. Finally, the vessel NAVIOS ANTARES berthed at the TPP Terminal on August 30, 2019, and unloading began on September 1, 2019, at 15h00.[258]

554. From the analysis of requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

555. On the other hand, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, the quality and weight certificates of the coal seized on the vessel CL NAVIOS ANTARES and the port of departure, was served between July 29 and 31, 2019, while the vessel arrived at the port on July 30, 2019, thus failing to comply with the required 72-hour prior notice period.

### (ix) HARROW

556. On July 8, 2019, CFE sent the "*CTPPEC Vessel Schedule updated as of July 8, 2019.*"[259]

557. The information contained in such schedule includes the type of coal and its ETA scheduled for July 30, 2019.

| No. | EMB | WINDOW START | WINDOW FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETB/START | ETCD/END | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | 963 | jul-06-2019 | jul-10-2019 | 700492790 | 4 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | SSI LYNX 2v | Jul/04/2019 11:12 | Jul/09/2019 0:00 | Jul/11/2019 12:00 | 68,800 | TRMC |
| 33 | 964 | jul-04-2019 | jul-16-2019 | 700492790 | 4 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | SSI REGGAE | Jul/08/2019 5:45 | Jul/11/2019 22:00 | Jul/14/2019 10:00 | 58,000 | TRMC |
| 34 | 3 | jun-15-2019 | jun-27-2019 | 700492790 | 12 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GRIZZLY 5v | Jun/04/2019 15:48 | Jul/14/2019 0:00 | Jul/17/2019 12:00 | 64,007 | TPP |
| 35 | 967 | jul-11-2019 | jul-17-2019 | 700492790 | 3 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | MINERAL BELGIUM 6v | Jul/15/2019 14:00 | Jul/15/2019 20:00 | Jul/19/2019 14:00 | 157,019 | TRMC |
| 36 | 4 | jun-29-2019 | jul-08-2019 | 700492790 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANNA MARIA 2v | Jun/16/2019 1:30 | Jul/17/2019 12:00 | Jul/21/2019 0:00 | 68,570 | TPP |
| 37 | 968 | jul-18-2019 | jul-24-2019 | 700492790 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | HARVEST RAIN | Jun/13/2019 6:00 | Jul/18/2019 12:00 | Jul/21/2019 6:00 | 87,309 | TRMC |
| 38 | 5 | jun-29-2019 | jul-08-2019 | 700492790 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | ANANGEL ASTRONOMER 3v | Jun/10/2019 16:35 | Jul/21/2019 0:00 | Jul/24/2019 18:00 | 85,000 | TPP |
| 39 | 969 | jul-18-2019 | jul-24-2019 | 700492790 | 5 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | W-ACE 4v | Jul/18/2019 9:00 | Jul/22/2019 22:00 | Jul/26/2019 10:00 | 73,300 | TRMC |
| 40 | 6 | jul-09-2019 | jul-18-2019 | 700492790 | 12 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | CL TAIZHOU | Jun/15/2019 10:00 | Jul/24/2019 11:00 | Jul/28/2019 6:00 | 69,308 | TPP |
| 41 | 970 | jul-25-2019 | jul-31-2019 | 700492790 | 6 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GOLDEN CALVUS 6v | Jul/26/2019 8:00 | Jul/26/2019 14:00 | Jul/30/2019 8:00 | 143,002 | TRMC |
| 42 | 7 | jul-30-2019 | aug-08-2019 | 700492790 | 2 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | NAVIOS ANTARES 2v | Jul/24/2019 8:00 | Jul/28/2019 6:00 | Aug/01/2019 0:00 | 85,000 | TPP |
| 43 | 8 | jul-30-2019 | aug-08-2019 | 700492790 | 2 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | HARROW | Jul/30/2019 8:00 | Aug/01/2019 0:00 | Aug/05/2019 12:00 | 86,000 | TPP |

558. The vessel HARROW arrived at the Port Lázaro Cárdenas on August 2, 2019, and remained anchored due to the occupation of the dock by other vessels. Thus, the Parties agreed to divert the vessel HARROW to the TMRC, where it berthed on September 17, 2019, starting its unloading on the same day.

---

258 Exhibit 53 to the Testimonial of Arturo Cortes Alvarado.
259 D-CFE-16



559. On September 17, 2019, CFE issued Official Communication HECC3-0-0200/2019 and HECC3-0-0202/2019, including the vessel's characteristics and stowage plan and the vessel's unloading plan, respectively.[260]

560. From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the quality and weight certificates of the coal shipped, the port of departure, and the copy of the general diagram of the ship, including the holds, containing its configurations and dimensions.

561. Moreover, the notification of the vessel's unloading plan and the vessel's characteristics and stowage plan was served on September 17, 2019, while the vessel arrived at the port on August 2, 2019, thus failing to comply with the required 72-hour prior notice period.

   (x)  HARVEST RAIN

562. On August 26, 2019, CFE sent the "*CTPPEC Vessel Schedule updated as of August 26, 2019.*"[261]

563. The information contained in that schedule includes the type of coal and ETA scheduled for September 17, 2019.

564. On September 18, 2019, CFE issued Official Communications HECC3-0-0209/2019 and HECC3-0-0-0210/2019, including the vessel's characteristics and stowage plan and vessel's unloading plan, respectively.[262]

565. On the same date, CFE issued Official Communication HECC3-0-0206/2019, including the quality and weight certificates of the coal shipped on the vessel HARVEST RAIN, and the port of departure (Ciénaga, Colombia).[263]

566. According to the information included in the Statement of Facts, the vessel HARVEST RAIN arrived at the Port of Lázaro Cárdenas on September 18, 2019, with 90,055 tons of coal.[264]

---

[260]   D-CFE-55 and D-CFE-56.
[261]   D-CFE-16. The Exhibit includes only the email, without the file with the breakdown of the ETAs.
[262]   Exhibits 18 and 19 of the Testimony of Genaro Cuevas García.
[263]   Exhibits 20 and 20.1 of the Testimony of Genaro Cuevas García.
[264]   Exhibit 22 of the Testimony of Genaro Cuevas García.



567.  From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

568.  On the other hand, the notification of the vessel's unloading plan and the vessel's characteristics and stowage plan was served on September 18, 2019, while the vessel arrived at the port on the same day, thus failing to comply with the required 72-hour prior notice period.

### (xi) W-ARCTURUS

569.  On August 26, 2019, CFE sent the *"CTPPEC Vessel Schedule updated as of August 26, 2019."*[265]

570.  The information contained in such schedule includes the type of coal and its ETA expected by August 31, 2019.

571.  On September 12, 2019, CFE issued Official Communications HECC3-0-0197/2019, HECC3-0-0198/2019 and HECC3-0-0199/2019, including the vessel's characteristics and stowage plan, the vessel's unloading plan, quality and weight certificates of coal seized on vessel W-ARTICUS, and port of departure (Ciénaga, Colombia) respectively.[266]

572.  According to the information included in the Statement of Facts, the vessel W-ARTICUS arrived at the Port of Lázaro Cárdenas on August 31, 2019, with 71,750 tons of coal.[267]

573.  Finally, the vessel W-ARTICUS berthed at the TPP Terminal on September 14, 2019, and unloading began on September 17, 2019 at 00h00.[268]

574.  From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

575.  On the other hand, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, and the quality and weight certificates of the coal seized on the vessel W-ARTICUS and the port of departure, was served on September 12, 2019, while the vessel

---

[265]  D-CFE-16 and D-CFE-56. The Exhibit only includes the email, without the file with the breakdown of the ETAs.
[266]  Exhibits 11, 12, 13, and 13.1 of the Testimony of Genaro Cuevas García, respectively.
[267]  Exhibit 10 of the Testimony of Genaro Cuevas García.
[268]  Exhibit 10 of the Testimony of Genaro Cuevas García.



116

ARBITRATION LCIA NO. 215145

arrived at the port on August 31, 2019, thus failing to comply with the required 72-hour prior
notice period.

### (xii) HARVEST RAIN (second voyage)

576.    On August 26, 2019, CFE sent the *"CTPPEC Vessel Schedule updated as of August 26, 2019."*[269]

577.    The information contained in such program includes the type of coal and its ETA scheduled for
September 17, 2019.

| No. | EMB | WINDOW START | FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETB/START | ETCD/END | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | JULY 02, 2019 TO JULY 08, 2019 MAINTENANCE TO TRMC | | | | | | | |
| 38 | 958 | jul-18-2019 | jul-24-2019 | 5 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | WACIL 4v | Jul/24/2019 12:30 | Jul/24/2019 19:00 | Jul/26/2019 22:00 | 76,728 | TRMC |
| 39 | 5 | jun-29-2019 | jul-06-2019 | 8 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | ANNA MARIA 3v | Jun/16/2019 1:00 | Jul/30/2019 8:00 | Aug/03/2019 11:00 | 68,876 | TPP |
| 40 | 970 | jul-25-2019 | jul-31-2019 | 6 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | GOLDEN CALVUS 4v | Jul/29/2019 8:00 | Jul/29/2019 13:00 | Aug/02/2019 1:00 | 138,308 | TRMC |
| 41 | 6 | jul-09-2019 | jul-16-2019 | | | GLENCORE INTERNATIONAL | TYPE 3 | COLOMBIA | CL TAIZHOU | Jul/15/2019 15:45 | Aug/14/2019 0:00 | Aug/17/2019 12:00 | 69,308 | TPP |
| 42 | 7 | jul-30-2019 | aug-06-2019 | 3 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | NAVIOS ANTARES 3v | Jul/30/2019 7:10 | Aug/19/2019 22:00 | Sep/03/2019 16:00 | 138,017 | TPP |
| 43 | 971 | aug-08-2019 | aug-14-2019 | 7 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | SATORI 2V | Aug/03/2019 11:30 | Aug/05/2019 13:00 | Aug/11/2019 14:00 | 141,221 | TRMC |
| 44 | 972 | aug-01-2019 | aug-07-2019 | 4 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | SRI REGGAE 2v | Aug/07/2019 22:50 | Aug/13/2019 22:30 | Aug/15/2019 19:00 | 70,300 | TRMC |
| 46 | 973 | aug-01-2019 | aug-07-2019 | 9 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | GRIZZLY 3v | Aug/03/2019 19:40 | Aug/19/2019 22:30 | Aug/19/2019 3:00 | 70,525 | TRMC |
| 47 | 974 | aug-30-2019 | sep-05-2019 | 2 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | HARVEST RAIN 2v | Aug/13/2019 22:56 | Aug/21/2019 14:20 | Aug/24/2019 3:00 | 89,653 | TRMC |
| 49 | 976 | aug-29-2019 | sep-04-2019 | 5 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | ANNA MARIA 3v | Aug/30/2019 20:00 | Aug/31/2019 22:00 | Sep/03/2019 10:00 | 70,723 | TRMC |
| 50 | 977 | sep-05-2019 | sep-11-2019 | 4 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | GOLDEN CIRRUS | Aug/27/2019 8:00 | Sep/06/2019 11:30 | Sep/08/2019 21:00 | 138,084 | TRMC |
| 53 | 979 | sep-12-2019 | sep-19-2019 | 6 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | CL TAIZHOU 3v | Sep/09/2019 20:00 | Sep/16/2019 19:00 | Sep/13/2019 0:00 | 70,933 | TRMC |
| 55 | 11 | sep-17-2019 | sep-26-2019 | 3 | | GLENCORE INTERNATIONAL | TYPE 2 | | TBN | | | | 65,000 | TPP |
| 56 | 979 | sep-20-2019 | sep-26-2019 | 5 | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | HARVEST RAIN 3v | Sep/17/2019 8:00 | Sep/20/2019 8:00 | Sep/22/2019 20:00 | 88,000 | TPP |
| 57 | 960 | sep-30-2019 | sep-26-2019 | | | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | W-SMASH 3v | Sep/22/2019 22:00 | Sep/23/2019 14:00 | Sep/26/2019 2:00 | 73,000 | TRMC |
| 58 | 12 | sep-27-2019 | oct-06-2019 | 12 | | GLENCORE INTERNATIONAL | TYPE 3 | COLOMBIA | CL TAIZHOU 3v | Oct/07/2019 14:00 | Oct/17/2019 0:00 | Oct/19/2019 13:00 | 73,434 | TPP |

578.    On September 19, 2019, CFE issued Official Communications HECC3-0-0209/2019, HECC3-0-
0- 0210/2019 and HECC3-0-0206/2019, including the vessel's characteristics and stowage plan,
the vessel's unloading plan, the quality and weight certificates of the coal seized on the vessel
HARVEST RAIN (second voyage), and the port of departure (Ciénaga, Colombia),
respectively.[270]

579.    According to the information included in the Statement of Facts, the vessel W-ARTICUS arrived
at the Port of Lázaro Cárdenas on September 18, 2019, with 90,055 tons of coal.[271]

580.    Finally, the vessel HARVEST RAIN (second voyage) berthed at the TPP Terminal on September
26, 2019, and unloading commenced on September 27, 2019 at 00h00.[272]

---

[269] D-CFE-16 and Exhibit 31 of the Testimony of Genaro Cuevas García.

[270] Exhibits 18, 19, 20 and 20.1 of the Testimony of Genaro Cuevas García, respectively.

[271] Exhibit 22 of the Testimony of Genaro Cuevas García.

[272] Exhibit 22 of the Testimony of Genaro Cuevas García.

117



AUTHORIZED BY THE MEXICAN
GERALDINA
CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021
FEDERAL JUDICIARY

581. From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

582. On the other hand, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan and the quality and weight certificates of the coal seized on the vessel HARVEST RAIN (second voyage) and the port of departure, was served on September 19, 2019, while the vessel arrived at the port on September 18, 2019, thus failing to comply with the required 72-hour prior notice period.

(xiii) CL TAIZHOU (second voyage)

583. On October 3, 2019, CFE sent the "CTPPEC Vessel Schedule updated as of October 3, 2019."[273]

584. The information contained in that schedule includes the type of coal and ETA scheduled for October 1, 2019.

| No. | EMB | WINDOW START | FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETB/START | ETC/WEND | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | JULY 02, 2019 TO JULY 08, 2019 MAINTENANCE TO TRMC | | | | | | |
| 38 | 960 | jul-18-2019 | jul-24-2019 | 700499290 | 9 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | W.ACE 4v | Jul/24/2019 12:30 | Jul/24/2019 19:00 | Jul/26/2019 23:00 | 76,729 | TRMC |
| 39 | 5 | jun-29-2019 | jul-06-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | ANNA MARIA 3v | Jun/16/2019 1:30 | Jul/03/2019 8:00 | Aug/03/2019 11:00 | 68,870 | TPP |
| 40 | 970 | jul-25-2019 | jul-31-2019 | 700499290 | 6 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | GOLDEN CALVUS 4v | Jul/29/2019 8:00 | Jul/29/2019 19:00 | Aug/02/2019 1:00 | 138,958 | TRMC |
| 41 | 6 | jul-09-2019 | jul-18-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL | TYPE 3 | COLOMBIA | CL TAIZHOU | Jul/13/2019 13:45 | Aug/16/2019 0:00 | Aug/17/2019 12:00 | 69,308 | TPP |
| 42 | 7 | Jul-30-2019 | aug-06-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | NAVIOS ANTARES 2v | Jul/30/2019 7:30 | Aug/30/2019 22:00 | Sep/03/2019 19:00 | 108,017 | TPP |
| 43 | 971 | aug-08-2019 | aug-14-2019 | 700499290 | 7 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | SATORI 2V | Aug/07/2019 11:30 | Aug/07/2019 18:00 | Aug/11/2019 14:00 | 141,233 | TRMC |
| 44 | 972 | aug-01-2019 | aug-07-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | SBI BEOGAE 2v | Aug/07/2019 23:55 | Aug/13/2019 22:30 | Aug/17/2019 19:00 | 70,500 | TRMC |
| 45 | 973 | aug-01-2019 | aug-07-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | GRIZZLY 3v | Aug/07/2019 19:40 | Aug/16/2019 23:30 | Aug/19/2019 2:00 | 70,525 | TRMC |
| 47 | 974 | aug-30-2019 | aug-08-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | HARVEST RAIN 2v | Aug/12/2019 23:54 | Aug/21/2019 14:50 | Aug/24/2019 2:00 | 89,655 | TRMC |
| 49 | 976 | aug-29-2019 | sep-04-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | ANNA MARIA 3v | Aug/30/2019 20:00 | Aug/31/2019 22:00 | Sep/03/2019 13:00 | 70,733 | TRMC |
| 50 | 977 | sep-05-2019 | sep-11-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | GOLDEN CIRRUS | Aug/27/2019 8:00 | Sep/06/2019 11:30 | Sep/09/2019 21:00 | 118,086 | TRMC |
| 53 | 979 | sep-12-2019 | sep-19-2019 | 700499290 | 6 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | CL TAIZHOU 2v | Sep/09/2019 20:00 | Sep/16/2019 19:00 | Sep/13/2019 9:00 | 70,555 | TRMC |
| 55 | 11 | sep-17-2019 | sep-26-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL | TYPE 2 | | TBN | | | | 65,000 | TPP |
| 56 | 979 | sep-20-2019 | sep-26-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL | TYPE 2 | COLUMBIA | HARVEST RAIN 3v | Sep/17/2019 8:00 | Sep/29/2019 8:00 | Sep/22/2019 20:00 | 88,000 | TPP |
| 57 | 980 | sep-20-2019 | sep-26-2019 | 700499296 | 5 | GLENCORE INTERNATIONAL | TYPE 2 | COLOMBIA | W-SMASH 2v | Sep/22/2019 22:00 | Sep/23/2019 14:00 | Sep/26/2019 2:00 | 73,000 | TRMC |
| 58 | 12 | sep-27-2019 | oct-06-2019 | 700499290 | 13 | GLENCORE INTERNATIONAL | TYPE 3 | COLOMBIA | CL TAIZHOU 3v | Oct/01/2019 14:00 | Oct/17/2019 0:00 | Oct/19/2019 12:00 | 73,434 | TPP |

585. On October 4, 2019, CFE issued Official Communications HECC3-0-0220/2019 and HECC3-0-0-0221/2019, including the vessel's characteristics and stowage plan and vessel's unloading plan, respectively.[274]

---

[273] D-CFE-16 and Exhibit 31 of the Testimony of Genaro Cuevas García.

[274] Exhibits 26 and 27 of the Testimony of Genaro Cuevas García.



118

586. On October 9, 2019, CFE issued Official Communication HECC3-0-0228/2019, including the quality and weight certificates of coal loaded on the vessel CL TAIZHOU (second voyage), and the port of departure (Ciénaga, Colombia).[275]

587. According to the information included in the Statement of Facts, the vessel CL TAIZHOU (second voyage) arrived at the Port of Lázaro Cárdenas on October 2, 2019, with 73,434 tons of coal.[276]

588. Finally, the vessel CL TAIZHOU (second voyage) berthed at TPP Terminal on October 13, 2019, and unloading started on October 14, 2019 at 08h00.[277]

589. From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

590. On the other hand, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, the quality and weight certificates of the coal seized on the vessel CL TAIZHOU (second voyage) and the port of departure, was served between October 4 and 9, 2019, while the vessel arrived at the port on October 2, 2019, thus failing to comply with the required 72-hour prior notice period.

(xiv) MINERAL NINGBO

591. On October 3, 2019, CFE sent the "CTPPEC Vessel Schedule updated as of October 3, 2019."[278]

592. The information contained in such program includes the type of coal and ETA scheduled for October 27, 2019.

| No. | WINDOW START FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA-NOR | ETRSTART | ETCI/END | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SEPTEMBER 29, 2019 TO OCTOBER 05, 2019 MAINTENANCE TO TRMC | | | | | | | |
| 57 | oct-06-2019 oct-12-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | NAVIOS ANTARES 5V | Oct/02/2019 14:00 | Oct/06/2019 0:00 | Oct/09/2019 18:00 | 88,000 | TRMC |
| 58 | sep-27-2019 oct-06-2019 | 700499290 | 17 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | CL TAIZHOU 2v | Oct/01/2019 14:00 | Oct/13/2019 0:00 | Oct/15/2019 12:00 | 73,434 | TPP |
| 59 | oct-06-2019 oct-12-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | GRIZZLY 5V | Oct/11/2019 8:00 | [illegible] | Oct/13/2019 14:00 | 77,000 | TRMC |
| 60 | oct-13-2019 oct-19-2019 | 700499290 | 7 | GLENCORE INTERNATIONAL AG | TYPE 2 | RUSSIA | MINERAL BRUSSEL | [illegible] | Oct/13/2019 3:00 | Oct/16/2019 20:00 | [illegible] | TRMC |
| 61 | oct-20-2019 oct-26-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TYPE 1 | COLOMBIA | HARVEST RAIN 4V | Oct/24/2019 8:00 | Oct/20/2019 0:00 | Oct/23/2019 12:00 | 92,500 | TRMC |
| 62 | oct-21-2019 oct-30-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | RUSSIA | MINERAL NINGBO 5V | Oct/23/2019 8:00 | Oct/27/2019 14:00 | Oct/31/2019 [illegible] | 166,000 | TPP |

---

[275] Exhibits 28 and 28.1 of the Testimony of Genaro Cuevas García.
[276] Exhibit 30 of the Testimony of Genaro Cuevas García.
[277] Exhibit 30 of the Testimony of Genaro Cuevas García.
[278] Exhibit 40 of the Testimony of Genaro Cuevas García.



593.    On October 25, 2019, CFE issued Official Communications HECC3-0-0240/2019 and HECC3-0-0- 0241/2019, including the vessel's characteristics and stowage plan and vessel's unloading plan, respectively.[279]

594.    On the same day, CFE issued Official Communication HECC3-0-0235/2019, including the quality and weight certificates of the coal shipped on the vessel MINERAL NINGBO, and the port of departure (Vanino, Russia).[280]

595.    According to the information included in the Statement of Facts, the vessel MINERAL NINGBO arrived at the Port of Lázaro Cárdenas on October 21, 2019, with 135,845 tons of coal.[281]

596.    Finally, the vessel MINERAL NINGBO berthed at the TPP Terminal on October 31, 2019, and unloading began on November 1, 2019 at 00h00.[282]

597.    From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

598.    On the other hand, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, the quality and weight certificates of the coal seized on the vessel MINERAL NINGBO and the port of departure, was served on October 25, 2019, while the vessel arrived at the port on October 21, 2019, thus failing to comply with the required 72-hour prior notice period.

(xv)    NAVIOS ANTARES (second voyage)

599.    On October 22, 2019, CFE sent the "*CTPPEC Vessel Schedule updated as of October 22, 2019.*"[283]

600.    The information contained in that schedule includes the type of coal and ETA scheduled for November 2, 2019.

---

[279] Exhibits 34 and 35 of the Testimony of Genaro Cuevas García.
[280] Exhibits 36 and 36.1 of the Testimony of Genaro Cuevas García.
[281] Exhibit 39 of the Testimony of Genaro Cuevas García.
[282] Exhibit 39 of the Testimony of Genaro Cuevas García.
[283] Exhibit 49 of the Testimony of Genaro Cuevas García.



| No. | EMB | WINDOW START | FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETB/START | ETCD/END | TONNAGE | PORT OF DISCHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | SEPTEMBER 28, 2019 TO OCTOBER 05, 2019 MAINTENANCE TO TRMC | | | | | | | | | | | |
| 57 | 983 | oct-06-2019 | oct-12-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | NAVIOS ANTARES 3V | Oct/04/2019 8:30 | Oct/06/2019 0:00 | Oct/08/2019 11:00 | 77,007 | TRMC |
| 58 | 984 | oct-06-2019 | oct-12-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | GRIZZLY 5V | Oct/06/2019 23:30 | Oct/10/2019 11:00 | Oct/12/2019 20:00 | 72,143 | TRMC |
| 59 | 985 | oct-13-2019 | oct-19-2019 | 700499290 | 7 | GLENCORE INTERNATIONAL AG | TYPE 2 | RUSSIA | MINERAL BRUSSEL | Oct/10/2019 8:30 | Oct/13/2019 13:00 | Oct/20/2019 20:00 | 133,470 | TRMC |
| 60 | 10 | sep-27-2019 | oct-08-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | CL TAIZHOU 3V | Oct/03/2019 2:00 | Oct/14/2019 8:00 | Oct/19/2019 13:00 | 73,434 | TPP |
| 61 | 986 | oct-20-2019 | oct-26-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | HARVEST RADI 4V | Oct/26/2019 3:00 | Oct/26/2019 9:00 | Oct/28/2019 21:00 | 88,023 | TRMC |
| 62 | 987 | oct-27-2019 | nov-02-2019 | 700499290 | 6 | GLENCORE INTERNATIONAL AG | TYPE 2 | RUSSIA | [illegible] | Oct/26/2019 12:00 | Oct/29/2019 9:00 | Nov/02/2019 1:00 | 141,203 | TRMC |
| 63 | [illegible] M/ | nov-03-2019 | nov-09-2019 | 700499290 | 7 | GLENCORE INTERNATIONAL AG | TYPE 2 | RUSSIA | STAR AUDREY | [illegible] | [illegible] | [illegible] | 186,000 | TRMC |
| 64 | 11 | oct-31-2019 | nov-30-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | RUSSIA | MINERAL NINGBO 2V | Oct/31/2019 [illegible] | [illegible] | [illegible] | 136,000 | TPP |
| 65 | [illegible] M/ | nov-10-2019 | nov-16-2019 | 700499290 | 11 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | W-ARCTURUS 2V | Oct/24/2019 9:00 | Nov/15/2019 8:00 | Nov/17/2019 13:00 | 72,869 | TRMC |
| 66 | 12 | nov-03-2019 | nov-14-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TYPE 2 | COLOMBIA | NAVIOS ANTARES 4V | [illegible] | TBC | TBC | 104,175 | TPP |

601.    On November 4, 2019, CFE issued Official Communication HECC3-0-0248/2019, including the quality and weight certificates of coal shipped on the vessel NAVIOS ANTARES (second voyage), and the port of departure (Ciénaga, Colombia).[284]

602.    On November 6, 2019, CFE issued Official Communications HECC3-0-0250/2019 and HECC3-0-0- 0251/2019, including the vessel's characteristics and stowage plan and vessel's unloading plan, respectively.[285]

603.    According to the information included in the Statement of Facts, the vessel NAVIOS ANTARES (second voyage) arrived at the Port of Lázaro Cárdenas on November 5, 2019, with 104,175 tons of coal.[286]

604.    Finally, the vessel NAVIOS ANTARES (second voyage) berthed at the TPP Terminal on November 13, 2019, and unloading started on November 14, 2019 at 08h00.[287]

605.    From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

606.    On the other hand, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, the quality and weight certificates of the coal seized on the vessel CL NAVIOS ANTARES and the port of departure, was served between November 4 and 6, 2019, while the vessel arrived at the port on November 5, 2019, thus failing to comply with the required 72-hour prior notice period.

---

[284] Exhibits 45 and 45.1 of the Testimony of Genaro Cuevas García.
[285] Exhibits 43 and 44 of the Testimony of Genaro Cuevas García.
[286] Exhibit 48 of the Testimony of Genaro Cuevas García.
[287] Exhibit 48 of the Testimony of Genaro Cuevas García.



GERALDINA
CHÁVEZ LOZANO
CERTIFIED TRANSLATOR
P. 0193-2021

ARBITRATION LCIA NO. 215145

(xvi) LMZ FRANCISCO

607. On November 2, 2019, CFE sent the *"CTPPEC Vessel Schedule updated as of November 2, 2019."*[288]

608. The information contained in such program includes the type of coal and ETA scheduled for November 22, 2019.

| No. | ENE | WINDOW START FINISH | CONTRACT | ITEM | SUPPLIER | TYPE OF COAL | ORIGIN | VESSEL | ETA/NOR | ETMSTART | ETL/DEND | TONNAGE | PORT OF DISCHARGE | INSPECTION COMPANY | CUSTOMS AGENCY | SHIPPING AGENCY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | 961 | nov-04-2019 nov-12-2019 | 70049290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | NAVIOS ANTARES 3V | Oct/04/2019 8:10 | Oct/08/2019 0:00 | Oct/08/2019 11:00 | 75,000 | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 38 | 964 | oct-26-2019 nov-12-2019 | 70049290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | GRIZZLY 3V | Oct/26/2019 23:30 | Oct/30/2019 11:00 | Oct/31/2019 20:00 | 72,142 | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 39 | 943 | oct-17-2019 nov-19-2019 | 70049290 | 7 | GLENCORE INTERNATIONAL AG | TYPE 3 | RUSSIA | MINERAL BRUSSEL | Oct/10/2019 8:30 | Oct/15/2019 15:00 | [alegria] 20:00 | 153,670 | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 40 | 10 | sep-21-2019 oct-06-2019 | 70049290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | CL TACHKU 3V | Oct/02/2019 2:00 | Oct/4/2019 8:00 | Oct/19/2019 12:00 | 73,454 | TPP | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 41 | 984 | oct-22-2019 nov-26-2019 | 70049290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | HARVEST KAO 4V | Oct/23/2019 23:06 | Oct/26/2019 8:13:18 | Oct/26/2019 23:48 | 86,633 | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 42 | 957 | oct-21-2019 nov-02-2019 | 70049290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 3 | RUSSIA | [alegria] | Oct/24/2019 10:10 | Oct/29/2019 15:30 | Nov/02/2019 11:27 | 145,285 | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 43 | 11 | oct-31-2019 nov-31-2019 | 70049290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 4 | RUSSIA | MINERAL NINGBO 2V | Oct/31/2019 6:30 | [alegria] | [alegria] | [alegria] | TPP | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 44 | 958 | nov-05-2019 nov-09-2019 | 70049290 | 7 | GLENCORE INTERNATIONAL AG | TYPE 3 | RUSSIA | STAR AUDREY | [alegria] | [alegria] | [alegria] | [alegria] | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 45 | 989 | nov-18-2019 nov-16-2019 | 70049290 | 11 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | W-ARCTURUS 3V | [alegria] | [alegria] | Nov/13/2019 12:00 | [alegria] | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 46 | 12 | nov-05-2019 nov-14-2019 | 70049290 | 4 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | NAVIOS ANTARES 4V | [alegria] | [alegria] | [flegbo] | [alegria] | TPP | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 47 | 991 | nov-10-2019 nov-16-2019 | 70049290 | 11 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | CL TACHKU 4V | [alegria] | [flegbo] | [flegbo] | [flegbo] | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 48 | [alegria] | nov-17-2019 nov-12-2019 | 70049290 | 9 | GLENCORE INTERNATIONAL AG | TYPE 3 | RUSSIA | [alegria] | [flegbo] | [flegbo] | [alegria] | [alegria] | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 49 | 992 | nov-24-2019 nov-30-2019 | 70049290 | 3 | GLENCORE INTERNATIONAL AG | TYPE 3 | RUSSIA | [alegria] | [alegria] | [alegria] | [alegria] | [alegria] | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 70 | 963 | dic-01-2019 dic-08-2019 | 70049290 | 11 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | SATORI 3V | Dic/04/2019 8:00 | [alegria] | [alegria] | [flegbo] | TRMC | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |
| 71 | 13 | nov-29-2019 nov-29-2019 | 70049290 | 12 | GLENCORE INTERNATIONAL AG | TYPE 3 | COLOMBIA | LMZ FRANCISCO | Nov/22/2019 8:43 | TBD | | [alegria] | TPP | MARINE INSPECTIONS | GRUPO ALIANZA R. | MEXSHIPPING |



609. On November 20, 2019, CFE issued Official Communications HECC3-0-0264/2019 and HECC3-0-0- 0263/2019, including the vessel's characteristics and stowage plan and vessel's unloading plan, respectively.[289]

610. On November 22, 2019, CFE issued Official Communication HECC3-0-0265/2019, including the quality and weight certificates of coal shipped on the vessel LMZ FRANCISCO, and the port of departure (Ciénaga, Colombia).[290]

611. According to the information included in the Statement of Facts, the vessel LMZ FRANCISCO arrived at the Port of Lázaro Cárdenas on November 22, 2019, with 61,358 tons of coal.[291]

612. Finally, the vessel LMZ FRANCISCO berthed at the TPP Terminal on November 25, 2019, and unloading began the same day at 17h00.[292]

---

[288] Exhibit 57 of the Testimony of Genaro Cuevas García.
[289] Exhibits 52 and 53 of the Testimony of Genaro Cuevas García.
[290] Exhibits 54 and 54.1 of the Testimony of Genaro Cuevas García.
[291] Exhibit 56 of the Testimony of Genaro Cuevas García.
[292] Exhibit 56 of the Testimony of Genaro Cuevas García.



613.  From the analysis of the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, it is concluded that CFE's notifications complied with such requirements, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions.

614.  On the other hand, the notification of the vessel's unloading plan, the vessel's characteristics and stowage plan, the quality and weight certificates of the coal seized on the vessel LMZ FRANCISCO and the port of departure, was served between November 20 and 22, 2019, while the vessel arrived at the port on November 22, 2019, thus failing to comply with the required 72-hour prior notice period.

    (xvii) Conclusion regarding demurrage

615.  In conclusion, the Arbitral Tribunal considers that the Defendants have not complied with the 72-hour prior notice period provided in paragraph 15 of Exhibit 6, except with respect to the vessel ANNA MARIA, first voyage.

616.  Failure to comply with this notification deadline is not a minor non-compliance, since the required information is necessary to organize diligently the unloading of coal from the vessels.

617.  On the other hand, in no case, a copy of the general diagram of the vessel including the holds, containing its configurations and dimensions, was submitted according to paragraph A.14(i) of Exhibit 6. Likewise, regarding the vessel HARROW, there is no evidence that CFE notified the quality and weight certificates of the coal shipped and the port of departure, according to paragraph A.15(iv) of Exhibit 6. Notwithstanding, there is also no record that Greenfield complained about CFE's failure to comply with these requirements, on the contrary, Greenfield executed the Free For Discharge according to the *Statement of Facts* of each vessel and proceeded to unload the vessels.

618.  As it has been explained, the only vessel for which CFE complied with the 72-hour in advance notification period was the ANNA MARIA, the first voyage. As mentioned hereinabove, the vessel ANNA MARIA arrived at the Port of Lázaro Cárdenas on May 22, 2019, with 71,500 tons of coal,[293] was berthed at the TPP Terminal on the same day,[294] and began unloading also on May 22, 2019, at 8:30.

---

[293] Exhibit 15 to the Testimonial of Arturo Cortes Alvarado.
[294] Exhibit 15 to the Testimonial of Arturo Cortes Alvarado.



123

619. According to paragraph A.6 of Exhibit 6, the Laytime is computed from the Clearance to Unload, for which the following actions shall be performed:

    (i)    The vessel shall be berthed;

    (ii)    The vessel shall be in free pratique;

    (iii)    The initial draught should have been performed;

    (iv)    The inspection of the holds and cargo should have been carried out;

    (v)    The holds shall be open to verify the cargo; and

    (vi)    The receipt of the vessel executed by Greenfield, CFE, and the personnel in charge of the vessel.

620. Under the deadweight tonnage capacity of the vessel ANNA MARIA and the laytime set forth in paragraph A.5 of Exhibit 6 of the Contract, TPP had 60 hours to unload such vessel.

621. Unloading began on May 22, 2019 at 8:30 a.m. and ended on May 25, 2019 at 9:00 p.m., due to equipment failure or preventive maintenance shutdowns at the TPP Terminal for two hours and 45 minutes.[295]

622. Therefore, the total unloading time was 84 hours and 30 minutes, this is, 24 hours and 30 minutes of demurrage, which generated a total demurrage cost of USD 15,312. This cost was notified to Greenfield by CFE Generación IV on May 28, 2019.[296] It should be recalled that Greenfield did not allege CFE's failure to comply with the requirements set forth in paragraphs A.14 and A.15 of Exhibit 6, regarding the vessel ANNA MARIA before the arbitration.

623. CFE paid this amount to Glencore, as evidenced in the Detailed Delivery Record of de Thermal Mineral Coal dated May 27, 2021.[297]

    b.   *Rescheduling of delivery windows*

624. The Claimants allege that the Defendants failed to reschedule the coal delivery windows, despite their requests to do so.[298]

---

[295] Exhibit 15 to the Testimonial of Arturo Cortes Alvarado.
[296] Exhibit D-CFE-23.
[297] Exhibit D-CFE-117.
[298] Exhibit D-GF-81, Exhibit D-GF-82 and Exhibit D-GF-44.



625. As it has been explained, the Glencore Agreement was executed on April 25, 2019, this is, the same day that Greenfield ratified to CFE that it maintained the FOC for May 21, 2019.[299]

626. In the Glencore Agreement, several delivery windows were agreed from May to November 2019, indicating the tons of coal to be delivered and the terminal where the coal was to be unloaded.[300]

627. In accordance with the delivery windows convened in the Glencore Agreement, Glencore nominated the vessels to CFE[301], and then CFE notified Greenfield the nomination and arrival of the vessels, pursuant to paragraphs A.14 and A.15 of Exhibit 6 of the Contract.

628. Now, paragraph 3 of clause FOURTH of the Glencore Agreement provides the following:

*"This agreement may be amended due to the following reasons:*

- *Amendments to the amount, term or duration*
- *General economic circumstances*
- *Item cancellations*
- *Deferral of contractual obligations*
- *Extension of contractual obligations*
- *Suspension of contractual obligations*
- *Renewal of services during the term of the agreement*
- *Early termination and termination of the contract for reasons other than its performance*
- *Change of destination*
- *Modifications to the extension of alternative dispute resolution*
- *Inconsistencies*

*The supplier shall execute the amendment agreement between the sixth and tenth business day following the request by the Contract Administrator."* [302]

629. Therefore, an amendment agreement between CFE and Glencore is required to modify the Glencore Agreement, which means that CFE cannot unilaterally modify such agreement, since Glencore's consent. This was recognized by

---

[299] Exhibit D-CFE-12 and Exhibit D-CFE-13.
[300] Exhibit D-CFE-13,Exhibit 1.
[301] Exhibit D-CFE-109 and Exhibit D-CFE-114.
[302] Exhibit D-CFE-13.



Greenfield's experts at the Hearing, who stated that CFE had no discretion to unilaterally modify the Glencore Agreement.[303]

630. On the other hand, paragraph 2 of clause NINTH of the Glencore Agreement provides that: "[t]HE *CONTRACTING COMPANY* [i.e., CFE] *reserves the right to request THE SUPPLIER* [i.e., Glencore] *to deliver the contracted coal at an alternate dock at the Industrial Port Lázaro Cárdenas, Michoacán, with at least a 24 hours prior notice, considering the time required to obtain the corresponding authorizations, maintaining the unloading conditions established in the agreement or, if applicable, agreeing on particular conditions for unloading.*" [304]

631. In other words, CFE reserved the right to request Glencore to deliver the coal at an alternate dock, that is, the TPP Terminal or the TMRC, with at least a 24-hours prior notification to Glencore, "*maintaining the unloading conditions established in the agreement*"; notwithstanding, this shall not be deemed as an amendment to the Glencore Agreement. Therefore, the Arbitral Tribunal considers that CFE may exercise this right without the Glencore´s prior approval.

632. In this regard, the vessel GRIZZLY was the first vessel diverted from the TMRC to the TPP Terminal. In fact, vessel GRIZZLY was scheduled to unload at the TMRC, however, on May 27, 2019, despite knowing that the FOC was not achieved, CFE changed the original schedule to divert said vessel to the TPP Terminal to set off the excess of Type 2 coal at the TPP Terminal.[305] This resulted in a greater accumulation of coal at TPP Terminal.

633. Now, on June 4, 2019, Greenfield requested CFE to divert vessel SARTORI to TMRC on the basis that the safety conditions for unloading the vessel were not met, given that TPP Terminal would be operational on June 25, 2019.[306]

---

[303] Hearing Transcript, Day 4, p.92, l.3664-3665
[304] Exhibit D-CFE-13.
[305] CTPPEC vessel schedule updated as of May 27, 2019. In this regard, before transporting the coal from TPP Terminal to Central, the two types of coal to be unloaded, i.e. Type 2 and Type 3 coal, were to be blended according to CFE's requirements. The mix of the coal types had to be in a proportion of 80% Type 2 and 20% Type 3, as required by CFE.
[306] Exhibit D-GF-81.



634. On the same day, CFE requested Glencore to divert the vessel SARTORI and unload at TMRC[307], and, on the following day, June 5, 2019, CFE informed Greenfield that it would make the necessary arrangements to unload vessel Sartori at another terminal.[308]

635. On June 20, 2019, Greenfield notified CFE that the safety conditions at TPP Terminal did not allow unloading vessels, requesting the diversion of the scheduled vessels to an alternate port, given that TPP Terminal would be operational on July 8, 2019.[309]

636. On June 21, 2019, CFE informed Greenfield that it was not possible to divert vessels GRIZZLY and ANNA MARIA, second voyage, which were already at anchor, to an alternate port. CFE informed Greenfield that such vessels should remain at anchor until TPP Terminal would be able to begin unloading. [310]

637. On July 2, 2019, Greenfield again notified CFE that safety conditions did not permit vessel unloading and that TPP Terminal would be operational on July 10, 2019.[311]

638. In this regard, it should be noted that CFE Generación issued a technical opinion in order to support and ground in law and fact the amendment of the Glencore Agreement ("**Technical Opinion**"). From the Technical Opinion it appears that, on July 4, 2019, per official communication HECC0-O-0950/2019, CFE requested Glencore to reschedule certain delivery windows in the TMRC, because the stocks in the coal storage yards of the Central had reached the maximum capacity due to the low generation demand of the CENACE.[312] In this regard, the Technical Opinion states that the reasons that caused the Central low consumption were *"failures, generation dispatch by CENACE and the continuation of maintenance periods"*[313] and delays in the maintenance works of the U7 of the Central. [314]

639. As evidenced by Glencore's July 22, 2019, communication, in a meeting held on July 9, 2019, CFE requested Glencore to delay three contractual windows due to

---

[307] E-mail from CFE to Glencore, Exhibit D-CFE-120.
[308] Exhibit D-CFE-27.
[309] Exhibit D-GF-82.
[310] Exhibit D-CFE-33.
[311] Exhibit D-CFE-35.
[312] Exhibit D-TPP-63, page 5. The Parties did not submit Official Communication HECC0-O-0950/2019.
[313] Exhibit D-TPP-63, page 2.
[314] Exhibit D-TPP-63, page 3.



"*an excess of stock in its yards.*"[315] However, "*considering the existing logistical restrictions and limitations,*" Glencore only agreed to delay two of the three windows requested by CFE, maintaining the other contractual windows and deadlines under the Glencore Agreement. [316]

640. Thus, on August 8, 2019, CFE Generación and Glencore entered into an Amendment Agreement to the Glencore Agreement, by virtue of which two delivery windows that would be unloaded at the TMRC were rescheduled.[317]

641. On September 17, 2019, and considering the situation at the TPP Terminal, it was agreed to divert the vessel HARROW to the TMRC.

642. Based on the foregoing, the Arbitral Tribunal concludes that the diversion of vessels to the TMRC was at the Defendants' discretion and did not require Glencore's approval. Although two vessels were diverted from the TPP Terminal to the TMRC, such actions were insufficient as the accumulation of vessels at the TPP Terminal continued.

643. This conclusion is confirmed by the individual report of the Compliance Audit 2019-6-90UJB-19-0426-2020 of the Mexican Federal Audit Office (*Auditoria Superior de la Federación*) ("**Audit Report**"), which expressly concluded that "*the necessary measures to mitigate the accumulation of mineral coal were not taken, since the EPS had the possibility to request the mineral coal supplier to reschedule the vessels that had not yet been nominated for both terminals (TRMC and TPP), without consequences for that entity, and no other actions were taken to mitigate the problem.*" [318]

644. The Arbitral Tribunal cannot ignore the relevance of the Audit Report, since the Mexican Federal Audit Office is the specialized technical agency of the House of Representatives of the United Mexican States, vested with technical and management autonomy, in charge of auditing the use of federal public funds in Mexico.

645. Thus, the Arbitral Tribunal concludes that the Defendants contributed to the demurrage of the vessels by failing to adopt all the mitigation measures available to them, such as requesting the diversion of the vessels to the TMRC.

---

315  Exhibit 15 to the Testimonial of Arturo Cortes Alvarado.
316  Exhibit 15 to the Testimonial of Arturo Cortes Alvarado.
317  Exhibit D-CFE-216.
318  Exhibit D-GF-44, page 16.



c. *Coal purchase planning*

646.  The Claimants also attribute liability to the Defendants for vessel demurrage due to poor planning in the purchase of coal for 2019.

647.  The Claimants' position is confirmed by the same Audit Report, which expressly concludes that "[...] *for the integration of the PAC 2019, CFE generation IV did not consider the stock of goods in the warehouses.*" [319]

648.  The Audit Report also confirms, such as the Technical Report, that "*the stocks in the Central's storage yards reached maximum capacity due to the low coal consumption of the units, as a result of the generation dispatch by [CENACE], failures in one unit and the continuation of the maintenance periods of another unit*".[320]

649.  Specifically, as of the close of the month of July 2019, the Defendants received 1,987,529 tons of coal under the Glencore Agreement and, in addition, had a useful stock of coal in storage yards of 1,878,293 tons.[321]

650.  On the other hand, the Defendants did not consider the failures presented and the prolongation of the maintenance periods. U7 had a scheduled maintenance from March 29 to May 27, 2019[322]; however, on March 25, 2019, it presented a forced outage due to the rupture of pipes in the primary reheater of the steam generator, which remained out of service from March 25 to June 26, 2019, since the maintenance was extended for a longer period than estimated. For the second half of 2019, U7 was not scheduled for maintenance shutdown, however, there was in unplanned maintenance from November 6 to 21 and from December 6 to 15.[323]

651.  And, as stated in the previous section, the coal consumption of the Central was lower than forecast due to the lower generation dispatch by CENACE.[324]

---

[319]  Exhibit D-GF-44, page 7.
[320]  Exhibit D-GF-44, pages 10 and 11.
[321]  Exhibit D-GF-155.
[322]  Appendix JSII-AP-020 - CFE GII Maintenance.
[323]  Exhibit D-TPP-45, D-TPP-63, D-GF-65.
[324]  Exhibit D-GF-155.



652.    Due to the foregoing, the Audit Report instructed the initiation of an investigation for irregularities by Defendants' officers, who, in their management, did not plan, schedule or implement corrective actions to mitigate the impact of the accumulation of the vessels, and thus avoid or reduce the payment of demurrage, despite having knowledge of the decrease in coal consumption at the Central, the rescheduling and extension of the maintenance periods of the U7, and the accumulation of inventory due to the delay in achieving the FOC by Greenfield.[325]

653.    Therefore, the Arbitral Tribunal concludes that the Defendants contributed to the demurrage of the vessels due to poor planning in the purchase of coal, notwithstanding Greenfield's delay in achieving the FOC, and the constant erroneous indications as to when it would achieve the FOC, contributed to the Defendants' poor planning. In other words, the Arbitral Tribunal considers that both Parties (CFE and Greenfield) contributed to the deficient planning in the purchase of coal.

### 5.3.4.3   *Conclusion of the Arbitral Tribunal*

654.    In connection with the crossclaims regarding the vessel demurrage, the Arbitral Tribunal considers that, since the Defendants were the ones who executed the Operational Guarantee based on this, and in accordance with the general principle of law *onus probandi actori incumbit*, the Defendants shall prove that they were entitled to execute the guarantee to collect the claimed demurrage.

655.    As it has been explained, clause 10.2(B) of the Contract provides that for compensation to be due, the damages shall be attributable to the fault, willful misconduct, or negligence of Greenfield, *"to the extent that the Commission has not contributed thereto."*

656.    In this regard, and given the literal wording of clause 10.2(B), the Arbitral Tribunal concurs with Claimants' interpretation that the text quoted in the preceding paragraph operates as a release of liability in favor of Greenfield. In this regard, and notwithstanding the aforementioned literalness, the Arbitral Tribunal also considers that such release would have a limit in the event that the damage is caused by Greenfield's willful misconduct, since a party´s willful misconduct cannot exclude the liability of such party for the caused damages.

657.    In any case, the Arbitral Tribunal does not find any element that would allow it to conclude that Greenfield acted with willful misconduct in the exercise of its rights or in the performance of its

---

[325]    Exhibit D-GF-44, page 17.



obligations under the Contract. Therefore, if CFE contributed to the damage suffered, in this case, the vessels demurrage, the Contract requires that Greenfield is released from liability pursuant to clause 10.2(B).

658.   In this regard, the Arbitral Tribunal notes that the solution provided by the Contract may seem excessive, especially in a context where both Parties contributed to the demurrage of the vessels. However, as this is an arbitration at law, the Arbitral Tribunal cannot deviate from the terms of the Contract freely agreed between the Parties.

659.   In the previous sections, the Arbitral Tribunal concluded that the demurrage of the vessels was generated due to a shared liability between Greenfield and CFE.

660.   In the case of Greenfield, its liability derives from the delay in achieving the FOC on May 19, 2019, in addition with Greenfield's constant changes to the estimated FOC date, which made planning extremely difficult for CFE, thus, contributing to the demurrage of the vessels. In addition, Greenfield made a commitment to unload the vessels, without any reservations.

661.   On the other hand, the Defendants are also liable for the demurrage of the vessels as they failed to comply with the deadlines in 14 of the 15 terms of the notifications to be made to Greenfield as required by Exhibit 6 of the Contract, for not having exercised their right to request the diversion of the vessels to the TMRC, and for the deficient planning in the purchase of coal.

662.   Therefore, the Arbitral Tribunal concludes that both Parties were liable for the demurrage of the vessels, and, therefore, the Defendants should not have executed the Operational Guarantee, at least in its entirety.

663.   In fact, as stated in Section 5.3.4.1, the demurrage related to the vessel ANNA MARIA, first voyage, was mainly due to stoppages due to equipment failure or preventive maintenance at the TPP Terminal.[326] In turn, CFE complied with the required notifications, except for the copy of the general diagram of the vessel, including the holds, containing its configurations and dimensions, with respect to which there is no record that Greenfield has objected before the arbitration, nor that it has hindered or delayed the unloading of the vessel.

---

[326]   Exhibit 15 of the Testimony of Arturo Cortes Alvarado.



664.    Consequently, the Arbitral Tribunal will order the reimbursement of the amounts collected by CFE, except for the demurrage of the vessel ANNA MARIA, first voyage, with the corresponding interest, pursuant to clauses 10.2(B) and 4.8(b)(iii) of the Contract.

665.    In this regard, the demurrage corresponding to the vessel ANNA MARIA, first voyage, amounts to USD 15,312, for which Defendants shall reimburse Greenfield the amount of USD 6,896,021.11.

666.    Greenfield requests the application of interests for undue collection of the Operational Guarantee, between April 24, 2021, and September 25, 2023, which is of USD 537,350.15 (based on the whole Operating Guarantee, without considering the discount of the demurrage corresponding to the vessel ANNA MARIA, first voyage).[327]

667.    On the other hand, the Defendants, do make specific reference to Greenfield's claim regarding the interest derived from the collection of the Operational Guarantee, other than the generic request for the dismissal of all Greenfield's claims.

668.    In this regard, clause 4.8(b)(iii) of the Contract provides as follows:

> "In the event *that the Commission makes an undue collection of Operational Guarantee and collects any amount not due by the Provider from the Commission under this Agreement, the Commission shall return such amount to the Provider within 5 (five) Business Days following the Day on which it is determined by final judgment or arbitration award that the amount made effective was improperly collected, plus interest on such amount, from the Day on which it was improperly collected until the Day on which it is actually returned, at the Financial Expense Interest Rate."*

669.    In other words, the Defendants shall reimburse to Greenfield the amount corresponding to the undue execution of the Operational Guarantee, plus interest, within five days following the date of receipt of this Award.

670.    In addition, regarding the applicable interest rate, the Arbitral Tribunal agrees with Greenfield that the 6-month Libor rate in USD + 300 basis points dated April 22, 2021 should be applied; in other words, an annual interest rate of 3.21023% should be applied from April 24, 2021 to September 25, 2023. In this regard, the Arbitral Tribunal

---

[327]    See paragraph 205 of Greenfield's Brief of Conclusions.



note that, in its Brief of Conclusions, Greenfield limits its claim to the interests accrued for this concept corresponding to the indicated period.

671. Regarding the application of VAT, the Arbitral Tribunal considers that it is applicable for the reasons explained in paragraphs 349-352 of this Award.

### 5.4 *Regarding demurrage at the TPP Terminal for a period exceeding the free storage period, in the amount of USD 6,919,636, plus VAT and interest.*

672. Below, the Arbitral Tribunal will analyze the Claimants' claim regarding coal demurrage at the TPP Terminal for a period exceeding the free storage period, in the amount of USD 6,919,636, plus VAT and interest.

#### 5.4.1 Greenfield´s Position[328]

673. Greenfield alleges that, due to causes attributable to CFE, the coal was stored in the TPP Terminal yard for longer periods exceeding free storage, thus, generating a liquidated damages payable by CFE based on the provisions of Exhibit 2 of the Contract.

674. According to Greenfield, the Defendants owe USD 6,919,636, as shown in the TPP Expert Report for the payment of coal demurrage for more than 90 days at the TPP Terminal.

675. Greenfield claims that, due to the lack of planning and scheduling in the purchase and consumption of coal, which was CFE's responsibility, the TPP Terminal's yards were saturated, exceeding the free storage period, all of which was confirmed by the Audit Report.

#### 5.4.2 Position of TPP and TMC[329]

676. TPP and TMC allege that, throughout the construction and congestion period of the Transportation and Storage System, CFE had full knowledge that it would be unlikely that the FOC occurred on the date initially contemplated.

---

[328] Section IV.C of the Reply Brief and Section IV. of the Brief on Conclusions.
[329] Section III.6.3 and IV.4 of the Statement of Case, Section III.3 of the Reply Brief and Section III. of the Brief of Conclusions.



677.   TPP and TMC claim that CFE knew, or should have known, that the shipment of vessels to the TPP Terminal before the FOC would imply significant complications and risks in the provision of services; however, even knowing that it would be extremely complicated to proceed with the unloading and transportation under the conditions of the Project, CFE adopted an unconcerned position, maintaining the originally projected shipment schedule.

678.   TPP and TMC claim that, since the CFE refused to reschedule or divert the vessels, the only conduct that could have reduced to some extent some of the negative effects of the accumulation of an excessive volume of coal at the TPP Terminal would have been CFE's constant demand of a sufficient amount of coal to relieve the congestion that existed at that time. However, according to TPP and TMC, CFE did not demand coal to the Central until August 2019. Before the FOC, CFE only demanded a volume of approximately 42,156 tons, therefore, by August 16, 2019, the volume of coal stored at the TPP Terminal exceeded the contracted capacity of 300,000 tons.

679.   Likewise, TPP and TMC point out that during November 2019, the U7 of the Central was under maintenance, so the coal demand by CFE was drastically reduced, which implied that the excessive accumulation of coal continued. In addition to the foregoing, TPP and TMC allege that there were weeks during which CFE specifically instructed TPP to refrain from sending coal to the Central, since it would be Carbonser who would supply 100% of the coal required during such period. In this regard, according to TPP and TMC, the CFE unreasonable behavior in connection with the shipment of vessels to the TPP Terminal and the demand of coal to the Central caused the saturation of coal at the TPP Terminal for a long period of time.

### 5.4.3   Defendants' Position[330]

680.   The Defendants claim that the payment for coal demurrage in the TPP Terminal's yards is incorrect, since this occurred due to causes attributable to the Claimants, such as the delay of 87 days to achieve the FOC, deficiencies in the vessels unloading and in the handling of the coal, and the saturation of the TPP Terminal for several months as a consequence of the unavailability of the Transportation and Storage System.

---

[330]   Section III.R and IV.B of the Statement of Reply, Section V of the Rejoinder Statement and Section III. of the Conclusions Brief.

681. Also, CFE alleges that, during mid-June, July and mid-August 2019, the coal consumed by U7 was supplied by TRCM given the unavailability of the Transportation and Storage System by the Claimants, which only achieved the FOC on August 16, 2019. This explains, according to CFE, the reason why coal stocks were caused for periods longer than 90 days at the TPP Terminal, which implied that tons of coal remained immobile in the TPP Terminal yard due to causes attributable to the Claimants and not to CFE.

**5.4.4    Analysis of the Arbitral Tribunal**

682. The Arbitral Tribunal considers that there are sufficient elements to determine that there was a shared responsibility between the Parties in the generation of the coal demurrage at the TPP Terminal.

683. Exhibit 2 of the Contract and its correlative Exhibit 7 of the O&M Contract, in its relevant part, establish liquidated damages for coal demurrage at the TPP Terminal for a period longer than the free storage period:

*VARIABLE DEMURRAGE CHARGE PHASE I*

*90 free Days will be granted and without storage charge. After 90 days, a daily charge of USD$0.05 (five cents of the United States of America) per metric ton will be applied for the following 30 days; this is, up to a maximum of 120 days. Such rate that will be increased every 30 days in the same amount, this is, from 121 to 150 days a rate of USD$0.10 (ten cents of the United States of America) will be charged, and so on.*

*The referred Variable Demurrage Charge shall not be applicable if the demurrage is produced as a consequence of a default in the provision of the Port Services derived from failures in the Transportation and Storage System attributable to the fault or willful misconduct of the Supplier, provided that the Commission has not contributed to it.*

684. In other words, once the coal is unloaded at the TPP Terminal, it has a 90-day free storage period, so that if the coal remains in storage for more than 90 days, a daily charge is applied as of the 91st day, in accordance with the terms of Exhibit 2 of the Contract.

685. Coal from nine vessels unloaded at the TPP Terminal remained at the terminal for a period longer than the free storage period, according to the following breakdown provided by the Claimants' experts:[331]

---

[331] Exhibit D-TPP-45



135

ARBITRATION LCIA NO. 215145

| Vessel | Received | | Date on which the unload concluded | Date on which the storage concluded | Days of coal storage in TPP and TMC yards | Liquidated damages for demurrage calculated by J.S. Held |
|---|---|---|---|---|---|---|
| | Type 2 Carbon in tm | Type 3 carbon in tm | | | | |
| W-Ace | 71,500 | | 05.09.19 | 06.02.20 | 390 | 3,521,239 USD |
| Anna Maria | 68,470 | | 05.25.19 | 09.04.19 | 102 | 18,132 USD |
| Grizzly 2V | | 68,007 | 07.17.19 | 06.03.20 | 322 | 1,278,189 USD |
| Anna Maria 2V | 68,870 | | 08.03.19 | 10.12.19 | 70 | - USD |
| Assangel Astronomer 3V | 88,000 | | 07.27.19 | 09.21.19 | 56 | - USD |
| CL Taizhou | | 69,308 | 08.17.19 | 12.29.19 | 134 | 21,330 USD |
| Navios Antares 2V | 108,017 | | 09.07.19 | 11.02.19 | 56 | - USD |
| W-Arcturus | 71,750 | | 09.20.19 | 12.17.19 | 88 | - USD |
| Harvest Rain 3V | 90,055 | | 10.02.19 | 05.22.20 | 233 | 583,990 USD |
| CL Taizhou 3V | | 73,434 | 10.19.19 | 05.21.20 | 215 | 315,725 USD |
| Mineral Ningbo 2V | 135,845 | | 11.07.19 | 03.12.20 | 126 | 86,428 USD |
| Navios Antares 4V | 104,175 | | 11.18.19 | 04.25.20 | 159 | 340,092 USD |
| LMZ Francisco | | 61,358 | 11.28.19 | 06.17.20 | 202 | 754,519 USD |
| Subtotal | 806,682 | 272,107 | | | | 6,919,636 USD |
| Total | | 1,078,789 | | | | |

686.   The Arbitral Tribunal concurs with the Claimants that the traceability of the coal to determine the storage period at the TPP Terminal is demonstrated by the monthly operation and maintenance reports issued by TMC, pursuant to the O&M Contract ("**Monthly Reports**").[332]

687.   These Monthly Reports indicate the amount of coal that was unloaded at the TPP Terminal, as well as the amount of coal that was shipped every day from the TPP Terminal to the Central, allowing to know the time the coal was stored at the TPP Terminal. In this way, it is possible to trace the coal, being able to establish the time the coal remained at the TPP Terminal.

688.   Below, the Arbitral Tribunal will analyze the causes that demonstrate, in its opinion, that both CFE and Greenfield are responsible for exceeding the free coal storage period at the TPP Terminal.

### 5.4.4.1   *Defendants' role in coal demurrage at the TPP Terminal*

689.   The Arbitral Tribunal considers that CFE's deficient planning in the purchase of coal for 2019 contributed to the coal demurrage at the TPP Terminal. In fact,

---

[332] Exhibit D-TPP-45



and as it has been explained in Section 5.3.4.2(c), CFE bought coal in excess, without considering failures, interruptions, maintenance of U7 and the lower demand of the CENACE.[333]

690. In fact, and it has been explained, the Audit Report concluded that, in the purchase of coal for 2019, the Defendants did not consider the coal stock in the storage yards of the Central and that the necessary actions were not taken to mitigate the accumulation of coal in the TPP Terminal.[334]

691. Furthermore, the Audit Report stated that, when making the Glencore Amendment Agreement, the Defendants considered fundamentally rescheduling delivery windows of the TMRC, without taking measures to mitigate the accumulation of coal in the TPP Terminal; this, in addition to the fact that the Defendants had the possibility to request Glencore to reschedule the vessels that had not yet been nominated to the TPP Terminal[335] , thus, contributing to the coal remaining for a period longer than the free storage period in the TPP Terminal.

692. As it was also explained, according to the Audit Report, CFE did not plan, schedule, or implement corrective actions to mitigate the impact of the accumulation of acquired coal, despite having knowledge of the decrease in coal consumption at the Central, the extension of the maintenance periods of U7 and the accumulation of stock due to the delay in achieving the FOC by Greenfield.[336]

693. According to the Demand Analysis 70049[337] , the Central had a forecasted consumption of 6,765,323 tons of coal for 2019, with a consumption for U7 of 1,965,986:

| FORECASTED CONSUMPTION OF THERMAL MINERAL COAL IN TONS | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MONTH | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
| UNITS 1 to 6 | 383,110 | 372,066 | 419,944 | 359,970 | 415,371 | 406,830 | 456,708 | 469,914 | 396,180 | 395,381 | 362,100 | 358,763 | 4,799,337 |
| UNIT 7 | 159,651 | 154,495 | 171,528 | 147,030 | 169,659 | 166,170 | 186,543 | 191,937 | 161,820 | 162,719 | 147,900 | 146,537 | 1,965,986 |
| TOTAL CENTRAL | 542,762 | 526,552 | 591,470 | 507,000 | 585,030 | 573,000 | 643,250 | 661,855 | 558,006 | 561,100 | 510,000 | 505,300 | 6,765,323 |

---

333  Exhibit D-TPP-63.
334  Exhibit D-TPP-63.
335  Exhibit D-GF-44, p. 16.
336  Exhibit D-GF-44, p. 17.



694. CFE's management contributed to the saturation of coal at the TPP Terminal for several months, even when the Transportation and Storage System was already completed. In fact, CFE demanded coal volumes lower than the forecasted consumption, which caused coal to remain in the TPP Terminal for longer than the free storage time:[338]

| MONTH | CFE YARD SHIPMENT | FORECASTED CONSUMPTION U7 | ACTUAL CONSUMPTION U7 |
|---|---|---|---|
| AUGUST | 127.214 | 191.397 | 69.047 |
| SEPTEMBER | 220.226 | 161.820 | 137.062 |
| OCTOBER | 142.725 | 162.719 | 149.545 |
| NOVEMBER | 98.204 | 147.900 | 37.732 |
| DECEMBER | 75.568 | 146.537 | 96.169 |
| | 663.937 | 810.373 | 489.555 |

695. As of December 31, 2019, the total coal in the TPP Terminal yards reached 461,043 tons and 127,606 tons in the Central storage yards.[339] However, considered together, the yards of both terminals have a maximum storage capacity of 425,000 tons. The oversaturation of both yards proves a deficient scheduling by CFE in the planning of supplies and coal consumption for the supply of U7 and the rest of the units, which also contributed to a coal demurrage.[340]

696. The coal storage capacity of the Central was 125,000 tons[341] , which was quickly reached due to the purchase of coal by CFE and the low coal consumption by U7. In particular, U7 did not consume coal on the following dates (i) August 17 and 18, 2019, (ii) October 6 and 7, 2019, (iii) November 2, 2019, (iv) from November 4 to 11 and November 14 to 23, 2019, and (v) December 6 to 12, 2019.[342]

697. Also, U7 did not consume coal from November 3-23 and December 7-12, 2019, due to unplanned maintenance, which also contributed to coal demurrage at the TPP Terminal.[343]

---

[338]    Exhibit D-TPP-45, Monthly Report August through December.
[339]    Exhibit D-TPP-45, Monthly Report December 2019, p.3.
[340]    Exhibit D-TPP-45.
[341]    Section, paragraph 1 of Exhibit 7 of the Contract.
[342]    Exhibit D-TPP-45.
[343]    Exhibit D-TPP-45



138

### 5.4.4.2   *Greenfield's role in coal demurrage at the TPP terminal*

698.   Notwithstanding the Defendants' contribution to the coal demurrage at the TPP Terminal, the Arbitral Tribunal considers that Greenfield played a preponderant role in such demurrage.

699.   In fact, as it has been explained, during the meeting held on April 25, 2019, CFE presented to Greenfield the vessel reception schedule for 2019 and requested from Greenfield information regarding the preparations for the reception of the first vessel, which was scheduled for May 5, 2019. Greenfield confirmed to CFE the FOC for May 21, 2019, as scheduled in the Contract.[344]

700.   On April 25, 2019, CFE and Glencore signed the Glencore Agreement, which contained several arrival windows for the coal.[345]

701.   However, not only did Greenfield fail to achieve the FOC by the committed date, but Greenfield subsequently repeatedly modified the estimated date for achieving the FOC, failing to meet any of those estimated dates, until it finally achieved the FOC on August 16, 2019.

702.   The Arbitral Tribunal considers that Greenfield's erratic actions necessarily contributed to CFE's deficient coal purchase planning, notwithstanding the fact that Greenfield's actions were not the only cause of CFE's planning errors.

703.   However, the Arbitral Tribunal considers that as of April 25, 2019 Greenfield should have at least been aware that it would not achieve the FOC on May 21, 2019, and, thus, it should have formally notified CFE this situation. Likewise, if Greenfield considered that the TPP Terminal was not ready to receive vessels because the Transportation and Storage System was not completed, it should have notified CFE in clear terms; however, it failed to do so.

704.   At the time the FOC was achieved on August 16, 2019, Greenfield had 428,626 tons of coal[346] in storage at the TPP Terminal, which resulted in 128,626 tons

---

[344]   Minutes of meeting held on April 25, 2019, Exhibit D-GF-55.
[345]   Exhibit D-CFE-13.
[346]   Exhibit D-TPP-45.



exceeding the TPP Terminal's storage capacity of up to 300,000 tons of coal.

705. Since the Transportation and Storage System was not completed and Greenfield agreed to unload the vessels at the TPP Terminal before achieving the FOC, the unloaded coal remained for a longer period than the free storage period at the TPP Terminal, since, in the absence of the System and not using trailer trucks as provided by clause 4.3(b) of the Contract, it was difficult to transfer the coal from the TPP Terminal to the SIMC at the Central.

706. For this same reason, since the Transportation and Storage System was not completed, during the months of May, June and July 2019, it was the TMRC that had to supply coal to U7. This generated that the coal that had been unloaded at the TPP Terminal for those months remained immobile until the Transportation and Storage System was available, in order to transport it to the SIMC.

707. Based on the foregoing, the Arbitral Tribunal considers that Greenfield contributed to the fact that the coal unloaded at the TPP Terminal remained longer than the free storage time.

**5.4.4.3** *Conclusion of the Arbitral Tribunal*

708. As it has been explained, Exhibit 2 of the Contract provides the following with respect to the Variable Demurrage Charge:

*"The referred Variable Demurrage Charge shall not be applicable if the demurrage occurs as a consequence of a breach in the provision of the Port Services derived from the failures in the Transportation and Storage System attributable to the fault or willful misconduct of the Supplier, provided that the Commission has not contributed thereto."*

709. In other words, the Variable Demurrage Charge does not apply if the coal remains in the TPP Terminal for a time longer than the free storage period when this occurs as a consequence of a breach in the provision of Port Services caused by failures in the Transportation and Storage System. The Arbitral Tribunal considers that the wording of Exhibit 2 is clear and does not require further interpretation.



710.  Although Exhibit 2 refers to "*failures*" in the Transportation and Storage System, the Arbitral Tribunal considers that the unavailability of the Transportation and Storage System as of May 21, 2019, the date on which it should have been operational, although it does not technically constitute a "failure", it undoubtedly falls under the hypothesis set forth in Exhibit 2.

711.  In order for Greenfield to be released from liability for the coal demurrage resulting from the unavailability of the Transportation and Storage System, Exhibit 2 requires that CFE "*contributed to it*". Now, in this case, *"it"* does not refer to the coal demurrage itself, but to the "*failure to provide Port Services originated by failures in the Transportation and Storage System.*"

712.  In this regard, the Arbitral Tribunal considers that there is no evidence that CFE has contributed to the delay in the start-up of the Transportation and Storage System.

713.  Therefore, although both Greenfield and CFE contributed to the coal demurrage at the TPP Terminal, the release of liability provided in Exhibit 2 is not satisfied, unlike the release of liability for the demurrage of the vessels, provided in clause 10.2(B) of the Contract.

714.  In light of the express provisions of Exhibit 2 of the Contract regarding the Variable Demurrage Charge, the Arbitral Tribunal concludes that the Claimants have not satisfied the burden of the proof to evidence that the coal demurrage at the TPP Terminal did not occur as a result of Greenfield's failure to provide Port Services as a consequence of the unavailability of the Transportation and Storage System until August 16, 2019, or that CFE contributed to such delay.

715.  Although there are causes attributable to CFE that contributed to the coal demurrage at the TPP Terminal, the Arbitral Tribunal concludes that such demurrage was mainly caused by the failure to provide Port Services due to the unavailability of the Transportation and Storage System.

716.  Therefore, the Arbitral Tribunal dismisses the Claimants' claim for coal demurrage under Exhibit 2.



**5.5    Regarding arbitration costs**

**5.5.1    Greenfield Position**

717.    Greenfield requests that the Defendants are ordered to bear the costs and expenses of the present arbitration, including the fees and expenses of the arbitration, the Arbitral Tribunal and those incurred by the Claimants in procuring their defense, pursuant to Article 28 of the Rules.

718.    Greenfield quantifies these expenses as follows:

1.    LCIA Administrative Fee: GBP £338,450.

2.    Legal Fees: USD $797,544.

3.    Expert's fees: USD $322,681.

4.    Hearing expenses: MXN $670,092.

**5.5.2    Position of TPP and TMC**

719.    TPP and TMC request that Defendants are ordered to bear the costs and expenses of this arbitration, including the fees and expenses of the arbitration, the Arbitral Tribunal and those incurred by Claimants in securing their defense, pursuant to Article 28 of the Rules.

720.    TPP and TMC quantify these expenses as follows:

1.    Bufete Asali, S.C.: USD $500,000 plus success bonus.[347]

2.    Alberto Estrella: MXN $249,090.

3.    J.S. Held: USD $52,777.

4.    Jorge Oria - Ritch Muller: USD $20,427.

5.    Javier Arreola - Nader Hayaux Goebel: USD $29,999.

6.    Stenography: MXN $118,166.

7.    Carmen Codes: USD $11,005.

8.    Hearing presentation: MXN $255,000.

---

[347]    Success bonus equivalent to 2% of the total economic benefit obtained by TPP and TMC in the final arbitration award.

9. Spaces and banquet hearing: MXN $106,365.

10. Hearing travel allowance: MXN $105,105.

**5.5.3    Defendants' Position**

721. The Defendants allege that the claims made by the Claimants are not only groundless, but also that the Claimants have breached the Contract, which reflects the bad faith with which the present arbitration has been commenced. Therefore, the Defendants request that the Claimants bear the entire costs of the present arbitration, in accordance with Article 28 of the Rules.

722. The Defendants quantify these expenses according to the following breakdown:

1. Arbitration Fees: GBP £327,500.

2. Attorneys' Fees: MXN $2,041,577.50.

3. Expert's Fees: MXN $99,801.34

4. Hearing expenses: MXN $368,700.03.

**5.5.4    Arbitral Tribunal Decision**

723. The rules regarding the decision on costs that the Arbitral Tribunal shall adopt in this Award are set forth in Articles 28.2, 28.3 and 28.4 of the LCIA Rules, which provide as follows:

> *"28.2    The Arbitral Tribunal shall specify by an order or award the amount of the Arbitration Costs determined by the LCIA Court. The Arbitral Tribunal shall decide the proportions in which the parties shall bear such Arbitration Costs (in the absence of a final settlement of the parties' dispute regarding liability for such costs). If the Arbitral Tribunal has decided that all or any part of the Arbitration Costs shall be borne by a party other than a party which has already covered such costs by way of a payment to the LCIA under Article 24, the latter party shall have the right to recover the appropriate amount of Arbitration Costs from the former party.*
>
> *28.3 The Arbitral Tribunal shall also have the power to decide by an order or award that all or part of the legal or other expenses incurred by a party (the "Legal Costs") be paid by another party. The Arbitral Tribunal*



143

*shall decide the amount of such Legal Costs on such reasonable basis as it deemed appropriate. The Arbitral Tribunal shall not be required to apply the rates or procedures for assessing such costs practiced by any state court or other legal authority.*

*28.4 The Arbitral Tribunal shall make its decisions on both Arbitration Costs and Legal Costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration or under different issues, except where it appears to the Arbitral Tribunal that in the circumstances the application of such a general principle would be inappropriate under the Arbitration Agreement or otherwise. The Arbitral Tribunal may also take into account the conduct of the parties and that of their authorized representatives in the arbitration, including any cooperation in facilitating the proceedings as to time and cost and any non-cooperation resulting in undue delay and unnecessary expense. Any decision on costs by the Arbitral Tribunal shall be made with reasons in the order or award containing such decision (unless it is a Consent Award)."*

724. Therefore, the Arbitral Tribunal shall decide the proportion in which the Parties shall bear the Arbitration Costs established by the LCIA Court, as well as the manner in which the Legal Costs shall be borne.

725. In this regard, the net costs of the arbitration (excluding legal and other costs incurred by the Parties) have been determined by the LCIA Court, in accordance with Article 28.1 of the Rules as follows:

| | |
|---|---|
| Registration Fee: | £1,950.00 |
| Emergency Arbitration Fee: | £9,000.00 |
| LCIA Administrative Expenses: | £46,848.07 |
| Tribunal Fees and Expenses: | £558,606.65 |
| Total Arbitration Costs: | £616,404.72 |

726. From such costs, the Claimants have paid £338,450.00, which includes the registration fee, the emergency arbitration fee and the advances on costs paid, and the Defendants have paid £327,500.00, which includes the advances on costs paid,

144

and accrued interest. A total of £665,950.00 has been received from the Parties of which £616,404.72 plus VAT of £21,092.80 has been used for arbitration costs.

727.     In deciding the proportion in which the Parties shall bear the Arbitration Costs fixed by the LCIA Court and the Legal Costs, the LCIA Rules require the Arbitral Tribunal to rely on the general principle that costs should reflect the relative success and failure of the Parties in the arbitration, unless the Arbitral Tribunal decides, considering the circumstances, that the application of such general principle would be inappropriate. The Arbitral Tribunal may also consider the conduct of the Parties and their representatives in the arbitration.

728.     In this Final Award, the Arbitral Tribunal has endorsed the Claimants' claims regarding the payment of the Port Service Charge and on the inadmissibility of the execution of the Operational Guarantee by the Defendants, except with respect to the vessel ANNA MARIA, first voyage.

729.     On the other hand, the Arbitral Tribunal decided that TMC is not a party to the Contract and rejected the Claimants' claim for coal demurrage. Furthermore, the Arbitral Tribunal considers that the separate participation of Greenfield, on the one hand, and TPP and TMC, on the other, has increased the procedural complexity of the arbitration, and has contributed to the duplication of allegations that have undoubtedly required more time and resources from the Defendants.

730.     Finally, the Tribunal considers that all the Parties, together with their counsel, have done a highly professional job in a complex case, presenting reasonable arguments and defenses, without delaying or hindering the arbitration proceedings.

731.     Based on the foregoing, the Arbitral Tribunal resolves that, on the one hand, the Claimants, and on the other hand, the Defendants, shall bear 50% of the Arbitration Costs, and that each Party shall bear the Legal Costs incurred by them. Thus, pursuant to Article 24.3 of the Rules, the Tribunal orders that the Claimants are entitled to be reimbursed for an amount of £19,701.24 of the unspent LCIA funds and that the Defendants are entitled to be reimbursed the amount of £8,751.24.

## 6.     DECISIONS

732.     The Arbitral Tribunal DECIDES to:

    (i) Determine that TPP is a Party to the Contract, and that this is not the case for TMC;



(ii) Determine that TPP and TMC have standing to claim in the present arbitration pursuant to clause 4.6(f) of the Contract;

(iii) Order the Defendants to pay to TTP, with Greenfield's consent, the amounts corresponding to the Port Service Charge that did not achieve the Annual Fixed Amount in the period corresponding to the years 2019-2020, 2020-2021, 2021-2022 and 2022-2023, according to the following breakdown:

-   USD 4,039,727.10, plus VAT, corresponding to the first operating year from August 16, 2019 to August 15, 2020;

-   USD $9,632,084.80, plus VAT, corresponding to the second operating year from August 16, 2020 to August 15, 2021;

-   USD $9,603,492.13, plus VAT, corresponding to the third operating year from August 16, 2021 to August 15, 2022; and

-   USD $8,561,715.85, plus VAT, corresponding to the fourth operating year from August 16, 2022 to August 15, 2023.

(iv) Order the Defendants to pay TTP, with Greenfield's consent, default interest on the amounts indicated in the previous paragraph for a total of USD 1,708,496.61, plus VAT, according to the following breakdown:

-   USD 398,383.47 plus VAT, corresponding to the default interest for the first operative year from September 21, 2020 to September 25, 2023;

-   USD $610,582.21 plus VAT, corresponding to the default interest for the second operative year from September 21, 2021 to September 25, 2023;

-   USD $691,581.13 plus VAT, corresponding to the default interest for the third operative year from September 21, 2022 to September 25, 2023; and

-   USD $7,949.80 plus VAT, corresponding to the default interest for the fourth operative year from September 21, 2023 to September 25, 2023.

(v) Order Defendants to continue paying interest to TTP, with Greenfield's consent, at the rates applied to each of the periods referred to in the previous paragraph, as provided in paragraph 359 of this Final Award, from September 25, 2023, until the date of actual payment.

146

(vi) Determine that the Defendants shall pay the Port Service Charge to TTP, with Greenfield's consent, for subsequent operating years during the term of the Contract as a minimum charge to be calculated based on the Annual Fixed Amount, plus, if applicable, any tons unloaded in addition to the Annual Fixed Amount.

(vii) Determine that the vessel demurrage derived from a shared responsibility between Greenfield and the Defendants, and, therefore, the Defendants should not have executed the Operational Guarantee in its entirety.

(viii) Order the Defendants to reimburse to Greenfield the amount of USD 6,896,021.11, plus VAT, charged for the execution of the Operational Guarantee, net of the amount of the demurrage corresponding to the vessel ANNA MARIA, first voyage, in accordance with the provisions of Clauses 10.2(B) and 4.8(b)(iii) of the Contract.

(ix) Order the Defendants to pay Greenfield interest, plus VAT, on the amount indicated above at an annual interest rate of 3.21023%, from April 24, 2021 to September 25, 2023.

(x) Determine that both Greenfield and CFE contributed to the coal demurrage at the TPP Terminal, and that, although there are causes attributable to CFE that contributed to the coal demurrage at the TPP Terminal, such demurrage was mainly caused by the failure to provide Port Services due to the unavailability of the Transportation and Storage System.

(xi) Dismiss the Claimants' claim for coal demurrage under the terms of Exhibit 2 of the Contract.

(xii) Set the Arbitration Costs at £616,404.72, plus VAT of £21,092.80;

(xiii) Order that the Claimants, on the one hand, and the Defendants, on the other hand, bear 50% of the Arbitration Costs, and that each Party covers the Legal Costs incurred by them.

(xiv) Reject all the other reliefs sought by the Parties.


**Place of Arbitration**: Mexico City, Mexico.

**Date**: May 28, 2024



147

ARBITRATION LCIA NO. 215145

_[signature]_

David Arias
Arbitrator

_[signature]_

Oscar Vázquez del Mercadl Cordero
Arbitrator

_[signature]_

Christian Albanesi
President



148

Geraldina Chávez Lozano, expert translator duly authorized by the Federal Judiciary Council as evidenced in the Federal Official Gazette on December 15th, 2023 with registry number P-0193-2021, I hereby certify that, to the best of my knowledge this is a correct translation from Spanish of the original pdf. document. This certifies only the accuracy of the translation and not the truthfulness, accuracy, or validity of the original document.-----------------------------------------------------------------
Date: June 6, 2024.-----------------------------------------------------------------------------------------------
Mobile: 5537272763 / E-mail: geraldina.chavezl@legallyspeaking.com.mx ------------------------------
Authorization available at:----------------------------------------------------------------------------------------
https://www.cjf.gob.mx/resources/index/infoRelevante/2023/pdf/peritos/listaPeritos_PJF_2024.pdf

GERALDINA
CHÁVEZ LOZANO

CERTIFIED TRANSLATOR
P. 0193-2021