CORTE DE ARBITRAJE INTERNACIONAL DE LONDRES
ARBITRAJE LCIA No. 215145


**GREENFIELD SPV I, S.A.P.I. DE C.V.**
(México)

**Demandante 1 o Greenfield**

**TERMINALES PORTUARIAS DEL PACÍFICO, S.A.P.I. DE C.V.**
(México)

**Demandante 2 o TPP**


**TERMINAL MARÍTIMA DE CARBÓN, S.A. DE C.V.**
(México)

**Demandante 3 o TMC**
**Demandantes y Demandadas Reconvencionales**

c.

**COMISIÓN FEDERAL DE ELECTRICIDAD**
(México)

**CFE GENERACIÓN II EPS**
(México)


**Demandadas y Demandantes Reconvencionales**

en adelante llamadas, de manera conjunta, las **Partes**

_____

# LAUDO FINAL
_____


TRIBUNAL ARBITRAL

David Arias
Oscar Vásquez Del Mercado Cordero
Christian Albanesi

## TABLA DE CONTENIDO

1. INTRODUCCIÓN ............................................................................................... 3

1.1 Demandantes y Demandadas Reconvencionales ............................................... 3

1.2 Demandadas y Demandantes Reconvencionales ............................................... 4

1.3 El Tribunal Arbitral ........................................................................................ 6

2. HECHOS RELEVANTES PROBADOS ........................................................... 6

3. RESUMEN DEL PROCEDIMIENTO ARBITRAL ....................................... 21

4. PRETENSIONES DE LAS PARTES .............................................................. 29

4.1 Pretensiones de Greenfield ............................................................................ 29

4.2 Pretensiones de TPP y TMC .......................................................................... 33

4.3 Pretensiones de las Demandadas ................................................................... 37

5. ANALISIS DEL TRIBUNAL ARBITRAL ..................................................... 39

5.1 *Sobre la calidad jurídica de TPP y TMC bajo el Contrato, y si estas cuentan con legitimación activa para presentar reclamos contra las Demandadas* ...................................................... 41
    5.1.1 Posición de CFE .................................................................................. 41
    5.1.2 Posición de Greenfield ......................................................................... 43
    5.1.3 Posición de TPP y TMC ....................................................................... 43
    5.1.4 Análisis del Tribunal Arbitral .............................................................. 44

5.2 *Sobre el pago del CSP en base a la CFA* .................................................... 51
    5.2.1 Posición de Greenfield ......................................................................... 51
    5.2.2 Posición TPP y TMC ............................................................................ 53
    5.2.3 Posición de las Demandadas ................................................................. 54
    5.2.4 Análisis del Tribunal Arbitral .............................................................. 55

5.3 *Sobre las penalidades por sobreestadía de buques y devolución de las cantidades ejercidas respecto de la Garantía Operativa por USD 6.911.333, más IVA e intereses* ..................................... 80
    5.3.1 Posición Greenfield ............................................................................. 80
    5.3.2 Posición TPP y TMC ............................................................................ 84
    5.3.3 Posición de las Demandadas ................................................................. 87
    5.3.4 Análisis del Tribunal Arbitral .............................................................. 91

5.4 *Sobre las sobreestadías de carbón en la Terminal TPP por un tiempo superior al periodo de libre almacenamiento, por la cantidad de USD 6.919.636, más IVA e intereses* ............................. 133
    5.4.1 Posición de Greenfield ......................................................................... 133
    5.4.2 Posición de TPP y TMC ....................................................................... 133
    5.4.3 Posición de las Demandadas ................................................................. 134

5.4.4    Análisis del Tribunal Arbitral ............................................................................... 135

**5.5    Sobre las costas del arbitraje ................................................................................ 142**
5.5.1    Posición de Greenfield ......................................................................................... 142
5.5.2    Posición de TPP y TMC ...................................................................................... 142
5.5.3    Posición de las Demandadas ................................................................................ 143
5.5.4    Decisión Tribunal Arbitral .................................................................................. 143

**6.    DECISIONES ....................................................................................................... 145**

1.    **INTRODUCCIÓN**

1.    El presente arbitraje de la Corte de Arbitraje Internacional de Londres ("**LCIA**") No. 215145 ha sido conducido de conformidad con el Reglamento de Arbitraje de la Corte de Arbitraje Internacional del Londres ("**Reglamento**"), e involucra a las siguientes partes:

**1.1    Demandantes y Demandadas Reconvencionales**

2.    Las Demandantes y Demandadas Reconvencionales en este arbitraje son:

   (i)    **GREENFIELD SPV I, S.A.P.I. DE C.V.**; sociedad legalmente constituida y existente conforme con las leyes de los Estados Unidos Mexicanos, con Registro Federal de Contribuyentes GSI160202MA7, inscrita en el Registro Público de la Propiedad y del Comercio bajo el folio mercantil número 551967-1, y con domicilio en Avenida Pedregal 24, Piso 5, Colonia Molino del Rey, Delegación Miguel Hidalgo, Código Postal 11040, Ciudad de México, México ("**Greenfield**").

   (ii)   **TERMINALES PORTUARIAS DEL PACÍFICO, S.A.P.I. DE C.V.**; sociedad mercantil constituida conforme con las leyes de los Estados Unidos Mexicanos, con domicilio en Recinto Portuario, Canal Oriente, s/n, Av. Los Ríos, Apartado Postal 83, Lázaro Cárdenas, Michoacán, México ("**TPP**").

   (iii)  **TERMINAL MARÍTIMA DE CARBÓN, S.A. DE C.V.**; sociedad mercantil constituida conforme con las leyes de los Estados Unidos Mexicanos, con domicilio en Recinto Portuario, Canal Oriente, s/n, Av. Los Ríos, Apartado Postal 83, Lázaro Cárdenas, Michoacán, México ("**TMC**").

3.    Greenfield se encuentra representada en este arbitraje por los siguientes letrados, con los siguientes datos de contacto:

   -    Fernando del Castillo Elorza
        fdelcastillo@dc-ca.mx
   -    Favio Camilo Vázquez López
        cvazquez@dc-ca.mx
   -    Linda María García de Alba
        lgarcia@dc-ca.mx
   -    Renata Arellano Pérez Vela
        rarellano@dc-ca.mx

4.    El presente Laudo Final deberá serle notificado a Greenfield en la siguiente dirección:

   Del Castillo y Castro Abogados
   Av. Santa Fe, número 428, Torre III, Piso 16 -1601

Col. Desarrollo Santa Fe, Alcaldía Cuajimalpa
C.P. 05348, CDMX
México

5.      TPP y TMC se encuentran representadas en este arbitraje por los siguientes letrados con los
siguientes datos de contacto:

-   Luis Asali Harfuch
    luis.asali@bufeteasali.com
-   Jorge Asali Harfuch
    jorge.asali@bufeteasali.com
-   Santiago Escobar Magaña
    santiago.escobar@bufeteasali.com
-   Omar Colomé Menéndez
    omar.colomé@bufeteasali.com
-   José Dante Nader Delgado
    dante.nader@bufeteasali.com

6.      El presente Laudo Final deberá serle notificado a TPP y TMC en la siguiente dirección:

Bufete Asali, S.C.
Juan Salvador Agraz 73, piso 17
Alcaldía Cuajimalpa, Colonia Santa Fe, C.P. 05348
Ciudad de México, México

## 1.2      Demandadas y Demandantes Reconvencionales

7.      Las Demandadas y Demandantes Reconvencionales en este arbitraje son:

(i)   **COMISIÓN FEDERAL DE ELECTRICIDAD**; tiene nacionalidad mexicana y es
una empresa productiva del Estado de propiedad exclusiva del Gobierno Federal, con
personalidad jurídica y patrimonio propios, con autonomía técnica, operativa y de
gestión, según lo dispuesto en el artículo 2 de la Ley de la Comisión Federal de
Electricidad, publicada el 11 de agosto de 2014 en el Diario Oficial de la Federación,
y con domicilio en la Oficina del Abogado General de la Comisión Federal de
Electricidad, Paseo de la Reforma 164, piso 11, Colonia Juárez, Alcaldía Cuauhtémoc,
Código Postal 06600, Ciudad de México, México ("**CFE**"). A lo largo de los hechos
descritos en el presente Laudo, CFE actuaba directamente o a través de otras sociedades
relacionadas, como, por ejemplo, CFE Generación IV. El Tribunal se referirá
indistintamente a CFE o CFE Generación IV.

(ii)   **CFE GENERACIÓN II EPS**; tiene nacionalidad mexicana y es una empresa
productiva del Estado con personalidad jurídica y patrimonio propios en términos de
lo dispuesto por el artículo 58 de la Ley de la Comisión Federal de Electricidad, con

domicilio en la Oficina del Abogado General de la Comisión Federal de Electricidad, Paseo de la Reforma 164, piso 11, Colonia Juárez, Alcaldía Cuauhtémoc, Código Postal 06600, Ciudad de México, México ("**CFE Generación**").

8.    CFE se encuentra representada en este arbitraje por la Oficina del Abogado General de CFE:

> Oficina del Abogado General de CFE
> Paseo de la Reforma No. 164, piso 11
> Colonia Juárez, Alcaldía Cuauhtémoc
> Ciudad de México, 06600
> México

9.    CFE Generación se encuentra representada en este arbitraje por el siguiente letrado:

- Lic. Francisco Javier Orozco Torres
  francisco.orozcot@cfe.mx

10.    Adicionalmente, en toda comunicación enviada a las Demandadas y Demandantes Reconvencional se debe copiar a las siguientes personas:

- Dr. Raúl Armando Jiménez Vázquez
  raul.jimenezva@cfe.mx
- Lic. Raúl Otero
  raul.otero@cfe.mx
- Lic. Antonio Grayeb Cervantes
  antonio.grayeb@cfe.mx
- Lic. Olimpia de los Ángeles Castro Barreto Madrigal
  olimpia.castro@cfe.mx
- Lic. Martha Alicia Magdaleno Medina
  martha.magdaleno@cfe.mx
- Lic. Atenas Sebastián Zepeda
  atenas.sebastian@cfe.mx
- Lic. Norma Mireles Fragoso
  norma.mirelesf@cfe.mx
- Lic. Carlos Alberto Bejarano Torres
  carlos.bejarano@cfe.mx
- Lic. María Fernanda Gaminio Reyes
  maria.gaminio@cfe.mx
- Lic. Luis Rodolfo Vázquez Rubí
  luis.vazquezr@cfe.mx
- Lic. Rosa del Carmen Nieto Ornelas
  rosa.nieto@cfe.mx

11.    El presente Laudo Final deberá serle notificado a las Demandadas y Demandantes Reconvencionales en las direcciones de sus abogados y personas indicadas más arriba.

**1.3      El Tribunal Arbitral**

12.    De conformidad con el artículo 5 del Reglamento, el 20 de julio de 2021, la Corte de la LCIA nombró como integrantes del Tribunal Arbitral a las siguientes personas:

> **DAVID ARIAS**
> Arias SLP
> Gurtubay 4, 3D
> 28001 Madrid
> España
> david.arias@ariasslp.com

> **OSCAR VÁSQUEZ DEL MERCADO CORDERO**
> Bosque De Yuriria 82
> Fraccionamiento La Herradura
> Segunda Sección Huixquilucan
> Ciudad de México
> México
> oscarvmc@gmail.com

> **CHRISTIAN ALBANESI (Presidente)**
> Linklaters LLP
> 601 Thirteenth Street N.W., Suite 400 South
> Washington D.C.
> Estados Unidos de América
> christian.albanesi@linklaters.com

**2.      HECHOS RELEVANTES PROBADOS[1]**

13.    La Central Presidente Plutarco Elías Calles es una central termoeléctrica de generación de energía eléctrica a carbón o combustóleo, construida en las costas del Estado de Guerrero, México, y que comprende siete unidades de generación, propiedad de CFE ("**Central**").

14.    El 22 de noviembre de 1996, Carbonser, S.A. de C.V. ("**Carbonser**") suscribió un contrato con CFE, el cual tiene por objeto la prestación por parte de Carbonser de los servicios de recepción, descarga, almacenamiento, mezcla, transporte y entrega de carbón a CFE, a través de su terminal portuaria ubicada en el Puerto Lázaro Cárdenas ("**Terminal Carbonser**") para seis unidades de generación que forman parte de la Central mediante el sistema interno de manejo de carbón de la Central ("**SIMC**").

---

[1]    Este capítulo resume los principales hechos probados que sirven de antecedentes fácticos del presente arbitraje. Los hechos incluidos en este capítulo son aquellos que han sido alegados por las Partes y que el Tribunal Arbitral considera que se encuentran respaldados por la prueba documental obrante en el expediente, o bien que han sido alegados por una Parte sin haber sido refutados por la otra Parte. Sin perjuicio de lo anterior, el Tribunal Arbitral considerará otros hechos relevantes, cuando lo estime apropiado, al analizar los argumentos de las Partes.

15.    El 21 de diciembre de 2006, TPP suscribió un contrato de cesión parcial de derechos con la Administración Portuaria Integral Lázaro Cárdenas ("**APILAC**"), para la construcción y operación de una terminal especializada de uso público, destinada a la operación de minerales a granel y productos del acero, ubicada en el Puerto Lázaro Cárdenas ("**Terminal TPP**").[2]

16.    El 15 de diciembre de 2016, mediante Oficio No. 241.02-2120/2016, CFE adjudicó a Greenfield, TPP y Carbonser, en virtud del procedimiento de adjudicación directa No. CFE-001-ADSAN-0009-2016, los servicios de ampliación de abastecimiento de carbón a la Central por 1.300.000 toneladas anuales.[3]

17.    El 23 de diciembre de 2016, CFE y Greenfield, con la comparecencia de TPP y Carbonser, suscribieron el "*Contrato de Prestación de Servicios de Transporte y Almacenamiento de Carbón*" ("**Contrato**")[4], el cual tiene por objeto (i) la construcción por parte de Greenfield de un sistema de transporte y almacenamiento de carbón con capacidad de hasta 1.300.000 toneladas métricas anuales desde la Terminal TPP a la Central mediante un sistema de bandas ("**Sistema de Transporte y Almacenamiento**")[5], incluyendo la repotenciación del SIMC, y (ii) la prestación por parte de Greenfield de los servicios de recepción, descarga, almacenamiento, mezcla, transporte y entrega de carbón desde la Terminal TPP a la Central por un volumen mínimo equivalente a la cantidad firme anual.[6]

18.    La cantidad firme anual corresponde a la cantidad de carbón que, de forma anual, Greenfield está obligado a descargar, transportar y almacenar como parte de los Servicios de Transporte y Almacenamiento, y CFE está obligada a recibir y pagar, o bien a pagar si no recibe, conforme a los términos del Contrato. La cantidad firme anual es igual a 1.300.000 toneladas de carbón ("**CFA**").[7]

19.    Conforme a las cláusulas 5.6(a) y 6.1 del Contrato, por la disponibilidad y, en su caso, por la prestación de los Servicios de Transporte y Almacenamiento requeridos por la CFA, CFE se obligó a pagar una contraprestación conforme a los términos y conceptos detallados en el

---

[2]    Anexo D-TPP-1.
[3]    Oficio No. 241.02-2120/2016, Anexo D-TPP-16.
[4]    Anexo D-GF-1.
[5]    Anexo D-CFE-3, Anexo 7 del Contrato.
[6]    Anexo D-CFE-8, Anexo 6 del Contrato.
[7]    Cláusula 1 del Contrato, Definiciones.

Anexo 2 del Contrato ("**Contraprestación**")[8], la cual incluye un cargo por servicios portuarios, correspondiente a USD 6,50 por tonelada de carbón ("**CSP**"). [9]

20.     El Contrato tiene un plazo de 172 meses a partir de la fecha de operación comercial.

21.     La fecha de operación comercial corresponde a la fecha en la que Greenfield ha cumplido con los requisitos establecidos en el Anexo 3 de Contrato, la cual estaba comprometida a alcanzarse dentro de los 23 meses contados a partir de la fecha de inicio, conforme se encuentra definida en el Contrato ("**FOC**").[10]

22.     El 23 de diciembre de 2016, Greenfield y Carbonser suscribieron el *"Contrato de Operación y Mantenimiento en relación con el SIMC"* ("**Contrato Carbonser**"), el cual tiene por objeto la operación y mantenimiento del SIMC.[11]

23.     El 23 de diciembre de 2016, Greenfield y TMC, con la comparecencia de TPP como obligado solidario, suscribieron el *"Contrato de Operación y Mantenimiento"* ("**Contrato O&M**"), el cual tiene por objeto la operación del Servicio de Transporte y Almacenamiento y el mantenimiento del Sistema de Transporte y Almacenamiento.[12]

24.     El 21 de junio de 2017, CFE y Greenfield, con la comparecencia de TPP y Carbonser, suscribieron el Convenio Modificatorio al Contrato ("**Convenio Modificatorio**"), en virtud del cual acordaron modificar la cláusula 3.1(c) del Contrato, acordando que la fecha de inicio debía cumplirse a más tardar el 21 de agosto de 2017. Asimismo, no obstante, la modificación de la cláusula 3.1(c), las Partes mantuvieron su compromiso de lograr la FOC a más tardar el 21 de mayo de 2019.[13]

25.     Mediante minuta de reunión del 25 de abril de 2019, CFE Generación IV presentó a Greenfield el programa de recepción de buques para el año 2019 y solicitó a Greenfield información respecto de los preparativos para la recepción del primer buque, el cual estaba programado

---

[8]     La cláusula 5.6(a) del Contrato establece que *"por la disponibilidad y, en su caso, prestación, de los Servicios de Transporte y Almacenamiento requeridos por la Cantidad Firme Anual, la Comisión deberá pagar al Proveedor la Contraprestación de conformidad a la Cláusula 6"*.
        La cláusula 6.1 del Contrato establece que *"A partir de la Fecha de Operación Comercial y durante la vigencia de este Contrato, la Comisión pagara al Proveedor la contraprestación por los cargos y con respecto a los conceptos que se detallaron en el Anexo III de la Propuesta, mismo documento que se anexa al presente como Anexo 2 (la "Contraprestación")"*.

[9]     Anexo D-CFE-2.

[10]    Cláusula 1 del Contrato, Definiciones y Anexo 2 del Contrato.

[11]    Anexo D-GF-22.

[12]    Anexo D-GF-23.

[13]    Anexo D-TPP-20.

ARBITRAJE LCIA No. 215145

para el 5 de mayo de 2019. Por su parte, Greenfield mantuvo la FOC para el 21 de mayo de 2019.[14]

26. El 25 de abril de 2019, CFE Generación IV y Glencore International AG ("**Glencore**") suscribieron el "*Contrato de Adquisición de Carbón Mineral No. 700499290*" ("**Contrato Glencore**").[15]

27. El 30 de abril de 2019, CFE Generación IV informó a Greenfield las características, plan de estiba y plan de descarga del buque W-ACE, con una fecha estimada de llegada (*estimated time of arrival*, "**ETA**") para el 2 de mayo de 2019.[16]

28. El 2 de mayo de 2019, CFE envió a Greenfield los certificados de calidad y peso del buque W-ACE.[17]

29. El 3 de mayo de 2019, TMC informó a Greenfield que la decisión de prestar los servicios de descarga del buque W-ACE se había tomado para no interrumpir los servicios solicitados por CFE. Además, TMC indicó que haría sus mejores esfuerzos para cumplir los tiempos de descargas fijados, pero dado que la operación se realizaría en condiciones distintas a las previstas, el cargo por no cumplir con los tiempos de descargas no era aplicable o imputable a TMC ni TPP.[18]

30. El 10 de mayo de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque W-ACE, por no cumplir con los tiempos de descarga acordados en el numeral 5 inciso A del Anexo 6 del Contrato[19] ("**Tiempos de Plancha del Contrato**").[20]

31. El 13 de mayo de 2019, TMC informó a Greenfield que la decisión de prestar los servicios de descarga del buque ANNA MARIA se había tomado para no interrumpir los servicios solicitados por CFE, indicando que haría sus mejores esfuerzos para cumplir los tiempos de descargas fijados, pero dado que la operación se realizaría en condiciones distintas a las

---

[14]  Minuta de reunión celebrada el 25 de abril de 2019, Anexo D-GF-55.

[15]  Anexo D-CFE-13.

[16]  Oficio HECC3-O-0068/2019, Anexo  D-CFE-14.

[17]  Oficio HECC0-0-0070/2019, Anexo D-CFE-110.

[18]  Oficio GG-M-006, Anexo D-TPP-23.

[19]  Numeral 5 inciso A del Anexo 6 del Contrato indica *"la Terminal TPP está equipada con dos grúas móviles diseñadas para la descarga de barcos, los cuales permitan tiempos de descarga como se muestra en la siguiente tabla:"*

| Capacidad del barco, toneladas de peso muerto (TPM) | Tiempo de Plancha (Horas) |
|---|---|
| Mayor e igual a 50 000 a menos e igual a 70 000 | 53 |
| Mayor a 70 000 a menor e igual a 100 000 | 60 |
| Mayor a 100 000 a menor e igual a 150 000 | 90 |

[20]  Oficio HECC0-0-0622/2019, Anexo D-GF-85.

prevista el cargo por no cumplir con los tiempos de descargas no era aplicable o imputable a TMC ni TPP. Asimismo, TMC comunicó a Greenfield que la capacidad de almacenamiento en los patios de la Terminal TPP estaba llegando a su límite con 140.000 toneladas.[21]

32.    Mediante minuta de reunión de fecha 16 de mayo de 2019, Greenfield informó a las Demandadas que la nueva fecha probable para la FOC era el 4 de julio de 2019. Asimismo, las Demandadas solicitaron a Greenfield que realizara las medidas necesarias para disminuir los tiempos de descarga de los buques considerando que la descarga del primer buque significó 48 horas adicionales al Tiempo de Plancha del Contrato.[22]

33.    El 17 de mayo de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque ANNA MARIA, con ETA para el 22 de mayo de 2019.[23]

34.    El 17 de mayo de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque ANNA MARIA.[24]

35.    El 21 de mayo de 2019, CFE informó a Greenfield que aplicaría la pena convencional establecida en la cláusula 8.1(b) del Contrato[25] hasta el cumplimiento efectivo de la FOC.[26]

36.    El 29 de mayo de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque ANNA MARIA, por no realizar la descarga en conformidad con los Tiempos de Plancha del Contrato.[27]

37.    El 29 de mayo de 2019, las Demandadas solicitaron a Greenfield la programación de atraque y descarga para el buque SARTORI, el cual contaba con ETA para el 31 de mayo de 2019.[28]

---

[21]    Oficio GG-M-010-19, Anexo D-TPP-25.

[22]    Minuta de reunión celebrada el 16 de mayo de 2019, Anexo D-GF-56.

[23]    Oficio HECC3-0-0080/2019, Anexo D-GF-101.

[24]    Oficio HECC3-0-0079/2019, Anexo D-CFE-21.

[25]    La cláusula 8.1(b) del Contrato establece que "*si el Proveedor no lleva a cabo la construcción del Sistema de Transporte y Almacenamiento de conformidad y en los tiempos previstos en el Anexo 3 del presente Contrato, y no logra alcanzar la Fecha de Operación Comercial dentro de los 90 (noventa) Días a partir de la Fecha de Operación Comercial establecida para estos propósitos en el Anexo 3, en el entendido que, independientemente de que el retraso en cuestión aun no sea considerado un Evento de Incumplimiento, el Proveedor deberá pagar a la Comisión una pena convencional en la cantidad de EUA$50,000.00 Dólares (cincuenta mil 00/100 Dólares de los Estados Unidos de América) por cada Día de atraso de la Fecha de Operación Comercial hasta alcanzar los 90 (noventa) Días mencionados y que, en abundancia de claridad, únicamente a partir del Día 91 (noventa y uno) será el retraso en cuestión considerado un Evento de Incumplimiento del Proveedor, pudiendo la Comisión dar por terminado el presente Contrato conforme a la Cláusula 8.3 siguiente*".

[26]    Oficio HECC0-0-0663/2019, Anexo D-GF-61.

[27]    Oficio HECC0-0-0699/2019, Anexo D-GF-86.

[28]    Oficio HECC0-0-0712/2019, Anexo D-GF-87.

38.     El 4 de junio de 2019, Greenfield solicitó a las Demandadas desviar el buque SARTORI por cuestiones de seguridad de la Terminal TPP. Asimismo, Greenfield informó que la Terminal TPP no se encontraba en condiciones de recibir buques hasta que se reestablecieran las condiciones de seguridad, lo cual, estimó, acontecería a partir del 25 de junio de 2019.[29]

39.     El 4 de junio de 2019, CFE solicitó a Glencore realizar la descarga del buque SARTORI en la Terminal de Carbonser.[30]

40.     El 5 de junio de 2019, CFE comunicó a Greenfield que realizaría las gestiones necesarias para llevar a cabo la operación de descarga del buque SARTORI en un puerto alterno, señalando que Greenfield debía cumplir con los costos adicionales generados por la demora de descarga del buque desde su arribo el 30 de mayo de 2019. Asimismo, CFE señaló que se aplicaría el cobro por la sobreestadía del buque GRIZZLY 2V, cuyo inicio de descarga estaba programado para el 18 de junio de 2019.[31]

41.     El 7 de junio de 2019, CFE requirió de pago a Greenfield por incumplir con la FOC el 21 de mayo de 2019 por USD 550,000; monto correspondiente a la pena convencional establecida en el Contrato desde el 21 al 31 de mayo de 2019. [32]

42.     El 18 de junio de 2019, CFE requirió de pago a Greenfield por incumplir con la FOC el 21 de mayo de 2019 por USD 750,000; monto correspondiente a la pena convencional establecida en el Contrato desde el 1 al 15 de junio de 2019.[33]

43.     El 20 de junio de 2019 Greenfield informó a las Demandadas que la Terminal TPP no se encontraba en condiciones de recibir buques hasta que se reestablecieran las condiciones de seguridad, solicitando el desvío de los buques programados a un puerto alterno. Greenfield además estimó que, a partir del 8 de julio de 2019, la Terminal TPP estaría operando en forma regular para recibir buques.[34]

44.     El 20 de junio de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque GRIZZLY 2V, el cual arribó el 4 de junio de 2019.[35]

---

[29]     Oficio LCPL-OPS-CFE-0007, Anexo D-GF-81.

[30]     Correo electrónico de CFE a Glencore, Anexo D-CFE-120.

[31]     Oficio HECC0-0-0757/2019, Anexo D-CFE-27.

[32]     Oficio HECC0-0-0753/2019, Anexo D-GF-57.I.

[33]     Oficio HECC0-0-0837/2019, Anexo D-GF-57.II.

[34]     Oficio LCPL-CFE-OPS-0008, Anexo D-GF-82.

[35]     Oficio HECC3-0-0115/2019, Anexo D-GF-102.

45.    El 20 de junio de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque GRIZZLY 2V.[36]

46.    El 21 de junio de 2019, CFE comunicó a Greenfield que no era posible desviar a un muelle alterno los buques GRIZZLY 2V y ANNA MARIA, que ya se encontraban fondeados, señalando que dichos buques debían permanecer fondeados hasta que la Terminal TPP estuviera en condiciones de comenzar la descarga, considerando los costos asociados a las sobreestadías.[37]

47.    El 21 de junio de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque SARTORI, por no realizar la descarga en conformidad con los Tiempos de Plancha del Contrato.[38]

48.    Mediante minuta de reunión de fecha 26 de junio de 2019, las Demandadas ratificaron a Greenfield el programa de recepción de buques para el año 2019. Asimismo, las Demandadas solicitaron que se les informara la fecha en la que se iniciarían las maniobras de descarga de los buques que arribaron el 4 y 15 de junio de 2019. Por su parte, Greenfield informó a CFE que, el 1 de julio de 2019, iniciarían las maniobras para trasladar el carbón almacenado en el patio del muelle y analizarían las opciones para llevar a cabo la descarga de uno de los buques en espera. Además, Greenfield informó a las Demandadas que las condiciones de seguridad de la Terminal TPP no permitían la descarga de buques hasta el 8 de julio de 2019.[39]

49.    El 2 de julio de 2019, Greenfield informó a las Demandadas que las condiciones de seguridad, debido a la construcción, operación y descarga de la Terminal TPP, no permitían la descarga de busques. Greenfield también informó a las Demandadas que estimaba la descarga de nuevos buques para el 10 de julio de 2019.[40]

50.    El 3 de julio de 2019, CFE requirió de pago a Greenfield por incumplir con la FOC el 21 de mayo de 2019 por USD 750,000, monto correspondiente a la pena convencional establecida en el Contrato desde el 16 al 30 de junio de 2019.[41]

---

[36]    Oficio HECC3-0-0114/2019, Anexo D-CFE-31.
[37]    Oficio HECC0-0-0860/2019, Anexo D-CFE-33.
[38]    Oficio HECC0-0-0848/2019, Anexo D-GF-88.
[39]    Minuta de reunión celebrada el 26 de junio de 2019, Anexo D-GF-114.
[40]    Oficio LCPL-OPS-CFE-0010, Anexo D-CFE-35.
[41]    Oficio HECC0-0-0943/2019, Anexo D-GF-57.III.

51.     El 5 de julio de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque ANANGEL ASTRONOMER 3V, el cual arribó el 30 de junio de 2019.[42]

52.     El 5 de julio de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque ANANGEL ASTRONOMER 3V, el cual arribó el 30 de junio de 2019.[43]

53.     El 5 de julio de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque ANNA MARIA 2V, el cual arribó el 15 de junio de 2019.[44]

54.     El 5 de julio de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque ANNA MARIA 2V.[45]

55.     El 11 de julio de 2019, TMC informó a Greenfield que la decisión de prestar los servicios de descarga del buque MV GRIZZLY se había tomado para no interrumpir los servicios solicitados por CFE, indicando que el Cargo Variable por sobreestadía no era aplicable o imputable a TMC ni TPP, dado que la operación se realizaría en condiciones distintas a las previstas.[46]

56.     El 18 de julio de 2019, CFE requirió de pago a Greenfield por incumplir con la FOC el 21 de mayo de 2019 por USD 750,000, correspondiente a la pena convencional establecida en el Contrato desde el 1 al 15 de julio de 2019.[47]

57.     El 18 de julio de 2019, Greenfield informó a CFE el pago de USD 1,500,000 correspondiente a la aplicación de las penas convencionales establecida en el Contrato desde el 1 al 30 de junio de 2019 por no alcanzar la FOC el 21 de mayo de 2019.[48]

58.     El 18 de julio de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque GRIZZLY 2V, por no realizar la descarga de conformidad con los Tiempos de Plancha del Contrato.[49]

---

[42]    Oficio HECC3-0-0129/2019, Anexo D-GF-103.
[43]    Oficio HECC0-0-0130/2019, Anexo D-CFE-43.
[44]    Oficio HECC3-0-0132/2019, Anexo D-GF-104.
[45]    Oficio HECC3-0-0133/2019, Anexo D-CFE-39.
[46]    Oficio GG-M-012-19, Anexo D-TPP-31.
[47]    Oficio HECC0-0-1009/2019, Anexo D-GF-57.IV.
[48]    Oficio LCPL-OPS-CFE-0011, Anexo D-GF-58.I.
[49]    Oficio HECC0-0-1016/2019, Anexo D-CFE-37.

59.    El 19 de julio de 2019, Greenfield informó a CFE el pago de USD 550,000, monto correspondiente a la aplicación de las penas convencionales establecida en el Contrato desde el 21 al 31 de mayo de 2019 por no alcanzar la FOC el 21 de mayo de 2019.[50]

60.    El 20 de julio de 2019, TMC informó a Greenfield que la decisión de prestar los servicios de descarga del buque ANANGEL ASTRONOMER V3 se había tomado para no interrumpir los servicios solicitados por CFE, indicando que el Cargo Variable por sobreestadía no era aplicable o imputable a TMC ni TPP, dado que la operación se realizaría en condiciones distintas a las previstas.[51]

61.    El 29 de julio de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque NAVIOS ANTARES 2V con ETA para el 30 de julio de 2019.[52]

62.    El 29 de julio de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque NAVIOS ANTARES 2V.[53]

63.    El 30 de julio de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque CL TAIZHOU, el cual arribó el 13 de julio de 2019.[54]

64.    El 30 de julio de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque CL TAIZHOU, el cual arribó el 13 de julio de 2019.[55]

65.    El 31 de julio de 2019, TMC informó a Greenfield que la decisión de prestar los servicios de descarga del buque ANNA MARIA V2 se había tomado para no interrumpir los servicios solicitados por CFE, indicando que el Cargo Variable por sobreestadía no era aplicable o imputable a TMC ni TPP, dado que la operación se realizaría en condiciones distintas a las previstas. Asimismo, TMC comunicó que luego de proceder a la descarga del buque ANNA MARIA la capacidad de almacenamiento de los patios de las zonas dos de la Terminal TPP llegaría a su límite con 364.847 toneladas.[56]

---

[50]    Oficio LCPL-OPS-CFE-0012, Anexo D-GF-58.II.
[51]    Oficio GG-M-013-19, Anexo D-TPP-31.
[52]    Oficio HECC3-0-0157/2019, Anexo D-GF-105.
[53]    Oficio HECC3-0-0158/2019, Anexo D-CFE-51.
[54]    Oficio HECCH3-0-0159/2019, Anexo D-GF-106.
[55]    Oficio HECC3-0-0160/2019, Anexo D-CFE-47.
[56]    Oficio GG-M-016-19, Anexo D-TPP-31.

66.     El 8 agosto de 2019, CFE requirió de pago a Greenfield por incumplir con la FOC el 21 de mayo de 2019 por USD 800,000, monto correspondiente a la pena convencional desde el 16 al 31 de julio de 2019.[57]

67.     El 8 de agosto de 2019, CFE Generación y Glencore suscribieron una modificación del Contrato Glencore, por medio del cual se modificaron tres entregas de las partidas 10 y 11 en la Terminal Carbonser, las cuales estaban consideradas entre el 22 de agosto y el 16 de noviembre, y se reprogramaron para entre el 10 de noviembre y el 16 de diciembre. Lo anterior, debido a que la existencia en los patios de almacenamiento de la Central alcanzó el máximo de capacidad por el bajo consumo de las unidades, como resultado de (i) despacho de generación por el Centro Nacional de Control de Energía ("**CENACE**"), (ii) fallas presentadas en ciertas unidades, y (iii) la prolongación de los periodos de mantenimiento de otras unidades ("**Modificación Contrato Glencore**").[58]

68.     El 16 de agosto de 2019, Greenfield informó a las Demandadas que la Terminal TPP estaba en condiciones de prestar los servicios en forma segura y que se habían cumplido los requisitos establecidos en el Anexo 3 del Contrato necesarios para alcanzar la FOC.[59]

69.     El 23 de agosto de 2019, Greenfield informó a CFE el pago de USD 750,000, correspondiente a la aplicación de las penas convencionales establecida en el Contrato desde el 1 al 15 de julio de 2019 por no alcanzar la FOC el 21 de mayo de 2019.[60]

70.     El 23 de agosto de 2019, Greenfield informó a CFE el pago de USD 800,000, correspondiente a la aplicación de las penas convencionales establecida en el Contrato desde el 16 al 31 de julio de 2019 por no alcanzar la FOC el 21 de mayo de 2019.[61]

71.     El 26 agosto de 2019, CFE requirió de pago a Greenfield por incumplir con la FOC el 21 de mayo de 2019 por USD 750,000, monto correspondiente a la pena convencional establecida en el Contrato desde el 1 al 15 de agosto de 2019.[62]

[57]    Oficio HECC0-0-1151/2019, Anexo D-GF-57.V.
[58]    Anexo D-CFE-216 y Anexo D-TPP-63.
[59]    Oficio LCPL-OPS-CFE-0016, Anexo D-GF-83.
[60]    Oficio LCPL-OPS-CFE-0017, Anexo D-GF-58.III.
[61]    Oficio LCPL-OPS-CFE-0018, Anexo D-GF-58.IV.
[62]    Oficio HECC0-0-1276/2019, Anexo D-GF-57.VI.

72.    El 27 de agosto de 2019, CFE requirió nuevamente de pago a Greenfield por la demora en la descarga del buque GRIZZLY 2V por USD 406,250.00, por no realizar la descarga de conformidad con los Tiempos de Plancha del Contrato.[63]

73.    El 27 de agosto de 2019, CFE requirió de pago a Greenfield por la demora en la descarga de los buques ANNA MARIA 2V[64], ANANGEL ASTRONOMER 3V[65], y CL TAIZHOU[66], por no realizar la descarga en conformidad con los Tiempos de Plancha del Contrato.

74.    El 2 de septiembre de 2019, CFE informó a Greenfield la aceptación provisional de la FOC, con fecha 16 de agosto de 2029.[67]

75.    El 12 de septiembre de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque W-ARCTURUS, el cual arribó el 31 de agosto de 2019.[68]

76.    El 12 de septiembre de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque W-ARCTURUS.[69]

77.    El 13 de septiembre de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque NAVIOS ANTARES 2V, por no realizar la descarga de conformidad con los Tiempos de Plancha del Contrato.[70]

78.    El 17 de septiembre de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque HARROW, el cual arribó el 2 de agosto de 2019.[71]

79.    El 17 de septiembre de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque HARROW.[72]

80.    El 19 de septiembre de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque HARVEST RAIN 3V, con ETA para el 18 de septiembre de 2019.[73]

---

[63]    Oficio HECCH0-0-1275/2019, Anexo D-GF-43.
[64]    Oficio HECC0-0-1286/2019, Anexo D-GF-41.
[65]    Oficio HECC0-0-1285/2019, Anexo D-GF-42.
[66]    Oficio HECC0-0-1287/2019, Anexo D-GF-91.
[67]    Oficio CFE HECC0-O-1236/2019, Anexo D-GF-40.
[68]    Oficio HECC3-0-0197/2019, Anexo D-GF-107.
[69]    Oficio HECC3-0-0198/2019, Anexo D-CFE-63.
[70]    Oficio HECC0-0-1397/2019, Anexo D-GF-92.
[71]    Oficio HECC3-0-0200/2019, Anexo D-CFE-55.
[72]    Oficio HECC3-0-0202/2019, Anexo D-CFE-56.
[73]    Oficio HECC3-0-0209/2019, Anexo D-GF-108.

81.     El 19 de septiembre de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque HARVEST RAIN 3V.[74]

82.     El 25 de septiembre de 2019, CFE requirió de pago a Greenfield por la demora en la descarga de los buques HARROW[75] y W-ARCTURUS[76], por no realizar la descarga de conformidad con los Tiempos de Plancha del Contrato.

83.     El 20 de septiembre de 2019, CFE requirió de pago a Greenfield por la demora en la descarga de los buques por USD 3,083,548.11.[77]

84.     El 3 de octubre de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque CL TAIZHOU 3V, el cual arribó el 2 de octubre de 2019.[78]

85.     El 3 de octubre de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque CL TAIZHOU 3V.[79]

86.     El 11 de octubre de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque HARVEST RAIN 3V, por no realizar la descarga de conformidad con los Tiempos de Plancha del Contrato.[80]

87.     El 23 de octubre de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque CL TAIZHOU 3V, por no realizar la descarga en conformidad con los Tiempos de Plancha del Contrato.[81]

88.     El 25 de octubre de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque MINERAL NINGBO 2V, el cual arribó el 21 de octubre de 2019.[82]

89.     El 25 de octubre de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque MINERAL NINGBO 2V.[83]

---

[74]    Oficio HECC3-0-0210/2019, Anexo D-CFE-67.
[75]    Oficio HECC0-0-1456/2019, Anexo D-GF-93.
[76]    Oficio HECC0-0-1461/2019, Anexo D-GF-94.
[77]    Oficio HECC0-0-1429/2019, Anexo D-CFE-59.
[78]    Oficio HECC3-0-0220/2019, Anexo D-GF-109.
[79]    Oficio HECC3-0-0221/2019, Anexo D-CFE-71.
[80]    Oficio HECC0-0-1564/2019, Anexo D-GF-95.
[81]    Oficio HECC0-0-1639/2019, Anexo D-GF-96.
[82]    Oficio HECC3-0-0240/2019, Anexo D-GF-110.
[83]    Oficio HECC3-0-0241/2019, Anexo D-CFE-75.

90.    El 5 de noviembre de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque NAVIOS ANTARES 4V, el cual arribó el 5 de noviembre de 2019.[84]

91.    El 5 de noviembre de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque NAVIOS ANTARES 4V.[85]

92.    El 14 de noviembre de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque MINERAL NINGBO 2V, por no realizar la descarga de conformidad con los Tiempos de Plancha del Contrato.[86]

93.    El 20 de noviembre de 2019, las Demandadas informaron a Greenfield las características y plan de estiba del buque LMZ FRANCISCO, con ETA para el 22 de noviembre de 2019.[87]

94.    El 20 de noviembre de 2019, las Demandadas informaron a Greenfield el plan de descarga del buque LMZ FRANCISCO.[88]

95.    El 21 de noviembre de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque NAVIO ANTARES 4V, por no realizar la descarga de conformidad con los Tiempos de Plancha del Contrato.[89]

96.    El 3 de diciembre de 2019, CFE requirió de pago a Greenfield por la demora en la descarga del buque LMZ FRANCISCO, por no realizar la descarga de conformidad con los Tiempos de Plancha del Contrato.[90]

97.    El 9 de diciembre de 2019, CFE requirió de pago a Greenfield por la demora en la descarga de quince buques por un total de USD 6,310,256.60.[91]

98.    El 28 de marzo de 2020, CFE reiteró el requerimiento de pago a Greenfield por la demora en la descarga de quince buques por un total de USD 6,310,256.60.[92]

---

[84]    Oficio HECC3-0-0251/2019, Anexo D-GF-111.
[85]    Oficio HECC3-0-0250/2019, Anexo D-CFE-79.
[86]    Oficio HECC0-0-1729/2019, Anexo D-GF-97.
[87]    Oficio HECC3-0-0264/2019, Anexo D-GF-112.
[88]    Oficio HECC3-0-0263/2019, Anexo D-CFE-83.
[89]    Oficio HECC0-0-1779/2019, Anexo D-GF-98.
[90]    Oficio HECC0-0-1835/2019, Anexo D-GF-99.
[91]    Oficio HECC0-0-1904/2019, Anexo D-CFE-86.
[92]    Oficio CFE HECC0-O-0233/2020, Anexo D-GF-39.

99.     El 23 de julio de 2020, CFE reiteró nuevamente el requerimiento de pago a Greenfield por la demora en la descarga de quince buques por un total de USD 6,310,256.60.[93]

100.    El 1 de septiembre de 2020, Greenfield comunicó a las Demandadas que existía un cargo pendiente correspondiente al CSP por USD 4,039,727.10 más IVA, correspondiente a 586,058 toneladas, diferencial para alcanzar la CFA.[94]

101.    El 8 de septiembre de 2020, CFE respondió al requerimiento de pago de Greenfield, señalando que se encontraban en proceso de análisis, y reiteró a Greenfield su requerimiento sobre el pago de los costos asociados a la sobrestadía de los buques por no realizar la descarga de conformidad con los Tiempos de Plancha del Contrato.[95]

102.    El 10 de septiembre de 2020, Greenfield comunicó a las Demandadas que era improcedente el pago de las cantidades reclamadas por no cumplir con el Tiempo de Plancha del Contrato, toda vez que los retrasos no eran imputables a ella, y, además, no se cumplían los requisitos establecidos en la cláusula 10.2(b) del Contrato.[96]

103.    El 17 de septiembre de 2020, Greenfield nuevamente requirió de pago a CFE por USD 4,039,727.10, reiterando que, a la fecha, no existía ningún supuesto de incumplimiento por parte de Greenfield en los términos previstos en el Contrato.[97]

104.    El 13 de octubre de 2020, CFE envió a Greenfield la documentación de soporte de pagos realizados a Glencore debido a las sobreestadías de los buques.[98]

105.    El 29 de octubre de 2019, Greenfield, notificó a las Demandadas que existía una controversia sobre la procedencia de los pagos por sobreestadías reclamados por las Demandadas, y solicitó, conforme a la cláusula 17.2 del Contrato, que las Partes intenten resolver la controversia amistosamente en un plazo de 30 días.[99]

---

[93]   Oficio HECC0-0-0584/2019, Anexo D-CFE-90.
[94]   Oficio LCPL-OPS-CFE-0058, Anexo D-GF-30.
[95]   Oficio HECC0-O-0700/2020, Anexo D-GF-31.
[96]   Oficio LCPL-OPS-CFE-0057, Anexo D-GF-29.
[97]   Oficio LCPL-OPS-CFE-0060, Anexo D-GF-32.
[98]   Oficio HECC0-O-0839/2020, Anexo D-CFE-94.
[99]   Oficio LCPL-OPS-CFE-0061, Anexo D-CFE-95.

106.    El 23 de noviembre de 2020, las Demandadas informaron a Greenfield la suspensión temporal y hasta nuevo aviso de los Servicios de Transporte y Almacenamiento bajo el Contrato a partir del 24 de noviembre de 2020.[100]

107.    El 4 de diciembre de 2020, Greenfield reiteró el requerimiento de pago a CFE por USD 4,039,727.10, correspondiente a los CSP en base a la CFA del periodo 2019-2020.[101]

108.    El 23 de abril de 2021, Greenfield reiteró a CFE el requerimiento de pago por USD 4,039,727.10, correspondiente a los CSP en base a la CFA del periodo 2019-2020.[102]

109.    El 23 de abril de 2021, CFE solicitó al Banco Nacional de México S.A. el pago de USD 6,911,333.11, con cargo a la Carta de Crédito Irrevocable Standby No. 5608601449 ("**Garantía Operativa**"), por concepto de sobreestadías de buques y costos financieros generados.[103]

110.    El 24 de abril de 2021, el Banco Nacional de México S.A. procedió a efectuar el pago de USD 6,911,333.11, con cargo a la Garantía Operativa, de acuerdo con la solicitud de las Demandadas.[104]

111.    El 3 de mayo de 2021, CFE comunicó a Greenfield que, en virtud del presente arbitraje y al ser la CFA materia del mismo, correspondía al Tribunal Arbitral indicar la procedencia o improcedencia del pago del CSP con base en la CFA.[105]

112.    El 3 de septiembre de 2021, Greenfield requirió de pago a CFE por USD 9,632,084.80 más IVA, correspondiente al CSP con base en la CFA del periodo 2020-2021.[106]

113.    El 6 de enero de 2022, CFE comunicó a Greenfield el reinicio de la operación de los Servicios de Transporte y Almacenamiento, indicando que se esperaba el arribo del buque CAPE PEREGRINE con ETA para el 10 de enero de 2022.[107]

---

[100]    Oficio HECC0-O-0961/2020, Anexo D-GF-90.
[101]    Oficio LCPL-OPS-CFE-0064, Anexo D-GF-33.
[102]    Oficio LCPL-OPS-CFE-0078, Anexo D-GF-34.
[103]    Solicitud ejecución carta de crédito, Anexo D-GF-7.
[104]    Email de Citibanamex de pago, Anexo D-CFE-100.
[105]    Oficio HECC0-O-0298/2021, Anexo D-GF-35.
[106]    Oficio LCPL-OPS-CFE-0088, Anexo D-GF-37.
[107]    Oficio HECC0-O-0018/2022, Anexo D-TPP-41.

from-header

114.    El 26 de enero de 2022, CFE requirió de pago a Greenfield por la demora en la descarga del buque CAPE PEREGRINE, de conformidad con los Tiempos de Plancha del Contrato.[108]

115.    El 1 de septiembre de 2022, TMC requirió de pago a Greenfield por USD 9,603,492.13, correspondiente al CSP con base en la CFA del periodo 2021-2022.[109]

116.    El 1 de septiembre de 2022, Greenfield requirió de pago a CFE por USD 9,603,492.13 más IVA, correspondiente al CSP con base en la CFA del periodo 2021-2022.[110]

117.    El 17 de enero de 2023, las Demandadas informaron a Greenfield las características y plan de estiba del buque NAVIOS STELLAS, con ETA para el 18 de enero de 2023.[111]

**3.    RESUMEN DEL PROCEDIMIENTO ARBITRAL**

118.    El 12 de abril de 2021, Greenfield presentó una Solicitud de Arbitraje ("**Solicitud**") ante la Secretaría de la Corte de Arbitraje Internacional de Londres ("**Secretaría de la LCIA**") identificando a CFE como Demandadas. En la Solicitud, Greenfield nominó al Sr. David Arias como coárbitro.

119.    Dicha Solicitud halla su fundamento jurisdiccional en el siguiente convenio arbitral comprendido en la cláusula 17.5 del Contrato:

*17.5 Arbitraje*

*(a) Toda controversia que derive del presente Contrato, o que guarde relación con el mismo, su incumplimiento, resolución o validez, excepto por las controversias de naturaleza técnica, operativa o económica que se resuelvan de conformidad con la Cláusula 17.4 anterior, deberán ser resueltas exclusiva y definitivamente mediante arbitraje, de conformidad con las Reglas de la LCIA, las cuales se incorporan a la presente Cláusula por referencia como si a la letra se insertasen.*

*b) La sede del arbitraje será la ciudad de México, Distrito Federal, y el arbitraje se conducirá en idioma español.*

*(c) La Ley Aplicable al fondo del arbitraje será la ley de México.*

*(d) El tribunal arbitral se integrará por 3 (tres) árbitros, uno designado por el Proveedor y uno por la Comisión en la Solicitud de Arbitraje y en la Contestación o petición de prórroga para la misma, respectivamente, y el tercero, quien será el presidente, será designado por acuerdo de los 2 (dos) árbitros designados por el Proveedor y la Comisión; dentro de los 30 (treinta) Días siguientes a la confirmación de los dos primeros árbitros por el LCIA.*

---

[108]    Oficio HECC0-O-0106/2022, Anexo D-TPP-42.
[109]    Oficio GG-TMC-027-22, Anexo D-TPP-50.
[110]    Oficio LCPL-OPS-CFE-0126, Anexo D-GF-143.
[111]    Oficio HECC30-O-0013/2023, Anexo D-TPP-53.

*(e) Si alguna de las Partes no designa un árbitro según lo indicado en esta Cláusula o si los 2 (dos) árbitros designados por las Partes no llegan a un acuerdo en la designación del tercer árbitro dentro del plazo señalado, dicho árbitro será nombrado por el Secretario del LCIA.*

*(f) El laudo arbitral será definitivo y obligatorio para el Proveedor y la Comisión.*

*(g) El proceso arbitral será confidencial y cualquier Persona que participe en el mismo deberá guardar reserva, incluyendo, sin limitación, en cuanto a las actuaciones arbitrales y cualquier documento presentado en el arbitraje, salvo y en la medida en que su revelación sea exigida a una Parte en ejercicio de su legítimo derecho para proteger cualquier derecho o ejecutar o impugnar cualquier laudo ante una corte competente o cualquier otra autoridad.*

*(h) El tribunal arbitral deberá aceptar como definitivo y obligatorio cualquier dictamen, si lo hubiere, de un Experto respecto de aspectos técnicos, operativos o económicos en términos de la Cláusula 17.4, salvo en caso de (i) irregularidades en la designación del Experto, o (ii) error manifiesto, fraude o mala fe en su dictamen.*

*(i) Si alguna de las Partes desea impugnar el dictamen del Experto deberá promover un arbitraje de conformidad con esta Cláusula dentro de los 30 (treinta) Días de la notificación del dictamen, y deberá expresar en la Solicitud de Arbitraje en qué causal o causales de las enumeradas en este párrafo fundamenta su impugnación. En caso de que se invoque la causal de error manifiesto, el Tribunal deberá determinar que el mismo afecta sustancialmente el resultado del desacuerdo o controversia y constatar la existencia de dicha causal solamente con base en el texto de la determinación del Experto.*

*(j) No obstante que una controversia sea sometida a arbitraje, las Partes deberán continuar cumpliendo con sus obligaciones al amparo del presente Contrato, salvo que se decrete alguna providencia precautoria por el tribunal arbitral.*

120. El 10 de mayo de 2021, las Demandadas presentaron su Contestación a la Solicitud. En la Contestación, las Demandadas nominaron al Dr. Oscar Vásquez del Mercado Cordero como coárbitro;

121. El 20 de julio de 2021, la Corte de la LCIA nombró a Christian Albanesi como Presidente del Tribunal Arbitral, tras la nominación conjunta de los coárbitros, y a David Arias y Oscar Vásquez del Mercado Cordero como coárbitros. En la misma fecha, la Secretaría de la LCIA notificó a las Partes la constitución del Tribunal Arbitral.

122. El 29 de julio de 2021, Greenfield presentó una solicitud de incorporación de TPP y TMC al presente arbitraje ("**Solicitud de Incorporación**"), en los términos del artículo 22.1(x) del Reglamento. Asimismo, Greenfield solicitó la suspensión del plazo de presentación del Memorial de Demanda y que se retomase la discusión sobre la conducción del procedimiento una vez que el Tribunal Arbitral haya resuelto la solicitud de incorporación.

123. El 1 de agosto de 2021, Greenfield remitió al Tribunal Arbitral y a las Demandadas un documento suscrito por TPP y TMC el 30 de julio de 2021, en el cual manifestaron su consentimiento a ser incorporados a este arbitraje.

124.  El 5 de agosto de 2021, las Demandadas presentaron sus comentarios a la Solicitud de Incorporación. En dicha comunicación, las Demandadas indicaron que no tenían objeción a la suspensión del plazo para la presentación del Memorial de Demanda previsto en el Art. 15.2 del Reglamento.

125.  El 6 de agosto de 2021, Greenfield solicitó que se le concediera un plazo razonable para pronunciarse sobre las manifestaciones de las Demandadas respecto de la Solicitud de Incorporación.

126.  El 6 de agosto de 2021, el Tribunal Arbitral confirmó la suspensión del plazo para la presentación del Memorial de Demanda hasta que se resuelva la Solicitud de Incorporación. Asimismo, el Tribunal Arbitral: (i) invitó a Greenfield a presentar sus comentarios, exclusivamente, respecto de las manifestaciones vertidas por las Demandadas en su escrito precedente, el o antes del 12 de agosto de 2021; e (ii) invitó a las Demandadas a presentar sus comentarios, exclusivamente, respecto de las manifestaciones que realice Greenfield en su siguiente escrito, el o antes del 19 de agosto de 2021.

127.  El 12 de agosto de 2021, Greenfield presentó sus comentarios adicionales respecto de las manifestaciones vertidas por las Demandadas en su comunicación del 5 de agosto de 2021.

128.  El 19 de agosto de 2021, las Demandadas presentaron sus comentarios adicionales respecto de las manifestaciones vertidas por Greenfield en su comunicación del 12 de agosto de 2021.

129.  El 13 de septiembre de 2021, el Tribunal Arbitral informó a Greenfield y las Demandadas que, luego de analizar detenidamente sus respectivas alegaciones respecto de la Solicitud de Incorporación, consideraba conveniente invitarlas a manifestarse sobre las siguientes cuestiones:

   *a. "Las Partes han debatido extensamente sobre si TPP y TMC son, o no, partes del Contrato de Prestación de Servicios de Transporte y Almacenamiento de Carbón ("Contrato"). Si el Tribunal Arbitral concluyera que TPP y TMC no son partes del Contrato, ¿cuál sería el efecto de dicha conclusión sobre la Solicitud de Incorporación, a la luz de lo previsto en el Art. 22.1(x) del Reglamento LCIA?*

   *b. En relación con la pregunta precedente, el Tribunal Arbitral ha podido consultar tres artículos doctrinales (en inglés) que analizan el mecanismo de incorporación de terceros previsto en el Art. 22.1(x) del Reglamento LCIA. Lamentablemente, el Tribunal Arbitral no ha encontrado traducciones al español de dichos artículos, ni tampoco ha logrado hallar otros artículos sobre este tema. Sin perjuicio de lo anterior, el Tribunal Arbitral invita a las Partes a realizar cualquier manifestación que entiendan conveniente sobre el contenido de estos artículos, en lo que se refiere al mecanismo de incorporación de terceros bajo el Reglamento LCIA. Desde luego, las Partes son libres de aportar cualquier otra fuente de doctrina que entiendan pertinente sobre este tema.*

> *c. Teniendo en cuenta que la Demandada ha manifestado que no ha dirigido ninguna reclamación en contra de TPP o TMC (ver, por ej., §34 del escrito del 5 de agosto de la Demandada), y atendiendo a lo previsto en la Cláusula 4.6(f) del Contrato, si el Tribunal Arbitral decidiera incorporar a TPP y TMC al arbitraje, ¿cuál sería el rol específico que TPP y TMC ocuparían en el arbitraje? Por ejemplo, ¿cuál sería el rol procesal de TPP y TMC en la fase escrita del procedimiento o en el desarrollo de la audiencia, incluyendo durante el interrogatorio de testigos y peritos? Al responder esta cuestión, las Partes deben tener en cuenta que una potencial (y aun no resuelta) incorporación de TPP y TMC al arbitraje no debería causar ningún desequilibrio procesal en detrimento de la Demandada."*

130.    A dichos efectos, el Tribunal Arbitral invitó a Greenfield y las Demandadas a una conferencia virtual para oírlas sobre estas cuestiones, a celebrarse el 23 de septiembre de 2021, sin perjuicio de solicitarles que hicieran llegar sus comentarios, por escrito, respecto de las cuestiones planteadas el 20 de septiembre de 2021.

131.    Asimismo, el Tribunal Arbitral sostuvo que no tendría objeciones a que TPP y TMC participasen de la conferencia pero únicamente en el caso de que tanto Greenfield como las Demandadas creyeran conveniente su participación y lo aceptasen expresamente, señalando que si TPP y TMC llegasen a participar de la conferencia, sería únicamente para aclarar cualquier inquietud que podría llegar a tener el Tribunal Arbitral una vez recibida las manifestaciones escritas de Greenfield y las Demandadas, y en el entendido de que su participación en la conferencia sería en carácter de terceros al arbitraje.

132.    El 21 de septiembre de 2021, Greenfield y las Demandadas presentaron sus comentarios a las cuestiones planteadas por el Tribunal Arbitral, confirmando su participación en la conferencia convocada para el 23 de septiembre de 2021. En su comunicación de dicha fecha, las Demandadas manifestaron su oposición a la participación de TPP y TMC en la conferencia.

133.    El 23 de septiembre de 2021, Greenfield, las Demandadas y el Tribunal Arbitral mantuvieron una conferencia para aclarar ciertas dudas del Tribunal Arbitral.

134.    El 5 de octubre de 2021, el Tribunal Arbitral recibió una comunicación directa por parte de TPP y TMC. En dicha comunicación, TPP y TMC adjuntaron un escrito de Expresión de Consentimiento, con sus respectivos Anexos.

135.    El 7 de octubre de 2021, el Tribunal Arbitral respondió la comunicación de TPP y TMC, manifestando que dicho escrito no forma parte del expediente ya que TPP y TMC no eran partes del presente arbitraje.

136.    En la misma fecha, el Tribunal Arbitral puso en conocimiento de Greenfield y las Demandadas la comunicación de TPP y TMC, remitiendo a Greenfield y las Demandadas dicha

comunicación y la respuesta del Tribunal. A la misma vez, el Tribunal Arbitral informó a Greenfield y las Demandadas que el escrito de TPP y TMC no sería considerado por el Tribunal Arbitral a los efectos de decidir sobre la solicitud de incorporación pendiente.

137.    En respuesta, el mismo 7 de octubre de 2021, las Demandadas realizaron observaciones respecto de la comunicación de TPP y TMC, manifestando que dicha comunicación ponía de manifiesto que TPP y TMC se encontraban indebidamente enterados de las actuaciones del arbitraje, lo cual, según las Demandadas, configuraría una violación a los deberes de confidencialidad dispuestos en el art. 30 del Reglamento.

138.    El 8 de octubre de 2021, Greenfield informó al Tribunal Arbitral que no había tenido conocimiento del contenido del escrito de TPP y TMC, ni del envío del mismo por parte de éstos, acusando recibo de la comunicación de las Demandadas de fecha 7 de octubre de 2021, y reservándose su derecho de responder.

139.    El 12 de octubre de 2021, Greenfield envió una comunicación al Tribunal Arbitral, manifestando en resumen su rechazo a las afirmaciones de las Demandadas respecto de la supuesta violación de los deberes de confidencialidad, y brindando sus argumentos al respecto.

140.    El mismo día, 12 de octubre de 2021, las Demandadas enviaron una comunicación al Tribunal Arbitral y a Greenfield refrendando su posición.

141.    El 21 de octubre de 2021, el Tribunal Arbitral dictó la Orden de Procedimiento No. 1, en la cual se admitió la Solicitud de Incorporación de TPP y TMC efectuada por Greenfield sujeto a ciertos términos y condiciones.

142.    El 27 de octubre de 2021, TPP y TMC comunicaron su aceptación a comparecer en el presente arbitraje en los términos y condiciones fijados por el Tribunal Arbitral en la Orden de Procedimiento No. 1, incluyendo, entre otras, la aceptación expresa de TPP y TMC a la conformación del Tribunal Arbitral.

143.    El 30 de noviembre de 2021 a las 11:00 de la Ciudad de México, tuvo lugar la conferencia de conducción del procedimiento entre las Partes y el Tribunal Arbitral, en la que las Partes presentaron sus posiciones respecto de las reglas aplicables al presente arbitraje, y realizaron sus propuestas sobre el calendario procesal.

144.    El 3 de febrero de 2022, el Tribunal Arbitral dictó la Orden de Procedimiento No. 2, en la cual se fijó el calendario procesal que regiría la conducción del arbitraje. El candelario no preveía fecha específica para la Audiencia.

145.    El 13 de febrero de 2022, tras consultar con las Partes, el Tribunal Arbitral fijó la Audiencia para la semana del 10 de julio de 2023 en la Ciudad de México, en sede a confirmar.

146.    El 6 de abril de 2022, las Demandantes presentaron su Memorial de Demanda, junto con pruebas documentales, declaraciones de testigos e informes de peritos.

147.    El 6 de abril de 2022, las Demandadas presentaron su Memorial de Demanda Reconvencional, junto con pruebas documentales, declaraciones de testigos e informes de peritos.

148.    El 10 de junio de 2022, las Demandantes presentaron su Memorial de Contestación a la Demanda Reconvencional, junto con pruebas documentales, declaraciones de testigos e informes de peritos.

149.    El 7 de agosto de 2022, las Demandadas solicitaron un plazo adicional al establecido en el Calendario Procesal de al menos 30 días para la presentación de su Memorial de Contestación.

150.    El 8 de agosto de 2022, las Demandantes presentaron sus comentarios sobre la solicitud de las Demandadas.

151.    El 9 de agosto de 2022, el Tribunal Arbitral emitió la Orden de Procedimiento No. 3, mediante la cual decidió (i) otorgar una prórroga a las Demandadas hasta el 15 de agosto de 2022 para la presentación de su Memorial de Contestación; (ii) que los 6 días de prorroga concedidos a las Demandadas para la presentación del Memorial de Contestación serían descontados del plazo correspondiente para la presentación del Memorial de Replica a la Contestación de Demanda Reconvencional; y (iii) ajustar el Calendario Procesal según lo dispuesto en el Anexo 1 de la propia Orden de Procedimiento No. 3.

152.    El 11 de agosto de 2022, TPP y TMC presentaron una Solicitud de Medida Cautelar de Pago Provisional, junto con un dictamen pericial y documentos relacionados ("**Solicitud Medida Cautelar**") y con esa misma fecha Greenfield informó al Tribunal Arbitral que suscribía la comunicación previa de TPP y TMC.

153.    El 12 de agosto de 2022, el Tribunal Arbitral acusó recibo de la Solicitud, y acompañó una copia para información de las Demandadas. En vista de la extensión de la Solicitud Medida Cautelar y de la presentación de un dictamen pericial, el Tribunal Arbitral invitó a las

Demandadas a presentar una contestación en un plazo de 6 semanas, es decir, a más tardar, el 23 de septiembre de 2022.

154.    Asimismo, dada la presentación del dictamen pericial por las Demandantes, el Tribunal Arbitral invitó a las Partes a indicar si solicitarían una audiencia para la Solicitud Medida Cautelar, a efectos de reservar en ese caso fechas a la mayor brevedad.

155.    El 15 de agosto de 2022, las Demandadas presentaron su Memorial de Contestación a la Demanda, junto con pruebas documentales, declaraciones de testigos e informes de peritos.

156.    El 17 de agosto de 2022, TPP y TMC indicaron que la celebración de una audiencia relacionada a la Solicitud Medida Cautelar no sería necesaria, pues los hechos, argumentos y pruebas que sustentaban su procedencia estaban ampliamente explicados en la Solicitud Medida Cautelar. Asimismo, señalaron que una audiencia retrasaría la decisión sobre una petición que era urgente por naturaleza. Sin perjuicio de lo anterior, TPP y TMC señalaron que la celebración de la audiencia podría volverse necesaria en vista de la evidencia que, en su caso, presentase CFE. El mismo día, Greenfield manifestó su conformidad con la comunicación de TPP y TMC.

157.    El 24 de agosto de 2022, CFE indicó que, ya desde el comienzo del arbitraje, se había opuesto a la incorporación de TPP y TMC como partes, anunciando que su participación, lejos de contribuir al esclarecimiento de los hechos, entorpecería la tramitación del procedimiento.

158.    El 25 de agosto de 2022, el Tribunal Arbitral informó a las Partes que, en vista de sus respectivas posiciones, consideraba prudente reservar una fecha tentativa de audiencia para la Solicitud Medida Cautelar, independientemente de que luego se confirmase o no.

159.    El 26 de agosto de 2022, las Partes informaron al Tribunal que habían acordado fijar el 6 de octubre de 2022 como fecha tentativa de audiencia sobre la Solicitud Medida Cautelar, la cual sería confirmada o no posteriormente.

160.    El 23 de septiembre de 2022, las Demandadas presentaron su contestación a la Solicitud Medida Cautelar.

161.    El 30 de septiembre de 2022, las Demandantes indicaron que, tras la presentación de la Solicitud Medida Cautelar y su respectiva Contestación por parte de CFE, estimaban que la evidencia presentada por las Partes no ameritaba la celebración de una audiencia para el análisis o desahogo de las pruebas aportadas.

162.    El mismo día, el Tribunal Arbitral invitó a las Demandadas a presentar sus comentarios respecto de la comunicación de las Demandantes, a más tardar, el lunes 3 de octubre de 2022. Asimismo, el Tribunal Arbitral informó a las Partes que, sin perjuicio de los comentarios de las Demandadas, el Tribunal Arbitral no consideraba necesaria la realización de la audiencia.

163.    También el mismo día, las Demandadas indicaron que no consideraban pertinente la celebración de una audiencia con motivo de la Solicitud Medida Cautelar.

164.    El 3 de octubre de 2022, el Tribunal Arbitral tomó nota de que las Partes coincidían en que la evidencia presentada no ameritaba la celebración de una audiencia.

165.    El 17 de octubre de 2022, las Partes intercambiaron simultáneamente las Solicitudes de Exhibición de Documentos ("**Solicitudes de Documentos**").

166.    El 7 de noviembre de 2022, el Tribunal Arbitral dictó la Orden de Procedimiento No. 4, desestimando la Solicitud Medida Cautelar.

167.    El 7 de noviembre de 2022, el Tribunal Arbitral dictó la Orden de Procedimiento No. 5, resolviendo las Solicitudes de Documentos.

168.    El 30 de enero de 2023, las Demandantes presentaron su Memorial de Réplica a la Contestación de la Demanda Principal, junto con pruebas documentales, declaraciones de testigos e informes de peritos.

169.    El 21 de febrero de 2023, las Demandas presentaron su Memorial de Réplica a la Contestación de Demanda Reconvencional, junto con pruebas documentales, declaraciones de testigos e informes de peritos;

170.    El 24 de abril de 2023, las Demandantes presentaron su Memorial de Dúplica a la Réplica de la Contestación de la Demanda Reconvencional, junto con pruebas documentales, declaraciones de testigos e informes de peritos.

171.    El 27 de abril de 2023, tras consultar con las Partes, el Tribunal Arbitral decidió que la Audiencia se celebre en el Hotel DoubleTree by Hilton México City Santa Fe.

172.    El 10 de mayo de 2023, las Demandadas presentaron su Memorial de Dúplica a la Réplica de la Demanda Principal, junto con pruebas documentales, declaraciones de testigos e informes de peritos.

173.   El 12 y 13 de junio de 2023, las Partes comunicaron al Tribunal Arbitral los nombres de los testigos y peritos que desean llamar a la Audiencia.

174.   El 19 de junio de 2023, las Partes y el Tribunal Arbitral celebraron la Conferencia Pre-Audiencia, en la que se discutieron los aspectos relativos a la organización de la Audiencia.

175.   El 3 de julio de 2023, el Tribunal Arbitral dictó la Orden de Procedimiento No. 6, sobre la organización de la Audiencia.

176.   La Audiencia se celebró en forma presencial entre el 10 y el 14 de julio de 2023 en la Ciudad de México, en el Hotel DoubleTree by Hilton México City Santa Fe.

177.   El 19 de julio de 2023, el Tribunal Arbitral dictó la Orden de Procedimiento No. 7, en la cual se recapitularon los acuerdos alcanzados por las Partes y el Tribunal Arbitral. El Tribunal Arbitral también invitó a las Partes a identificar en sus conclusiones las cláusulas contractuales aplicables, su interpretación, y los documentos fácticos que sustenten sus posiciones respecto de cada una de las cuestiones controvertidas;

178.   El 22 de agosto de 2023, las Partes presentaron la versión conciliada de las transcripciones de la Audiencia, e informaron al Tribunal Arbitral la fecha de presentación de los Escritos de Conclusiones y Costos.

179.   El 26 de septiembre de 2023, las Partes presentaron sus Escritos de Conclusiones.

180.   El 4 de octubre de 2023, las Partes presentaron sus Escritos de Costos.

## 4.    PRETENSIONES DE LAS PARTES

181.   Las pretensiones de Greenfield (**Sección 4.1**), TPP y TMC (**Sección 4.2**) y las Demandadas (**Sección 4.3**) son las siguientes:

## 4.1    Pretensiones de Greenfield

182.   En su Memorial de Réplica, Greenfield solicita al Tribunal Arbitral lo siguiente:

> *"a. Se declare que Greenfield no es responsable del pago de indemnización con motivo de las "Sobreestadías de buques": (i) al considerar que las sobreestadías se debieron a la falta de planeación, por parte de CFE, respecto de la compra y consumo de carbón; (ii) al no haber tenido Greenfield obligación de descargar buques previo a la Fecha de Operación Comercial; (iii) al haber resultado imposible para Greenfield descargar los buques que arribaron de forma posterior a la Fecha de Operación Comercial dentro de los Tiempos de Plancha por la situación provocada por CFE, (iv) al no haber iniciado el cómputo de Tiempo de Plancha en ningún caso; y (v) al no actualizarse los supuestos de la cláusula 10.2*

*B del Contrato TSA en perjuicio de Greenfield. Por lo anterior, las Demandadas carecen de derecho para reclamar su pago a Greenfield;*

*b. Se declare indebido el cobro de la Garantía Operativa ejercido por las Demandadas, y en consecuencia;*

*c. Se condene a las Demandadas a la devolución íntegra a Greenfield de las cantidades que ejercieron respecto de la Garantía Operativa, por la cantidad de USD $6'911,333.11 más IVA.*

*d. Se condene a las Demandadas al pago del interés del gasto financiero con motivo del cobro indebido de la Garantía Operativa relacionado con las "Sobreestadías de buques", dentro de los 5 días hábiles siguientes al laudo arbitral, en términos de la Cláusula 4.8(b)(iii) del Contrato y en términos de las cuantificaciones que se realicen por experto en este arbitraje;*

*e. Se condene a las Demandadas al pago de las cantidades por concepto de Cargo por Servicios Portuarios con base en la Cantidad Firme Anual, por las cantidades siguientes:*

*i. USD $4'039,727.10 más IVA, correspondiente al primer año operativo (que transcurrió del 16 de agosto de 2019 al 15 de agosto de 2020),*

*ii. USD $9'632,084.80 más IVA, correspondiente al segundo año operativo (que transcurrió del 16 de agosto de 2020 al 15 de agosto de 2021), y*

*iii. USD $9'603,492.13 más IVA, correspondiente al tercer año operativo (que transcurrió del 16 de agosto de 2021 al 15 de agosto de 2022).*

*Lo anterior, en términos de las Cláusulas use or pay y hell or high water y Anexo 2 del Contrato TSA, ordenando que dicho pago se realice directamente a TPP con el consentimiento de Greenfield para ello;*

*f. Se condene a las Demandadas al pago de las cantidades por concepto de intereses moratorios, ante el incumplimiento de pago del Cargo por Servicios Portuarios por CFE, en términos de la Cláusula 7.3 del Contrato TSA y las cuantificaciones que se realicen por experto en este arbitraje;*

*g. Se ordene a CFE a pagar en tiempo y forma el Cargo por Servicios Portuarios de los años operativos subsecuentes durante la vigencia del Contrato TSA, considerándolo como un cargo mínimo a ser calculado con base en la Cantidad Firme Anual a la cual se sumará, en su caso, cualesquier toneladas descargadas en adición a dicha Cantidad Firme Anual. Lo anterior, ordenando que dicho pago se realice directamente a TPP con el consentimiento de Greenfield para ello;*

*h. Se condene a la CFE el pago de la pena convencional prevista en el Anexo 2 del Contrato TSA, y su correlativo Anexo 7 del Contrato O&M, referente a las sobreestadías del carbón de la CFE en la Terminal por un tiempo superior al periodo de libre almacenaje, por la cantidad de USD $6,919,636.00 más IVA;*

*i. Deseche todas y cada una de las pretensiones de la Comisión y CFE Generación con relación a la incorporación/permanencia de TPP y TMC y confirme dicha incorporación, en virtud de los argumentos expuestos en la Solicitud de Incorporación, en el Pronunciamiento a las Manifestaciones CFE, en la Orden Procesal 1 y en el presente Memorial.*

*j. Ordenar a las Demandadas pagar los gastos y costos originados con motivo del presente procedimiento arbitral, incluyendo el pago de honorarios de abogados incurridos por las Demandantes, considerando, entre otros aspectos, la mala fe con la que se han conducido las Demandadas."*

183. En su Memorial de Dúplica a la Demanda Reconvencional, Greenfield solicita al Tribunal Arbitral lo siguiente:

*"A. Tenga por presentado este Memorial de Dúplica;*

*B. Desestime todas y cada una de las pretensiones formuladas en el Memorial de Réplica de CFE en forma definitiva;*

*C. Condene a CFE a pagar a Greenfield los gastos y costos del presente arbitraje, así como, declare procedente las condenas que Greenfield ha reclamado a CFE en el presente arbitraje.*

*D. Absuelva a Greenfield de todas y cada una de las pretensiones reclamadas en el Memorial de Demanda Reconvencional;"*

184. En su Memorial de Conclusiones, Greenfield solicita al Tribunal Arbitral lo siguiente:

*"1. Pretensión declarativa con motivo de las Sobreestadías de Buques.*

*(i) Que Greenfield no es responsable del pago de una indemnización por daños y perjuicios con motivo de las sobreestadías de los quince buques que se le reclaman, al no actualizarse en su perjuicio los supuestos de la cláusula 10.2 B del Contrato TSA.*

> *(a) Al considerar que las sobreestadías se debieron a la falta de planeación, por parte de CFE, respecto de la compra y consumo de carbón; (b) al no haber tenido Greenfield obligación de descargar buques previo a la Fecha de Operación Comercial; (iii) al haber resultado imposible para Greenfield descargar los buques que arribaron de forma posterior a la Fecha de Operación Comercial dentro de los Tiempos de Plancha por la situación provocada por CFE, (iv) al no haber iniciado el cómputo de Tiempo de Plancha en ningún caso y (v) en todo caso la indemnización de daños y perjuicios de no haber alcanzado la Fecha de Operación Comercial el 21 de mayo de 2019 ha quedado resarcido con motivo del pago de la Pena Convencional por Greenfield.*

*(ii) Que la Comisión conforme a la Cláusula 10.2 B del Contrato TSA, contribuyó a la generación de las sobreestadías de los quince buques cuya indemnización por daños y perjuicios reclama a Greenfield.*

*(iii) Se declare indebido el cobro de la Garantía Operativa por parte de la Comisión.*

*(iv) Por lo tanto, se absuelva a Greenfield de todas y cada una de las prestaciones declarativas y de condena reclamadas por las Demandadas en su acción reconvencional y se declare que TPP y TMC tienen legitimación activa para hacer reclamos directamente a la Comisión.*

*2. Pretensión de condena con motivo de las Sobreestadías de Buques.*

*(i) Como consecuencia del cobro indebido de la Garantía Operativa por la Comisión, se condene a las Demandadas a la devolución íntegra a Greenfield de las cantidades que ejercieron respecto de la Garantía Operativa, de USD $6'911,333.11 dólares, más el IVA respectivo.*

*(ii) Se condene a las Demandadas al pago del interés del gasto financiero con motivo del cobro indebido de la Garantía Operativa relacionado con las "Sobreestadías", dentro de los 5 días hábiles siguientes al laudo arbitral, en términos de la Cláusula 4.8(b)(iii) del Contrato TSA, que a la fecha de este memorial se ha cuantificado en $537,350.15 dólares, más el IVA respectivo*

*3. Pretensión declarativa con motivo del Cargo por Servicios Portuarios.*

*(i) Declare que las Demandadas ha incumplido el Contrato TSA al abstenerse de pagar el Cargo por Servicios Portuarios por un volumen mínimo anual de 1.3 millones de toneladas métricas de carbón por los periodos de primero, segundo, tercero y el cuarto años operativos.*

*4. Pretensión de condena con motivo del Cargo por Servicios Portuarios.*

*(i) Se condene a las Demandadas al pago de las cantidades por concepto de la Cantidad Firme Anual y en específico el Cargo por Servicios Portuarios, en términos de las Cláusulas use or pay y hell or high water y Anexo 2 del Contrato TSA, por las siguientes cantidades:*

> *a. USD 4'039,727.10 dólares correspondientes al primer año operativo, del 16 de agosto de 2019 al 15 de agosto de 2020, más IVA.*

> *b. USD 9'632,084.80 dólares correspondientes al segundo año operativo, del 16 de agosto de 2020 al 15 de agosto de 2021, más IVA.*

> *c. USD 9'603,492.13 dólares correspondientes al tercer año operativo, del 16 de agosto de 2021 al 15 de agosto de 2022, más IVA.*

> *d. USD 8'561,715.85 dólares correspondientes al cuarto año operativo, del 16 de agosto de 2022 al 15 de agosto de 2023, más IVA*

*Ordenando que ese pago sea por los periodos que se generen durante la vigencia del Contrato TSA, y que dicho pago se realice directamente a TPP con el consentimiento de Greenfield para ello.*

*(ii) Ordene a las Demandadas a pagar en tiempo y forma el Cargo por Servicios Portuarios de los años operativos subsecuentes durante la vigencia del Contrato TSA, considerándolo como un cargo mínimo a ser calculado con base en la Cantidad Firme Anual a la cual se sumará, en su caso, cualesquier toneladas descargadas en adición a dicha Cantidad Firme Anual. Lo anterior, ordenando que dicho pago se realice directamente a TPP con el consentimiento de Greenfield para ello;*

*(iii) Condene a las Demandadas al pago de las cantidades por concepto de intereses moratorios, ante el incumplimiento de pago del Cargo por Servicios Portuarios, hasta la fecha de su pago total, en términos de la Cláusula 7.3 del Contrato TSA y se haga el pago directamente o por conducto de Greenfield, a TPP de las siguientes cantidades, calculadas a la fecha de este memorial:*

> *(i) USD 398,383.47, correspondientes al primer año operativo, más IVA*

> *(ii) USD 610,582.21, correspondientes al segundo año operativo, más IVA*

> *(iii) USD 691,581.41, correspondientes al tercer año operativo, más IVA*

> *(iv) USD 7,949.80, correspondientes al cuarto año operativo, más IVA*

*5. Pretensión declarativa y de condena con motivo de la pena convencional causada por las sobreestadías de carbón en la Terminal TPP.*

*(i) Declare que las Demandadas están obligadas al pago de la pena convencional por las sobreestadías de carbón en la Terminal por un tiempo superior al periodo de libre almacenaje, prevista en el Anexo 2 del Contrato TSA, y su correlativo Anexo 7 del Contrato O&M, para lo cual Greenfield solicita al Tribunal que tenga por reproducido en este apartado, los montos y cuantificaciones directamente reclamadas por TPP y TMC en su Memorial de Conclusiones, tanto por principal como por intereses moratorios y/o accesorios, hasta la fecha de su pago total, y se haga el pago directamente o por conducto de Greenfield, a TPP.*

*6. Pretensiones relacionadas con los costos del arbitraje y cualquier otro remedio que el Tribunal Arbitral considere.*

*(i) Condene a la Comisión a pagar los gastos y costas en los que Greenfield incurrieron en el Arbitraje, en términos de la Orden de Procedimiento número 7 y ordene cualquier otra declaración o condena que el Tribunal Arbitral considere pertinente para preservar y proteger la postura y derechos de Greenfield en acatamiento de una reparación integral que en este arbitraje se reclaman a las Demandadas."*

## 4.2    Pretensiones de TPP y TMC

185.    En su Memorial de Réplica, TPP y TMC solicitan al Tribunal Arbitral lo siguiente:

*"(i) Declare que TPP y TMC son parte del Contrato TSA y que han participado eficientemente como partes en este arbitraje, por lo que no excedieron los términos y alcances de su incorporación.*

*(ii) Declare que TPP y TMC tienen legitimación activa para hacer reclamos directamente a la Comisión.*

*(iii) Declare que el acuerdo use-or-pay previsto, ejemplificativa pero no limitativamente, en las cláusulas 4.4, 5.5, 5.6, 6.1, 6.2 y Anexo 2 del Contrato TSA, comprende la contraprestación identificada como Cargo por Servicios Portuarios, que debe calcularse y cubrirse junto con el Impuesto al Valor Agregado correspondiente, por los años operativos transcurridos y los subsecuentes durante la vigencia del Contrato TSA, con base en un volumen mínimo equivalente a la Cantidad Firme Anual a la que se sumará, en su caso, cualesquier toneladas descargadas por encima de dicha Cantidad Firme Anual para cada año operativo.*

*(iv) Declare que la posición adoptada por las Demandadas, en cuanto a la exclusión del Cargo por Servicios Portuarios de la modalidad use-or-pay y sujeto a la condición de que existan toneladas efectivamente descargadas carece de sustento legal y/o contractual.*

*(v) Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP el Cargo por Servicios Portuarios con base en la Cantidad Firme Anual, por las cantidades siguientes, a las que deberán agregarse los intereses moratorios calculados en términos del Contrato TSA y el Impuesto al Valor Agregado correspondiente:*

*(a) USD $4,039,727.10 correspondiente al primer año operativo, que transcurrió del 16 de agosto de 2019 al 15 de agosto de 2020,*

*(b) USD $9,632,084.80 correspondiente al segundo año operativo, que transcurrió del 16 de agosto de 2020 al 15 de agosto de 2021, y*

*(c) USD $9,603,492.13 correspondiente al tercer año operativo, que transcurrió del 16 de agosto de 2021 al 15 de agosto de 2022.*

*(vi) Declare que las sobreestadías de carbón en la Terminal por un tiempo superior al periodo de libre almacenaje obedecen a conductas imputables a CFE.*

*(vii) Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP el Cargo Variable por Sobreestadías, en términos del apartado 2.3.1 del Anexo 2 del Contrato TSA y su correlativo Anexo 7 del Contrato O&M, en un monto no menor a USD $6,919,636 más el Impuesto al Valor Agregado correspondiente."*

186.  En su Memorial de Dúplica a la Demanda Reconvencional, TPP y TMC solicitan al Tribunal Arbitral lo siguiente:

*"(i) Declare procedentes todas y cada una de las pretensiones formuladas por TPP y TMC en su Memorial de Contestación a la Reconvención.*

*(ii) Declare que la participación de TPP y TMC en la fase reconvencional de este arbitraje es pertinente y justificada.*

*(iii) Rechace cualquier pretensión, argumento o interpretación propuesta por CFE en la litis reconvencional.*

*(iv) Declare la procedencia de las posturas, argumentos e interpretaciones expuestas por TPP y TMC en la etapa reconvencional.*

*(v) Condene a la CFE al pago de todos los gastos y costas derivados de la tramitación del presente arbitraje."*

187.  En su Memorial de Conclusiones, TPP y TMC solicitan al Tribunal Arbitral lo siguiente:

*"1. Pretensiones declarativas relacionadas con el pago del Cargo por Servicios Portuarios por un monto mínimo equivalente la Cantidad Firme Anual.*

*TPP y TMC solicitan al Tribunal que:*

*1.1. Declare que el Contrato TSA obliga a la Comisión a pagar a TPP, directamente o por conducto de Greenfield, el Cargo por Servicios Portuarios por un volumen mínimo anual de 1.3 millones de toneladas métricas de carbón, bajo la modalidad use-or-pay prevista enunciativamente (i) en la definición de Cantidad Firme Anual, (ii) en las cláusulas 4.4, 5.5, 5.6, 6.1, 6.2 y (iii) en el Anexo 2 del Contrato TSA.*

*1.2. Declare que la Comisión ha incumplido el Contrato TSA al abstenerse de pagar a TPP y/o a Greenfield el Cargo por Servicios Portuarios por un volumen mínimo anual de 1.3 millones de toneladas métricas de carbón al concluir el primer, el segundo, el tercer y el cuarto años operativos.*

*1.3. Declare que la Comisión está obligada a pagar a TPP, directamente o por conducto de Greenfield, el Cargo por Servicios Portuarios por un volumen mínimo anual de 1.3 millones de toneladas métricas de carbón, bajo la modalidad use-or-pay y en términos del Contrato TSA, hasta la conclusión de su vigencia.*

*1.4. Declare que las posiciones e interpretaciones adoptadas por las Demandadas, en cuanto a que el Cargo por Servicios Portuarios (i) sólo debe pagarse por la cantidad que equivalga a las toneladas descargadas en la Terminal y (ii) está excluido de la modalidad use-or- pay y, por tanto, no debe pagarse por un mínimo equivalente a la Cantidad Firme Anual, carecen de sustento legal y/o contractual. Es decir, que declare que la interpretación que CFE ha hecho del Contrato TSA en este arbitraje en cuanto al pago del Cargo por Servicios Portuarios y su consecuente abstención de pagarlo al final de cada año operativo son incorrectas y/o ilegales.*

*2. Pretensiones de condena al pago del Cargo por Servicios Portuarios por un monto mínimo equivalente la Cantidad Firme Anual.*

*TPP y TMC solicitan al Tribunal que:*

*2.1. Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP el Cargo por Servicios Portuarios con base en la Cantidad Firme Anual por las cantidades siguientes:*

> *(i) USD 4'039,727.10 dólares correspondientes al primer año operativo, que transcurrió del 16 de agosto de 2019 al 15 de agosto de 2020.*

> *(ii) USD 9'632,084.80 dólares correspondientes al segundo año operativo, que transcurrió del 16 de agosto de 2020 al 15 de agosto de 2021.*

> *(iii) USD 9'603,492.13 dólares correspondientes al tercer año operativo, que transcurrió del 16 de agosto de 2021 al 15 de agosto de 2022.*

> *(iv) USD 8'561,715.85 dólares correspondientes al cuarto año operativo, que transcurrió del 16 de agosto de 2022 al 15 de agosto de 2023.376*

*2.2. Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP los intereses moratorios causados a la fecha de presentación de este escrito, sobre las cantidades referidas en la pretensión 2.1 anterior y que ascienden a los siguientes montos:*

> *(i) USD 398,383.47, correspondientes al primer año operativo.*

> *(ii) USD 610,582.21, correspondientes al segundo año operativo.*

> *(iii) USD 691,581.41, correspondientes al tercer año operativo.*

> *(iv) USD 7,949.80, correspondientes al cuarto año operativo.*

*2.3. Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP los intereses moratorios (i) que se causen entre la fecha de presentación de este escrito y el laudo final y (ii) los que se causen con posterioridad al laudo final, hasta la total liquidación del adeudo, sobre las cantidades referidas en la pretensión 2.1 anterior, a la tasa prevista en la cláusula 7.3 del Contrato TSA.*

*2.4. Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP el Impuesto al Valor Agregado sobre las cantidades referidas en las pretensiones 2.1 y 2.2 anteriores, a la tasa aplicable del 16%, y que resulta en los montos siguientes:*

> *(i) USD 710,097.69 dólares correspondientes al primer año operativo.*

*(ii) USD 1'638,826.72 dólares correspondientes al segundo año operativo.*

*(iii) USD 1'647,211.76 dólares correspondientes al tercer año operativo.*

*(iv) USD 1'371,146.50 dólares correspondientes al cuarto año operativo.*

*3. Pretensiones declarativas y de condena relacionadas con la pena convencional causada por las sobreestadías de carbón en la Terminal TPP.*

*TPP y TMC solicitan al Tribunal que:*

*3.1. Declare que CFE está obligada al pago de la pena convencional por las sobreestadías de carbón que ocurrieron en la Terminal por un tiempo superior al periodo de libre almacenaje.*

*3.2. Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP el Cargo Variable por Sobreestadías, en términos del apartado 2.3.1 del Anexo 2 del Contrato TSA y su correlativo Anexo 7 del Contrato O&M, por un monto de USD 6'919,636 dólares.*

*3.3. Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP los intereses moratorios causados desde la fecha en la que la CFE reclamó el carbón de la Terminal de TPP, sobre las cantidades referidas en la pretensión 3.2 anterior, a la tasa prevista en la cláusula 7.3 del Contrato TSA.*

*3.4. Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP los intereses moratorios causados con posterioridad a la fecha del laudo final, y hasta la total liquidación del adeudo, sobre las cantidades referidas en la pretensión 3.2 anterior, a la tasa prevista en la cláusula 7.3 del Contrato TSA.*

*3.5. Condene a las Demandadas para que, directamente o por conducto de Greenfield, paguen a TPP los intereses moratorios causados con posterioridad a la fecha del laudo final, y hasta la total liquidación del adeudo, sobre las cantidades referidas en la pretensión 3.2 anterior, a la tasa prevista en la cláusula 7.3 del Contrato TSA.*

*4. Pretensiones relacionadas con la legitimación en la causa de TPP y TMC.*

*TPP y TMC solicitan al Tribunal que:*

*4.1. Declare que TPP y TMC son parte del Contrato TSA y que han participado eficientemente como partes en este arbitraje, por lo que no excedieron los términos y alcances de su incorporación.*

*4.2. Declare que TPP y TMC tienen legitimación activa para hacer reclamos directamente a la Comisión. En su defecto, declare que todos los reclamos que hicieron TPP y TMC los incorporó e hizo suyos Greenfield, quien cuenta con legitimación y autorización expresa de TPP y TMC para tal efecto.*

*5. Pretensiones relacionadas con los costos del arbitraje y otros remedios.*

*TPP y TMC solicitan al Tribunal que:*

*5.1. Ordene cualquier otra declaración o condena que el Tribunal Arbitral considere pertinente para tutelar los derechos de TPP y TMC, así como para otorgarles una reparación*

*integral respecto de todas las afectaciones sufridas por TPP y TMC por las conductas y omisiones que se imputan a la Comisión.*

*5.2. Condene a la Comisión a pagar los gastos y costas en los que TPP y TMC incurrieron en el arbitraje, según el Memorial de Costos que éstas presenten oportunamente en términos de la Orden de Procedimiento número 7."*

**4.3     Pretensiones de las Demandadas**

188.     En su Memorial de Dúplica, las Demandadas solicitan al Tribunal Arbitral lo siguiente:

*"SEGUNDO. - Declare infundadas e improcedentes las pretensiones de Greenfield, TPP y TMC;*

*TERCERO. - Absuelva a CFE y CFE Generación II de tosas y cada una de las pretensiones de las Demandantes;*

*CUARTO. - Declare que CFE y CFE Generación II no han incumplido sus obligaciones bajo el Contrato;*

*QUINTO. - Declare procedente la interpretación ofrecida por CFE y CFE Generación II del concepto de Cantidad Firme Anual, las cláusulas use-or-pay y hell-or-highwater, el Cargo Servicios Portuarios y el mecanismo de pago contenido en el Anexo 2 del Contrato;*

*SEXTO. - Libere a CFE y CFE Generación II de cualquier responsabilidad por las sobreestadías de los quince buques que descargaron carbón en 2019;*

*SÉPTIMO. - Absuelva a CFE y CFE Generación II del pago de las sobreestadías por la mayor permanencia del carbón en la Terminal TPP;*

*OCTAVO. - Declare que TPP y TMC han actuado en exceso su derecho de incorporación al Arbitraje bajo la Orden de Procedimiento No. 1 y en contra del principio de eficiencia y economía procesal;*

*NOVENO. - Tome las medidas procesales pertinentes para la conservación del equilibrio y debido proceso en el Arbitraje; y*

*DÉCIMO. - Condene a Greenfield, TPP y TMC al pago de todos los gastos y costas derivadas del Arbitraje."*

189.     En su Memorial de Demanda Reconvencional y Memorial de Réplica de la Demanda Reconvencional, las Demandadas solicitan al Tribunal Arbitral lo siguiente:

*"SEGUNDO. - Declare infundados e improcedentes los argumentos y defensas de Greenfield;*

*TERCERO. - Declare que Greenfield estaba obligada a alcanzar la Fecha de Operación Comercial el 21 de mayo de 2019, así como su cumplimiento a dicha obligación;*

*CUARTO. - Declare que Greenfield estaba obligada a prestar los Servicios de Transporte y Almacenamiento desde la Fecha de Inicio;*

*QUINTO. - Declare que Greenfield incumplió su obligación de prestar los Servicios de Transporte y Almacenamiento del carbón descargado en 2019 en los términos establecidos en el Anexo 6 del Contrato;*

*SEXTO. - Declare que Greenfield debió pagar la indemnización por concepto de las quince sobrestadías de los buques que fueron descargados fuera de los Tiempos de Plancha previstos en el Contrato;*

*SÉPTIMO. - Declare que CFE ejecutó debidamente la Garantía Operativa;*

*OCTAVO. -Declare la procedencia del cobro reclamado por CFE respecto de los gastos financieros generados hasta el 14 de abril de 2021;*

*NOVENO. - Desestime la Contestación a la Reconvención presentada por TPP y TMC, así como cualquier argumento, alegato, reclamación y prueba ofrecida por ellas en dicha Contestación;*

*DÉCIMO. - Declare que, en cualquier caso, las pretensiones de TPP y TMC respecto del mecanismo de cálculo del Cargo por Servicios Portuarios, son inadmisibles;*

*UNDÉCIMO. - Tome las medidas procesales pertinentes para la conservación del equilibrio y debido proceso en el Arbitraje; y*

*DUODÉCIMO. - Ordene a Greenfield, TPP y TMC al pago de todos los gasto y costas derivados del Arbitraje."*

190.   En su Memorial de Conclusiones, las Demandadas y Demandantes Reconvencionales solicitan al Tribunal Arbitral lo siguiente:

*"PRIMERO. - Tenga por presentado el Memorial de Conclusiones de las Demandadas;*

*SEGUNDO. - Declare infundadas e improcedentes las pretensiones de Greenfield, TPP y TMC;*

*TERCERO. - Absuelva a CFE y CFE Generación II de todas y cada una de las pretensiones de las Demandantes;*

*CUARTO. - Declare que CFE y CFE Generación II no han incumplido sus obligaciones bajo el Contrato TSA;*

*QUINTO. - Declare procedente las interpretaciones literal, teleológica e histórica ofrecidas por las Demandadas del concepto de Cantidad Firme Anual, las cláusulas use-or-pay y hell-or-highwater, el Cargo Servicios Portuarios y la mecánica de pago contenido en el Anexo 2 del Contrato;*

*SEXTO. - Declare que las Demandadas no han contravenido sus propios actos;*

*SÉPTIMO. - Libere a CFE y CFE Generación II de cualquier responsabilidad por las sobreestadías de los quince buques que descargaron carbón en 2019;*

*OCTAVO. - Declare que Greenfield es la única responsable por las sobreestadías de los quince buques que descargaron carbón en 2019, toda vez que fueron resultado de su culpa, dolo y negligencia;*

*NOVENO. - Declare procedente el cobro de la Garantía Operativa efectuado por las Demandadas;*

*DÉCIMO. - Absuelva a CFE y CFE Generación II del pago de las sobreestadías por la mayor permanencia del carbón en la Terminal TPP;*

*UNDÉCIMO. - Declare que TPP y TMC no son partes del Contrato TSA;*

*DUODÉCIMO. - Declare que TPP y TMC carecen de legitimación activa para presentar reclamos en contra de CFE y CFE Generación II bajo el Contrato TSA;*

*DÉCIMOTERCERO. - Declare que TPP y TMC han actuado en exceso su derecho de incorporación al Arbitraje bajo la Orden de Procedimiento No. 1 y en contra del principio de eficiencia y economía procesal;*

*DÉCIMOCUARTO. - Condene a Greenfield, TPP y TMC al pago de todos los gastos y costas derivados del Arbitraje."*

## 5.    ANALISIS DEL TRIBUNAL ARBITRAL

191.    De las pretensiones antes transcritas, resulta que las Partes alegan incumplimientos contractuales recíprocos. Ahora bien, antes de determinar si los incumplimientos alegados efectivamente existieron, el Tribunal Arbitral debe primero determinar la calidad jurídica de TPP y TMC bajo el Contrato y, de ser el caso, si estas cuentan con legitimación activa para presentar reclamos contra las Demandadas bajo el Contrato, lo cual ha sido materia de debate entre las Partes (**Sección 5.1**).

192.    Una vez resuelta esta cuestión, el Tribunal Arbitral deberá examinar y decidir si las Demandantes, por un lado, y las Demandadas, por otro lado, han incumplido el Contrato, como cada una de ellas alega en relación con la contraparte.

193.    En primer lugar, el Tribunal Arbitral analizará la reclamación de las Demandantes respecto del pago del CSP en base a la CFA (**Sección 5.2**).

194.    A continuación, el Tribunal Arbitral analizará la reclamación de las Demandantes y de las Demandadas Reconvencionales sobre las penalidades aplicadas por CFE por sobreestadía de buques a través de la ejecución de la Garantía Operativa por USD 6,911,333, más IVA e intereses. En este sentido, debido a que las pretensiones principales y las pretensiones reconvencionales versan sobre los mismos conceptos, para mayor claridad, y a efectos de evitar una duplicación de análisis, el Tribunal Arbitral analizará ambas pretensiones conjuntamente (**Sección 5.3**).

195. Posteriormente, el Tribunal Arbitral analizará la reclamación de las Demandantes sobre las sobreestadías de carbón en la Terminal TPP por un tiempo superior al periodo de libre almacenamiento, por la cantidad de USD 6,919,636, más IVA e intereses (**Sección 5.4**).

196. Finalmente, el Tribunal Arbitral decidirá sobre las costas del arbitraje (**Sección 5.5**).

197. Al analizar las reclamaciones de las Partes, el Tribunal Arbitral aplicará el Contrato y el Derecho mexicano, conforme lo previsto en la cláusula 17.5 del Contrato:

> *"17.5 Arbitraje*
>
> *(c) La Ley Aplicable al fondo del arbitraje será la ley de México."*

198. En este sentido, el Tribunal Arbitral se guiará por las reglas de interpretación previstas en el Código Civil Federal.

199. Así, el primer criterio de interpretación bajo el Código Civil Federal es el de la literalidad:

> "***Artículo 1851***.*- Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas.*"

200. El Código Civil Federal también recoge, entre otros, los criterios de interpretación que buscan la intención de las Partes, el efecto útil, la interpretación sistemática, la interpretación más conforme a la naturaleza y objeto del contrato, y los usos y costumbres:

> "***Artículo 1852***.*- Cualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquéllos sobre los que los interesados se propusieron contratar.*
>
> ***Artículo 1853***.*- Si alguna cláusula de los contratos admitiere diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto.*
>
> ***Artículo 1854***.*- Las cláusulas de los contratos deben interpretarse las unas por las otras, atribuyendo a las dudosas el sentido que resulte del conjunto de todas.*
>
> ***Artículo 1855***.*- Las palabras que pueden tener distintas acepciones serán entendidas en aquella que sea más conforme a la naturaleza y objeto del contrato.*

*Artículo 1856.- El uso o la costumbre del país se tendrán en cuenta para interpretar las ambigüedades de los contratos.*"

**5.1    Sobre la calidad jurídica de TPP y TMC bajo el Contrato, y si estas cuentan con legitimación activa para presentar reclamos contra las Demandadas**

**5.1.1    Posición de CFE[112]**

201.    Las Demandadas sostienen que la incorporación de TPP y TMC ha tenido como efecto la duplicidad de las actuaciones del procedimiento arbitral, y que los reclamos presentados por TPP y TMC no guardan relación con los mecanismos de cálculo del CSP sobre los cuales se justificó su incorporación al arbitraje.

202.    Asimismo, las Demandadas alegan que, en lugar de establecer una defensa de sus derechos asociados con el Contrato y cuyo origen debiera ser el desempeño del Contrato O&M por la prestación de los servicios allí previstos, TPP y TMC se han pronunciado sobre eventos en los que no han tenido participación, tales como el retraso incurrido por las empresas contratadas por Greenfield para la construcción del Sistema de Transporte y Almacenamiento.

203.    Sostienen las Demandadas que TPP y TMC han pretendido justificar su incorporación al arbitraje y su legitimación para la formulación de reclamos bajo el incorrecto argumento que TPP y TMC son parte del Contrato. En particular, alegan las Demandadas que la inclusión de TPP al Contrato no tuvo como propósito hacerla parte del mismo, sino simplemente obligarla frente a las Demandadas en la porción correspondiente al cumplimiento de sus obligaciones y responsabilidades en el marco del Contrato O&M, conforme lo dispone la cláusula 4.6 del Contrato.

204.    Las Demandadas alegan que, tomando en cuenta el alcance de la participación de TPP y TMC definida en el clausulado del Contrato relacionada con el desempeño del proyecto, TPP y TMC únicamente adquirieron derechos y obligaciones en lo que respecta al Contrato O&M y, por tanto, su participación en el procedimiento arbitral, como máximo, debería limitarse a establecer una defensa respecto de los supuestos derechos y obligaciones efectivamente adquiridos en el llamado *pass through* con el Contrato.

205.    Asimismo, las Demandadas indican que TPP y TMC carecen de legitimación activa. Las Demandadas sostienen que el propio Contrato reconoce a TPP como subcontratista de

---

[112]    Sección IV.A del Memorial de Contestación, Sección II del Memorial de Dúplica y Sección V. del Memorial de Conclusiones.

Greenfield en la ejecución del Proyecto. En particular, las Demandadas sostienen que la cláusula 4.6(f) del Contrato[113] establece que los subcontratistas no tienen acción que hacer valer en forma directa en contra de las Demandadas, sino que deben ejercerla directamente en contra de Greenfield, dada la vinculación contractual inmediata que éste guarda con el Contrato O&M.

206. Las Demandadas sostienen que la supuesta decisión de otorgar a TPP un derecho de acción bajo el Contrato conforme a la cláusula 4.6(f) del mismo estaba relacionada con la obligación de pago eventual en caso de rescisión o terminación anticipada del Contrato conforme a la cláusula 8.3(e)[114], y que, en vista de que, en los hechos, no ha ocurrido ninguno de los supuestos contemplados en dicha cláusula, dicho derecho de acción directa no es procedente, de manera que TPP ha desnaturalizado la razón detrás del supuesto derecho de acción que tendría bajo el Contrato.

207. Finalmente, las Demandadas alegan que la Demanda Reconvencional se presentó solo en contra de Greenfield y que no se presentó reclamo alguno en contra de TPP y TMC. Señalan las Demandadas que Greenfield es el responsable del cumplimiento del Contrato frente a las Demandadas independientemente de que existan subcontratistas.

---

[113] La cláusula 4.6(f) del Contrato establece que "*Los Subcontratistas no tendrán acción o derecho alguno que hacer valer en contra de la Comisión, pero en el cumplimiento de sus obligaciones contarán con las mismas excepciones que podrían oponer en contra del Proveedor, bajo sus respectivos Contrató Carbonser o Contrato TPP, según corresponda. En tal virtud, sujeto a los términos y condiciones previstos en la Cláusula 10.2, el Proveedor se obliga a sacar en paz y a salvo a la Comisión de cualquier demanda o reclamación de cualquier tipo, incluyendo las de carácter laboral, que pudieran presentar los Subcontratistas por la ejecución de los Servicios de Transporte y Almacenamiento, salvo que dicha demanda o reclamación sea por causas atribuibles a la Comisión*".

[114] La cláusula 8.3(e) del Contrato establece que "*Las Partes convienen en que, en caso de terminación anticipada o recisión del presente Contrato con posterioridad a la Fecha de Inicio, como resultado de un Evento de Incumplimiento de la Comisión, y que dicha terminación o rescisión repercuta o derive en una terminación del Contrato TPP, la Comisión y el Proveedor harán todos sus esfuerzos ya sea entre sí y/o frente a terceros para mitigar el impacto y/o el quebranto económico que derive de tal terminación o recisión. En adición a los Pagos por Terminación, la Comisión deberá pagar a TPP, a través del Proveedor, o directamente a TPP, según se lo instruya el Proveedor por escrito, los gastos no recuperables, razonables, debidamente documentados y directamente vinculados con la prestación de los Servicios Portuarios, y además la Comisión permanecerá obligada al pago del Cargo por Servicios Portuarios (según éste concepto se define en el Anexo 2 del presente Contrato) por la Cantidad Firme Anual, por un plazo máximo de hasta 2 (dos) años calendario contados a partir del mes siguiente a que sea efectiva la terminación del Contrato a que se refiere este inciso (e), en el expreso entendido de que, si en cualquier momento durante el plazo referido de 2 (dos) años, TPP consigue, mediante un contrato de largo plazo, algún usuario tercero para utilizar la Terminal TPP y/o sus activos destinados a los fines de este Contrato, la obligación de pago de los Cargos por Servicios Portuarios de la Comisión terminará de forma inmediata y quedará automáticamente liberada. Los referidos Cargos por Servicios Portuarios deberán ser pagados por la Comisión de forma mensual, dentro de los primeros 7 (siete) Días de cada mes, dentro del plazo mencionado de 2 (dos) años. Todo lo anterior en el entendido de que, aun sin estar obligado a ello, si el Proveedor o alguno de sus Subcontratistas recupera cualquier gasto de los amortizados, el Proveedor deberá notificar tal circunstancia y devolver con toda prontitud a la Comisión las cantidades correspondientes a cualesquiera ganancias obtenidas*".

### 5.1.2    Posición de Greenfield[115]

208.    Greenfield sostiene que existe una relación entre CFE y TPP, que llevó a la suscripción del Contrato O&M, el cual, según Greenfield, es un reflejo del Contrato. En particular, Greenfield alega que el origen el Proyecto fue concebido por CFE y TPP, y que fue debido a temas de financiamiento que se incorporó Greenfield; sin embargo, quien presta materialmente el Servicio de Transporte y Almacenamiento del Contrato es TPP y TMC bajo el Contrato de O&M.

209.    Asimismo, Greenfield indica que la participación de TPP en el Proyecto es indispensable, toda vez que TPP es quien opera la Terminal TPP bajo el contrato de cesión de derechos que suscribió con la APILAC.

210.    Greenfield indica que la disputa materia del presente arbitraje versa principalmente sobre el pago del CSP con base en la CFA; cuestión que impacta directamente en TPP y TMC, ya que el pago del CSP se realiza bajo un esquema *pass through* entre el Contrato y el Contrato O&M.

211.    Por último, Greenfield indica que si bien la cláusula 4.6(f) del Contrato establece que los subcontratistas no tendrán acción o derecho alguno que hacer valer en contra de CFE, dicha cláusula incluye una excepción en caso de que la demanda o reclamación sean por causas atribuibles a CFE. En consecuencia, Greenfield sostiene que se actualizó la excepción, toda vez que la demanda de TPP y TMC se desprende de causas atribuibles a CFE, quien se ha negado a estar obligada a pagar el CSP, de manera que TPP y TMC cuentan con legitimación activa conforme al Contrato.

### 5.1.3    Posición de TPP y TMC[116]

212.    TPP y TMC alegan que son parte del Contrato porque existe un acuerdo de voluntades entre TPP y CFE que crea derechos y obligaciones. En términos del Artículo 1803 fracción I del Código Civil Federal, TPP afirma que es parte del Contrato por el hecho de haber firmado el Contrato y consentido expresamente todas las cláusulas que lo integran, creando así derechos y obligaciones para TPP.

213.    Asimismo, TPP y TMC fundamentan su posición en el Convenio Modificatorio, en el cual se corrige la denominación que se le dio a TPP originalmente en el Contrato, calificándolo como

---

[115]    Sección IV.D del Memorial de Réplica y Sección V. del Memorial de Conclusiones.

[116]    Sección IV.1 del Memorial de Demanda, Sección III.1 del Memorial de Réplica y Sección IV. del Memorial de Conclusiones.

"Parte". Si TPP fuera un simple compareciente, no habría existido razón alguna para modificar su denominación; por el contrario, el Convenio Modificatorio corrigió la denominación para ajustarse a la realidad de que TPP es parte en el Contrato.

214. En particular, TPP y TMC sostienen que la negociación y ejecución del Contrato revelan que TPP y TMC son partes, tal y como se desprende de los antecedentes del Contrato. La conducta activa y determinante de TPP y TMC en la negociación, celebración y ejecución del Contrato, principalmente en beneficio de CFE, evidencia la existencia de una relación contractual entre ellas, y un consentimiento tácito entre TPP y CFE para obligarse contractualmente.

215. TPP y TMC alegan que su intervención en el desarrollo del Proyecto se distingue claramente de la participación que ordinariamente tiene un subcontratista en un proyecto de infraestructura. Ordinariamente, los subcontratistas no participan en la gestión del proyecto directamente con el dueño de la obra, no poseen activos o instalaciones indispensables para el desarrollo de la obra y no son mencionados expresamente en el contrato principal, ni asumen obligaciones en él, de manera que queda claro que la conducta desplegada por TPP y TMC es distinta de la conducta de un subcontratista.

216. Finalmente, TPP y TMC indican que cuentan con legitimación activa en virtud de la cláusula 4.6(f) del Contrato. En particular, sostienen que dicha cláusula debe leerse completa, ya que, si bien se señala que los subcontratistas no tendrán acción o derecho alguno que hacer valer en contra de CFE, luego indica una excepción a dicha prohibición en el caso de que dicha demanda o reclamación sea por causas atribuibles a CFE.

217. En este caso, TPP y TMC señalan que como CFE es quien causa el reclamo de TPP y TMC por la falta de pago del CSP con base en la CFA, CFE debe responder directamente frente a TPP y TMC.

### 5.1.4    Análisis del Tribunal Arbitral

218. El Tribunal Arbitral analizará, en un primer momento, si TPP y TMC son Partes, o no, del Contrato (**Sección 5.1.4.1**).  Posteriormente, el Tribunal Arbitral analizará si éstas tienen, o no, legitimación activa para reclamar en el presente arbitraje (**Sección 5.1.4.1**).

### 5.1.4.1    *Sobre el carácter de Partes de TPP y TMC*

219.    El Tribunal Arbitral considera que existen elementos suficientes para concluir que TPP es Parte del Contrato; no así TMC, quien no asume ningún derecho ni obligación bajo el mismo, y ni siquiera lo firma.

220.    Es cierto, como alegan las Demandadas, que TPP firmó el Contrato como "compareciente". Asimismo, TPP y TMC se ven alcanzadas por la definición de Subcontratista prevista en el Contrato.[117]

221.    Sin embargo, el carácter de parte en una relación contractual no está determinado exclusivamente por su denominación formal en el contrato en cuestión.  En efecto, de conformidad con el Artículo 1792 del Código Civil, *"[c]onvenio es el acuerdo de dos o más personas para crear, transferir, modificar o extinguir obligaciones*."  A su vez, el Artículo 1793 del Código Civil Federal prevé que *"[l]os convenios que producen o transfieren las obligaciones y derechos, toman el nombre de contratos."*

222.    Como vemos, el punto de partida para determinar si TPP y TMC son partes del Contrato consiste en analizar si el Contrato crea, transfiere, modifica o extingue algún derecho u obligación a su cargo, independientemente de su carácter de firmante.  El Tribunal Arbitral considera que la respuesta es afirmativa en relación con TPP, y negativa respecto de TMC. Veamos.

223.    En primer lugar, la cláusula 4.6(iii) del Contrato (Subcontratistas; Solidaridad y Mancomunidad),[118] en su parte pertinente, prevé expresamente lo siguiente:

> *"TPP, reconoce y conviene expresamente en obligarse de manera mancomunada con el Proveedor frente a la Comisión, por lo que respecta a todas y cualquiera de sus obligaciones y responsabilidades bajo el Contrato TPP y en los términos del mismo.*
>
> *En el entendido de que lo aquí establecido es sin perjuicio y con independencia de cualquier asunción de obligación mancomunada que pudieran haber pactado el Proveedor y los Subcontratistas entre sí, y además, que el Proveedor es y permanece como el principal responsable frente a la Comisión para la realización del Sistema de Transporte y Almacenamiento y de prestar los Servicios de Transporte y Almacenamiento, y mantendrá además la dirección y control de todas las obligaciones que se le imponen bajo el presente Contrato, siendo facultativo para la Comisión recurrir en cualquier tiempo ya sea al Proveedor, para que este a su vez recurra frente al Subcontratista que corresponda, o de recurrir de manera directa al Subcontratista para exigir el cumplimiento de la obligación respectiva y que estuviera establecida*

---

[117]    Anexo D-GF-1.  "*"Subcontratistas" significa cualquier persona (distinta de la Comisión o el Proveedor), contratado por el Proveedor para (i) realizar la ejecución o el suministro de todas o cualquier parte del Sistema de Transporte y Almacenamiento, o (ii) la disponibilidad o prestación de los Servicios de Transporte y Almacenamiento."*

[118]    Anexo D-GF-1.

*bajo el presente Contrato o bajo el Contrato Carbonser y/o el Contrato TPP, según corresponda."*

224.    De esta forma, TPP reconoce y conviene expresamente en obligarse mancomunadamente con Greenfield frente a CFE por todas las obligaciones y responsabilidades asumidas bajo el Contrato.  A juicio del Tribunal Arbitral, la asunción expresa de estas obligaciones hacen a TPP parte del Contrato.

225.    La conclusión del Tribunal Arbitral no se ve alterada por el último párrafo de la cláusula 4.6(iii) del Contrato.  En efecto, si bien el propósito de esta estipulación es confirmar que Greenfield permanece como principal responsable frente a CFE bajo el Contrato, y permitir a CFE recurrir directamente, y a su elección, frente a Greenfield o TPP, precisamente, el hecho de que CFE pueda recurrir directamente frente a TPP "*para exigir el cumplimiento de la obligación respectiva y que estuviera establecida bajo el presente Contrato o bajo el Contrato […] TPP*", no hace sino reafirmar la condición de parte de TPP bajo el Contrato.

226.    En segundo lugar, la cláusula 8.3(e) (Efectos de un Evento de Incumplimiento, Rescisión) del Contrato reafirma la conclusión anterior.  En efecto, dicha cláusula prevé el derecho de TPP a percibir directamente de CFE, según lo instruya Greenfield, los gastos no recuperables, razonables, debidamente documentados y directamente vinculados con la prestación de los Servicios Portuarios en caso de terminación anticipada o recisión del Contrato como resultado de un Evento de Incumplimiento de CFE, el cual repercuta o derive en una terminación del Contrato TPP.[119] Independientemente de que la instrucción de pago provenga de Greenfield, el hecho de que se le reconozca a TPP el derecho a percibir dicho pago por los gastos

---

[119]    Anexo D-GF-1. Cláusula 8.3(e): "*Las Partes convienen en que, en caso de terminación anticipada o rescisión del presente Contrato con posterioridad a la Fecha de Inicio, como resultado de un Evento de Incumplimiento de la Comisión, y que dicha terminación o rescisión repercuta o derive en una terminación del Contrato TPP, la Comisión y el Proveedor harán todos sus esfuerzos ya sea entre sí y/o frente a terceros para mitigar el impacto y/o el quebranto económico que derive de tal terminación o rescisión. En adición a los Pagos por Terminación, la Comisión deberá pagar a TPP, a través del Proveedor, o directamente a TPP, según se lo instruya el Proveedor por escrito, los gastos no recuperables, razonables, debidamente documentados y directamente vinculados con la prestación de los Servicios Portuarios, y además la Comisión permanecerá obligada al pago del Cargo por Servicios Portuarios (según este concepto se define en el Anexo 2 del presente Contrato) por la Cantidad Firme Anual, por un plazo máximo de hasta 2 (dos) años calendario contados a partir del mes siguiente a que sea efectiva la terminación del Contrato a que se refiere este inciso (e), en el expreso entendido de que, si en cualquier momento durante el plazo referido de 2 (dos) años, TPP consigue, mediante un contrato de largo plazo, algún usuario tercero para utilizar la Terminal TPP y/o sus activos destinados a los fines de este Contrato, la obligación de pago de los Cargos por Servicios Portuarios de la Comisión terminará de forma inmediata y quedará automáticamente liberada. Los referidos Cargos por Servicios Portuarios deberán ser pagados por la Comisión de forma mensual, dentro de los primeros 7 (siete) Días de cada mes, dentro del plazo mencionado de 2 (dos) altos. Todo lo anterior, en el entendido de que, aun sin estar obligado a ello, si el Proveedor o alguno de sus Subcontratistas recupera cualquier gasto de los amortizados, el Proveedor deberá notificar tal circunstancia y devolver con toda prontitud a la Comisión las cantidades correspondientes a cualesquiera ganancias obtenidas.*"

"*vinculados con la prestación de los Servicios Portuarios*", no hace sino confirmar el rol fundamental que cumple TPP en la prestación de dichos servicios.

227.    Además de los derechos y obligaciones asumidos por TPP bajo el Contrato, su carácter de Parte se encuentra fundado en tres circunstancias adicionales.

228.    *Primero*, el Preámbulo del Convenio Modificatorio al Contrato, firmado el 21 de junio de 2017, reconoce expresamente a TPP como "Parte del Convenio": [120]

> **PRIMER CONVENIO MODIFICATORIO (ESTE "CONVENIO MODIFICATORIO") AL CONTRATO DE PRESTACIÓN DE SERVICIOS DE SUMINISTRO DE TRANSPORTE Y ALMACENAMIENTO DE CARBÓN NÚMERO 800803052 QUE CELEBRAN LA COMISIÓN FEDERAL DE ELECTRICIDAD (EN LO SUCESIVO LA "COMISIÓN"), Y GREENFIELD SPV I, S.A.P.I. DE C.V. (EL "PROVEEDOR"), CON LA COMPARECENCIA DE CARBONSER, S.A. DE C.V. ("CARBONSER"), Y TERMINALES PORTUARIAS DEL PACÍFICO, S.A.P.I. DE C.V. ("TPP" Y, CONJUNTAMENTE CON CARBONSER, EL PROVEEDOR Y LA COMISIÓN, LAS "PARTES DEL CONVENIO"), DE CONFORMIDAD CON LOS SIGUIENTES ANTECEDENTES, DECLARACIONES Y CLÁUSULAS:**

229.    En este sentido, la cláusula SEXTA (Totalidad del Acuerdo y Vigencia de Disposiciones) del Convenio prevé que el mismo "*incluye la totalidad de las modificaciones realizadas al Contrato a la fecha de este Convenio Modificatorio.*" Asimismo, dicha cláusula añade que "[*l*]*as Partes, por lo tanto, reconocen y convienen que el Contrato únicamente se entenderá modificado en los términos que expresa y exclusivamente se han convenido en este Convenio Modificatorio, por lo que todas las demás disposiciones y términos del Contrato se entienden ratificados y en pleno vigor y efectos. En caso de cualquier discrepancia entre los términos del Contrato que fueran modificados expresamente en términos de este Convenio Modificatorio, los términos de este Convenio Modificatorio prevalecerán.*"

230.    Por lo tanto, aun apegándose a una interpretación literal del carácter en el que TPP firmó el Contrato (esto es, como compareciente), al haber sido definida como "Parte" en el Convenio, y siendo que dicho Convenio "*incluye la totalidad de las modificaciones realizadas al Contrato*", y que, además, "[*e*]*n caso de cualquier discrepancia entre los términos del Contrato que fueran modificados expresamente en términos de este Convenio Modificatorio, los términos de este Convenio Modificatorio prevalecerán*", no quedan dudas del carácter de Parte de TPP.

---

[120]    Anexo D-TPP-20.

231.    A su vez, el Convenio prevé varias obligaciones a cargo de las "Partes", incluyendo TPP, tales
        como, por ejemplo, la aplicación del periodo de saneamiento de las Condiciones Suspensivas
        del Contrato[121] y los esfuerzos por lograr las Condiciones Suspensivas.[122]

232.    *Segundo*, la propia CFE nombró a TPP como destinataria del Oficio de Adjudicación sobre el
        Proyecto y la instruyó a formalizar el Contrato:[123]



Oficio No. 241.02-2120/2016

Ciudad de México, a 15 de diciembre de 2016.

GREENFIELD  SPV I, S.A.P.I. DE C.V.;
TERMINALES PORTUARIAS DEL PACÍFICO, S.A.P.I. DE C.V.
Y CARBONSER, S.A. DE C.V.
Paseo de los Tamarindos No. 90
Torre 2, piso 4, col. Bosques de las Lomas
Delegación Cuajimalpa, C.P. 11700
Ciudad de México, Tel: (55)5413-5925
Presente.

BLACKROCK

15 DIC 2016

233.    Lo anterior es lógico, por cuanto la Terminal TPP es un componente necesario e indispensable
        para el desarrollo del Proyecto, cuya utilización corresponde exclusivamente a TPP.

234.    En este sentido, fue TPP quien diseñó cuestiones fundamentales del Proyecto, por ejemplo,
        los *Term Sheets*, los cuales fueron negociados exclusivamente entre TPP y CFE[124], y, tal como
        lo reconoció el testigo Armando Zapién en la Audiencia, fueron la base de lo que finalmente
        sería el Contrato.[125]

235.    *Tercero*, TPP y TMC son quienes ejecutan materialmente los Servicios Portuarios y la Fase
        de los Servicios de Transporte y Almacenamiento.[126]  En este sentido, el Antecedente VII del
        Contrato establece claramente la necesidad de que Greenfield celebrara con TPP y Carbonser
        contratos para la operación y mantenimiento de la infraestructura que habría de construirse a
        fin de dar cumplimiento a las obligaciones asumidas en términos del Contrato.[127]

236.    Asimismo, el Antecedente VIII del Contrato prevé que "*para efectos de lo establecido en la
        Propuesta y de la comparecencia de Carbonser y TPP a la firma del presente Contrato, el
        Proveedor, Carbonser y TPP firmaron un Convenio de Participación Conjunta y por virtud*

---

[121]    Cláusula SEGUNDA (Modificaciones y Acuerdo), Anexo D-TPP-20.

[122]    Cláusula CUARTA (Modificaciones y Acuerdo), Anexo D-TPP-20.

[123]    Anexo D-TPP-60.

[124]    Anexo D-GF-13 y Anexo D-GF-14.

[125]    Transcripción Audiencia Día 4, p.9, l.327-334.

[126]    Contrato de Operación y Mantenimiento, Anexo D-GF-23.

[127]    Antecedente VII del Contrato: "*Para el cumplimiento de este Contrato y como fuera acordado en la Propuesta, el
        Proveedor celebró en esta misma fecha contratos de operación y mantenimiento para operar y mantener el SIMC y el
        Sistema de Transporte y Almacenamiento, conforme a los términos definidos posteriormente (el "**Contrato Carbonser**"
        y el "**Contrato TPP**")*".

*del cual acordaron contribuir al adecuado desarrollo y culminación del proyecto que se consigna en la Propuesta.*"

237.     En cuanto a TMC, por el contrario, el Tribunal Arbitral no encuentra ninguna estipulación en el Contrato que cree, modifique o extinga derechos u obligaciones en su favor, ni que haya tenido un rol significativo en la negociación del Contrato. Si bien TMC tiene un rol preponderante en la ejecución del Contrato O&M, a juicio del Tribunal Arbitral, ello no es suficiente para considerarla como Parte bajo el contrato principal.

238.     Por lo anterior, el Tribunal Arbitral considera que TPP es Parte del Contrato, pero no así TMC.

### 5.1.4.2    *Sobre la legitimación activa de TPP y TMC*

239.     El Tribunal Arbitral considera que TPP y TMC tienen legitimación activa para demandar a CFE bajo el Contrato.

240.     En efecto, de conformidad con la cláusula 4.6(f) del Contrato (Subcontratista, Solidaridad y Mancomunidad): "[*l]os Subcontratistas no tendrán acción o derecho alguno que hacer valer en contra de la Comisión*, pero en el cumplimiento de sus obligaciones contarán con las mismas excepciones que podrían oponer en contra del Proveedor, bajo sus respectivos Contrató Carbonser o Contrato TPP, según corresponda. En tal virtud, sujeto a los términos y condiciones previstos en la Cláusula 10.2, *el Proveedor se obliga a sacar en paz y a salvo a la Comisión de cualquier demanda o reclamación de cualquier tipo*, incluyendo las de carácter laboral, *que pudieran presentar los Subcontratistas por la ejecución de los Servicios de Transporte y Almacenamiento, salvo que dicha demanda o reclamación sea por causas atribuibles a la Comisión*". (énfasis añadido)

241.     Como vimos en la sección precedente, no cabe duda de que TPP y TMC se ven alcanzadas por la definición de Subcontratista prevista en el Contrato.[128] Incluso, las propias Demandadas le han reconocido carácter de Subcontratistas a TPP y TMC.[129]

---

[128]     Anexo D-GF-1. ""*Subcontratistas*" significa cualquier persona (distinta de la Comisión o el Proveedor), contratado por el Proveedor para (i) realizar la ejecución o el suministro de todas o cualquier parte del Sistema de Transporte y Almacenamiento, o (ii) la disponibilidad o prestación de los Servicios de Transporte y Almacenamiento."

[129]     Manifestaciones de CFE respecto de Solicitud de Incorporación al Arbitraje del 5 de agosto de 2021:
         "*27. Contrario a lo señalado por la Demandante de lo Principal en el párrafo 19 de su Solicitud, no es la intención de CFE desconocer cualquier intervención que pudiera haber tenido TPP y/o TMC como Subcontratistas y como partes del "Contrato O&M". Sin embargo, ello no significa que TMC pueda ni deba ser considerado como Parte del Contrato.*" (énfasis añadido)
         Memorial de Contestación de las Demandadas:

242.    En este sentido, el hecho de que TMC no sea Parte del Contrato no significa, necesariamente, que carecería de legitimación activa para reclamar bajo el Contrato. En efecto, según el Artículo 1868 del Código Civil Federal:

> *"En los contratos se pueden hacer estipulaciones en favor de tercero de acuerdo con los siguientes artículos."*

243.    A su vez, el Artículo 1869 del mismo Código dispone lo siguiente:

> *"La estipulación hecha a favor de tercero hace adquirir a éste, salvo pacto escrito en contrario, el derecho de exigir del promitente la prestación a que se ha obligado.*
>
> *También confiere al estipulante el derecho de exigir del promitente el cumplimiento de dicha obligación."*

244.    Por otra parte, y como se puede apreciar, la cláusula 4.6(f) del Contrato prevé expresamente que los Subcontratistas no tendrían acción o derecho alguno que hacer valer en contra de CFE, y Greenfield se obliga a sacar en paz y a salvo a CFE de cualquier demanda o reclamación que pudieran presentar los Subcontratistas, *"salvo que dicha demanda o reclamación sea por causas atribuibles a la Comisión."*

245.    Por lo tanto, a efectos de determinar si TPP y/o TMC tienen legitimación activa para demandar a CFE, el Tribunal Arbitral debe analizar, en esta etapa, únicamente si la reclamación de TPP y TMC se funda en *"causas atribuibles a la Comisión"*, independientemente de si la causa atribuible a CFE es justificada, o no.

246.    En este caso, las dos reclamaciones principales de TPP y TMC se fundan en causas atribuibles a CFE.

247.    En efecto, la primera reclamación de TPP y TMC es que CFE pague la contraprestación por concepto del CSP en base a la CFA.  Según TPP y TMC, *"pasara lo que pasara, salvo que existiera y se mantuviera un Evento de Incumplimiento de Greenfield, CFE estaría obligada a pagar una contraprestación por la disponibilidad de Greenfield –por conducto de TPP y TMC– para prestar los Servicios Portuarios por un volumen mínimo de 1.3 millones de*

---

*"148. Como es de conocimiento del Tribunal Arbitral y de las Partes, a partir de la Solicitud de Incorporación de TPP y TMC presentada por Greenfield fue originado un extenso debate sobre la procedencia y condiciones en que podría darse la incorporación de TPP y TMC al arbitraje. Dicha discusión culminó con la emisión de la Orden Procesal No. 1 donde se establecieron los parámetros y detalles sobre la decisión de incorporar a los Subcontratistas al procedimiento arbitral."* (énfasis añadido)

*"182. Asimismo, se hace notar que, al momento de emitir la Orden Procesal No. 1, el Tribunal Arbitral manifestó su interés por escuchar los posicionamientos de TPP y TMC sobre las objeciones de CFE a su incorporación; sin embargo, éstas han omitido pronunciarse sobre la limitación contenida en el Contrato TSA que provoca una ausencia de legitimación activa de los subcontratistas y que fue invocada en múltiples ocasiones por CFE en el incidente respectivo."* (énfasis añadido)

*toneladas de carbón anuales.* […] *En pocas palabras, pasara lo que pasara, la CFE debía cumplir con su obligación de pago, y no lo ha hecho.*"[130] (énfasis añadido)

248.    La segunda reclamación de TPP y TMC se funda en "*un manejo negligente del carbón por parte de CFE*"[131] en la Terminal TPP.

249.    Como vemos, ambas reclamaciones de TPP y TMC se fundan en supuestos incumplimientos de CFE, encuadrándose así en la excepción prevista en la cláusula 4.6(f) del Contrato.

250.    Por lo tanto, siendo que las reclamaciones de TPP y TMC se fundan en "*causas atribuibles a la Comisión*", el Tribunal Arbitral concluye que TPP y TMC cuentan con legitimación activa para reclamar en el presente arbitraje.

## 5.2    *Sobre el pago del CSP en base a la CFA*

### 5.2.1    **Posición de Greenfield[132]**

251.    Greenfield alega que las Demandadas incumplieron su obligación de pagar a Greenfield el CSP con base en la CFA, derivado de la cláusula use-or-pay del Contrato. Según Greenfield, al 25 de septiembre de 2023, las Demandadas acumulaban impagos por la suma de USD 31,837,019.88 más IVA, en concepto de principal, correspondiente a los tres primeros años operativos del Contrato.

252.    Sostiene Greenfield que el Contrato se encontraba condicionado a la suscripción del Contrato O&M, ya que éste era indispensable para poder llevar a cabo el Contrato. Como consecuencia de lo anterior, ante la falta de pago del CSP con base en la CFA por parte de las Demandadas, Greenfield no pudo pagar a TPP y TMC la totalidad de las cantidades debidas por concepto de servicios portuarios en términos del Contrato O&M. En particular, Greenfield indica que el Anexo 2 del Contrato establece el pago del CSP, cuyo beneficiario único y total es TPP, bajo el esquema de *pass through* de los contratos, razón por la cual se incluyó el Anexo 7 al Contrato O&M, el cual es una copia exacta del Anexo 2 del Contrato.

253.    Según Greenfield, una condición indispensable para que TPP participara del Proyecto era que CFE garantizara a Greenfield, y por tanto a TPP, la recepción de ingresos por la prestación de los servicios portuarios respecto de, al menos, 1.3 millones de toneladas anuales de carbón.

---

[130]    Sección II.2 del Memorial de Demanda de TPP y TMC.

[131]    Sección II.10 del Memorial de Demanda de TPP y TMC.

[132]    Sección V.B del Memorial de Demanda, Sección IV.B del Memorial de Réplica y Sección III. del Memorial de Conclusiones.

La razón de ello radica en que, para la realización del Proyecto, TPP necesariamente debía asumir obligaciones de pago adicionales frente a la APILAC.

254.    Asimismo, Greenfield fundamenta su posición citando las cláusulas 4.4 y 5.5 del Contrato, las cuales señalan que, a partir de la FOC y durante la vigencia del Contrato, CFE se obligó a recibir y pagar, o bien, a pagar en caso de que no reciba o esté imposibilitada para recibir, la CFA. En particular, Greenfield indica que la redacción incluida en el Contrato refleja de forma clara y sin lugar a duda los acuerdos alcanzados entre las Partes en lo que respecta al volumen mínimo de carbón cuya llegada a la Terminal TPP debía estar garantizada.

255.    Añade Greenfield que las cláusulas *use-or-pay* tienen una doble funcionalidad, por un lado, proporcionar al vendedor un flujo de dinero estable y constante, independiente de las fluctuaciones y variaciones de la demanda real de la mercancía respectiva en el mercado donde opera el comprador, y, por otro lado, garantizar al comprador un suministro regular y constante de la mercancía o servicios respectivos para satisfacer la correspondiente demanda del mercado, sin necesidad de negociar en ningún momento las condiciones con el vendedor. De lo anterior, según Greenfield, resulta evidente que el objetivo de dicha cláusula es garantizar, por una parte, que el vendedor ponga a disposición del comprador, en este caso, la disponibilidad exclusiva del Terminal TPP, y, por otra parte, que el comprador pague el precio pactado, en este caso, el CSP calculado con base en la CFA, independientemente de si decide tomar o no los servicios referidos.

256.    Greenfield alega que CFE ha incumplido sus obligaciones al evadir el pago bajo el pretexto de que los Cargos Fijos remuneran a Greenfield bajo la modalidad de la cláusula *use-or-pay* y *hell-or-highwater*, toda vez que aun si la Terminal TPP dejara de recibir buques, Greenfield seguiría percibiendo todos las Cargos Fijos por la mera disponibilidad del Servicio de Transporte y Almacenamiento, lo que es completamente incorrecto.

257.    Sostiene Greenfield que, bajo la errónea interpretación de las Demandadas, estas se han abstenido de nominar buques a la Terminal TPP durante los últimos años operativos del Contrato, dejando por tanto de pagar el CSP con base en la CFA, causando así un perjuicio severo a Greenfield y, por ende, a TPP y TMC.

258.    El incumplimiento específico imputable a las Demandadas es no haber pagado, sin justa causa, el CSP con base en la CFA, independientemente de no haber recibido dicha cantidad de carbón debido a la cláusula *use-or-pay*.

259.    Greenfield insiste en que las Demandadas tergiversan los conceptos que integran la Contraprestación, su naturaleza, la forma de calcularlos y la razón de negocio.

260.    Finalmente, Greenfield sostiene que, contrariamente a lo insinuado por las Demandadas, del Anexo 2 del Contrato se desprende que, por cada fase y tipo de servicio, se establece un esquema para contar con una porción fija en algunos casos, y mínima en otros, para cubrir la disponibilidad de la infraestructura portuaria para CFE, y así garantizar la viabilidad financiera del proyecto para Greenfield y TPP. En consecuencia, para poder contar con la disponibilidad de la Terminal TPP y así garantizar la prestación de los servicios de descarga para las Demandadas, se debía garantizar el pago de una cantidad mínima no fija ni variable. Dicha cantidad mínima se estableció entre las Partes en base al número de toneladas anuales que la propia CFE estimaba descargar, y se indicó que no era fija porque si se descargaban toneladas adicionales a los 1.3 millones estas debían pagarse adicionalmente.

### 5.2.2    Posición TPP y TMC[133]

261.    TPP y TMC alegan que CFE incumplió sus obligaciones en términos del Contrato ya que se abstuvo de pagarle a Greenfield el CSP por un volumen equivalente a la CFA al amparo de la cláusula *use-or-pay* y, ante la falta de pago de CFE, Greenfield, a su vez, se abstuvo de pagarle a TPP y TMC la totalidad de las cantidades debidas por concepto de servicios portuarios en términos del Contrato O&M.

262.    Señalan TPP y TMC que, en términos del Contrato y del Contrato O&M, la forma en que funcionaba el esquema de pago era que CFE pagaba a Greenfield las contraprestaciones previstas en el Anexo 2 del Contrato, y luego Greenfield pagaba a TPP y TMC las contraprestaciones establecidas en el Anexo 7 del Contrato O&M, las cuales son idénticas. Así, más allá que el derecho de TPP y TMC de cobrar las contraprestaciones previstas en el Contrato O&M es independiente al Contrato, la forma en que se estructuró el Proyecto hacía que los pagos de todas las partes involucradas dependieran de que CFE honrara sus obligaciones bajo el Contrato.

263.    TPP y TMC alegan que CFE, de manera unilateral, notificó la suspensión temporal de los Servicios de Transporte y Almacenamiento por un plazo indefinido, lo que condujo a que durante más de dos años no haya existido carbón que descargar y transportar. TPP y TMC señalan que, precisamente, para este tipo de escenarios, habían sido enfáticas en señalar que

---

[133]    Sección III.7, III.8, III.9, IV.2, IV.3 del Memorial de Demanda, Sección III.2 del Memorial de Réplica y Sección II. del Memorial de Conclusiones.

era indispensable que la contraprestación que recibirían a cambio de la prestación de los servicios portuarios estuviera condicionada únicamente a la disponibilidad de la Terminal TPP y no a la efectiva prestación de los servicios.

264.    TPP y TMC sostienen que, durante el primer año operativo, que corrió entre el 16 agosto de 2019 y el 15 agosto de 2020, CFE fue omisa en pagarle a Greenfield el diferencial existente entre el volumen de 713,942, por el cual efectivamente se prestaron los servicios, y la cantidad mínima fija de 1.3 millones de toneladas, según el mecanismo acordado por las Partes para la aplicación de la cláusula *use-or-pay*. Respecto del segundo año operativo, que corrió entre el 16 de agosto de 2020 y el 15 de agosto de 2021, donde no hubo operación por la falta de buques nominados, CFE se abstuvo de pagarle a Greenfield cantidad alguna al amparo del Contrato en relación con la cláusula *use-or-pay*.

265.    Asimismo, TPP y TMC alegan que la falta de cumplimiento por parte de CFE al compromiso bajo las cláusulas *use-or-pay* constituye un desconocimiento profundo de la forma en que, durante casi dos años, las Partes concibieron y estructuraron el Proyecto, así como una transgresión frontal al acuerdo alcanzado entre ellas que motivó la suscripción del Contrato y el Contrato O&M.

266.    Finalmente, TPP y TMC señalan que la falta de pago de CFE y el consecuente impago de Greenfield pone seriamente en riesgo la viabilidad de todo el Proyecto, dada la incapacidad de TPP y TMC de hacer frente a sus obligaciones frente a terceros, tales como APILAC, cuyo cumplimiento es esencial para el funcionamiento del Proyecto, ya que los volúmenes mínimos a los que están obligadas TPP y TMC bajo el contrato con APILAC es igual a las 1.300.000 toneladas anuales de carbón que CFE debe pagar al amparo de la cláusula *use-or-pay* del Contrato. Además, TPP y TMC sostienen que, conforme al contrato con APILAC, esta última puede poner término a dicho contrato si TPP incurre en dos años consecutivos de incumplimiento, de manera que a la fecha existe el riesgo de que APILAC pueda válidamente rescindir el contrato.

### 5.2.3    Posición de las Demandadas[134]

267.    Las Demandadas sostienen que han cumplido con la obligación de pago del CSP con base en la CFA mediante el pago periódico de cantidades fijas que las Demandadas han pagado a Greenfield.

---

[134]    Sección III.Q y IV.C del Memorial de Contestación, Sección III del Memorial de Dúplica y Sección IV. del Memorial de Conclusiones.

268.    Asimismo, las Demandadas señalan que las Demandantes omiten mencionar una serie de Cargos Fijos que pagan las Demandadas a Greenfield, y que, precisamente, tienen por objeto garantizar un flujo de ingresos suficientes para garantizar la viabilidad económica del proyecto aun cuando no haya descarga de carbón.

269.    Sostienen las Demandadas que, al pagarse los Cargos Fijos con una cierta periodicidad que no depende de los arribos de buques, estos remuneran a Greenfield bajo las modalidades de *use-or-pay* y *hell-or-highwater*, toda vez que, aun si la Terminal TPP dejara de recibir buques, Greenfield seguiría percibiendo todos las Cargos Fijos por la mera disponibilidad del Servicio de Transporte y Almacenamiento conforme a la CFA.

270.    Las Demandadas señalan también que el Anexo 2 del Contrato, el cual fue confeccionado por las Demandantes, describe con suficiente detalle los conceptos que deben ser pagados a Greenfield, incluyendo, explícitamente, cargos que son generados por la mera disponibilidad del Sistema de Transporte y Almacenamiento y pagados con cierta periodicidad, así como conceptos que deben ser calculados y pagados según las cantidades de carbón que hayan sido descargadas y transportadas.

271.    Asimismo, las Demandadas alegan que fueron las propias Demandantes quienes estructuraron el CSP como un cargo variable calculado y pagado exclusivamente en función de las toneladas efectivamente descargadas en el mes de facturación, y cuya composición no es compatible con las pretensiones de las Demandantes, puesto que, de haber sido esa la intención, así lo habrían dispuesto en el Anexo 2 del Contrato.

272.    Finalmente, las Demandadas sostienen que las Demandantes intentan reclamar el pago de un cargo anualizado por el CSP con base en la CFA que distorsiona por completo la metodología pactada para el cálculo del cargo y que no guarda relación alguna con la mecánica de cálculo prevista en la Sección 2.3.1 del Anexo 2 del Contrato.

### 5.2.4    Análisis del Tribunal Arbitral

273.    El Tribunal Arbitral considera que existen elementos suficientes para concluir que el CSP es un cargo mínimo que debe ser calculado con base en la CFA, a la cual debe añadirse, en su caso, cualquier cantidad adicional de carbón que haya sido efectivamente descargada en la Terminal TPP. Esto es, si las toneladas de carbón descargadas en la Terminal TPP son inferiores a la CFA, CFE debe pagar a Greenfield las cantidades efectivamente descargadas, más el saldo pendiente hasta cubrir la CFA. Si, por el contrario, las cantidades descargadas

son superiores a la CFA, CFE únicamente debe pagar a Greenfield por las cantidades efectivamente descargadas.

274.    El Tribunal Arbitral ha llegado a esta conclusión en base a una interpretación sistemática de diversas cláusulas contractuales (**Sección 5.2.4.1**), las negociaciones previas entre las Partes (**Sección 5.2.4.2**), la razón de negocio de la operación (**Sección 5.2.4.3**), y la conducta contemporánea de las Partes (**Sección 5.2.4.4**).  A continuación, analizaremos cada uno de estos elementos, antes de exponer la conclusión del Tribunal Arbitral (**Sección 5.2.4.5**).

### 5.2.4.1   *Cláusulas contractuales*

275.    La cláusula 1 del Contrato define "Cantidad Firme Anual" como "*la cantidad de Carbón que, de forma anual, el Proveedor está obligado a descargar, transportar y almacenar como parte de los Servicios de Transporte y Almacenamiento, y la Comisión está obligada a recibir y pagar, o bien a pagar si no recibe, conforme a los términos y sujeto a las condiciones de este Contrato*." A su vez, la cláusula 1 prevé que "[…] *la Cantidad Firme Anual es igual a 1,300,000 (un millón trescientos) toneladas de Carbón*."

276.    De la aplicación literal de esta cláusula, vemos que, según sus términos, Greenfield está obligado a descargar, transportar y almacenar 1,300,000 toneladas de carbón, la cual CFE está obligada a recibir y pagar, "*o bien a pagar si no recibe*".

277.    La obligación de Greenfield de prestar los servicios por un volumen mínimo de 1,300,000 toneladas de carbón se refuerza por lo previsto en la cláusula 2, la cual prevé que el objeto del Contrato "*es establecer la obligación a cargo del Proveedor a poner a disposición de la Comisión el Sistema de Transporte y Almacenamiento en los términos establecidos en el Anexo 7 y prestar a la Comisión los Servicios de Transporte y Almacenamiento por un volumen mínimo equivalente a la Cantidad Firme Anual en los términos establecidos en el Anexo 6, por lo cual la Comisión se obliga a pagar al Proveedor la Contraprestación, de conformidad con los términos y sujeto a las condiciones establecidas en este Contrato*."

278.    Es decir, el objeto mismo del Contrato consiste en la obligación de Greenfield de poner a disposición el Sistema de Transporte y Almacenamiento y prestar los servicios de dicho sistema por "*un volumen mínimo equivalente a* [*1,300,000 toneladas de carbón*] *en los términos establecidos en el Anexo 6*."

279.    En este sentido, el Anexo 6 del Contrato regula los servicios de descarga, transporte y almacenamiento de carbón.  Puntualmente, el apartado A.9. prevé que "[*e*]*n todo momento y*

*a partir de la Fecha de Inicio de Operación Comercial, el Proveedor tendrá disponible, operará, dará mantenimiento y reparará la Terminal TPP, los sistemas y equipos en el patio de almacenamiento de la Terminal, de hasta 300,000 toneladas de capacidad, de acuerdo con las Prácticas Prudentes de la Industria, de tal manera que el Proveedor esté en capacidad de suministrar a la Central hasta 5,500 toneladas métricas en un día.*" Como se puede apreciar, Greenfield debe estar en capacidad de suministrar hasta 5,500 toneladas métricas en un día, lo cual, anualizado, excede el volumen mínimo anual de 1,300,000 toneladas de carbón.

280.    Las cláusulas 4.4 y 5.5 refieren a la CFA, a la que expresamente califican de "*Use-or-Pay*". Por su parte, la cláusula 4.4, incluida dentro de la sección del Contrato relativa a las obligaciones de Greenfield, prevé que "[*a*] *partir de la Fecha de Operación Comercial y durante la vigencia del Contrato, y siempre y cuando el Proveedor no estuviera en incumplimiento a cualquiera de sus obligaciones bajo este Contrato, la Comisión se obliga a recibir y pagar, o bien, a pagar en caso de que no reciba o esté imposibilitada para recibir, la Cantidad Firme Anual*."

281.    La cláusula 5.5, incluida dentro de la sección del Contrato relativa a las obligaciones de CFE, es consistente con lo anterior, por cuanto reitera que "[…] *la Comisión – siempre y cuando no existiera y permanezca un Evento de Incumplimiento del Proveedor – se obliga a recibir y pagar, o bien a pagar en caso de que no reciba o esté imposibilitada para recibir, la Cantidad Firme Anual*."

282.    La literalidad de estas cláusulas no deja dudas de la obligación de CFE de "*recibir y pagar*", o bien, "*pagar en caso de que no reciba*", la CFA, esto es, 1,300,000 toneladas de carbón.

283.    A la literalidad de la obligación de CFE se le suma el hecho de que las Partes han calificado la CFA como "*Use-or-Pay*", lo que refuerza la intención de las Partes de que CFE pague a Greenfield por 1,300,000 de toneladas de carbón, independientemente de que las reciba, o no.

284.    En este sentido, el Tribunal Arbitral comparte la posición de Greenfield en cuanto a que el objetivo de la cláusula "Use-or-Pay" es garantizar que el vendedor, i.e., Greenfield, ponga a disposición del comprador, i.e., CFE, un volumen mínimo de servicios pactados, i.e., la disponibilidad exclusiva de la Terminal TPP, y que el comprador, i.e., CFE, pague el precio

pactado, i.e., el CSP con base en la CFA, con independencia de si decide tomar los servicios pactados.[135]

285.    Por si lo anterior no fuera suficiente, las Partes tuvieron la previsión de aclarar que el pago que debe realizar CFE bajo la cláusula 6 es "*Incondicional*", al que también calificaron como "*Hell-or-Highwater*".    En efecto, bajo la cláusula 6.2, Pago Incondicional (*Hell-or-Highwater*), las Partes estipularon que "[…] *la obligación de la Comisión de pagar la Contraprestación al Proveedor por la disponibilidad o la prestación de los Servicios de Transporte y Almacenamiento, salvo en caso de un Evento de Incumplimiento del Proveedor, será absoluta e incondicional* […]". A su vez, las Partes aclararon que dicha obligación, absoluta e incondicional, "[…] *no se verá afectada por cualquier acto o evento, incluyendo, sin limitar: (i) la pérdida o inutilización total o parcial de la Terminal TPP o el SIMC; (v) la falta de entrega del Carbón en el Punto de Origen por parte de la Comisión*."[136]

286.    Es decir, la obligación de CFE de pagar a Greenfield por un volumen mínimo anual de 1,300,000 toneladas de carbón, esto es, la CFA, es "*absoluta e incondicional*", y no se verá afectada por la pérdida aun total de la Terminal TPP o el SMIC, ni por la falta de entrega de carbón por parte de CFE.    Este es precisamente el propósito de las cláusulas *Hell-or-Highwater*, las cuales tienen por objetivo garantizar el cumplimiento de una obligación bajo cualquier circunstancia, sin que existan mayores defensas contractuales de la contraparte.[137]

287.    En este sentido, las Demandadas no discuten el significado de las cláusulas *Use-or-Pay* o *Hell-or-Highwater*, sino que alegan que las obligaciones de pago sobre la CFA se cumplieron mediante el pago por CFE de una serie de Cargos Fijos que precisamente tienen por objeto garantizar un flujo de ingresos suficientes para garantizar la viabilidad económica del Proyecto aun cuando no haya descargas de carbón.[138] En efecto, las Demandadas sostienen que "[*l*]*os Cargos Fijos remuneran a Greenfield bajo las modalidades use-or-pay y hell-or-*

---

[135]    Memorial de Demanda Greenfield, párrafo 252 *"Resulta evidente que el objetivo de la cláusula take or pay (o use or pay), es garantizar, por una parte, que el vendedor (como prestación principal) ponga a disposición del comprador un volumen mínimo de mercancías o servicios pactados (en nuestro caso, la disponibilidad exclusiva de la Terminal TPP) y, por otra, que el comprador (como prestación principal) pague el precio pactado (Cargo Servicios Portuarios calculado con base en la Cantidad Firme Anual) no importando si decide tomar o no las mercancías o servicios antes referidos."*

[136]    Cláusula 6.2 (i) y (v) del Contrato, Anexo D-GF-1.

[137]    Anexo F-GF-4 "*En los financiamientos de proyectos este tipo de disposiciones representan el compromiso absoluto de una parte de realizar una acción u obligación en virtud de un acuerdo, sin ningún tipo de defensa contractual.*" (traducción libre).

[138]    Memorial de Contestación de Demanda CFE, párrafo 232 *"Lo anterior implica que, bajo los propios términos del Contrato TSA, Greenfield recibiría una remuneración compuesta por cuatro cargos fijos asociados a la Cantidad Firme Anual, dejando como único cargo variable el Cargo Servicios Portuarios. De ahí que resulte inexplicable que las Demandantes aleguen la existencia de un riesgo a la viabilidad económica del Proyecto con motivo del pago del CSP por montos menores a la CFA.".*

*highwater puesto que, aún si la Terminal TPP dejara de recibir buques nominados para descarga, ésta seguiría percibiendo todos los Cargos Fijos por la mera disponibilidad del STA para descargar el carbón conforme a la Cantidad Firme Anual pactada.*"[139]

288.    Veamos entonces el mecanismo de pago bajo el Contrato.

289.    De conformidad con la cláusula 5.6 del Contrato, "[*p*]*or la disponibilidad y, en su caso, prestación, de los Servicios de Transporte y Almacenamiento requeridos por la Cantidad Firme Anual, la Comisión deberá pagar al Proveedor la Contraprestación de conformidad con la Cláusula 6.*"[140] En este sentido, la cláusula 6.1 especifica que CFE pagará a Greenfield la Contraprestación "*por los cargos y con respecto a los conceptos que se detallaron en el Anexo III de la Propuesta* [Vinculante]*, mismo documento que se anexa al presente como Anexo 2.*"[141]

290.    El Anexo 2 del contrato prevé que, "[*a*] *partir de la Fecha de Operación Comercial, los cargos asociados a la Cantidad Firme Anual serán: el Cargo Servicios Portuarios, el Cargo Fijo USD Fase I, el Cargo Fijo MXN Fase I, el Cargo Fijo USD Fase II y el Cargo Financiamiento, mismos que estarán sujetos a lo dispuesto en la Sección 2.3 del presente Anexo 2.*"

291.    Como se puede apreciar, el Anexo 2 señala expresamente que el CSP se encuentra asociado a la CFA, sin hacer distinción entre los distintos elementos que integran la CFA.

292.    Por su parte, la Sección 2.3 del Anexo 2 contiene la siguiente fórmula para el CSP:

---

[139]    Memorial de Contestación de Demanda CFE, párrafo 218 *"Cabe destacar que, al pagarse con una cierta periodicidad que no depende de los arribos de buques, los Cargos Fijos remuneran a Greenfield bajo las modalidades use-or-pay y hell-or-highwater puesto que, aún si la Terminal TPP dejara de recibir buques nominados para descarga, ésta seguiría percibiendo todos los Cargos Fijos por la mera disponibilidad del STA para descargar el carbón conforme a la Cantidad Firme Anual pactada y cuyos montos -calculados por Greenfield y TPP- estarían destinados al cumplimiento de las obligaciones, mantenimiento y disponibilidad de la Terminal TPP."*.

[140]    Cláusula 5.6(a) del Contrato, Anexo D-GF-1.

[141]    Cláusula 6.1 del Contrato, Anexo D-GF-1.

## 2.3.1 CARGO SERVICIOS PORTUARIOS
### CARGO SERVICIOS PORTUARIOS (CSP)

**Pago en mes n:**

$$CSP_n = (Tarifa\ Variable\ Base\ en\ USD) * (TM_n) * \left(\frac{PPI_{t-1}}{PPI_0}\right)$$

dónde:

**Toneladas en mes n:** $TM_n$

**Tarifa variable base en USD:** USD\$6.50/tonelada métrica

**$PPI_{t-1}$:** *Producer Price Index* de Estados Unidos de América al término del semestre operativo anterior

**$PPI_0$:** *Producer Prince Index* de Estados Unidos de América del mes de julio de 2016

293.    Vemos que, respecto de las toneladas en mes "n", la fórmula no contiene un monto determinado.

294.    Asimismo, la Sección 2.1 del Anexo 2 desglosa las tarifas base para el CSP de la siguiente forma:

## 2.1 RESUMEN TARIFAS BASE

| | Monto | Unidad / Frecuencia | Moneda | Índice de Aumento |
|---|---|---|---|---|
| **Cargo Servicios Portuarios** | \$6.50 | por tonelada devengada / mensual | Dólares Estadounidenses | Ajuste semestral US Producer Price Index |

295.    Así, vemos que, como sostienen las Demandadas, la Sección 2.1 prevé que la unidad de medida para calcular el CSP es por tonelada devengada mensualmente. En base a ello, las Demandadas sostienen que el CSP no es un cargo fijo, a diferencia de lo argumentado por las Demandantes.[142] Por su parte, las Demandantes discrepan de la interpretación de las Demandadas, y sostienen que la razón de haber usado el término "*tonelada devengada*" fue que la cantidad a ser descargada mensualmente difícilmente sería equivalente, y realizar el cálculo de forma anual implicaría un reto financiero para TPP porque tendría que asumir los costos asociados con las descargas si se operaban varios barcos en un mismo mes, puesto que ello implicaría un ingreso menor al gasto mensual. Por ello, según las Demandantes, el CSP

---

[142]    Memorial de Contestación de Demanda CFE, párrafo 241 *"Dicha situación implica que han sido las Demandantes quienes estructuraron al Cargo Servicios Portuarios como cargo variable calculado y pagado exclusivamente en función de las toneladas efectivamente descargadas en el mes de facturación y cuya composición no es compatible con las pretensiones de las Demandantes puesto que, de haber sido la intención de las Partes que el CSP fuera pagado por un monto equivalente a la CFA, así lo habrían dispuesto en el propio Anexo 2 del Contrato."*.

no se estableció de forma mensual, sino que se pagaría por las toneladas devengadas o descargadas en cada mes, y sería a final de cada año de operación que se haría un ajuste y se pagaría la diferencia en caso de que las cantidades mensuales sumadas no alcanzaran la CFA.[143]

296. Volveremos a la discusión entre las Partes sobre la referencia a "*tonelada devengada*" de la Sección 2.1 del Anexo 2 al analizar las negociaciones del Contrato entre las Partes con posterioridad a la Propuesta Vinculante.[144] Sin embargo, desde el punto de vista de una interpretación sistemática del Contrato, lo previsto en el resumen tarifas base de la Sección 2.1 se contradice con lo previsto en el último párrafo de la misma sección, en cuanto precisa que el CSP es uno de los cargos asociados a la CFA. De hecho, si bien el Anexo 2 incluye varios cargos variables (ver, por ejemplo, Secciones 2.3.2.2 y 2.3.3.2), estos cargos no están asociados a la CFA, a diferencia del CSP, lo cual refuerza la interpretación de que el CSP es, en efecto, un cargo fijo.

297. Por otro lado, la cláusula 8.3, al regular los efectos de un Evento de Incumplimiento y Recisión que repercuta o derive en una terminación del Contrato TPP, prevé que "[…] *la Comisión permanecerá obligada al pago del Cargo por Servicios Portuarios (según éste concepto se define en el Anexo 2 del presente Contrato) por la Cantidad Firme Anual, por un plazo máximo de hasta 2 (dos) años calendario contados a partir del mes siguiente a que sea efectiva la terminación del Contrato a que se refiere este inciso (e), en el expreso entendido de que, si en cualquier momento durante el plazo referido de 2 (dos) años, TPP consigue, mediante un contrato de largo plazo, algún usuario tercero para utilizar la Terminal TPP y/o sus activos destinados a los fines de este Contrato, la obligación de pago de los Cargos por Servicios Portuarios de la Comisión terminará de forma inmediata y quedará automáticamente liberada. Los referidos Cargos por Servicios Portuarios deberán ser*

---

[143] Memorial de Demanda Greenfield, párrafo 242 *"Lo anterior es confirmado por Galo Macías en su testimonial: "Si bien ya CFE había acordado incluir la cláusula take or pay, un primer esquema que se propuso es que CFE hiciera pagos mensuales, sin considerar la cantidad de carbón efectivamente descargada. Esto preocupaba a TPP porque existía la posibilidad de que en determinado mes se descargara una gran cantidad de carbón (lo cual eleva considerablemente los costos de operación) y los pagos mensuales fueran insuficientes para amortizar esos costos, generando posibles problemas de flujo de caja. Es por esta razón que solicité a CFE, con la anuencia de Carlos Álvarez, de BlackRock, que los pagos mensuales se hicieran por "tonelada devengada" lo que implica que CFE pagaría una tarifa por cada tonelada que se descargara en determinado mes. Aun con este ajuste, TPP, Greenfield y CFE siempre estuvimos de acuerdo y entendimos perfectamente que al final de cada año de operación se haría un "corte de cuenta" y que CFE pagaría cualquier cantidad faltante para que TPP al final del año recibiera una tarifa por Servicios Portuarios por un volumen de 1.3 millones de toneladas de carbón.".*

[144] Ver párrafos 327-337 del presente Laudo.

*pagados por la Comisión de forma mensual, dentro de los primeros 7 (siete) Días de cada mes, dentro del plazo mencionado de 2 (dos) años.* […]".[145]  (énfasis añadido)

298.    De la cláusula 8.3, se desprenden tres conclusiones. *Primero*, si CFE "*permanece*" obligada es porque ya estaba obligada desde antes, por lo que la obligación de pagar el CSP sobre la base de la CFA no parece estar vinculado a la descarga efectiva de carbón. *Segundo*, en este supuesto, CFE permanece obligada al pago del CSP sobre la base de la CFA por un plazo de hasta dos años, sin que exista descarga de carbón, por cuanto el contrato habrá terminado. *Tercero*, la obligación de CFE de pagar el CSP por la CFA cesa desde el momento en el que TPP consigue un tercero para utilizar la Terminal TPP, lo que refuerza el entendimiento de que lo que busca remunerar el CSP por la CFA es justamente la indisponibilidad de la Terminal TPP durante la vigencia del Contrato.

299.    Por lo anterior, y si bien el Contrato no se encuentra exento de cierta ambigüedad, el Tribunal Arbitral concluye que una interpretación sistemática de las distintas estipulaciones contractuales conduce a aceptar la posición de las Demandantes en lo que respecta a la obligación de CFE de pagar el CSP en base a la CFA.

### 5.2.4.2    *Negociaciones previas entre las Partes*

300.    El análisis de las negociaciones previas entre las Partes refuerza la conclusión del Tribunal Arbitral en cuanto a que el CSP es un cargo mínimo que debe ser calculado con base en la CFA, a la cual debe añadirse, en su caso, cualquier cantidad adicional de carbón que haya sido efectivamente descargada en la Terminal TPP por encima de la CFA.

301.    Concretamente, el Tribunal Arbitral se funda en el análisis de los *Term Sheets*, la Propuesta Económica de TPP del 25 de noviembre de 2015*,* la Propuesta Vinculante del 27 de mayo de 2016 y la negociación entre las Partes en septiembre y octubre de 2016.  Si bien el Tribunal Arbitral comparte la posición de las Demandadas en cuanto a que el Contrato en su versión firmada constituye el acuerdo total entre las Partes, sustituyendo cualquier acuerdo previo, lo cierto es que, ante las interpretaciones disímiles de las Partes sobre ciertas cláusulas contractuales, el análisis de acuerdos previos y preparatorios del Contrato son de utilidad para desentrañar la intención de las Partes al suscribir dichas cláusulas.

---

[145]    Cláusula 8.3(e) del Contrato, Anexo D-GF-1.

302. *Primero*, el 4 de agosto de 2015, CFE, TPP y Carbonser acordaron que TPP y Carbonser recibirían una primera versión de los *Term Sheets* que enunciaban los aspectos esenciales del Proyecto.[146]

303. Posteriormente, el 19 de noviembre de 2015, mediante Oficio No. 00746, CFE envió a TPP dos *Term Sheets* relativos al Proyecto, sobre la base de los cuales invitó a TPP a formular, a más tardar el 25 de noviembre de dicho año, ofertas técnicas y económicas que comprendan, entre otros, el servicio de "[d]*escarga, almacenamiento, reclamo y mezcla de carbón en el puerto de propiedad de esa empresa por 1.3 millones de toneladas*".[147]   Asimismo, CFE solicitó a TPP que, al remitir sus propuestas técnicas y económicas, "*lo haga acompañando las Hojas de Términos y Condiciones antes referida, debidamente suscritas en cada foja, por la persona que tenga poder notarial con facultades bastantes para ello.*"[148]

304. El 25 de noviembre de 2015, TPP envió los *Term Sheets* correspondientes, debidamente suscritos en cada foja, conforme lo solicitado por CFE. De esta forma, el Tribunal Arbitral entiende pertinente desestimar la insinuación de las Demandadas durante la Audiencia en cuanto a que los *Term Sheets* no habrían sido firmados por CFE.[149]

305. Los *Term Sheets* incluían los puntos esenciales de los contratos de ingeniería, procura y construcción,[150] así como del contrato de operación y mantenimiento necesarios para la implementación del Proyecto.[151]   Ahora bien, respecto de este punto, las Demandantes aclaran que los *Term Sheets* llaman "Contrato O&M" al Contrato TSA, sirviendo como base para el Proyecto en su integridad, aunque con el tiempo se desdobla en dos contratos y uno de ellos se llamara Contrato O&M.[152]

306. En este sentido, el Tribunal Arbitral coincide con la posición de las Demandantes, por cuanto basta con leer la descripción del Proyecto en cada uno de los *Term Sheets* para apreciar que uno se refiere únicamente a la "*construcción de infraestructura y obras auxiliares y necesarias para el transporte de carbón mineral desde la Terminal del Contratista [...] a la Central [...] para la repotenciación del sistema de suministro y entrega de carbón mineral e*

---

[146]   Anexo D-TPP-5.

[147]   Anexo D-TPP-7.

[148]   Anexo D-TPP-7.

[149]   Tr. D4, P.32-34, L.1267-1352.

[150]   Anexo D-TPP-8.

[151]   Anexo D-TPP-9.

[152]   Conclusiones TPP y TMC, párrafo 65.

*instalaciones asociadas en la Central*",[153] mientras que el otro se refiere a la [*r*]*ealización de las labores y prestación de los servicios de operación y mantenimiento ("O&M") a los equipos e infraestructura construida por los Contratistas IPC necesaria para el transporte del de carbón mineral a la Central* […]".[154] Es decir, ambos *Term Sheets* sirvieron de base para el objeto del Contrato, el cual incluye tanto la puesta a disposición del Sistema de Transporte y Almacenamiento, como la prestación de los Servicios de Transporte y Almacenamiento por un volumen mínimo equivalente a la CFA.[155]

307.    Al analizar el *Term Sheet* relativo a la operación y mantenimiento de los equipos, vemos que se distingue entre los llamados Servicios O&M y los Servicios Portuarios.[156] Según el Apéndice 1, los Servicios O&M "*incluirán todos los servicios de gestión, operación, mantenimiento, administración, laborales, de materiales combustibles* […]*, agua, supervisión y otros bienes y servicios necesarios para la diaria administración, operación y mantenimiento seguro, eficiente y confiable de la Infraestructura.*"[157]    Los servicios de operación incluyen, entre otros, el almacenamiento, manejo, y transporte del carbón mineral por medio del sistema de bandas hasta la Central, y desde allí hasta el punto de interconexión con el SIMC.[158]    Por su parte, los Servicios Portuarios "*incluirán todos los servicios de descarga, manejo y almacenaje del carbón mineral dentro de la Terminal Portuaria.*"[159]

308.    El *Term Sheet* en cuestión prevé que, a partir del inicio de los servicios de transporte y almacenamiento, los Servicios Portuarios serían prestados por un tonelaje mínimo anual equivalente a 1.3 millones de toneladas de carbón mineral:[160]

---

[153]    Anexo D-GF-13.
[154]    Anexo D-GF-14.
[155]    Cláusula 2 del Contrato, Anexo D-GF-1.
[156]    Anexo D-GF-14.
[157]    Anexo D-GF-14.
[158]    Anexo D-GF-14.
[159]    Anexo D-GF-14.
[160]    Anexo D-GF-14.

| | |
|---|---|
| *SERVICIOS PORTUARIOS* | El Operador prestará al Propietario los Servicios Portuarios, según los mismos se definen en el **Apéndice** 1. Las partes convienen y están de acuerdo en que los Servicios Portuarios serán prestados en la terminal pública operada por el Operador en términos y condiciones de mercado, por un período de 14 años, contado a partir de la firma del Contrato O&M. Durante la etapa de construcción de la Infraestructura los Servicios Portuarios serán facturados mensualmente al Propietario en función del tonelaje descargado en el mes inmediato anterior.¶ |
| | A partir del inicio de los Servicios O&M, los Servicios Portuarios serán prestados por un tonelaje mínimo anual de 1.3 millones de toneladas de carbón mineral (el "Volumen Mínimo Anual"). ¶ |

309.    Por otra parte, los *Term Sheets* también prevén que cuando CFE decidiera suspender unilateralmente los servicios tras la puesta en marcha del Sistema de Transporte y Almacenamiento, tanto el CSP como los costos fijos deberían continuarse pagando. Es decir, el pago de ambas prestaciones no dependía de la descarga efectiva de carbón en la Terminal TPP:

| | |
|---|---|
| *SUSPENSIÓN:* ¶ | Suspensión. El Operador podrá mediante instrucción del Propietario o de las personas que este designe, suspender los Servicios de O&M por el tiempo y forma que el Propietario, o las personas que este designe, consideren necesario y durante dicha suspensión deberá proteger y asegurar el Proyecto de manera adecuada, hasta que se instruya el reinicio de la prestación de los Servicios de O&M. La suspensión de los Servicios O&M no liberará al Propietario de la obligación de pagar las tarifas correspondientes a los costos fijos de los Servicios O&M, ni las tarifas por los Servicios Portuarios.¶ |

310.    De esta forma, vemos que los *Term Sheets* hacen una distinción entre el CSP y los "*costos fijos*", lo cual refuerza la posición de las Demandantes en cuanto a que el CSP tiene por objeto cubrir el costo de oportunidad y los gastos periódicos de TPP para poder garantizar la disponibilidad de la Terminal TPP, mientras que los "*costos fijos*" compensarían a TPP por las erogaciones necesarias para mantener la disponibilidad de la Fase I del Sistema de Transporte y Almacenamiento.

311.    *Segundo*, como vimos anteriormente, el 25 de noviembre de 2015, TPP envió su propuesta económica junto con los *Term Sheets* propuestos por CFE, conforme lo solicitado en el Oficio 00746.[161]

---

[161]    Transcripción de Audiencia, Día 4, p.32-34, l.1267-1352

312.    La propuesta económica de TPP referente a los servicios de operación y mantenimiento, los cuales, como vimos, incluyen el almacenamiento y transporte del carbón, contempla un volumen mínimo de descarga de entre 1,300,000 y 1,800,000 toneladas métricas anuales de carbón mineral:

- Volumen anual de descarga

   Entre 1'300,000 toneladas métricas anuales ( mínimo ) y hasta 1'800,000 toneladas métricas anuales de carbón mineral

313.    Asimismo, la propuesta económica de TPP prevé que su compensación se calcularía anualmente de la siguiente forma:

## V.  Compensación de Servicios Portuarios a TPP

Se calcula anualmente de la siguiente manera:

- Cantidad Deficitaria  =  Volumen Mínimo Anual  −  Cantidad Operada

   Cantidad Deficitaria en Toneladas Métricas

   Volumen Mínimo Anual .-

   1'300,000 ( Un millón trescientas mil ) Toneladas Métricas Anuales a partir de la entrada en operación del sistema de transporte por Bandas de los Patios de TPP al Patio de Almacenamiento de la Central y hasta el término de la Vigencia del Contrato.

   Cantidad Operada .-

   Corresponde al número de Toneladas Métricas de carbón mineral que fueron objeto de los Servicios de Terminal de TPP ( toneladas descargadas ) en el año respectivo contractual, durante la Vigencia del Contrato.

   No habrá Cantidad Deficitaria en el periodo correspondiente del inicio del Contrato de O&M y hasta la terminación del Contrato de IPC ( entrada en operación del sistema de transporte por Bandas de los Patios de TPP al Patio de Almacenamiento de la Central ).

- Compensación TPP  =  Cantidad Deficitaria  x  el Costo por Servicios de Terminal

   Compensación TPP  en Dólares Estadounidenses.

Se factura dentro de los 5 ( cinco ) días naturales siguiente a la terminación del año respectivo contractual y se paga dentro de los 15 ( quince ) días naturales siguientes a la entrega de la respectiva factura por parte de TPP.

314.    Como vemos, CFE pagaría a TPP una tarifa por la Cantidad Operada, entendida como las toneladas de carbón descargadas, debiendo abonar luego la Cantidad Deficitaria, entendida como la diferencia entre el volumen mínimo anual de 1,300,000 toneladas de carbón menos las toneladas efectivamente descargadas a lo largo del año.

315.    En este mismo sentido, el testigo Armando Zapién Tapia reconoció en la Audiencia que, de la propuesta económica de TPP, era evidente que su intención era cobrar al menos 1,300,000 toneladas de carbón al año.[162]

316.    Por otra parte, vemos que las tarifas incluidas en la propuesta económica de TPP fueron incorporadas en el Anexo 2, como se puede apreciar de la siguiente tabla comparativa elaborada por las Demandantes:

| Propuesta Técnica y Económica (D-TPP-10) | | Anexo 2 del Contrato TSA (D-TPP-18) | |
|---|---|---|---|
| Costo por servicios de Terminal | $6.50 | Cargo Servicios Portuarios | $6.50 |
| Costo Fijo por Operación y Mantenimiento USD | $4,005,000.00 | Cargo Fijo USD Fase I | $4,005,000.00 |
| Costo Fijo por Operación y Mantenimiento MXN | $25,850,000.00 | Cargo Fijo MXN Fase I | $25,850,000.00 |
| Costo Variable por Operación y Mantenimiento USD | $0.2575 | Cargo Variable USD Fase I | $0.2575 |
| Costo Variable por Operación y Mantenimiento MXN | $21.6180 | Cargo Variable MXN Fase I | $21.6180 |

317.    Finalmente, la propuesta económica de TPP recoge el mismo criterio propuesto por CFE en los *Term Sheets* en cuanto a la distinción entre el CSP y los "*costos fijos*", y el impacto en ellos derivado de la suspensión de los Servicios de O&M:

## XI.    Suspensión de los Servicios

El Operador podrá mediante instrucción del Propietario o de las personas que este designe, suspender los Servicios de O&M por el tiempo y forma que el Propietario, o las personas que este designe, consideren necesario.

El Operador deberá, durante dicha suspensión, proteger y asegurar los equipos y sistemas de manera adecuada hasta que se instruya el reinicio de la prestación de los Servicios de O&M.

La suspensión de los Servicios de O&M no libera al Propietario de su obligación de pagar las tarifas correspondientes al costo de los Servicios Portuarios y a los costos fijos de los Servicios de O&M.

---

[162]    Transcripción de Audiencia, Día 4, p.16, l.630-638.

318. *Tercero*, el 27 de mayo de 2016, TPP, Greenfield y Carbonser presentaron a CFE una Propuesta Vinculante para el desarrollo del Proyecto.[163] La razón de la propuesta conjunta se debió, entre otras, a que no era factible que cada una de las partes presente una propuesta por separado a CFE que cubra de manera integral la totalidad de los alcances y servicios requeridos por CFE para el Proyecto.[164]

319. En lo esencial, la Propuesta Vinculante suponía llevar a cabo el Proyecto a través de la celebración de un contrato de servicios entre CFE y una sociedad subsidiaria de BlackRock, quien sería "*la única responsable frente a la CFE respecto a la prestación de los servicios bajo el Contrato de Servicios, así como del cabal desarrollo, cumplimiento, operación y mantenimiento del Proyecto. Las Partes celebraran entre sí y con la Sociedad del Proyecto los respectivos contratos que se requieran y/o consideren conveniente para satisfacer las necesidades de la CFE y aquellas propias del Proyecto, en los términos condiciones contenidas en esta Propuesta.*"[165]

320. El Anexo III de la Propuesta Vinculante contiene el esquema de precios y mecanismo de determinación de pagos de los servicios. Allí, se puede apreciar que existe un concepto denominado Cargo por Volumen Portuario Excedente, el cual está cotizado en USD 6.50, cuya unidad de medida es "*por cada tonelada por encima de 1.3 MM*", con una frecuencia anual:

| Cargo por Volumen Portuario Excedente | 6 50 | por cada tonelada por encima de 1 3 MM, por año | USD | US PPI |
|---|---|---|---|---|

321. A su vez, el Anexo 5 de la Propuesta Vinculante, denominado Lista de Precios de los Servicios a Prestar, describe al cargo por volumen portuario excedente como la "[c]*ontraprestación variable en excedente por servicios portuarios de descarga, almacenaje y manejo de carbón en la Terminal Especializada. Este cargo solamente será aplicable para las toneladas métricas que superen el límite inferior de 1.3 millones de unidades por año.*"[166]

| Cargo por volumen portuario excedente | Contraprestación variable en excedente por servicios portuarios de descarga, almacenaje y manejo de carbón en la Terminal Especializada. Este cargo solamente será aplicable para las toneladas métricas que superen el límite inferior de 1.3 millones de unidades por año | 600431295 | Tonelada por encima de 1.3 MM, por año | $6.50 | $1.04 | México | USD | US PPI |
|---|---|---|---|---|---|---|---|---|

---

[163] Anexo D-TPP-14 y D-TPP-60.
[164] Anexo D-TPP-14 y D-TPP-60, cláusula I, ix).
[165] Anexo D-TPP-14 y D-TPP-60, cláusula II, a) y b).
[166] Anexo D-TPP-60, Anexo 5.

322.   Vemos entonces que la Propuesta Vinculante parte de la premisa de que habría una descarga mínima de 1,300,000 toneladas de carbón; cifra, como vemos, que coincide con la CFA prevista en el Contrato.

323.   Asimismo, el Anexo III de la Propuesta Vinculante previó un "*Cargo Fijo USD*" de frecuencia mensual por un importe de USD 3,340,000, el cual, necesariamente, debe incluir el CSP por hasta 1,300,000 de toneladas de carbón, ya que, de lo contrario, no tendría sentido la tarificación de un "*Cargo por volumen portuario excedente*" de 1,300,000 toneladas de carbón (énfasis añadido).

324.   Por lo anterior, el Tribunal Arbitral coincide con la interpretación de las Demandantes, en cuanto a que el Cargo Fijo USD previsto en el Anexo III de la Propuesta Vinculante luego se desagregó en el Anexo 2 del Contrato en cuatro componentes: (i) Cargo por Financiamiento; (ii) Cargo Fijo USD Fase I; (iii) Cargo Fijo USD Fase II; y (iv) el CSP por la CFA.   Prueba de ello es que, si comparamos el monto del Cargo Fijo USD bajo el Anexo III de la Propuesta Vinculante (es decir, USD 3,340,000 mensual), con los cargos fijos y el CSP incluidos en el Anexo 2 del Contrato, vemos que existe una coincidencia total entre los montos mensuales que CFE debe abonar a Greenfield bajo ambos Anexos, aunque organizados bajo distintos conceptos.   La identidad entre ambas formulaciones se ve claramente si se considera que el CSP se paga necesaria e incondicionalmente por un volumen mínimo anual de 1,300,000 toneladas de carbón.   Lo anterior se puede apreciar con claridad en la siguiente tabla comparativa elaborada por las Demandantes:

| Propuesta Anexo 2 del Contrato TSA | | Anexo 2 del Contrato TSA | |
| Basada en Anexo III de la Propuesta Vinculante | | Versión Firmada | |
| Cargo | Monto Mensual | Cargo | Monto Mensual |
| | | Cargo por Servicios Portuarios | (1.3 millones/12) x USD 6.50 = 108,333.33 x USD 6.50 = USD $704,166.66 |
| Cargo Fijo USD | USD $3,340,000.00 | Cargo Fijo USD Fase I | $4,005,000/12 = USD $333,750 |
| | | Cargo Fijo USD Fase II | $585,000/12 = USD $48,750 |
| | | Cargo Financiamiento | USD $2,253,333.33 |
| Total | USD $3,340,000.00 | Total | USD $3,340,000.00 |

325. La Propuesta Vinculante fue aceptada por CFE, quien sostuvo que la misma "*cumple técnicamente los requerimientos del Proyecto*", y que "*se considera razonable y competitiva en función del costo que representa para CFE el no contar con la habilidad para aportar 678 MW al SEN.*"[167]

326. Por otra parte, cabe reiterar que el propio Contrato, en su cláusula 6.1, prevé que CFE pagará a Greenfield la contraprestación "*por los cargos y con respecto a los conceptos que se detallaron en el Anexo III de la Propuesta* [Vinculante]*, mismo documento que se anexa al presente como* <u>*Anexo 2*</u>."[168] Es decir, el propio Contrato confirma que el Anexo 2 contiene los mismos términos que el Anexo III de la Propuesta Vinculante.

327. *Cuarto*, las negociaciones del Contrato entre las Partes con posterioridad a la Propuesta Vinculante corroboran la conclusión del Tribunal Arbitral.

328. La primera versión del Anexo 2 del Contrato propuesta por BlackRock retoma el Anexo III de la Propuesta Vinculante, según la cual el CSP estaba comprendido dentro del concepto

[167] Anexo D-TPP-61, página 11.
[168] Cláusula 6.1 de Contrato, Anexo D-GF-1.

ARBITRAJE LCIA No. 215145

Cargo Fijo USD, junto con los Cargos Fijos USD Fase I y Fase II y el Cargo Financiamiento que luego se desagregarían en la versión final del Anexo 2:[169]

## ANEXO 2
### CONTRAPRESTACIÓN

### 2.1 RESUMEN

| | Monto | Unidad / Frecuencia | Moneda | Indice de Aumento |
|---|---|---|---|---|
| **Cargo Fijo MXN** | $25,850,000.00 | por año / mensual | Pesos Mexicanos | Indice Nacional de Precios al Productor |
| **Cargo Variable USD** | $1.1275 | por tonelada / mensual | Dólares Estadounidenses | *US Producer Price Index* |
| **Cargo Variable MXN** | $21.6180 | por tonelada / mensual | Pesos Mexicanos | 25% Indice Nacional de Precios al Productor /75% Tarifa CFE, resultante de dividir la tarifa promedio H-S de los 6 meses anteriores a la fecha de ajuste, entre la tarifa promedio anterior a dichos 6 meses |
| **Cargo por Volumen Portuario Excedente** | $6.50 | por cada tonelada por encima de 1.3 MM / anual | Dólares Estadounidenses | *US Producer Price Index* |
| **Cargo Fijo USD** | Ver tabla de abajo | por mes / mensual | Dólares Estadounidenses | *US Producer Price Index* |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mes Operativo 1 | 3,340,000.00 | Mes Operativo 21 | 3,340,000.00 | Mes Operativo 41 | 3,340,000.00 |
| Mes Operativo 2 | 3,340,000.00 | Mes Operativo 22 | 3,340,000.00 | Mes Operativo 42 | 3,340,000.00 |
| Mes Operativo 3 | 3,340,000.00 | Mes Operativo 23 | 3,340,000.00 | Mes Operativo 43 | 3,340,000.00 |
| Mes Operativo 4 | 3,340,000.00 | Mes Operativo 24 | 3,340,000.00 | Mes Operativo 44 | 3,340,000.00 |
| Mes Operativo 5 | 3,340,000.00 | Mes Operativo 25 | 3,340,000.00 | Mes Operativo 45 | 3,340,000.00 |
| Mes Operativo 6 | 3,340,000.00 | Mes Operativo 26 | 3,340,000.00 | Mes Operativo 46 | 3,340,000.00 |
| Mes Operativo 7 | 3,340,000.00 | Mes Operativo 27 | 3,340,000.00 | Mes Operativo 47 | 3,340,000.00 |

329.    El 30 de septiembre de 2016, CFE formuló los siguientes comentarios a la primera versión del Anexo 2:[170]

---

[169]    Anexo D-CFE-222.
[170]    Anexo D-CFE-224.

Comentarios·CFE·30.09.16¶

¶

Anexo·2¶

CONTRATO DE PRESTACIÓN DE SERVICIOS DE TRANSPORTE Y ALMACENAMIENTO DE CARBÓN¶

¶
¶

2.2 → Respecto·al·cobro·por·la·prestación·de·los·servicios·del·SIMC·en·el·período· entre· la· Fecha· de· Inicio· y· Operación· Comercial· se· están· proponiendo·cobros· de· · Cargo· Fijos· USD,· Cargos· fijos· MXN,· cargos· Variables·USD,·Cargo·Variable·MXN,·Cargo·por·Volumen·Portuario·Excedente· USD.¶

• → Cargos·Fijos·USD.¶

La·tarifa·mensual·base·que·están·proponiendo·de·USD·3,340,000.00,·esta· es·la·tarifa·que·se·está·cobrando·mensualmente·por·todo·el·proyecto,·es·decir,·por· la·descarga·del·barco,·almacenamiento·de·carbón·,·mezcla,·envío·al·patio·de·la· central·y·transporte·a·través·del·SIMC·a·la·Unidad·7,·cuando·el·concepto·es· solamente·el·uso·del·SIMC·y·de·acuerdo·al·"desglose·que·BlackRock·presentó·de· los·costos·fijos·y·variables,·debería·de·ser·de·USD·48,750.00·¶

• → Cargos·fijos·MXN.·¶

De·acuerdo·con·el·desglose·de·los·costos·fijos·y·variables,·no·hay·este· concepto·para·el·SIMC.·¶

• → Cargos·variables·USD.¶

De·acuerdo.·¶

• → Cargos·Variables·MXN.¶

De·acuerdo·con·el·desglose·de·los·costos·fijos·y·variables,·no·hay·este· concepto·para·el·SIMC.·¶

• → Cargo·por·Volumen·Portuario·Excedente·USD.¶

No· estamos· de· acuerdo· con· el· concepto· de· toneladas· garantizadas,· ya· que· dependemos· de· la· disponibilidad· del· SIMC,· sin· que· se· afecte· el· suministro· de· carbón·a·las·unidades·1·a·6,·"solamente·se·pagaría·las·toneladas·descargadas·de· acuerdo· a· la· tarifa· establecida· de· 6.5· USD/Tonelada· descargada,· con· su· respectivo·ajuste.·Por·otro·lado·¶
¶

330. Por un lado, las Demandantes alegan que la inconformidad de CFE con el concepto de "tonelada garantizada" se refiere a la aplicación de este concepto antes de la FOC, es decir, durante la construcción del Sistema de Transporte y Almacenamiento. Las Demandantes añaden que, sin embargo, CFE no hizo comentarios en cuanto a que, a partir de la FOC, se pagara de manera fija mensual la cantidad de USD 3,340,000 que remuneraría a las Demandantes por la descarga de los barcos y el transporte y almacenamiento de carbón, el cual corresponde al monto del Cargo Fijo USD que en dicho momento incluía al CSP.[171]

331. Por su parte, las Demandadas sostienen que, en la propuesta de BlackRock, no existía una diferenciación en el momento de pago de los conceptos listados y que, además, existía un concepto denominado "Cargo por Volumen Portuario Excedente USD" que se pagaría si la

---

[171]    Anexo D-CFE-224.

cantidad de carbón descargada en un año era menor a 1,300,000 millones de toneladas de carbón.  Las Demandadas añaden que, en sus comentarios a este proyecto, CFE refirió a la Sección 2.2 y, si bien incluyó la frase "*de acuerdo*" con respecto a los cargos variables USD y Cargos Variables MXN, CFE aclaró que "*no esta*[*ba*] *de acuerdo con el concepto de toneladas garantizadas*", sin haber distinguido el momento temporal al que se refería. Más aún, las Demandadas sostienen que CFE nunca aceptó explícitamente la aplicación del cargo por volumen portuario excedente, el cual no fue incorporado en el Anexo 2 del Contrato.[172]

332.    Más allá de la posición contradictoria de las Partes, el Tribunal Arbitral observa que los comentarios formulados por CFE, efectivamente, hacen referencia a la Sección 2.2, la cual refiere, expresamente, al "*cobro por la prestación de los servicios del SIMC <u>en el periodo entre la Fecha de Inicio y Operación Comercial</u>*" (énfasis añadido). En este sentido, la indicación de CFE de que no estaba de acuerdo con el concepto de toneladas garantizadas la justifica en que "*depende*[] *de la disponibilidad del SIMC*," lo cual refuerza la idea de que los comentarios de CFE se ciernen al periodo comprendido entre la Fecha de Inicio y la Fecha de Operación Comercial.

333.    Ahora bien, la realidad es que la fórmula contenida en el Anexo III de la Propuesta Vinculante no fue reflejada exactamente en el Anexo 2 del Contrato, lo cual podría abonar la posición de las Demandadas en cuanto a que lo anterior se debió a la negativa de CFE de aceptar pagar el CSP sobre la base de la CFA.  Sin embargo, el Tribunal Arbitral no está convencido de dicha posición. Por el contrario, el Tribunal Arbitral considera que la razón por la cual las Partes decidieron desagregar el CSP del Cargo Fijo USD se explica en los correos de TPP a Greenfield del 3 y 13 de octubre de 2016. Veamos.

334.    En el correo del 3 de octubre de 2016, TPP detalla a Greenfield el mecanismo mediante el cual CFE pagaría a Greenfield el CSP de forma mensual en función de las toneladas de carbón efectivamente descargadas, haciendo un corte final a fin de año sobre la CFA, de forma tal de evitar un déficit operativo de TPP en caso de recibir descargas mayores a 108,333.33 toneladas mensuales:[173]

> "*El pago no se hace de 1.3 millones dividido entre 12 + un excedente si lo hay. El pago mensual por el servicio portuario debe ser por las toneladas descargadas en cada mes. Al final del año se compara lo pagado con las 1.3 millones de toneladas y si lo pagado es menor, se paga la diferencia correspondiente a la cantidad deficitaria, en una*

---

[172]    Memorial de Conclusiones de las Demandadas, párrafo 316.
[173]    Anexo D-TPP-58.

*factura aparte. TPP se obliga a reportar a la Aduana Central los pedimos y facturas de contraprestación, por lo que los montos facturados deben de coincidir con los pedimentos."*

335.    Por su parte, en el correo del 13 de octubre de 2016, TPP se queja del Factor de Ajuste por Disponibilidad al servicio portuario, el cual, según TPP, consistiría en una doble penalidad y no sería aceptable.[174]  Según las Demandantes, como tal penalidad se calculaba en función del Cargo Fijo USD, la indisponibilidad del Sistema de Transporte y Almacenamiento estaría afectando la tarifa pagadera por la disponibilidad de la Terminal TPP, aun cuando se trataba de instalaciones independientes.

336.    Así lo explicó la testigo Claudia Rachadell en la Audiencia:

"*Lo que sucedió fue que el cargo ese que habíamos visto en la propuesta vinculante que incluía todos los cargos, después en las negociaciones del contrato, la CFE estableció que debía haber una penalidad por no disponibilidad del Sistema de transporte y almacenamiento. Y como TPP consideramos que esa no disponibilidad no podía ser aplicada del cargo por servicios portuarios y por eso se dividieron las contraprestaciones y se separó el cargo por servicios portuarios de los cargos referidos al sistema de transporte y almacenamiento. Entonces, ahí es cuando surgió los diversos cargos que hoy en día existen en el contrato.*"[175]

337.    De esta forma, en el Anexo 2 del Contrato se separó el CSP del Cargo Fijo USD para que el CSP no fuera afectado por una penalidad relativa a la indisponibilidad del Sistema de Transporte y Almacenamiento. Así, se llega a los cuatro cargos indicados en el Anexo 2, esto es, (i) Cargo por Servicios Portuarios; (ii) Cargos Fijos USD Fase I; (iii) Cargos Fijos USD Fase II; y (iv) Cargo por Financiamiento, todos los cuales fueron expresamente asociados a la CFA.

### 5.2.4.3  *Razones de índole comercial*

338.    Como vimos, el 21 de diciembre de 2006, TPP suscribió un contrato de cesión parcial de derechos con APILAC para la construcción y operación de una terminal especializada de uso público, destinada a la operación de minerales a granel y productos del acero, ubicada en el Puerto Lázaro Cárdenas.    Mediante Acuerdo CA-CXI-2 (21-III-17), el Consejo de

---

[174]    Anexo D-TPP-58.
[175]    Transcripción de Audiencia, Día 3, p.67, l.2633-2644.

administración de APILAC aprobó la realización de un convenio modificatorio "*para que la superficie pactada para la segunda etapa de la terminal se ajuste dando cabida al desarrollo de una banda transportadora de carbón, para suministro a la termoeléctrica "Presidente Plutarco Elías Calles", ubicada en Petalco, Estado de Guerrero, propiedad de la Comisión Federal de Electricidad*".[176]

339.    Así, el 23 de agosto de 2018, TPP y APILAC celebraron el Convenio Modificatorio No. 4, mediante el cual se modificó el área de la Terminal cedida a TPP,[177] precisamente, para poder atender el requerimiento de las 1,300,000 toneladas adicionales de carbón derivadas del Contrato.[178] Nótese que en la descripción de la "*Situación Actual*", el Convenio Modificatorio No. 4 establece que TPP ha logrado "*la asignación de un contrato con Comisión Federal de Electricidad para la recepción, manejo y envío a la Termoeléctrica Plutarco Elías Calles de 1,300,000 toneladas de carbón al año.*"[179]

340.    Posteriormente, el 9 de enero de 2020, TPP y APILAC celebraron el Convenio Modificatorio No. 5, mediante el cual TPP incrementó sus obligaciones de pago frente a APILAC, asumiendo la obligación de pagar una contraprestación por un volumen mínimo anual de descarga de 1,300,000 toneladas de carbón:[180]

> "*VIGÉSIMA OCTAVA. **VOLÚMENES OFERTADOS.** Salvo CASO FORTUITO O FUERZA MAYOR y durante la vigencia inicial de este contrato, el CESIONARIO ofrece manejar los siguientes volúmenes (número de toneladas) anuales de PRODUCTOS en la TERMINAL, respecto de los cuales asume el compromiso de pagar por ellos la parte variable de la CONTRAPRESTACIÓN que se señala en la **fracción III** de la **cláusula quincuagésima sexta** de este contrato:*
>
> "
>
> *Para el 8° (octavo) año de operación de la TERMINAL, y durante el resto de la vigencia inicial de este CONTRATO, 1'300,000 (un millón trescientas mil) toneladas anualmente.*"

341.    En este sentido, cabe resaltar que, al describir la "*Problemática*" que dio lugar al convenio modificatorio, TPP y APILAC señalaron que "*la operación de la TERMINAL y la viabilidad financiera de[] [TPP] dependerán del PROYECTO DE CARBÓN*",[181] esto es, del Proyecto objeto de la presente controversia. Inclusive, señalaron que "*El PROYECTO DE CARBÓN*

---

[176]    Anexo D-TPP-21, página 4.
[177]    Anexo D-TPP-21, página 3, último párrafo.
[178]    Anexo D-TPP-21.
[179]    Anexo D-TPP-21, páginas 3 y 4.
[180]    Anexo D-TPP-39.
[181]    Anexo D-TPP-39.

*representará 1,300,000 toneladas anuales*",[182] lo cual coincide con la CFA establecida en el Contrato.

342.    En este sentido, bajo el Contrato de Cesión suscrito entre TPP y APILAC, ésta puede aplicar penalidades o incluso rescindir dicho contrato "[*p*]*or no alcanzar a manejar, sin causa justificada, el VOLUMEN OFERTADO anual de PRODUCTOS en la TERMINAL, en el año que corresponda, de los indicados en la cláusula vigésima octava de este contrato* […]".[183] Por lo tanto, no es razonable considerar que un comerciante sofisticado como TPP asumiría la obligación frente a APILAC de manejar 1,300,000 toneladas anuales de carbón sin tener la certeza de que CFE se habría comprometido bajo el Contrato a descargar en la Terminal TPP, o pagar si no descarga, igual cantidad de carbón.

343.    De la misma forma, si no fuera por la certeza de que CFE pagaría una contraprestación incondicional que remuneraría su costo de oportunidad por la indisponibilidad de la Terminal TPP, difícilmente TPP habría dejado pasar otros proyectos alternativos de negocio, tales como un proyecto de hidrocarburos derivado de la reforma energética de diciembre de 2013 concerniente a la ampliación de las terminales públicas y privadas para el manejo de hidrocarburos. A pesar de haber obtenido el permiso y la constancia de registro necesarios,[184] TPP decidió no seguir adelante con la licitación correspondiente a efectos de privilegiar el Proyecto, sobre el entendido de que el Proyecto aseguraría una utilidad mínima a TPP.[185]

344.    Dicho de otra forma, difícilmente un comerciante medianamente razonable aceptaría comprometer la disponibilidad total de su terminal, con el coste de oportunidad que ello trae aparejado, dejando al mero arbitrio y discreción de su contraparte el uso que se haría de la misma, sin tener la certeza de una compensación mínima predeterminada.  Indudablemente, mantener la disponibilidad total de la Terminal TPP tiene un valor económico.

**5.2.4.4    *Conducta contemporánea de la propia CFE***

345.    El Oficio HECCO-0-0700/2020 de CFE del 8 de septiembre de 2020, en respuesta a la solicitud de pago presentada por Greenfield el 27 de agosto de 2020, no cuestiona el monto

---

[182]    Anexo D-TPP-39.

[183]    Anexo D-TPP-1, cláusulas sexagésima sexta y septuagésima tercera.

[184]    Anexo D-TPP-55 y Anexo D-TPP-56.

[185]    T-TPP-7, párrafo 14, y T-TPP-8, párrafo 9.

aplicado por Greenfield sobre la CFA, sino que sujeta dicho pago al pago previo por parte de Greenfield de los costos derivados de las sobreestadías de los buques:[186]



acciones que considere pertinentes para evitar posibles daños a la Comisión, así como para en su caso mitigarlos, incluyendo la contratación y/o prestación de los Servicios de Transporte y Almacenamiento por medios alternativos, asumiendo la totalidad de los costos y gastos derivados de esa opción.

Por lo que se le reitera la solicitud efectuada en nuestro similar No. HECCO-O-0584/2020, mediante el cual le pedimos se cumpliera con lo establecido en el Contrato, respecto a los costos generados por la sobrestadía de buques a efecto de que la empresa Greenfield no tenga ninguna obligación pendiente a su cargo y así proceder a aplicar el pago de la "Cantidad Firme Anual" que se menciona en la cláusula 4.4 del citado contrato.

Sin más por el momento, quedo de usted y le envío un cordial saludo.

Atentamente

Ing. Alejandro Hernández Melgoza
Encargado de la Superintendencia General
C.T. Pdte. Plutarco Elías Calles

346.    La falta de objeción de CFE sobre la CFA reclamada por Greenfield es relevante a tenor de lo estipulado en la cláusula 7.4(g) del Contrato, en cuanto prevé que "[c]ada factura y su correspondiente estado de cuenta serán considerados como definitivos cuando la Comisión no haya notificado al Proveedor alguna objeción dentro de los 3 (tres) meses posteriores al mes en que tales estados de cuenta o facturas fueron entregados a la Comisión […]".

347.    En este caso, no fue sino hasta el 3 de mayo de 2021, ocho meses después de la presentación de la factura, mediante oficio HECCO-0-0298/2021, que CFE indicó que existía una diferencia de criterio entre Greenfield y CFE sobre la CFA.[187]

---

[186]    Anexo D-TPP-44.
[187]    Anexo D-GF-35.

**5.2.4.5** *Conclusión del Tribunal Arbitral*

348.    Por todo lo anterior, el Tribunal Arbitral determina que las Demandadas deben pagar a Greenfield los montos correspondientes al CSP que no alcanzaron la CFA en el periodo correspondiente a los años 2019-2020, 2020-2021, 2021-2022 y 2022-2023, conforme al siguiente desglose:

- USD 4,039,727.10, correspondiente al primer año operativo del 16 de agosto de 2019 al 15 de agosto de 2020;

- USD $9,632,084.80, correspondiente al segundo año operativo del 16 de agosto de 2020 al 15 de agosto de 2021;

- USD $9,603,492.13, correspondiente al tercer año operativo del 16 de agosto de 2021 al 15 de agosto de 2022; y

- USD $8,561,715.85, correspondiente al cuarto año operativo del 16 de agosto de 2022 al 15 de agosto de 2023.

349.    Por lo que se refiere al pago del impuesto al valor agregado establecido en la LIVA, el Tribunal Arbitral considera que deberá pagarse el IVA aplicable a los montos determinados en el presente Laudo.

350.    El IVA se calculará aplicando a los valores que señala el presente Laudo, la tasa del 16%.

351.    Se trasladará el IVA, en forma expresa y por separado, en términos de lo establecido por el artículo primero de la LIVA; debiéndose entender por traslado del impuesto el cobro o cargo que las Partes deben hacer en un monto equivalente al impuesto establecido en la LIVA, inclusive cuando se tenga que retener en los términos de los artículos 1o.-A, 3o., tercer párrafo o 18-J, fracción II, inciso a) de la LIVA.

352.    La LIVA establece que los organismos descentralizados, en este caso, CFE, aunque conforme a otras leyes o decretos no causen impuestos federales o estén exentos de ellos, deberán aceptar la traslación a que se refiere el artículo primero de la LIVA y, en su caso, pagar el impuesto al valor agregado y trasladarlo, de acuerdo con los preceptos de la propia Ley.

353.    El Tribunal Arbitral también determina que las Demandadas deberán pagar el CSP de los años operativos subsecuentes durante la vigencia del Contrato, considerándolo como un cargo mínimo a ser calculado con base en la CFA, a la cual se sumará, en su caso, cualesquiera toneladas descargadas en adición a dicha CFA.

354.    Por otra parte, las Demandantes solicitan que se condene a las Demandadas a pagar el monto de USD 1,708,496.61, más IVA, en concepto de intereses moratorios por no pago del CSP en base a la CFA, según el siguiente desglose:

- USD 398,383.47 más IVA, correspondiente al interés moratorio del primer año operativo del 21 de septiembre del 2020 al 25 de septiembre de 2023;

- USD $610,582.21 más IVA, correspondiente al interés moratorio del segundo año operativo del 21 de septiembre de 2021 al 25 de septiembre de 2023;

- USD $691,581.13 más IVA, correspondiente al interés moratorio del tercer año operativo del 21 de septiembre de 2022 al 25 de septiembre de 2023, y

- USD $7,949.80 más IVA, correspondiente al interés moratorio del cuarto año operativo del 21 de septiembre de 2023 al 25 de septiembre de 2023.

355.    Las Demandadas, por su parte, si bien objetan la procedencia del pago de monto alguno correspondiente al CSP en base a la CFA, no cuestionan específicamente la cuantificación realizada por las Demandantes.

356.    De conformidad con la cláusula 7.2 del Contrato, CFE debería pagar las facturas que reciba de las Demandantes dentro de los 20 días de la recepción de la factura.[188]

357.    Por su parte, la cláusula 7.3 del Contrato prevé que, "[e]n caso de que la Comisión omita cualquier pago en los términos del presente Contrato, deberá pagar al Proveedor intereses moratorios sobre cualquier cantidad pagadera, los cuales se computarán diariamente a partir de la fecha en que dichas cantidades sean exigibles hasta que se haya pagado en su totalidad. […] Los intereses moratorios mencionados anteriormente se calcularán aplicando la Tasa de Interés de Gastos Financieros que corresponda."

358.    A su vez, el Contrato define a la Tasa de Interés de Gastos financieros, respecto a importes en dólares, como "la tasa de interés interbancaria ofrecida (London Interbank Offered Rate) para operaciones de depósitos en Dólares a periodos de 6 (seis) meses, que aparezca

---

[188]    Anexo D-TPP-18: "7.2 Fecha de Pago

A partir de la Fecha de Inicio, la Comisión pagará las facturas que reciba de conformidad con la Cláusula 7.1, el 20 Día de cada mes. En caso de que el Proveedor entregue facturas por conceptos adicionales de conformidad con la Cláusula 7.1(b) y Cláusula 7.1(c), la Comisión deberá pagar dichos montos al Proveedor dentro de 20 días de la recepción de la factura, siempre que dichos montos estén debidamente documentados.

En caso de que el Día programado para el pago no sea un Día Hábil, la Parte que deba efectuar el pago deberá realizar el mismo en el Día Hábil inmediato siguiente."

*publicada en la página "Libor 01" del sistema de información Reuters (o, en su caso, en cualquier otra página que pudiera reemplazar la página "Libor 01" para el propósito de publicar esas tasas interbancarias), a las 11:00 a.m. hora de Londres, Inglaterra, 2 (dos) Días Hábiles antes de la fecha de pago respectiva, más 300 (tres cientos) puntos base*."

359. En el presente caso, el Tribunal Arbitral considera que el cálculo de intereses realizado por las Demandantes, incluyendo la utilización de la tasa "SOFR" (Secured Overnight Financing Rate) para el periodo comprendido entre el 21 de septiembre de 2023 y el 25 de septiembre de 2023, debido a que dicha tasa reemplazó el Libor 01, es apropiado:[189]

| Concepto | Monto Reclamado USD | Emisión de la factura | Fecha Inicio de los Intereses | Fecha del Memorial | Cantidad de Días | Fecha aplicable Tasa Libor | Tasa Libor 6m. USD | +300 Puntos Base (Contractual) | Tasa de Intereses (Anual) | Tasa de Intereses (Diaria) | Intereses Financieros |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CSP 2019 - 2020 | $ 4,039,727.10 | 01/09/2020 | 21/09/2020 | 25/09/2023 | 1099 | 19/09/2020 | 0.27525% | 3.00% | 3.27525% | 0.00897% | $ 398,383.47 |
| CSP 2020 - 2021 | $ 9,632,084.80 | 01/09/2021 | 21/09/2021 | 25/09/2023 | 734 | 19/09/2021 | 0.15225% | 3.00% | 3.15225% | 0.00864% | $ 610,582.21 |
| CSP 2021 - 2022 | $ 9,603,492.13 | 01/09/2022 | 21/09/2022 | 25/09/2023 | 369 | 19/09/2022 | 4.12329% | 3.00% | 7.12329% | 0.01952% | $ 691,581.41 |
| CSP 2021 - 2023 | $ 8,561,715.85 | 01/09/2023 | 21/09/2023 | 25/09/2023 | 4 | 19/09/2023 | 5.47283% | 3.00% | 8.47283% | 0.02321% | $ 7,949.80 |

360. En el mismo sentido, las Demandadas deberán continuar pagando intereses según las tasas aplicadas a cada uno de los periodos, desde el 25 de septiembre de 2023 hasta la fecha de efectivo pago.

**5.3    *Sobre las penalidades por sobreestadía de buques y devolución de las cantidades ejercidas respecto de la Garantía Operativa por USD 6.911.333, más IVA e intereses***

361. A continuación, el Tribunal Arbitral analizará la reclamación de las Demandantes y de las Demandadas Reconvencionales sobre las penalidades aplicadas por CFE por sobreestadía de buques a través de la ejecución de la Garantía Operativa por USD 6,911,333, más IVA e intereses. Como fuera indicado en el párrafo 195 del presente Laudo, debido a que las pretensiones principales y las pretensiones reconvencionales versan sobre los mismos conceptos, para mayor claridad, y a efectos de evitar una duplicación de análisis, el Tribunal Arbitral analizará ambas pretensiones conjuntamente.

**5.3.1    Posición Greenfield[190]**

362. Greenfield alega que los montos por sobreestadía de los buques que las Demandadas pagaron a Glencore no son imputables a Greenfield y, por tanto, no es responsable del pago de una

---

[189]    Conforme cálculo incluido en el párrafo 132 del Memorial de Conclusiones de Greenfield.

[190]    Sección V.A del Memorial de Demanda, Sección IV.A del Memorial de Réplica, Sección V y VI del Memorial de Contestación Demanda Reconvencional y Sección IV del Memorial de Dúplica Demanda Reconvencional.

indemnización con motivo de las sobreestadías. Greenfield también alega que no se cumplen los requisitos de la cláusula 10.2(b) del Contrato, siendo improcedente el cobro de la Garantía Operativa por parte de las Demandadas.

363.    Greenfield señala que es impropia la reclamación de sobreestadías de buques por no cumplir con los Tiempos de Plancha de Contrato. En este sentido, Greenfield sostiene que, toda vez que las obligaciones a cargo de Greenfield iniciaban a partir de la FOC, y no antes de ella, no es aplicable la cláusula 10.2(b) del Contrato a la descarga de buques que arribaron previo a la FOC. Respecto de los buques que arribaron de manera posterior a la FOC, Greenfield señala que los requisitos establecidos en la cláusula 10.2(b) del Contrato no se cumplieron.

364.    Asimismo, Greenfield alega que es ilógico que las Demandadas sostengan que son aplicables los mismos términos y condiciones a los servicios que se prestarían antes o después de la FOC.

365.    Greenfield sostiene que, previo a la FOC, ésta solo podía recibir carbón en caso de ser posible y seguro. En este sentido, Greenfield señala que tenía la facultad más no la obligación de recibir carbón previo a la FOC. En consecuencia, en caso de que Greenfield optara, como lo hizo, por descargar carbón previo a la FOC, no es razonable sostener que los Tiempo de Plancha señalados en el Anexo 6 del Contrato fueran aplicables, ya que dichas descargas se hicieron sin estar obligado a realizarlas, sin contar con el Sistema de Transporte y Almacenamiento que representa la infraestructura necesaria, y sin las condiciones óptimas para realizar las descargas y transporte en los términos contractuales.

366.    Greenfield también señala que, respecto del primer buque "W-ACE", éste arribó incluso antes de la FOC inicialmente estimada, de manera que el carbón tuvo que ser descargado en el muelle, creando con ello un mayor retraso en la construcción del Sistema de Transporte y Almacenamiento, produciendo así un impacto en la descarga de los buques subsecuentes.

367.    Sostiene Greenfield que, si las Demandadas optaron por nominar buques a la Terminal TPP previo a la FOC, CFE debió asumir lo anterior y tomar las medidas necesarias para evitar daños o, en su defecto, asumir la responsabilidad por las sobreestadías que su proveedor podría cobrar.

368.    Alega Greenfield que cualquier descarga que Greenfield optara por hacer previo a la FOC debía entenderse sobre la base de "mejores esfuerzos", en la medida de las posibilidades de Greenfield, y atendiendo a la seguridad del proyecto y las personas que participan en él.

369.     Asimismo, Greenfield alega que el retraso en alcanzar la FOC al 21 de mayo de 2019 fue debidamente cubierto con la pena convencional por retraso en la construcción del Sistema de Transporte y Almacenamiento, conforme lo pactado en el Contrato, la cual fue debidamente pagada a CFE.

370.     Sostiene Greenfield que, con independencia del retraso en la construcción del Sistema de Transporte y Almacenamiento, la falta de planeación y programación en la compra y consumo de carbón por parte de CFE tuvo un gran impacto en las sobreestadías de los buques. Greenfield sostiene que los patios donde se almacenaba el carbón estaban saturados, por lo que no había lugar dónde ubicar el carbón a descargar, haciendo imposible la descarga de los buques que llegaban a la Terminal TPP.

371.     Greenfield sostiene que las Demandadas procedieron a la ejecución de la Garantía Operativa en contravención del Contrato, no sólo porque el pago de las sobreestadías es improcedente por no ser imputable a Greenfield, sino también porque gran parte del reclamo que sostiene CFE corresponde a hechos que ocurrieron previo a la FOC, mientras que la Garantía Operativa garantiza el cumplimiento de obligaciones a cargo de Greenfield a partir de la FOC.

372.     En consecuencia, el objetivo de la Garantía Operativa es garantizar el cumplimiento de Greenfield de las obligaciones posteriores a FOC. Sin embargo, se realizaron descargas de buques a solicitud de CFE previo a la FOC, sin ser obligación de Greenfield y sin tener la infraestructura completa para ello, siendo, por ende, indebida la ejecución de la Garantía Operativa por CFE.

373.     Finalmente, Greenfield sostiene que no es responsable de las sobreestadías, pero aún si lo fuera por el retraso en la construcción del Sistema de Transporte y Almacenamiento, cualquier daño o perjuicio causado por dicho retraso quedó totalmente cubierto con el pago de la pena convencional.

374.     En cuanto a la Demanda Reconvencional de las Demandadas sobre el retraso de Greenfield en alcanzar la FOC dentro del Plazo Inicial, Greenfield sostiene que alcanzó la FOC dentro del Plazo Máximo, por lo que, en términos expresos del Contrato, no se actualizó un Evento de Incumplimiento.

375.     Si bien Greenfield debía alcanzar la FOC el 21 de mayo de 2019, también es cierto que las Partes pactaron un plazo adicional dentro del cual Greenfield podía alcanzar la FOC sin incurrir en un Evento de Incumplimiento, y Greenfield debía pagar una pena convencional

para cubrir cualquier daño o prejuicio que se produjese por no haber alcanzado la FOC dentro del plazo inicialmente previsto para ello.

376.   Así, Greenfield sostiene que, debido a que alcanzó la FOC durante el plazo máximo previsto para ello, pero posterior al 21 de mayo de 2019, pagó a CFE la pena convencional establecida en el Contrato por cada día posterior al 21 de mayo de 2019 hasta el 16 de agosto de 2019, fecha en la que se alcanzó la FOC. En particular, Greenfield señala que la pena convencional pagada a CFE tenía por objeto cubrir los daños y perjuicios sufridos por CFE derivados de que el Sistema de Transporte y Almacenamiento estuviere listo en el Plazo Máximo para la FOC en lugar del Plazo Inicial.

377.   Greenfield también sostiene que, previo a la FOC, su única obligación era operar el SIMC, lo cual no implicaba que Greenfield estuviera obligada a recibir carbón en la Terminal TPP; sin embargo, en apoyo a CFE y de buena fe, hizo junto a TPP y TMC los esfuerzos razonables para descargar, almacenar y transportar carbón antes de la FOC, incluso cuando no era seguro hacerlo, solicitando a CFE abstenerse de enviar buques a la Terminal TPP o desviar los que ya habían sido nominados.

378.   Sostiene Greenfield que, considerando lo anterior, es claro que las Demandadas no tienen razón cuando alegan que Greenfield no prestó los Servicios de Transporte y Almacenamiento de forma adecuada en relación con los buques que arribaron previo a la FOC, toda vez que Greenfield no tenía obligación de prestar dichos servicios.

379.   En relación con los buques que arribaron con posterioridad a la FOC, Greenfield alega que la situación provocada por CFE era tal que le fue imposible a Greenfield y TPP descargar los buques dentro de los Tiempo de Plancha del Contrato, ya que, al momento de alcanzar la FOC, los patios de la Terminal TPP ya se encontraban saturados, había buques en espera de ser descargados, existía muy poca diferencia de tiempo entre los buques nominados, y había poco consumo de carbón por parte de CFE.

380.   Asimismo, Greenfield sostiene que no es responsable de las sobreestadías que el proveedor de carbón cobró a CFE ya que no se actualizaron los supuestos ni se cumplieron los requisitos señalados en la cláusula 10.2(b) del Contrato.

381.   Greenfield sostiene que cualquier descarga que optara por realizar previo a la FOC no podía estar sujeta a los Tiempos de Plancha establecidos en el Contrato ya que no era razonable pensar que se podía descargar en los mismos plazos sin el Sistema de Transporte y Almacenamiento. Con todo, Greenfield sostiene, suponiendo sin conceder, que los Tiempos

de Plancha fueran aplicables, éstos sólo empiezan a contar respecto de buques debidamente notificados y habiendo cumplido diversos requisitos que, en ningún caso, se cumplieron por parte de CFE.

382.    Debido a lo anterior, Greenfield sostiene que es improcedente la ejecución de la Garantía Operativa porque las sobreestadías no son responsabilidad de Greenfield, sino que los hechos sobre los cuales CFE ejecutó la Garantía Operativa ocurrieron previo a la FOC.

383.    Asimismo, Greenfield sostiene que CFE contribuyó a la generación de sobreestadías provocando el propio daño que imputa a Greenfield.  En este sentido, Greenfield señala que la sobresaturación de los patios fue producto de una deficiente planeación de compra y consumo de carbón efectos totalmente ajenos a Greenfield.

384.    Finalmente, Greenfield sostiene que el Artículo 88 del Código de Comercio establece que, en el contrato mercantil en que se fijare pena de indemnización contra el que no lo cumpliere, la parte perjudicada podrá exigir el cumplimiento del contrato o la pena prescrita; pero utilizando una de estas dos acciones, quedará extinguida la otra. Es decir, si bien Greenfield no es responsable de las sobreestadías, aún si lo fuera por el retraso en la construcción del Sistema de Transporte y Almacenamiento, cualquier daño o perjuicio causado por dicho retraso quedó totalmente cubierto con el pago de la pena convencional.

### 5.3.2    Posición TPP y TMC[191]

385.    TPP y TMC sostienen que participaron en varias reuniones con las Demandadas y en ellas jamás se asumió un compromiso en cuanto a que se cumplirían los tiempos contractuales de descarga de los buques previo a la FOC, considerando que, en ese momento, el Sistema de Transporte y Almacenamiento no se encontraba en operación.

386.    Señalan TPP y TMC que el envío prematuro de buques a la Terminal TPP provocó la saturación de la Terminal, e incluso cuando el Sistema de Transporte y Almacenamiento ya estaba en funcionamiento, el volumen excesivo de carbón existente en la Terminal TPP provocó grandes dificultades en la operación.

387.    TPP y TMC sostienen que CFE tuvo conocimiento de los atrasos del proyecto desde marzo de 2019 en virtud de las supervisiones que realizaba al avance de las Obras. Sin embargo, TPP

---

[191]    Sección III.6 del Memorial de Demanda, Sección II. 2 y 3 del Memorial de Contestación a la Demanda Reconvencional, Sección II del Memorial de Réplica a la Contestación de Demanda y Sección I.2 del Memorial de Dúplica Reconvencional.

y TMC señalan que, no obstante que las condiciones de la construcción del Sistema de Transporte y Almacenamiento revelaban la imposibilidad de utilizar el sistema en mayo de 2019, CFE no modificó su plan de secuencia de buques que estaban proyectados para llegar a la Terminal TPP.

388.     TPP y TMC señalan que, como la FOC no había ocurrido, las obligaciones de TPP y TMC al amparo del Contrato O&M no se habían generado. TMC y TPP sostienen que fueron sumamente claros en cuanto a que procedería a la descarga del W-ACE en ánimo de buena fe para apoyar a CFE, y que harían un esfuerzo para lograr tal descarga en el tiempo contractualmente previsto. No obstante, como el Sistema de Transporte y Almacenamiento no estaba listo y, por lo tanto, la descarga se haría en condiciones de operatividad distintas, TMC y TPP señalaron que no serían responsables de sobrestadía alguna en caso de que los tiempos de descarga fueran mayores a los señalados en el Contrato y Contrato O&M.

389.     TPP y TMC alegan que la descarga del tercer buque coincidió con las labores de traspaleo del carbón proveniente de los primeros dos buques a la zona dos de la Terminal TPP, mismo carbón que seguía almacenado y respecto del cual no existieron instrucciones de movilización por parte de CFE bajo medios alternos como el uso de tracto camiones. En consecuencia, la pasividad de CFE en relación con el tratamiento que Greenfield, TPP y TMC debían darle al carbón que se descargó de estas primeras embarcaciones provocó que la Terminal TPP comenzara a acercarse al límite de su capacidad de diseño de 300,000 toneladas.

390.     Finalmente, TPP y TMC alegan que, luego de alcanzar la FOC, el patio de almacenamiento de la Terminal TPP y el muelle en la zona uno, el cual nunca estuvo previsto para ser usado como lugar de almacenamiento, ya se encontraban saturados, pero CFE continuó enviando buques de gran capacidad a la Terminal TPP. En particular TPP y TMC sostienen que, para septiembre de 2019, la Terminal TPP ya almacenaba más de 420,000 toneladas de carbón provenientes de las primeras seis embarcaciones que llegaron a dicha terminal.

391.     En relación con las Demandas Reconvencionales de las Demandadas, TPP y TMC sostienen que los servicios que se prestarían entre el periodo comprendido entre la Fecha de Inicio y la FOC tenían un alcance limitado a aquellos que pudieran prestarse en el SIMC. En particular, el hecho de que el Anexo 2 establezca un régimen diferenciado en cuanto a las contraprestaciones pagaderas por CFE y, concretamente, señale que la contraprestación por el CSP se pagaría a partir de la actualización de la FOC, revela que la prestación de servicios no era obligatoria antes de la FOC. Si Greenfield y, en última instancia, TPP y/o TMC hubieran tenido la obligación de prestar los servicios desde la Fecha de Inicio, no existiría razón alguna

para que el CSP estuviera excluido de aquellas contraprestaciones que se generarían a partir de tal momento, según la sección 2.2 del Anexo 2.

392.   Señalan TPP y TMC que un elemento adicional que confirma que Greenfield y, en última instancia, TPP y/o TMC no tenían la obligación de prestar tales servicios en un momento anterior a la FOC es el Contrato O&M celebrado entre Greenfield y TMC, el cual estipula puntualmente que las obligaciones de TPP y/o TMC comenzarían a partir de que ocurriera la FOC.

393.   Asimismo, TPP y TMC sostienen que el término "Fecha de Inicio" no aparece en el Contrato O&M, cuyo contenido era conocido por CFE, ya que en su momento realizó determinados comentarios o sugerencias en relación con su contenido. Así, TPP y TMC señalan que, si CFE realmente estuviera bajo el entendimiento de que los Servicios de Transporte y Almacenamiento debían prestarse a partir de la Fecha de Inicio, hubiera solicitado la modificación correspondiente del Contrato O&M antes de su celebración. El hecho de que no lo haya hecho así revela que, en realidad, CFE conocía perfectamente que los Servicios de Transporte y Almacenamiento únicamente serían exigibles en el momento en que llegara la FOC.

394.   TPP y TMC también alegan que las Demandadas carecen de cualquier acción y derecho de cobrar la indemnización por las sobreestadías de buques.

395.   Señalan TPPC y TMC que cualquier daño derivado del retraso en el Sistema de Transporte y Almacenamiento, incluyendo la demora en los tiempos de descarga, fueron subsanados cuando Greenfield realizó el pago de las penalidades conforme a la cláusula 8.1 del Contrato.

396.   TPP y TMC sostienen que las sobreestadías no son producto del dolo, culpa o negligencia de Greenfield ni sus subcontratistas y, más aún, CFE contribuyó a que se causaran; sin embargo, aunque no hubiera sido así, CFE pretende realizar un doble cobro.  En efecto, TPP y TMC señalan que CFE ya se benefició con la pena convencional que se le pagó por el retraso de la FOC y, adicionalmente, pretende cobrar una indemnización por los daños sufridos con motivo de las sobreestadías que CFE argumenta son consecuencia del retraso en la construcción.

397.   Asimismo, TPP y TMC sostienen que, ante los resultados experimentados con los buques W-ACE y ANNA MARÍA, una persona medianamente diligente en la posición de CFE debió haber detenido, o cuando menos reprogramado, el plan de arribo y descarga de los buques subsecuentes. No haberlo hecho denota una actitud negligente por parte de CFE, quien hizo caso omiso de las condiciones existentes del Sistema de Transporte y Almacenamiento, así

como de los problemas experimentados en la Terminal TPP ante la necesidad de descargar el carbón directamente "a piso" en el muelle y almacenarlo por un largo periodo dentro de la zona uno de la Terminal TPP, lo que provocó un efecto en cadena que perjudicó e inevitablemente ralentizó los tiempos de descarga de los buques subsecuentes.

### 5.3.3    Posición de las Demandadas[192]

398.    En relación con las Demandas de las Demandantes, las Demandadas sostienen que las sobrestadías y el consecuente pago que tuvo que realizar CFE son atribuibles a la responsabilidad exclusiva de Greenfield, pues las mismas se debieron a la indisponibilidad del Sistema de Transporte y Almacenamiento para el 21 de mayo de 2019, fecha prevista para la FOC.

399.    Alegan las Demandadas que, de conformidad con la cláusula 4.3(a) del Contrato, Greenfield debía prestar los Servicios de Transporte y Almacenamiento desde la Fecha de Inicio y no solamente a partir de la FOC, por lo que la interpretación parcial que realiza Greenfield de la cláusula 4.3 es incorrecta. En particular, las Demandadas sostienen que, leídos conjuntamente los incisos de la cláusula 4.3, no hay duda de que la prestación de los Servicios de Transporte y Almacenamiento a partir de la Fecha de Inicio, más allá de ser una facultad, una mera obligación de "mejores esfuerzos" o una demostración de buena fe, constituye una obligación con pleno efecto vinculante para Greenfield. En tal sentido, alegan las Demandadas que la inclusión de la formulación "*podrá/deberá*" en la cláusula 4.3(b) no modifica de ninguna manera el peso obligatorio de su contenido.

400.    Asimismo, las Demandadas sostienen que, a menos de un mes de la fecha pactada para alcanzar la FOC, Greenfield confirmó a CFE durante las reuniones de seguimiento que la FOC sería efectivamente lograda el 21 de mayo de 2019, sin manifestar reserva alguna sobre cualquier retraso que pudiera significar un riesgo al cumplimiento a dicha obligación. En consecuencia, las Demandadas sostienen que, bajo dicho entendimiento y confiando en que Greenfield honraría los compromisos confirmados por sus representantes, las Demandadas confirmaron a Glencore las fechas de descargas para los barcos que llevarían el carbón al Terminal TPP.

---

[192]    Sección III.P y IV.B del Memorial de Contestación, Sección IV del Memorial de Dúplica, Sección IV.A, IV.B, IV.C y IV. D del Memorial de Demanda Reconvencional y Sección III, IV, V y VI del Memorial de Réplica de Demanda Reconvencional.

401.    Las Demandadas sostienen que resulta equivocado afirmar que las sobreestadías fueron provocadas por la supuesta mala programación del arribo de buques a la Terminal TPP para el suministro de carbón de la U7 de la Central bajo el argumento del aparente bajo consumo de la U7. Asimismo, incluso con el Sistema de Transporte y Almacenamiento concluido y operando al 100% de su capacidad, Greenfield continuó presentando incumplimientos a los Tiempos de Plancha del Contrato.

402.    Asimismo, las Demandadas señalan que Greenfield efectivamente cubrió la pena convencional a la que se hicieron acreedoras ante el retraso en el cumplimiento de la FOC, con lo cual reconoció que no logró cumplir con la fecha originalmente pactada en el Contrato; sin embargo, lo cierto es que la generación de sobreestadías por exceder el Tiempo de Plancha para descargar los buques tuvo causas adicionales, diferentes al retraso en el cumplimiento de la FOC, como, por ejemplo, fallas en la maquinaria y tiempos muertos, por lo que su resarcimiento no queda comprendido dentro del alcance de la penalización cubierta con motivo del atraso en la terminación del Sistema de Transporte y Almacenamiento.

403.    Las Demandadas alegan que los hechos del caso configuran todos los requisitos previstos en la cláusula 10.2(b) del Contrato para el pago de una indemnización por motivo de las quince sobreestadías de los buques del 2019. En primer lugar, las Demandadas sostienen que el hecho de que las sobreestadías de los buques que descargaron carbón hasta antes del 16 de agosto de 2019 hayan sido ocasionadas por el retraso en la construcción del Sistema de Transporte y Almacenamiento no anula *per se* el derecho de las Demandadas a recibir la indemnización correspondiente. En segundo lugar, las Demandadas alegan que probaron los daños sufridos debido a las sobreestadías en cada comunicación en la que informaban a Greenfield el tiempo y monto de la sobreestadía en la que incurría con el respaldo del Estado de Hechos del buque en cuestión. En tercer lugar, las Demandadas señalan que existe un nexo causal evidente entre las quince sobreestadías y la conducta de Greenfield, la cual sólo puede ser catalogada como culposa, dolosa y negligente. En cuarto lugar, las Demandadas sostienen que no contribuyeron a las sobreestadías, ya que ellas cumplieron con la confirmación y notificación con la anticipación mínima establecida en el Contrato.

404.    Finalmente, las Demandadas alegan que resultaba procedente el reclamo de la Garantía Operativa ante el incumplimiento de la obligación de Greenfield de cubrir la indemnización por la generación de sobrestadías por haber excedido el Tiempo de Plancha en la descarga de los buques que estuvieron programados para la fecha que originalmente se había acordado en que estaría en operación el Sistema de Transporte y Almacenamiento, es decir, a partir del 21 de mayo de 2019. De esta manera, las Demandadas sostienen que, contrario a lo argumentado

por Greenfield, la ejecución de la Garantía Operativa no fue indebida, pues a la fecha de su ejecución era la garantía vigente para cubrir las obligaciones incumplidas por Greenfield, teniendo las Demandadas legitimación para reclamar el incumplimiento de la obligación derivada de la cláusula 10.2(b) a cargo de Greenfield.

405.    Por otra parte, en su Demanda Reconvencional, las Demandadas alegan que Greenfield no alcanzó la FOC en la fecha establecida, esto es el 21 de mayo de 2019, sino que la alcanzó el 16 de agosto de 2019, incumpliendo su obligación.

406.    Sostienen las Demandadas que el actuar doloso de Greenfield en ratificar que el Sistema de Transporte y Almacenamiento estaría en operación para el 21 de mayo de 2019, aún a sabiendas que no lo lograría, tuvo como efecto el entorpecimiento de la cadena de suministro de carbón necesaria para el funcionamiento de la Central y el cumplimiento de las obligaciones contractuales de CFE frente al suministrador de carbón.

407.    Asimismo, las Demandadas sostienen que Greenfield estaba obligada a alcanzar la FOC el 21 de mayo de 2019, de manera que, al no cumplir con dicho plazo, Greenfield cometió un incumplimiento, el cual es independiente de las consecuencias previstas para los Eventos de Incumplimiento de la cláusula 8.1 del Contrato.

408.    Las Demandadas reconocen que el Anexo 3 del Contrato establece los requisitos para alcanzar la FOC y que no contiene un plazo para el cumplimiento de estos requisitos, sin embargo, sostienen que se pactó el 21 de mayo de 2019 como límite para alcanzar la FOC de acuerdo con la cláusula 3.1(b) del Convenio Modificatorio.

409.    Sostienen las Demandadas que, en la reunión mensual de los meses de febrero, marzo y abril de 2019, Greenfield aseguró que, pese al retraso existente, ello no representada un riesgo en el avance de la construcción del Sistema de Transporte y Almacenamiento, y mantuvieron la FOC para el 21 de mayo de 2019.

410.    En particular, la conducta y declaraciones de Greenfield generaron en las Demandadas un entendimiento de que la FOC se materializaría el 21 de mayo de 2019 y con base a ello es que el 25 de abril de 2019 CFE Generación suscribió el contrato de adquisición de carbón mineral con Glencore.

411.    Las Demandadas también alegan que el no haber alcanzado la FOC en 21 de mayo de 2019 tuvo implicancias en el programa de descarga de buques que CFE había diseñado, planificado y acordado con Greenfield desde la reunión del 25 de abril de 2019.

412.    Las Demandadas sostienen que Greenfield tenía la obligación de prestar los Servicios de Transporte y Almacenamiento desde la Fecha de Inicio tal como lo señala la cláusula 4.3(a) del Contrato al utilizar la palabra "deberá", lo que implica un carácter obligatorio.

413.    Las Demandadas sostienen que, respecto del buque W-ACE, único buque que arribo antes del 21 de mayo de 2019, Greenfield nunca mencionó algún tema de seguridad o de cualquier otra naturaleza que le impidiera dar cumplimiento a su obligación; por el contrario, según las Demandadas, Greenfield siempre aseguró que se encontraba lista para la operación, refrendando su compromiso de alcanzar la FOC el 21 de mayo de 2019.

414.    Respecto de los 14 buques que llegaron con posterioridad al 21 de mayo de 2019, la obligación por parte de Greenfield era clara: Efectuada la notificación del arribo del buque, la estiba de carga y la propuesta de secuencia de descarga, Greenfield estaba obligada a descargar el carbón en los Tiempos de Plancha establecidos en el Anexo 6 del Contrato.

415.    Sostienen las Demandadas que Greenfield sobrepasó los Tiempos de Plancha en todos y cada uno de los buques que arribaron después del 21 de mayo de 2019, siendo que la fecha estimada de arribo le fue comunicada con anticipación a su director general en cada uno de los casos y se les presentó el programa de arribo de buque en las reuniones del 25 de abril de 2019 y del 27 de junio de 2019.

416.    Así, Greenfield incumplió su obligación de prestar los Servicios de Transporte y Almacenamiento en los términos establecidos en el Anexo 6 del Contrato lo que produjo sobreestadías de los buques cuyos costos tuvieron que ser cubiertos por CFE.

417.    Las Demandadas también sostienen que Greenfield incumplió su obligación de pagarles la indemnización por las sobreestadías de los buques al no cumplir con los Tiempos de Plancha establecidos en el Anexo 6 del Contrato correspondiente a la suma de USD 6,310,256.60, más la suma de USD 601,077.05 por concepto de interés moratorio de acuerdo con la Tasa de Interés de Gastos Financieros.

418.    Sostienen las Demandadas que las sobreestadías ocasionadas en los 15 buques son directamente atribuibles a la culpa, dolo y negligencia de Greenfield y, tal como lo prevé el Contrato, en caso de que un buque incurra en una sobreestadía causada por culpa, dolo o negligencia Greenfield, ésta tiene la obligación de indemnizar a CFE.

419.    Las Demandantes alegan que la única razón en las demoras en las descargas de los buques fue por la conducta de Greenfield. En primer lugar, por no haber alcanzado la FOC pactada para

el 21 de mayo de 2019, y, en segundo lugar, por haber excedido las horas establecidas en los Tiempos de Plancha del Anexo 6 del Contrato. En consecuencia, las sobreestadías de los buques son atribuibles directamente a la culpa y negligencia de Greenfield, lo cual configura su obligación de indemnizar a CFE el costo de la totalidad de las sobreestadías.

420. Alegan las Demandantes que, a pesar de sus múltiples requerimientos de pago realizados a Greenfield, se vieron obligadas a ejecutar la Garantía Operativa por la suma total de USD 6,911,333.11, debido a la negativa injustificada de Greenfield a cubrir el importe por la indemnización generada con motivo de las descargas de los buques fuera de los Tiempos de Plancha, siendo completamente improcedente la argumentación de Greenfield del cobro indebido de la Garantía Operativa.

421. Las Demandadas sostienen que, actuando de mala fe, Greenfield intenta ignorar a su conveniencia el Oficio No. HECC0-O-0839/2020 enviado por las Demandadas el 13 de octubre de 2020 en el cual le envió la información que comprueba los pagos realizados a Glencore a causa de las sobreestadías, de manera que el requisito de comprobación del daño sufrido por las Demandadas se encuentra verificado.

422. Finalmente, las Demandadas señalan que se encontraban plenamente legitimadas para reclamar el pago de los costos de las sobreestadías derivadas de la demora en la descarga de los buques, toda vez que CFE, previo a los arribos, programó la llegada de los buques y cumplió oportunamente con todos los avisos, notificaciones e informes necesarios para que Greenfield pudiera presar los Servicios de Transporte y Almacenamiento de carbón.

### 5.3.4    Análisis del Tribunal Arbitral

423. Como fuera explicado anteriormente, las pretensiones principales y las pretensiones reconvencionales sobre las penalidades aplicadas por sobreestadía de buques y devolución de las cantidades ejecutadas respecto de la Garantía Operativa versan sobre las mismas cuestiones. Mientras que las Demandantes solicitan la devolución de las penalidades aplicadas por CFE por sobreestadía de buques a través de la ejecución de la Garantía Operativa por USD 6,911,333, más IVA e intereses, las Demandadas defienden la aplicación de la penalidad, atribuyéndola a los incumplimientos de Greenfield.

424. Según las Demandantes, CFE fue responsable por las sobreestadías de buques debido, entre otras cosas, a una deficiente planificación. Según las Demandadas, Greenfield incumplió con los Tiempos de Plancha previstos en el Contrato, entre otras cosas, por no alcanzar la FOC el

21 de mayo de 2019 y por no prestar los Servicios de Transporte y Almacenamiento antes de la FOC.

425. La cláusula 10.2(B) del Contrato regula la indemnización a la que tendría derecho CFE en caso de daños derivados de la sobreestadía de los buques. Sin embargo, para que la indemnización sea procedente, los daños deben ser atribuible a la culpa, dolo o negligencia de Greenfield, y CFE no debe haber contribuido a ello:

> "*El Proveedor indemnizará a la Comisión respecto de cualesquiera daños sufridos y debidamente comprobados por la Comisión, derivados de la sobreestadía de las embarcaciones contratadas por la Comisión para el transporte marítimo del Carbón que sea atribuible a la culpa, dolo o negligencia del Proveedor o sus Subcontratistas, siempre y cuando la Comisión no haya contribuido a ello; lo anterior en el entendido que el Proveedor, tendrá el derecho mas no la obligación, de realizar aquellas acciones que considere pertinentes para evitar posibles daños a la Comisión, así como para en su caso mitigarlos, incluyendo la contratación y/o prestación de los Servicios de Transporte y Almacenamiento por medios alternativos, asumiendo la totalidad de los costos y gastos derivados de esta opción.*" (énfasis añadido)

426. Por su parte, la Garantía Operativa se encuentra regulada por la cláusula 4.8(b) del Contrato, la cual prevé que Greenfield "*deberá entregar a la Comisión una carta de crédito stand by incondicional e irrevocable en su favor*", "*[p]ara garantizar el cumplimiento de sus obligaciones posteriores a la Fecha de Operación Comercial.*"

427. En caso de cobro indebido de la Garantía Operativa por CFE, "*la Comisión deberá devolver dicho monto al Proveedor dentro de los 5 (cinco) Días Hábiles siguientes de aquel Día en que se determine, mediante sentencia o laudo arbitral firmes, que el monto hecho efectivo fue indebidamente cobrado, más intereses sobre dicho monto, desde el Día en que se cobró indebidamente hasta el Día en que efectivamente se devuelva, a la Tasa de Interés de Gastos Financieros.*"[193]

428. Finalmente, el numeral 5 del Anexo 6 del Contrato establece los tiempos de descarga de los buques a los cuales debe sujetarse Greenfield:

---

[193]    Cláusula 4.8(b)(iii) del Contrato, Anexo D-GF-1.

5. La Terminal TPP está equipada con dos grúas móviles diseñadas para la descarga de bar-cos, los cuales permitan tiempos de descarga como se muestra en la siguiente tabla:

| Capacidad del barco, toneladas de peso muerto (TPM) | Tiempo de Plancha (Horas) |
|---|---|
| Mayor e igual a 50 000 a menos e igual a 70 000 | 53 |
| Mayor a 70 000 a menor e igual a 100 000 | 60 |
| Mayor a 100 000 a menor e igual a 150 000 | 90 |

429.    Como vemos, la cláusula 10.2(B) del Contrato prevé que Greenfield deberá indemnizar a CFE por los daños derivados de la sobreestadía de las embarcaciones que sea atribuible a su culpa, dolo o negligencia, o la de sus subcontratistas, "*siempre y cuando la Comisión no haya contribuido a ello.*"

430.    Habiendo analizado cuidadosamente las alegaciones y pruebas ofrecidas por las Partes, el Tribunal Arbitral considera que existen elementos suficientes para concluir que las sobreestadías de los buques fueron generadas por una responsabilidad compartida entre Greenfield y CFE. Siendo ello así, y dado que CFE ejecutó la Garantía Operativa, el Tribunal Arbitral ordenará la devolución de los montos cobrados por CFE, salvo por los USD 15,312 correspondientes a la sobreestadía del buque ANNA MARIA, con los intereses correspondientes, a la luz de lo dispuesto en las cláusulas 10.2(B) y 4.8(b)(iii) del Contrato.

431.    A continuación, el Tribunal Arbitral analizará las causas de las sobreestadías de los buques atribuibles a Greenfield (**Sección 5.3.4.1**), seguido del análisis sobre las causas atribuibles a CFE (**Sección 5.3.4.2**), para luego arribar a la conclusión del Tribunal Arbitral (**Sección 5.3.4.3**).

### 5.3.4.1    *Causas atribuibles a Greenfield*

432.    El Contrato se suscribió el 23 de diciembre de 2016, por lo que, de conformidad con la cláusula 3.1(c), la fecha máxima para alcanzar la Fecha de Inicio era el 21 de junio de 2017 (esto es, 180 días desde la firma del Contrato).[194]

---

[194]    Anexo D-GF-1, cláusula 3.1(c) del Contrato: *"Salvo que las Partes acuerden una fecha distinta, las Condiciones Suspensivas deberán cumplirse (o renunciarse por escrito por la Parte que corresponda) dentro de los 120 (ciento veinte) Días contados a partir de la firma del presente Contrato. Transcurridos 60 (sesenta) Días contados a partir del vencimiento del plazo aquí mencionado, sin que se hayan cumplido en su totalidad las Condiciones Suspensivas, cualquiera de las Partes podrá terminar este Contrato de forma inmediata, mediante simple notificación por escrito a la otra Parte y sin necesidad de declaración judicial o formalidad alguna. Dicha terminación será sin perjuicio de los derechos que cualquier Parte hubiere adquirido antes de la terminación del Contrato."*.

433. De conformidad con lo previsto en el Anexo 3 y en la cláusula 8.1(b) del Contrato, la FOC debía alcanzarse el 21 de mayo de 2019 (esto es, 23 meses desde la Fecha de Inicio)[195], o, a más tardar, el 21 de agosto de 2019 (esto es, 90 días desde el 21 de mayo 2019):

> "*Si el Proveedor […] no logra alcanzar la Fecha de Operación Comercial dentro de los 90 (noventa) Días a partir de la Fecha de Operación Comercial establecida para estos propósitos en el Anexo 3, en el entendido que, independientemente de que el retraso en cuestión aun no sea considerado un Evento de Incumplimiento, el Proveedor deberá pagar a la Comisión una pena convencional en la cantidad de EUA$50,000.00 Dólares (cincuenta mil 00/100 Dólares de los Estados Unidos de América) por cada Día de atraso de la Fecha de Operación Comercial hasta alcanzar los 90 (noventa) Días mencionados y que, en abundancia de claridad, únicamente a partir del Dia 91 (noventa y uno) será el retraso en cuestión considerado un Evento de Incumplimiento del Proveedor, pudiendo la Comisión dar por terminado el presente Contrato conforme a la <u>Cláusula 8.3</u> siguiente*".

434. Es decir, Greenfield tenía la obligación de alcanzar la FOC el 21 de mayo de 2019, debiendo pagar una pena convencional por cada día de retraso hasta el 21 de agosto de 2019. Recién a partir del 21 de agosto de 2019, CFE podía dar por terminado el Contrato por ser el retraso en alcanzar la FOC un Evento de Incumplimiento.

435. El 21 de junio de 2017, las Partes modificaron la cláusula 3.1(c) del Contrato, prorrogando la fecha máxima para alcanzar la Fecha de Inicio al 21 de agosto de 2017 (en lugar del 21 de junio de 2017).[196] No obstante la modificación de la Fecha de Inicio, Greenfield reiteró su compromiso de lograr la FOC el 21 de mayo de 2019, conforme estaba previsto inicialmente:

> "*Asimismo, no obstante la modificación al plazo señalado en la Cláusula 3.1(c), según dicha Cláusula ha sido modificada en virtud de la Cláusula Segunda anterior, el Proveedor reconoce y reitera su compromiso de lograr la Fecha de Operación*

---

[195] Anexo D-GF-1, Anexo 2, página 3, del Contrato: "*De acuerdo con la Propuesta, la Fecha de Operación Comercial está comprometida a alcanzarse dentro de los 23 (veintitrés) meses contados a partir de la Fecha de Inicio.*"

[196] Anexo D-TPP-20, Convenio Modificatorio, cláusula 3.1(c) del Contrato modificada "*Salvo que las Partes acuerden una fecha distinta, las Condiciones Suspensivas deberán cumplirse (o renunciarse por escrito por la Parte que corresponda) dentro de los 120 (ciento veinte) Días contados a partir de la fecha de firma de este Contrato. Transcurridos 120 (ciento veinte) Días contados a partir del vencimiento del primer plazo de 120 (ciento veinte) Días aquí mencionado, es decir, a más tardar el 21 de agosto de 2017, sin que se hayan cumplido en su totalidad las Condiciones Suspensivas, cualquiera de las Partes podrá terminar este Contrato de forma inmediata, mediante simple notificación por escrito a la otra Parte y sin necesidad de declaración judicial o, formalidad alguna. Dicha terminación será sin perjuicio de los derechos que cualquier Parte hubiere adquirido antes de la terminación del Contrato.*".

*Comercial, a más tardar el 21 de mayo de 2019, en términos de lo previsto por la Propuesta, el Anexo 2 del Contrato y sujeto a los términos del mismo.*"[197]

436.    Es decir, a pesar de la modificación de la Fecha de Inicio, Greenfield mantuvo su obligación de llegar a la FOC el 21 de mayo de 2019.

437.    Dado que Greenfield no alcanzó la FOC el 21 de mayo de 2019, las Demandadas procedieron a aplicar la penalidad convencional prevista en la cláusula 8.1(b) del Contrato desde el 21 de mayo al 16 de agosto de 2019, fecha en que se alcanzó la FOC.[198]

438.    Así, Greenfield procedió a pagar a las Demandadas la cantidad de USD 4,350,000 por concepto de penalidades conforme a la cláusula 8.1(b) del Contrato.[199]

439.    A partir del retraso de Greenfield en alcanzar la FOC el 21 de mayo de 2019, y la penalidad convencional pagada, corresponde al Tribunal Arbitral determinar si Greenfield tenía la obligación de prestar los servicios de transporte y almacenamiento de carbón previo a alcanzar la FOC, y, de ser el caso, si la pena convencional pagada por Greenfield en virtud de la cláusula 8.1(b) del Contrato exonera a Greenfield de cualquier obligación relacionada con el retraso en alcanzar la FOC, incluida la sobreestadía de buques, asumiendo, en este último supuesto, que la razón de la sobreestadía de buques fue, precisamente, el retraso en alcanzar la FOC. El Tribunal Arbitral analizará ambas cuestiones a continuación.

   a.    *Retraso en alcanzar la FOC el 21 de mayo de 2019*

440.    Las Partes han debatido extensamente si Greenfield tenía, o no, la obligación de prestar los servicios de transporte y almacenamiento de carbón entre la Fecha de Inicio y la Fecha de Operación Comercial. El Contrato no está exento de ambigüedad respecto de este punto.

441.    En efecto, la cláusula 4.3(a) del Contrato establece que "[*e*]*l Proveedor deberá prestar los Servicios de Transporte y Almacenamiento requeridos a partir de la Fecha de Inicio y durante la vigencia del presente Contrato, ya sea directamente o a través de Subcontratistas.*" (énfasis añadido)

442.    Sin embargo, el inciso (b) de la misma cláusula aclara que "[*l*]*o anterior, en el entendido de que, durante el periodo comprendido entre la Fecha de Inicio y la Fecha de Operación*

---

[197]    Anexo D-TPP-20, cláusula TERCERA Convenio Modificatorio.
[198]    Anexo D-GF-57.
[199]    Anexo D-GF-58.

*Comercial, el Proveedor podrá/deberá prestar los Servicios de Transporte y Almacenamiento en el SIMC y en caso de ser posible y seguro podrá recibir el Carbón por otros medios distintos al Sistema de Transporte y Almacenamiento, incluyendo sin limitar mediante tracto camiones.*" (énfasis añadido)

443.    Indudablemente, la referencia a que, antes de la FOC, Greenfield "*podrá/deberá*" prestar los servicios en el SIMC es sumamente ambigua y susceptible de interpretaciones contradictorias. Por ello, el Tribunal Arbitral analizará documentos precontractuales, otras cláusulas contractuales, y la conducta contemporánea de las Partes para dilucidar esta cuestión.

444.    Por un lado, en el *Term Sheet* del O&M se previó la prestación de servicios durante la etapa de construcción, esto es, entre la Fecha de Inicio y la FOC:[200]

**SERVICIOS PORTUARIOS Y DE TRANSPORTE DE CARBÓN MINERAL MEDIANTE TRACTO CAMIONES DE TPP A LA CENTRAL TERMOELÉCTRICA PETACALCO:**

El operador proporcionará todos los servicios necesarios para la descarga, manejo y almacenaje, del carbón mineral y los servicios de transporte de carbón mineral mediante tractocamiones de TPP a la Central Termoeléctrica de forma temporal por la duración de los Contratos IPC o hasta un plazo de 15 días naturales siguientes a que los Contratistas IPC hayan alcanzado la Terminación Sustancial de las Obras (como dicho término se define en los Contratos IPC). El alcance de los Servicios Portuarios y transporte mediante tracto camiones que preste el Operador incluirá de manera enunciativa más no limitativa, lo siguiente:

ii)    Servicios de Transporte Terrestre

Como una solución inmediata de transporte del carbón mineral del Patio de Almacenamiento de TPP a la Central, y hasta la entrada en operación del sistema de transporte por Bandas de los Patios de TPP al Patio de Almacenamiento de la Central, se propone prestar el servicio de transporte terrestre de forma temporal por tracto camión.

| PROPUESTA POR LOS SERVICIOS DE TRANSPORTE TERRESTRE | |
|---|---|
| $MXP ( PESOS MEXICANOS ) / Tonelada Métrica | |
| COSTO POR SERVICIOS DE TRANSPORTE TERRESTRE | $ 152.00 |

445.    En este sentido, la testigo Claudia Elena Rachadell Montero declaró en la Audiencia que TPP había previsto un escenario en donde los servicios portuarios se prestarían durante la etapa de

---
[200]    Anexo D-TPP-11.

construcción.[201] Y añadió que CFE pidió a TPP que, durante la construcción, estuvieran en disposición de poder enviar el carbón por otras vías.[202]

446.    En consonancia con lo anterior, el Anexo 2 del Contrato establece que, si Greenfield prestaba servicios relacionados con la operación del SIMC después de la Fecha de Inicio, pero antes de la FOC, conforme a la cláusula 4.3(b), CFE debía pagar mensualmente los cargos o contraprestación relativos únicamente a los servicios prestados en dicho periodo.[203]

447.    De esta forma, el Anexo 2 contempla expresamente la posibilidad de que Greenfield preste servicios relacionados con la operación del SIMC antes de la FOC.  Sobre el particular, recordemos que la cláusula 4.3(b) del Contrato permitía expresamente la utilización por parte de Greenfield de tracto camiones, sin exigir autorización previa de CFE.

448.    Asimismo, la Propuesta Vinculante, en su apartado II.c., estableció que, a opción de CFE, TPP debía gestionar el transporte de carbón por vía terrestre en tractocamiones hasta la Central.[204]

449.    Por otro lado, existen varias cláusulas del Contrato que refieren a la obligación de Greenfield de prestar los servicios a partir de la FOC. Por ejemplo, la cláusula 4.7 el Contrato prevé que "[*a] partir de la Fecha de Operación Comercial, el Proveedor estará obligado a operar y mantener el Sistema de Transporte y Almacenamiento, a su costa, durante la vigencia del*

---

[201]    Transcripción Audiencia Día 3, p.26, l.1008-1019:
        "*Raúl Quintero Uribe: Gracias.*
        *Entonces según esta hoja de Términos y Condiciones de 2015, TPP había previsto un escenario en donde los servicios portuarios se prestaran durante la etapa constructiva del proyecto, ¿correcto?*
        *Claudia Elena Rachadell Montero: Sí.*
        *Raúl Quintero Uribe: Es decir, antes de la fecha de operación comercial. ¿Correcto?*
        *Claudia Elena Rachadell Montero: Correcto"*

[202]    Transcripción Audiencia Día 3, p.27 l. 1042-1044:
        "*Entonces la Comisión nos pidió a TPP que durante la construcción, es decir, antes de la fecha de operación comercial, estuviéramos en la disposición de poder enviar ese material por otras vías."*

[203]    Anexo D-GF-1, Anexo 2, cláusula 2.1 del Contrato "*Sin perjuicio de lo anterior, si el Proveedor presta servicios relacionados con la operación del SIMC a la Comisión después de la Fecha de Inicio, pero antes de la Fecha de Operación Comercial, de conformidad con la Cláusula 4.3(b) del Contrato, la Comisión deberá pagar mensualmente al Proveedor o éste trasladará a la Comisión los cargos o la contraprestación relativos únicamente a los servicios que el Proveedor haya prestado en dicho periodo, sin que ello se entienda como que haya ocurrido la Fecha de Operación Comercial, misma que seguirá sujeta a lo previsto en el Anexo 3 del presente Contrato. De acuerdo con la Propuesta, la Fecha de Operación Comercial está comprometida a alcanzarse dentro de los 23 (veintitrés) meses contados a partir de la Fecha de Inicio.".*

[204]    Anexo D-TPP-14: "*Mientras se lleve a cabo la construcción del Proyecto, a opción de CFE, y siempre y cuando CFE manifieste con la debida anticipación las respectivas cantidades, calidades, términos y condiciones de entrega, TPP estará obligado a gestionar el transporte de carbón mineral por vía terrestre en tractocamiones hasta la Central Termoeléctrica. Dicha obligación será exclusiva de TPP y así se reconocerá en el Contrato de Servicios y/o cualesquiera contratos o convenios entre las Partes por separado. Al efecto, se adjunta a la presente Propuesta como Anexo II, una carta compromiso en la que TPP describe las generalidades y los alcances para el servicio que TPP, de tiempo en tiempo y siempre y cuando así lo solicitara, le prestaría a la CFE.*"

*Contrato* […] *a fin de estar disponible para prestar los Servicios de Transporte y Almacenamiento requeridos a la Comisión*." (énfasis añadido)

450.    En igual sentido, la cláusula 5.3 del Contrato prevé que "[*a*] *partir de la Fecha de Operación Comercial y durante la vigencia del presente Contrato, la Comisión, a su propia costa, entregará Carbón en el Punto de Origen al Proveedor, para su transporte y almacenamiento de conformidad con los términos y sujeto a las condiciones previstas en el presente Contrato.*" (énfasis añadido)

451.    El numeral 9 del Anexo 6 del Contrato prevé que "[*e*]*n todo momento y a partir de la Fecha de Inicio de Operación Comercial, el Proveedor tendrá disponible, operará, dará mantenimiento y reparará la Terminal TPP* […]." (énfasis añadido)

452.    Las cláusulas 3.2 y 5.3 del Contrato O&M son consistentes con lo anterior, por cuanto prevén que los servicios debían prestarse una vez alcanzada la FOC, lo cual es relevante teniendo en consideración que materialmente son TPP/TMC quienes ejecutan los servicios.[205]

> "*A partir de la Fecha de Operación Comercial y durante el plazo de vigencia de este Contrato, el Operador recibirá los barcos con Carbón en el Punto de Origen; llevará a cabo los Servicios Portuarios necesarios para la descarga del Carbón y transportará y almacenará el Carbón de acuerdo con los términos y condiciones estipulados en este Contrato.*" (énfasis añadido)

> "*Operación Comercial. El Operador dará inicio a la prestación de los Servicios a los que se hace referencia en este Contrato, con excepción de los servicios previstos en la Clausula 5.2 anterior, en la fecha en la que la Operación Comercial efectivamente ocurra, de acuerdo con los términos del Contrato de Transporte de Carbón.*" (énfasis añadido)

453.    Mas allá de la ambigüedad de la cláusula 4.3 del Contrato y de las demás cláusulas contractuales, lo cierto es que, en la práctica, Greenfield aceptó la descarga de los buques antes de la FOC, modificando en reiteradas oportunidades la fecha en la que supuestamente alcanzaría la FOC.

---

[205]    Anexo D-GF-23.

454.     Así, el 25 de abril de 2019, Greenfield confirmó a CFE que alcanzaría la FOC el 21 de mayo de 2019, y le indicó que se encontraba preparada para la descarga del primer buque.[206]

455.     Luego, el 16 de mayo de 2019, Greenfield notificó a CFE que la fecha probable para la FOC sería el 4 de julio de 2019, sin que Greenfield indicase que no recibiría buques hasta alcanzar la FOC.[207]

456.     Posteriormente, el 4 de junio de 2019, Greenfield solicitó a CFE el desvío del buque SARTORI señalando que no se encontraban las condiciones de seguridad para descargar el buque y que la Terminal TPP estaría operativa el 25 de junio de 2019.[208]

457.     Una vez más, el 20 de junio de 2019, Greenfield informó a CFE que la Terminal TPP no se encontraba en condiciones de recibir buques hasta que se reestablecieran las condiciones de seguridad, solicitando el desvío de los buques programados a un puerto alterno, estimando que la Terminal TPP estaría operando en forma regular para recibir buques a partir del 8 de julio de 2019.[209]

458.     Sin embargo, el 2 de julio de 2019, Greenfield informó a CFE que las condiciones de seguridad de la Terminal TPP, debido a la construcción, operación y descarga, no permitían la descarga de busques, estimando la descarga de nuevos buques para el 10 de julio de 2019.[210]

459.     Finalmente, luego de haber realizado la descarga de seis buques, recién el 16 de agosto de 2019, Greenfield confirmó a CFE que se cumplieron requisitos del Anexo 3 para la FOC.[211]

460.     Lo anterior permite al Tribunal Arbitral extraer las siguientes conclusiones:

461.     *Primero*, es indudable que los cambios constantes de Greenfield de la fecha estimada de FOC hacían extremadamente difícil la planeación por parte de CFE.

462.     *Segundo*, no hay constancia de que Greenfield haya informado a CFE que, si bien procedería a la descarga de los buques antes de alcanzar la FOC, no sería responsable de las sobreestadías de los buques en consideración de que aún no estaban las condiciones para ello; distinto a lo realizado por TPP, quien notificó a Greenfield que procedería a la descarga de los buques a

---

[206]     Anexo D-GF-55.
[207]     Anexo D-GF-56.
[208]     Anexo D-GF-81.
[209]     Oficio LCPL-CFE-OPS-0008, Anexo D-GF-82.
[210]     Oficio LCPL-OPS-CFE-0010, Anexo D-CFE-35.
[211]     Anexo D-GF-83.

pesar de que no se había alcanzado la FOC, aunque indicó expresamente que no sería responsable de los tiempos de plancha por no estar dadas las condiciones contractuales previstas para ello.[212]

463.    Por lo anterior, el Tribunal Arbitral concluye que, independientemente de si Greenfield tenía la facultad o la obligación de prestar los servicios de descarga, transporte y almacenamiento de carbón antes de la FOC, lo cierto es que Greenfield asumió dicho compromiso sin efectuar reserva alguna, y que sus cambios constantes en la estimación de la FOC dificultaron la planeación por CFE, contribuyendo a la sobreestadía de los buques.

b.    *Penalidad por no haber alcanzado la FOC el 21 de mayo de 2019*

464.    Las Partes discrepan en cuanto al alcance de la penalidad convencional pagada por Greenfield de conformidad con la cláusula 8.1(b) del Contrato por USD 4,350,000. Mientras que Greenfield sostiene que dicha penalidad tiene por efecto cubrir cualquier daño sufrido por CFE por el retraso en alcanzar la FOC, incluyendo los daños derivados de la sobreestadía de los buques, las Demandadas sostienen que dicha penalidad es distinta e independiente de la penalidad correspondiente a las sobreestadías de los buques.

465.    Como vimos, la cláusula 8.1(b) del Contrato prevé la aplicación de una pena convencional "*por cada Día de atraso de la Fecha de Operación Comercial.*" Es decir, se trata de una penalidad cuyo alcance se limita a resarcir a CFE por el retraso de Greenfield en alcanzar la FOC.  La cláusula 8.1(b) no prevé que esta penalidad tenga por objeto compensar a CFE por daños derivados del retraso en alcanzar la FOC, como podría ser el caso de la sobreestadía de buques, asumiendo que dicho retraso fuera su causa principal.

466.    Por otro lado, las cláusulas 4.8(a) y (b) del Contrato se refieren, respectivamente, a las Garantías Pre-Operativa y Operativa, cuyo objeto es "*garantizar el cumplimiento de sus obligaciones derivadas de este Contrato a partir de la Fecha de Inicio y hasta la Fecha de Operación Comercial*", en el caso de la Garantía Pre-Operativa, y de "*garantizar el cumplimiento de sus obligaciones posteriores a la Fecha de Operación Comercial*", en el caso de la Garantía Operativa.

467.    De esta forma, vemos que la Garantía Pre-Operativa cubre las obligaciones a cargo de Greenfield entre la Fecha de Inicio y la Fecha de Operación Comercial.  En este sentido, la principal obligación a cargo de Greenfield en este periodo es, justamente, alcanzar la FOC, en

---

[212]    Anexo D-TPP-23 y D-TPP-31.

los términos previstos en el Anexo III del Contrato. Esto es, la culminación de los trabajos de ingeniería, procura y construcción, de forma tal que "*el proyecto est[é] en condiciones de prestar servicios de forma segura*"[213] del sistema de transporte y almacenamiento. Por lo tanto, el objetivo de la Garantía Pre-Operativa no puede ser el mismo que el de la pena convencional, la cual, como vimos, penaliza a Greenfield por cada día de retraso en alcanzar la FOC.

468.    El mismo razonamiento aplica a la Garantía Operativa, la cual, por definición, tiene un alcance mucho más amplio que el de la pena convencional prevista en la cláusula 8.1(b), la cual, como vimos, se limita a la penalización por cada día de atraso en alcanzar la FOC.

469.    Por lo tanto, el Tribunal Arbitral concluye que la pena convencional prevista en la cláusula 8.1(b) del Contrato cubre únicamente cada día de retraso en alcanzar la FOC el 21 de mayo de 2019, pero no así cualquier otro daño o perjuicio que pudo haber sufrido CFE como consecuencia del retraso en alcanzar la FOC.

470.    De esta manera, el Tribunal Arbitral concluye que los daños y perjuicios reclamados por las Demandadas en virtud de las sobreestadías de los buques conforme a la cláusula 10.2(b) del Contrato no se encuentran cubiertos por la pena convencional pagada por Greenfield en virtud de la cláusula 8.1(b).

**5.3.4.2    *Causas atribuibles a CFE***

471.    Las Demandantes atribuyen a CFE la responsabilidad por la sobreestadía de los buques, fundamentalmente, por las siguientes causas: (i) incumplimiento de los requisitos de nominación de buques para que iniciara el cómputo del Tiempo de Plancha; (ii) ausencia de reprogramación de las ventanas de buques; y (iii) deficiente planificación. A continuación, analizaremos cada una de estas alegaciones.

a.    *Requisitos de nominación de buques para que iniciara el cómputo del Tiempo de Plancha*

472.    Los requisitos para la nominación de buques por parte de CFE se encuentran recogidos, fundamentalmente, en cuatro estipulaciones previstas en el Anexo 6 del Contrato.

473.    En primer lugar, y como vimos anteriormente, el numeral A.5 detalla los Tiempos de Plancha de la siguiente forma:

---

[213]    Anexo D-GF-1, Anexo III del Contrato.

101

5.  La Terminal TPP está equipada con dos grúas móviles diseñadas para la descarga de bar-
cos, los cuales permitan tiempos de descarga como se muestra en la siguiente tabla:

| Capacidad del barco, toneladas de peso muerto (TPM) | Tiempo de Plancha (Horas) |
|---|---|
| Mayor e igual a 50 000 a menos e igual a 70 000 | 53 |
| Mayor a 70 000 a menor e igual a 100 000 | 60 |
| Mayor a 100 000 a menor e igual a 150 000 | 90 |

474.    En segundo lugar, el numeral A.6 detalla la manera en la que se contarán las horas
correspondientes al Tiempo de Plancha:

> "*Las horas que se mencionan en la columna denominada Tiempo de Pancha se
> contarán a partir del momento en que el barco cuyo arribo hubiere sido debidamente
> notificado al Proveedor, se encuentre atracado, en libre plática, realizado el calado
> inicial, la inspección de las bodegas y de la carga, con las bodegas abiertas para
> verificar la carga del barco. Una vez llevadas a cabo las acciones mencionadas y
> firmado el recibo del barco entre el Proveedor, la Comisión o su representante y el
> personal encargado del barco, se dará el aviso de Libre Para Descargar, se podrán
> iniciar las operaciones e iniciará el cómputo del Tiempo de Plancha.*"

475.    En tercer lugar, el numeral A.14 del Anexo 6 del Contrato regula los requisitos que debe
contener la notificación de nominación por CFE:

> "*La salida del barco del puerto de origen, su tiempo estimado de llegada, sus
> características, el tipo y calidad del Carbón, secuencia de descarga antes del arribo
> del barco serán informados al Proveedor por la Comisión tan pronto sea posible.*"

476.    Finalmente, el numeral A.15 del Anexo 6 del Contrato regula los requisitos que debe contener
la notificación de arribo de los buques, la cual debe tener lugar con una antelación mínima de
72 horas al arribo:

> "*La llegada del barco a la Terminal TPP será confirmada por la Comisión y notificada
> al Proveedor por escrito con una anticipación mínima de 72 horas al arribo de la
> misma, incluyendo la estiba de la carga, la propuesta de secuencia de descarga y
> proporcionará al Proveedor, respecto de cada uno de los buques que arriben al muelle
> de la Terminal TPP, copia del diagrama general del barco, incluyendo de las bodegas,
> conteniendo sus configuraciones y dimensiones.*"

477.    Las Partes discrepan en cuanto a si CFE cumplió, o no, con los requisitos previstos en el Anexo 6 del Contrato.  Veamos.

478.    En cuanto al cómputo de los Tiempos de Plancha, como vimos, comienzan a contar a partir de que el barco, cuya notificación debió haberse realizado debidamente a Greenfield, se encuentre *"atracado, en libre plática, realizado el calado inicial, la inspección de las bodegas y de la carga, con las bodegas abiertas para verificar la carga del barco."*

479.    Así, el primer requisito es que el arribo del barco haya sido *"debidamente notificado"*, lo cual nos remite a los requisitos previstos en los numerales A.14 y A.15 del Anexo 6, relativos a la nominación y arribo de los barcos, respectivamente.

480.    Como también vimos, la notificación de nominación debe tener lugar *"tan pronto como sea posible"*, y debe contener (i) la salida del barco del puerto de origen; (ii) su tiempo estimado de llegada; (iii) sus características; (iv) el tipo y calidad del Carbón; y (v) la secuencia de descarga antes del arribo del barco.

481.    Por su parte, la notificación de arribo debe tener lugar *"con una anticipación mínima de 72 horas al arribo del barco"*, y debe contener (i) la confirmación de la llegada del barco a la Terminal TPP; (ii) la estiba de la carga; (iii) la propuesta de secuencia de descarga; y (iv) copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

482.    A continuación, analizaremos si CFE cumplió con estos requisitos respecto de cada uno de los buques.

   (i)   W-ACE

483.    El 13 de abril de 2019, CFE envió el *"Programa de Buques CTPPEC actualizado al 13 de abril del 2019."*[214]

484.    La información contenida en dicho programa incluye el tipo de carbón y su tiempo estimado de llegada (**"ETA"**) previsto para el 5 de mayo de 2019.

---

[214]    Anexo 5 de la Testimonial de Arturo Cortes Alvarado.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|----|-----|---------|---|----------|---------|-----------|----------------|--------|-------|-----------|--------------|----------------|-----------|----------------------|
| | | INICIO | FINAL | | | | | | | | | | | |
| 14 | 949 | 05-abr-2018 | 20-abr-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CALVUS 4v | 03:abr:2019 16:42 | 06:abr:2019 0:00 | 09:abr:2019 6:00 | 120,000 | TRMC |
| 15 | 950 | 05-abr-2018 | 20-abr-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CUMULUS 2v | 09:abr:2019 9:50 | 10:abr:2019 5:30 | 13:abr:2019 7:00 | 119,916 | TRMC |
| 16 | 951 | 05-abr-2018 | 20-abr-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH | 18:abr:2019 18:00 | 19:abr:2019 12:00 | 23:abr:2019 6:00 | 58,000 | TRMC |
| 17 | 952 | 05-abr-2018 | 20-abr-2019 | 700497055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | MINERAL BELGIUM 4v | 18:abr:2019 22:00 | 23:abr:2019 16:00 | 27:abr:2019 10:00 | 118,000 | TRMC |
| 18 | 1 | 05-may-2019 | 14-may-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE | 05:may:2019 8:00 | 05:may:2019 14:00 | 08:may:2019 2:00 | 71,500 | TPP |

485.    El 30 de abril de 2019, CFE emitió los Oficios HECC3-0-0068/2019 y HECC3-0-0069/2019, incluyendo las características y el plan de estiba del buque (e indicando que mantenía su ETA el 2 de mayo de 2019) y el plan de descarga del buque, respectivamente.[215]

486.    El 2 de mayo de 2019, CFE emitió el Oficio HECC3-0-0070/2019, incluyendo los certificados de calidad y peso del carbón embarcado en el buque W-ACE, y el puerto de salida (Ciénaga, Colombia).[216]

487.    De conformidad con la información incluida en el Estado de Hechos, el buque W-ACE arribó al Puerto de Lázaro Cárdenas el 3 de mayo de 2019, con 71,500 toneladas de carbón.[217]

488.    El 3 de mayo de 2019, tuvo lugar una reunión operativa entre personal de TPP y CFE para coordinar la descarga del buque.[218]

489.    Finalmente, el barco quedó atracado el 4 de mayo de 2019 y la descarga comenzó el 5 de mayo de 2019.[219]

490.    Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

491.    En cuanto a la notificación requerida, el buque W-ACE arribó al puerto el 3 de mayo y quedó atracado en la Terminal TPP el 4 de mayo de 2019, pero los certificados de calidad y peso del carbón embarcado en el buque W-ACE, y el puerto de salida recién fueron notificados el 2 de mayo de 2019, esto es, incumpliendo el plazo exigido de 72 horas de antelación.

   (ii) ANNA MARIA

---

[215]    Anexo 7 de la Testimonial de Arturo Cortes Alvarado.

[216]    Anexo 7 de la Testimonial de Arturo Cortes Alvarado.

[217]    Anexo 8 de la Testimonial de Arturo Cortes Alvarado.

[218]    Anexo 9 de la Testimonial de Arturo Cortes Alvarado.

[219]    Anexo 8 de la Testimonial de Arturo Cortes Alvarado.

492. El 22 de abril de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 13 de abril del 2019.*"[220]

493. La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 15 de mayo de 2019.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|----|-----|---------|---|----------|---------|-----------|----------------|--------|-------|-----------|--------------|----------------|-----------|----------------------|
| | | INICIO | FINAL | | | | | | | | | | | |
| 14 | 949 | 05-abr-2018 | 20-abr-2019 | 700490055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CALVUS 4v | 03-abr-2019 16:42 | 06-abr-2019 0:00 | 09-abr-2019 6:00 | 120,000 | TRMC |
| 15 | 950 | 05-abr-2018 | 20-abr-2019 | 700490055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CUMULUS 2v | 09-abr-2019 9:50 | 10-abr-2019 5:30 | 13-abr-2019 7:00 | 119,961 | TRMC |
| 16 | 951 | 05-abr-2018 | 20-abr-2019 | 700490055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | MINERAL BELGIUM 4v | 18-abr-2019 19:50 | 19-abr-2019 1:30 | 21-abr-2019 5:00 | 84,750 | TRMC |
| 17 | 952 | 05-abr-2018 | 20-abr-2019 | 700490055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH | 19-abr-2019 16:30 | 23-abr-2019 13:00 | 27-abr-2019 7:00 | 84,789 | TRMC |
| 18 | 1 | 05-may-2019 | 14-may-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE | 05-may-2019 8:00 | 05-may-2019 14:00 | 08-may-2019 2:00 | 71,500 | TPP |
| 19 | 953 | 12-may-2019 | 28-may-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GRIZZLY | 12-may-2019 8:00 | 12-may-2019 14:00 | 15-may-2019 2:00 | 71,500 | TPP |
| 20 | 954 | 12-may-2019 | 28-may-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH 2v | 20-may-2019 8:00 | 20-may-2019 14:00 | 23-may-2019 8:00 | 120,000 | TRMC |
| 21 | 955 | 12-may-2019 | 28-may-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANANGEL STRONOMER 2v | 23-may-2019 8:00 | 24-may-2019 18:00 | 28-may-2019 12:00 | 120,000 | TRMC |
| 22 | 956 | 12-may-2019 | 28-may-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SURABAYA | 24-may-2019 8:00 | 28-may-2019 22:00 | 01-jun-2019 18:00 | 120,000 | TRMC |
| 23 | 2 | 15-may-2019 | 24-may-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANNA MARIA | 16-may-2019 8:00 | 16-may-2019 14:00 | 18-may-2019 2:00 | 71,500 | TPP |

494. El 16 de mayo de 2019, CFE emitió el Oficio HECC3-0-0076/2019, incluyendo los certificados de calidad y peso del carbón embarcado en el buque ANNA MARIA, y el puerto de salida (Ciénaga, Colombia).[221]

495. El 17 de mayo de 2019, CFE emitió los Oficios HECC3-0-0080/2019 y HECC3-0-0079/2019, incluyendo las características y el plan de estiba del buque (e indicando que mantenía su ETA el 22 de mayo de 2019) y el plan de descarga del buque, respectivamente.[222]

496. De conformidad con la información incluida en el Estado de Hechos, el buque ANNA MARIA arribó al Puerto de Lázaro Cárdenas el 22 de mayo de 2019, con 71,500 toneladas de carbón.[223]

497. El 21 de mayo de 2019, tuvo lugar una reunión operativa entre personal de TPP y CFE para coordinar la descarga del buque.[224]

498. Finalmente, la descarga comenzó el 22 de mayo de 2019 a las 8h30.[225]

499. Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

---

[220]   Anexo 12 de la Testimonial de Arturo Cortes Alvarado.

[221]   Anexo 12 de la Testimonial de Arturo Cortes Alvarado.

[222]   Anexo 12 de la Testimonial de Arturo Cortes Alvarado.

[223]   Anexo 15 de la Testimonial de Arturo Cortes Alvarado.

[224]   Anexo 16 de la Testimonial de Arturo Cortes Alvarado.

[225]   Anexo 15 de la Testimonial de Arturo Cortes Alvarado.

500.    En cuanto a la notificación requerida, el buque ANNA MARIA llegó al puerto y quedó atracado en la Terminal TPP del 22 de mayo de 2019, y la notificación tuvo lugar entre el 16 y 17 de mayo, cumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.[226]

(iii) SARTORI

501.    El 7 de mayo de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 7 de mayo del 2019.*"[227]

502.    La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 30 de mayo de 2019.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|----|-----|---------|---|----------|---------|-----------|----------------|--------|-------|-----------|--------------|----------------|-----------|----------------------|
| | | INICIO | FINAL | | | | | | | | | | | |
| 14 | 949 | 05-abr-2018 | 20-abr-2019 | 700490755 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CALVUS 4v | 03-abr-2019 16:42 | 06-abr-2019 0:00 | 09-abr-2019 6:00 | 120,000 | TRMC |
| 15 | 950 | 05-abr-2018 | 20-abr-2019 | 700490755 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CUMULUS 2v | 05-abr-2019 9:50 | 10-abr-2019 5:30 | 13-abr-2019 7:00 | 119,961 | TRMC |
| 16 | 951 | 05-abr-2018 | 20-abr-2019 | 700490755 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | MINERAL BELGIUM 4v | 18-abr-2019 19:50 | 19-abr-2019 1:30 | 21-abr-2019 5:00 | 84,750 | TRMC |
| 17 | 952 | 05-abr-2018 | 20-abr-2019 | 700490755 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH | 19-abr-2019 16:30 | 23-abr-2019 16:30 | 25-abr-2019 22:00 | 84,789 | TRMC |
| 18 | 1 | 05-may-2019 | 14-may-2019 | 700490290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE | 03-may-2019 0:06 | 05-may-2019 0:00 | 07-may-2019 12:00 | 71,500 | TPP |
| 19 | 953 | 12-may-2019 | 28-may-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GRIZZLY | 14-may-2019 8:00 | 12-may-2019 14:00 | 15-may-2019 2:00 | 68,858 | TRMC |
| 20 | 2 | 15-may-2019 | 24-may-2019 | 700490290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANNA MARIA | 18-may-2019 8:00 | 18-may-2019 14:00 | 21-may-2019 2:00 | 71,500 | TPP |
| 21 | 954 | 12-may-2019 | 28-may-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH 2v | 20-may-2019 8:00 | 20-may-2019 14:00 | 24-may-2019 8:00 | 120,000 | TRMC |
| 22 | 955 | 12-may-2019 | 28-may-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANANGEL STRONOMER 2v | 23-may-2019 8:00 | 24-may-2019 18:00 | 28-may-2019 12:00 | 120,000 | TRMC |
| 23 | 956 | 12-may-2019 | 28-may-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SURABAYA | 24-may-2019 8:00 | 28-may-2019 22:00 | 01-jun-2019 8:00 | 120,000 | TRMC |
| 24 | 957 | 29-may-2019 | 09-jun-2019 | 700490290 | 9 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | GOLDEN CALVUS 5v | 27-may-2019 14:00 | 02-jun-2019 2:00 | 05-jun-2019 20:00 | 142,900 | TRMC |
| 25 | 3 | 25-may-2019 | 03-jun-2019 | 700490290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SARTORI | 27-may-2019 14:00 | 29-may-2019 8:00 | 03-jun-2019 8:00 | 140,730 | TPP |

503.    El 28 de mayo de 2019, Glencore informó a CFE que "[*d*]*espués de haber observado los retrasos en las descargas de los buques "W-ACE" y "Anna María" en TPP, agradecemos ampliamente su confirmación que el buque "Satori" con 140,730 Tm de carbón mineral será atracado a su arribo*".[228]

504.    El 29 de mayo de 2019, CFE informó a Greenfield de la comunicación de Glencore, y le solicitó informar la fecha en la que podrían llevar a cabo el inicio de operaciones de descarga, junto con el tiempo estimado de descarga.[229]

505.    El 4 de junio de 2019, Greenfield solicitó a CFE desviar el buque SARTORI a un puerto alterno "*por razones de seguridad*", informando que "*a partir del día 25 de Junio del 2019 la terminal ya estará operando en forma regular y en condiciones de recibir buques nuevamente.*"[230]

---

[226]    Anexo 15 de la Testimonial de Arturo Cortes Alvarado.

[227]    Anexo 20 de la Testimonial de Arturo Cortes Alvarado.

[228]    D-CFE 24.

[229]    D-CFE 25.

[230]    D-CFE 26.

506.    El 5 de junio de 2019, CFE informó a Greenfield que se realizarían las gestiones correspondientes para llevar a cabo la descarga del buque en terminal alterna, señalando que Greenfield "*deberá cubrir los costos adicionales generados por la demora en la operación del buque.*"[231]

507.    Finalmente, el buque SARTORI arribó al puerto Lázaro Cárdenas el 30 de mayo de 2019 a las 20h30, para ser luego desviado a la Terminal Marítima de Recibo de Carbón ("**TMRC**"), donde fue descargado el 11 de junio a las 24h00. [232]

508.    Los escritos de las Demandadas, así como las declaraciones testimoniales e informes periciales presentados, se enfocaron en la interacción con Glencore y TMRC, por lo que el Tribunal Arbitral no encuentra constancia de la notificación por parte de CFE a Greenfield de los demás elementos exigidos por los numerales A.14 y A.15 del Anexo 6, salvo aquellos incluidos en la notificación del 7 de mayo de 2019.

(iv) GRIZZLY

509.    El 27 de mayo de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 27 de mayo del 2019.*"[233]

510.    La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 10 de junio de 2019.

| No | EMB | VENTANA INICIO | VENTANA FINAL | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 949 | 05-abr-2018 | 20-abr-2019 | 70049/055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CALVUS 4v | 03-abr:2019 16:42 | 06-abr:2019 6:00 | 09-abr:2019 6:00 | 120,000 | TRMC |
| 15 | 950 | 05-abr-2018 | 20-abr-2019 | 70049/055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CUMULUS 2v | 09-abr:2019 9:50 | 10-abr:2019 5:30 | 13-abr:2019 7:00 | 119,961 | TRMC |
| 16 | 951 | 05-abr-2018 | 20-abr-2019 | 70049/055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | MINERAL BELGIUM 4v | 18-abr:2019 9:50 | 19-abr:2019 1:30 | 21-abr:2019 5:00 | 84,750 | TRMC |
| 17 | 952 | 05-abr-2018 | 20-abr-2019 | 70049/055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH | 19-abr:2019 16:30 | 23-abr:2019 16:30 | 25-abr:2019 22:00 | 84,789 | TRMC |
| 18 | 1 | 05-may-2019 | 14-may-2019 | 70049290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE | 05-may:2019 0:06 | 05-may:2019 0:00 | 09-may:2019 12:00 | 71,500 | TPP |
| 19 | 953 | 12-may-2019 | 28-may-2019 | 70049290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GRIZZLY | 14-may:2019 0:00 | 14-may:2019 7:00 | 16-may:2019 14:00 | 68,858 | TRMC |
| 20 | 954 | 12-may-2019 | 28-may-2019 | 70049290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH 2v | 20-may:2019 11:00 | 20-may:2019 19:00 | 23-may:2019 23:00 | 112,152 | TRMC |
| 21 | 2 | 12-may-2019 | 28-may-2019 | 70049290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANNA MARIA | 22-may:2019 3:00 | 22-may:2019 8:30 | 25-may:2019 21:00 | 68,470 | TPP |
| 22 | 955 | 12-may-2019 | 28-may-2019 | 70049290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SURABAYA | 25-may:2019 3:00 | | | 113,600 | TRMC |
| 23 | 956 | 29-may-2019 | 09-jun-2019 | 70049290 | 9 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | W-ACE 2v | 28-may:2019 23:00 | 29-may:2019 13:00 | 01-jun:2019 1:00 | 75,649 | TRMC |
| 24 | 3 | 25-may-2019 | 03-jun-2019 | 70049290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SATORI | 31-may:2019 2:00 | 31-may:2019 14:00 | 04-jun:2019 8:00 | 140,730 | TPP |
| 25 | 957 | 29-may-2019 | 09-jun-2019 | 70049290 | 9 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | GOLDEN CALVUS 5v | 30-may:2019 11:00 | 01-jun:2019 11:00 | 05-jun:2019 5:00 | 142,900 | TRMC |
| 26 | 958 | 12-may-2019 | 28-may-2019 | 70049290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANANGEL ASTRONOMER 2v | 26-may:2019 22:28 | 05-jun:2019 15:00 | 09-jun:2019 9:00 | 114,438 | TRMC |
| 27 | 959 | 29-may-2019 | 09-jun-2019 | 70049290 | 9 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | SBI LYNX | 21-may:2019 16:00 | 09-jun:2019 19:00 | 12-jun:2019 7:00 | 69,190 | TRMC |
| 28 | 960 | 10-jun-2019 | 14-jun-2019 | 70049290 | 10 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | MINERAL BELGIUM 5v | 15-jun:2019 20:00 | 12-jun:2019 17:00 | 16-jun:2019 11:00 | 143,000 | TRMC |
| 29 | 4 | 18-jun-2019 | 27-jun-2019 | 70049290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | GRIZZLY 2v | 16-jun:2019 8:30 | 12-jun:2019 14:00 | 16-jun:2019 11:00 | | TRMC |

511.    El 20 de junio de 2019, CFE emitió los Oficios HECC3-0-0114/2019, HECC3-0-0115/2019 y HECC3-0-0116/2019, incluyendo el plan de descarga del buque, las características y el plan

---

[231]    D-CFE 27.

[232]    Anexo 22 de la Testimonial de Arturo Cortes Alvarado.

[233]    Anexo 31 de la Testimonial de Arturo Cortes Alvarado.

de estiba del buque, los certificados de calidad y peso del carbón embargado en el buque GRIZZLY y el puerto de salida (Ciénaga, Colombia), respectivamente.[234]

512.   De conformidad con la información incluida en el Estado de Hechos, el buque SARTORI había arribado al Puerto de Lázaro Cárdenas el 4 de junio de 2019, con 68,007 toneladas de carbón.[235]

513.   El 20 de junio de 2019, Greenfield informó a CFE que las condiciones de seguridad no permitían la descarga de buques, solicitando el desvío de los buques programados a un puerto alterno.[236]

514.   El 21 de junio de 2019, CFE informó a Greenfield que no era posible desviar los buques fondeados GRIZZLY y ANNA MARIA.[237]

515.   El 2 de julio de 2019, Greenfield reiteró a CFE que las condiciones de seguridad no permitían la descarga de buques, la cual podría tener lugar a partir del 10 de julio de 2019.

516.   Finalmente, el buque GRIZZLY quedó atracado en la Terminal TPP el 12 de julio de 2019, y comenzó su descarga el 14 de julio de 2019 a las 00h00.[238]

517.   Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

518.   En cuanto a la notificación del arribo del buque, en la notificación del 29 de mayo de 2019 se indicó un ETA al 10 de junio de 2019, pero el buque GRIZZLY llegó al puerto a las 13h30 del 4 de junio de 2019.

519.   Por su parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque, los certificados de calidad y peso del carbón embargado en el buque GRIZZLY y el puerto de salida, se realizó el 20 de junio de 2019, mientras que el buque llegó al puerto el 4 de junio de 2019 y atracó en la Terminal TPP el 12 de julio de 2019.

520.   En este sentido, si bien es cierto que el numeral A.15 del Anexo 6 exige a CFE efectuar una notificación sobre la llegada del barco con una anticipación mínima de 72 horas al arribo a la

---

[234]   Anexo 32 de la Testimonial de Arturo Cortes Alvarado.
[235]   Anexo 33 de la Testimonial de Arturo Cortes Alvarado.
[236]   D-CFE 32.
[237]   D-CFE 33.
[238]   Anexo 33 de la Testimonial de Arturo Cortes Alvarado.

Terminal TPP, el Tribunal Arbitral considera que esta estipulación presupone que la demora entre la llegada al puerto y la llegada a la Terminal TPP debería ser mínima, como lo fue, por ejemplo, en el caso de los buques W-ACE y ANNA MARIA, donde la llegada al puerto y a la terminal tuvo lugar el mismo día.

521.    Asimismo, las propias Demandadas computan los Tiempos de Plancha reclamados en el presente arbitraje desde la llegada de los buques al puerto, por lo que no podrían, por un lado, tomar como referencia para el cómputo del plazo de 72 horas de la notificación la llegada del buque a la <u>Terminal TPP</u>, y, al mismo tiempo, computar los Tiempos de Plancha desde la llegada del buque al <u>Puerto Lázaro Cárdenas</u>.

522.    Por lo anterior, a efectos de la notificación debida por CFE, el Tribunal Arbitral computará las 72 horas de antelación desde la llegada del buque al puerto.

523.    De esta forma, dado que la notificación del plan de descarga del buque, las características y el plan de estiba del buque, los certificados de calidad y peso del carbón embarcado en el buque GRIZZLY, y el puerto de salida tuvo lugar el 20 de junio de 2019, y que el buque GRIZZLY llegó al puerto el 4 de junio de 2019, CFE incumplió de esta forma con el plazo exigido de 72 horas de antelación.

        (v)  <u>ANANGEL ASTRONOMER</u>

524.    El 28 de junio de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 28 de junio del 2019.*"[239]

525.    La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 30 de junio de 2019.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|----|-----|---------|---|----------|---------|-----------|----------------|--------|-------|-----------|--------------|----------------|-----------|----------------------|
| | | INICIO | FINAL | | | | | | | | | | | |
| 27 | 960 | 25-may-2019 | 03-jun-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SATORI | 30/may/2019 20:30 | 12/jun/2019 0:00 | 15/jun/2019 12:00 | 140,730 | TRMC |
| 28 | 961 | 10-jun-2019 | 14-jun-2019 | 700499290 | 10 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | MINERAL BELGIUM 5v | 14/jun/2019 23:00 | 16/jun/2019 8:00 | 20/jun/2019 3:00 | 143,000 | TRMC |
| 29 | 962 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH 5v | 13/jun/2019 5:18 | 20/jun/2019 18:00 | 23/jun/2019 17:00 | 113,700 | TRMC |
| 30 | 963 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE 3v | 18/jun/2019 19:30 | 24/jun/2019 22:00 | 27/jun/2019 12:00 | 76,253 | TRMC |
| 31 | 964 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | NAVIOS ANTARES | 23/jun/2019 11:26 | 27/jun/2019 20:00 | 01/jul/2019 14:00 | 112,528 | TRMC |
| | | | | | | 02 AL 08 DE JULIO DEL 2019 MANTENIMIENTO A LA TERMINAL DE RECIBO MANEJO DE CARBÓN | | | | | | | | |
| 32 | 3 | 18-jun-2019 | 27-jun-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | GRIZZLY 2V | 04/jun/2019 15:48 | 08/jul/2019 0:00 | 10/jul/2019 12:00 | 68,007 | TPP |
| 35 | 965 | 04-jul-2019 | 10-jul-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SBI LYNX 2V | 03/jul/2019 19:00 | 09/jul/2019 0:00 | 11/jul/2019 12:00 | 67,500 | TRMC |
| 33 | 4 | 29-jun-2019 | 08-jul-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANNA MARIA 2V | 16/jun/2019 1:30 | 13/jul/2019 12:00 | 15/jul/2019 0:00 | 68,870 | TPP |
| 36 | 966 | 04-jul-2019 | 10-jul-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SBI REGGAE | 10/jul/2019 8:00 | 11/jul/2019 22:00 | 14/jul/2019 12:00 | 67,500 | TRMC |
| 34 | 5 | 29-jun-2019 | 08-jul-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANANGEL ASTRONOMER 3V | 30/jun/2019 18:00 | 13/jul/2019 0:00 | 16/jul/2019 18:00 | 88,000 | TPP |

526.    El 8 de julio de 2019, CFE emitió los Oficios HECC3-0-0129/2019, HECC3-0-0130/2019 y HECC3-0-0131/2019, incluyendo las características y el plan de estiba del buque, el plan de

---

[239]    Anexo 37 de la Testimonial de Arturo ^(Cortes) Alvarado.

descarga del buque, y los certificados de calidad y peso del carbón embargado en el buque ANANGEL ASTRONOMER y el puerto de salida (Ciénaga, Colombia), respectivamente.[240]

527.    De conformidad con la información incluida en el Estado de Hechos, el buque ANANGEL ASTRONOMER había arribado al Puerto de Lázaro Cárdenas el 30 de junio de 2019, con 88,000 toneladas de carbón.[241]

528.    Finalmente, el buque ANANGEL ASTRONOMER atracó en la Terminal TPP recién el 18 de julio de 2019, la descarga comenzó el 22 de julio de 2019 a las 08h00.[242]

529.    Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

530.    En cuanto a la notificación del arribo del buque "*tan pronto sea posible*", en la notificación del 28 de junio de 2019 se indicó un ETA al 30 de junio de 2019, fecha en la que el buque ANANGEL ASTRONOMER llegó al puerto; ello, a pesar de que Glencore había informado a CFE la nominación del buque ANANGEL ASTRONOMER desde el 12 de junio de 2019.[243] De esta forma, la notificación no se realizó "*tan pronto sea posible*".

531.    Por otra parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque, los certificados de calidad y peso del carbón embargado en el buque ANANGEL ASTRONOMER y el puerto de salida, se realizó el 8 de julio de 2019, mientras que el buque llegó al puerto el 30 de junio de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

(vi) ANNA MARIA (segunda vuelta)

532.    El 27 de mayo de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 27 de mayo del 2019.*"[244]

533.    La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 15 de junio de 2019.

---

[240]    Anexo 38 de la Testimonial de Arturo Cortes Alvarado.
[241]    Anexo 39 de la Testimonial de Arturo Cortes Alvarado.
[242]    Anexo 39 de la Testimonial de Arturo Cortes Alvarado.
[243]    Anexo 36 de la Testimonial de Arturo Cortes Alvarado.
[244]    Anexo 44 de la Testimonial de Arturo Cortes Alvarado.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|----|-----|---------|---|----------|---------|-----------|----------------|--------|-------|-----------|--------------|----------------|-----------|----------------------|
| | | INICIO | FINAL | | | | | | | | | | | |
| 14 | 949 | 05-abr-2018 | 20-abr-2019 | 700497/055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CALVUS 4v | 03:abr/2019 16:42 | 06:abr/2019 0:00 | 09:abr/2019 6:00 | 120,000 | TRMC |
| 15 | 950 | 05-abr-2018 | 20-abr-2019 | 700497/055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CUMULUS 2v | 09:abr/2019 9:50 | 13:abr/2019 5:30 | 13:abr/2019 7:00 | 119,961 | TRMC |
| 16 | 951 | 05-abr-2018 | 20-abr-2019 | 700497/055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | MINERAL BELGIUM 4v | 18:abr/2019 19:50 | 19:abr/2019 1:30 | 21:abr/2019 5:00 | 84,750 | TRMC |
| 17 | 952 | 05-abr-2018 | 20-abr-2019 | 700497/055 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH | 19:abr/2019 16:30 | 23:abr/2019 16:30 | 25:abr/2019 22:00 | 84,789 | TRMC |
| 18 | 1 | 05-may-2019 | 14-may-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE | 04:may/2019 0:06 | 05:may/2019 0:00 | 09:may/2019 12:00 | 71,500 | TPP |
| 19 | 953 | 12-may-2019 | 28-may-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GRIZZLY | 14:may/2019 7:00 | 14:may/2019 14:00 | 16:may/2019 14:00 | 68,858 | TRMC |
| 20 | 954 | 12-may-2019 | 28-may-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH 2v | 20:may/2019 11:00 | 20:may/2019 19:00 | 23:may/2019 23:00 | 112,152 | TRMC |
| 21 | 2 | 15-may-2019 | 24-may-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANNA MARIA | 22:may/2019 3:00 | 22:may/2019 8:30 | 25:may/2019 21:00 | 68,470 | TPP |
| 22 | 955 | 12-may-2019 | 28-may-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SURABAYA | 25:may/2019 3:00 | 25:may/2019 9:00 | 29:may/2019 3:00 | 113,600 | TRMC |
| 23 | 956 | 29-may-2019 | 09-jun-2019 | 700499290 | 9 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | W-ACE 2v | 28:may/2019 23:00 | 29:may/2019 13:00 | 01:jun/2019 1:00 | 75,649 | TPP |
| 24 | 3 | 25-may-2019 | 03-jun-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SATORI | 31:may/2019 14:00 | 31:may/2019 14:00 | 04:jun/2019 8:00 | 140,730 | TPP |
| 25 | 957 | 29-may-2019 | 09-jun-2019 | 700499290 | 9 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | GOLDEN CALVUS 5v | 30:may/2019 11:00 | 01:jun/2019 11:00 | 05:jun/2019 5:00 | 142,900 | TRMC |
| 26 | 958 | 17-may-2019 | 28-may-2019 | 700499290 | 1 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANANGEL ASTRONOMER 2v | 26:may/2019 22:28 | 05:jun/2019 15:00 | 09:jun/2019 9:00 | 114,438 | TRMC |
| 27 | 959 | 29-may-2019 | 09-jun-2019 | 700499290 | 9 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | SBI LYNX | 21:may/2019 16:00 | 09:jun/2019 19:00 | 12:jun/2019 7:00 | 69,190 | TRMC |
| 28 | 960 | 10-jun-2019 | 14-jun-2019 | 700499290 | 10 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | MINERAL BELGIUM 5v | 13:jun/2019 20:00 | 12:jun/2019 17:00 | 16:jun/2019 11:00 | 143,000 | TRMC |
| 29 | 4 | 18-jun-2019 | 27-jun-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | GRIZZLY 2v | 10:jun/2019 8:00 | 14:jun/2019 14:00 | 14:jun/2019 8:00 | 67,000 | TPP |
| 30 | 961 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH 3v | 16:jun/2019 8:00 | 19:jun/2019 19:00 | 23:jun/2019 12:00 | 110,000 | TRMC |
| 31 | 962 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | NAVIOS ANTARES | 20:jun/2019 8:00 | 23:jun/2019 23:00 | 27:jun/2019 17:00 | 108,000 | TRMC |
| 32 | 963 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE 3v | 21:jun/2019 8:00 | 16:jun/2019 21:00 | 20:jun/2019 15:00 | 76,000 | TRMC |
| | | | | | | 27 DE JUNIO AL 03 DE JULIO DE 2019  MANTENIMIENTO A LA TERMINAL DE RECIBO MANEJO DE CARBÓN | | | | | | | | |
| 33 | 5 | 29-jun-2019 | 08-jul-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANNA MARIA 2v | 15:jun/2019 8:00 | 29:jun/2019 0:00 | 01:jul/2019 12:00 | 71,500 | TPP |

534.    El 8 de julio de 2019, CFE emitió los Oficios HECC3-0-0132/2019 y HECC3-0-0133/2019, incluyendo las características y el plan de estiba del buque y el plan de descarga del buque, respectivamente.[245]

535.    El 17 de julio de 2019, CFE emitió el Oficio HECC3-0-0145/2019, incluyendo los certificados de calidad y peso del carbón embargado en el buque ANNA MARIA (segunda vuelta), y el puerto de salida (Ciénaga, Colombia).[246]

536.    De conformidad con la información incluida en el Estado de Hechos, el buque ANNA MARIA (segunda vuelta) había arribado al Puerto de Lázaro Cárdenas el 15 de junio de 2019, con 68,870 toneladas de carbón.[247]

537.    Finalmente, el buque ANNA MARIA (segunda vuelta) atracó en la Terminal TPP recién el 27 de julio de 2019, y la descarga comenzó el 30 de julio de 2019 a las 08h00.[248]

538.    Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

539.    Por otra parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque, los certificados de calidad y peso del carbón embarcado en el buque ANNA MARIA (segunda vuelta) y el puerto de salida, se realizó entre el 8 y el 17 de julio de 2019, mientras que el buque llegó al puerto el 15 de junio de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

---

[245]    Anexo 45 de la Testimonial de Arturo Cortes Alvarado.

[246]    Anexo 45 de la Testimonial de Arturo Cortes Alvarado.

[247]    Anexo 46 de la Testimonial de Arturo Cortes Alvarado.

[248]    Anexo 46 de la Testimonial de Arturo Cortes Alvarado.

(vii)    CL TAIZHOU

540.    El 28 de junio de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 28 de junio del 2019.*"[249]

541.    La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 8 de julio de 2019.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | INICIO | FINAL | | | | | | | | | | | |
| 27 | 960 | 25-may-2019 | 03-jun-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SATORI | 30/may/2019 20:30 | 12/jun/2019 0:00 | 15/jun/2019 12:00 | 140,730 | TRMC |
| 28 | 961 | 10-jun-2019 | 14-jun-2019 | 700499290 | 10 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | MINERAL BELGIUM 5v | 14/jun/2019 23:00 | 16/jun/2019 8:00 | 20/jun/2019 3:00 | 143,000 | TRMC |
| 29 | 962 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH 3v | 13/jun/2019 5:18 | 20/jun/2019 18:00 | 23/jun/2019 17:00 | 113,700 | TRMC |
| 30 | 963 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE 3v | 18/jun/2019 19:30 | 24/jun/2019 22:00 | 27/jun/2019 3:00 | 76,253 | TRMC |
| 31 | 964 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | NAVIOS ANTARES | 23/jun/2019 11:26 | 27/jun/2019 20:00 | 01/jul/2019 14:00 | 112,528 | TRMC |
| 02 AL 08 DE JULIO DEL 2019 MANTENIMIENTO A LA TERMINAL DE RECIBO MANEJO DE CARBÓN | | | | | | | | | | | | | | |
| 32 | 3 | 18-jun-2019 | 27-jun-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | GRIZZLY 2V | 04/jun/2019 15:48 | 06/jul/2019 0:00 | 10/jul/2019 12:00 | 68,007 | TPP |
| 35 | 965 | 04-jul-2019 | 10-jul-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | SBI LYNX 2V | 03/jul/2019 19:00 | 09/jul/2019 0:00 | 11/jul/2019 12:00 | 67,500 | TPP |
| 33 | 4 | 29-jun-2019 | 08-jul-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANNA MARIA 2V | 16/jun/2019 1:30 | 10/jul/2019 12:00 | 13/jul/2019 0:00 | 68,870 | TPP |
| 36 | 966 | 04-jul-2019 | 10-jul-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SBI REGGAE | 10/jul/2019 8:00 | 11/jul/2019 22:00 | 14/jul/2019 10:00 | 67,500 | TRMC |
| 34 | 5 | 29-jun-2019 | 08-jul-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANANGEL ASTRONOMER 3V | 30/jun/2019 18:00 | 13/jul/2019 0:00 | 16/jul/2019 18:00 | 88,000 | TPP |
| 36 | 966 | 11-jul-2019 | 17-jul-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | MINERAL BELGIUM 6V | 12/jul/2019 8:00 | 14/jul/2019 20:00 | 18/jul/2019 0:00 | 107,019 | TRMC |
| 37 | 6 | 09-jul-2019 | 18-jul-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | CL TAIZHOU | 09/jul/2019 8:00 | 16/jul/2019 18:00 | 19/jul/2019 0:00 | 67,500 | TPP |

542.    El 18 de julio de 2019, CFE emitió el Oficio HECC3-0-0146/2019, incluyendo los certificados de calidad y peso del carbón embargado en el buque CL TAIZHOU, y el puerto de salida (Ciénaga, Colombia).[250]

543.    El 31 de julio de 2019, CFE emitió los Oficios HECC3-0-0159/2019 y HECC3-0-0160/2019, incluyendo las características y el plan de estiba del buque y el plan de descarga del buque, respectivamente.[251]

544.    De conformidad con la información incluida en el Estado de Hechos, el buque CL TAIZHOU había arribado al Puerto de Lázaro Cárdenas el 13 de julio de 2019, con 69,308 toneladas de carbón.[252]

545.    Finalmente, el buque CL TAIZHOU atracó en la Terminal TPP recién el 3 de agosto de 2019, y la descarga comenzó el 14 de agosto de 2019 a las 00h00.[253]

546.    Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

---

[249]    Anexo 51 de la Testimonial de Arturo Cortes Alvarado.

[250]    Anexo 52 de la Testimonial de Arturo Cortes Alvarado.

[251]    Anexo 52 de la Testimonial de Arturo Cortes Alvarado.

[252]    Anexo 53 de la Testimonial de Arturo Cortes Alvarado.

[253]    Anexo 53 de la Testimonial de Arturo Cortes Alvarado.

547.    Por otra parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque, los certificados de calidad y peso del carbón embargado en el buque CL TAIZHOU y el puerto de salida, se realizó entre el 18 y el 31 de julio de 2019, mientras que el buque llegó al puerto el 13 de julio de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

(viii)    NAVIOS ANTARES

548.    El 28 de junio de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 28 de junio del 2019.*"[254]

549.    La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 27 de julio de 2019.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|----|-----|---------|---|----------|---------|-----------|----------------|--------|-------|-----------|--------------|----------------|-----------|----------------------|
| | | INICIO | FINAL | | | | | | | | | | | |
| 27 | 960 | 25-may-2019 | 03-jun-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SATORI | 30-may-2019 20:30 | 12-jun-2019 0:00 | 15-jun-2019 12:00 | 140,730 | TRMC |
| 28 | 961 | 10-jun-2019 | 14-jun-2019 | 700499290 | 10 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | MINERAL BELGIUM 4V | 14-jun-2019 23:00 | 16-jun-2019 8:00 | 20-jun-2019 3:00 | 143,000 | TRMC |
| 29 | 962 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN SAVANNAH 3v | 13-jun-2019 5:18 | 20-jun-2019 18:00 | 23-jun-2019 17:00 | 113,700 | TRMC |
| 30 | 963 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE 3v | 18-jun-2019 19:30 | 24-jun-2019 3:00 | 27-jun-2019 3:00 | 76,253 | TRMC |
| 31 | 964 | 15-jun-2019 | 26-jun-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | NAVIOS ANTARES | 23-jun-2019 11:26 | 27-jun-2019 0:00 | 01-jul-2019 14:00 | 112,528 | TRMC |
| | | | | | | 02 AL 08 DE JULIO DEL 2019 MANTENIMIENTO A LA TERMINAL DE RECIBO MANEJO DE CARBÓN | | | | | | | | |
| 32 | 3 | 18-jun-2019 | 27-jun-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | GRIZZLY 2V | 04-jun-2019 15:46 | 07-jun-2019 12:00 | | 68,007 | TPP |
| 35 | 965 | 04-jul-2019 | 10-jul-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SBI LYNX 2V | 03-jul-2019 19:00 | 09-jul-2019 0:00 | 11-jul-2019 12:00 | 67,500 | TRMC |
| 33 | 4 | 29-jun-2019 | 08-jul-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANNA MARIA 2V | 16-jun-2019 1:30 | 10-jul-2019 12:00 | 13-jul-2019 0:00 | 68,570 | TPP |
| 36 | 966 | 04-jul-2019 | 10-jul-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SBI REGGAE | 11-jul-2019 8:00 | 11-jul-2019 22:00 | 14-jul-2019 10:00 | 67,500 | TRMC |
| 34 | 5 | 29-jun-2019 | 08-jul-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANANGEL ASTRONOMER 3V | 30-jun-2019 18:00 | 13-jul-2019 0:00 | 16-jul-2019 18:00 | 88,000 | TPP |
| 36 | 966 | 11-jul-2019 | 17-jul-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | MINERAL BELGIUM 6V | 12-jul-2019 8:00 | 17-jul-2019 12:00 | 20-jul-2019 14:00 | 107,019 | TRMC |
| 37 | 6 | 09-jul-2019 | 18-jul-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | CL TAIZHOU | 08-jul-2019 8:00 | 20-jul-2019 20:00 | 23-jul-2019 8:00 | 67,500 | TPP |
| 38 | 967 | 18-jul-2019 | 24-jul-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE 4V | 18-jul-2019 8:00 | 19-jul-2019 0:00 | 21-jul-2019 12:00 | 73,500 | TRMC |
| | | 18-jul-2019 | 24-jul-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | HARVEST RAIN | 21-jul-2019 8:00 | 21-jul-2019 0:00 | 24-jul-2019 10:00 | 85,000 | TRMC |
| 40 | 7 | 30-jul-2019 | 08-ago-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | | | COLOMBIA | NAVIOS ANTARES 2V | 27-jul-2019 6:00 | 27-jul-2019 14:00 | 30-jul-2019 8:00 | 88,000 | TPP |

550.    El 29 de julio de 2019, CFE emitió los Oficios HECC3-0-0157/2019 y HECC3-0-0158/2019, incluyendo las características y el plan de estiba del buque y el plan de descarga del buque, respectivamente.[255]

551.    El 31 de julio de 2019, CFE emitió el Oficio HECC3-0-0153/2019, incluyendo los certificados de calidad y peso del carbón embarcado en el buque NAVIOS ANTARES, y el puerto de salida (Ciénaga, Colombia).[256]

552.    De conformidad con la información incluida en el Estado de Hechos, el buque NAVIOS ANTARES arribó al Puerto de Lázaro Cárdenas el 30 de julio de 2019, con 108,017 toneladas de carbón.[257]

---

[254]    Anexo 59 de la Testimonial de Arturo Cortes Alvarado.

[255]    Anexo 61 de la Testimonial de Arturo Cortes Alvarado.

[256]    Anexo 61 de la Testimonial de Arturo Cortes Alvarado.

[257]    Anexo 61 de la Testimonial de Arturo Cortes Alvarado.

553.    Finalmente, el buque NAVIOS ANTARES atracó en la Terminal TPP recién el 30 de agosto de 2019, y la descarga comenzó el 1 de septiembre de 2019 a las 15h00.[258]

554.    Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

555.    Por otra parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque, los certificados de calidad y peso del carbón embargado en el buque CL NAVIOS ANTARES y el puerto de salida, se realizó entre el 29 y el 31 de julio de 2019, mientras que el buque llegó al puerto el 30 de julio de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

(ix) HARROW

556.    El 8 de julio de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 8 de julio del 2019.*"[259]

557.    La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 30 de julio de 2019.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|----|-----|---------|---|----------|---------|-----------|----------------|--------|-------|-----------|--------------|----------------|-----------|----------------------|
| | | INICIO | FINAL | | | | | | | | | | | |
| 32 | 965 | 04-jul-2019 | 10-jul-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SBI LYNX 2v | 04-jul-2019 1:12 | 09-jul-2019 0:00 | 11-jul-2019 12:00 | 69,800 | TRMC |
| 33 | 966 | 04-jul-2019 | 10-jul-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | SBI REGGAE | 08-jul-2019 5:45 | 11-jul-2019 22:00 | 14-jul-2019 10:00 | 68,000 | TRMC |
| 34 | 3 | 18-jun-2019 | 27-jun-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | GRIZZLY 2v | 04-jul-2019 15:48 | 14-jul-2019 0:00 | 17-jul-2019 12:00 | 68,007 | TPP |
| 35 | 967 | 11-jul-2019 | 17-jul-2019 | 700499290 | 3 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | MINERAL BELGIUM 6v | 15-jul-2019 14:00 | 15-jul-2019 20:00 | 19-jul-2019 14:00 | 107,019 | TRMC |
| 36 | 4 | 29-jun-2019 | 08-jul-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANNA MARIA 2v | 16-jun-2019 1:30 | 17-jul-2019 12:00 | 21-jul-2019 0:00 | 68,870 | TPP |
| 37 | 968 | 18-jul-2019 | 24-jul-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | HARVEST RAIN | 18-jul-2019 18:00 | 18-jul-2019 18:00 | 21-jul-2019 6:00 | 87,309 | TRMC |
| 38 | 5 | 29-jun-2019 | 08-jul-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | ANANGEL ASTRONOMER 3v | 30-jun-2019 16:35 | 21-jul-2019 0:00 | 24-jul-2019 18:00 | 88,000 | TPP |
| 39 | 969 | 18-jul-2019 | 24-jul-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | W-ACE 4v | 18-jul-2019 8:00 | 22-jul-2019 22:00 | 25-jul-2019 10:00 | 73,500 | TRMC |
| 40 | 6 | 09-jul-2019 | 18-jul-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | CL TAIZHOU | 19-jul-2019 10:00 | 24-jul-2019 18:00 | 28-jul-2019 6:00 | 69,308 | TPP |
| 41 | 970 | 25-jul-2019 | 31-jul-2019 | 700499290 | 6 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GOLDEN CALVUS 6v | 26-jul-2019 8:00 | 26-jul-2019 14:00 | 30-jul-2019 8:00 | 143,000 | TRMC |
| 42 | 7 | 25-jul-2019 | 08-ago-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | NAVIOS ANTARES 2v | 30-jul-2019 4:10 | 01-ago-2019 0:00 | | | TPP |
| 43 | 8 | 30-jul-2019 | 08-ago-2019 | 700499290 | 2 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | HARROW | 30-jul-2019 8:00 | 01-ago-2019 0:00 | 06-ago-2019 12:00 | 80,000 | TPP |

558.    El buque HARROW arribó al Puerto Lázaro Cárdenas el 2 de agosto de 2019 y permaneció fondeado por la ocupación del muelle por otros buques. Así, las Partes acordaron desviar el buque HARROW a la TMRC, donde atracó el 17 de septiembre de 2019, iniciando su descarga el mismo día.

---

[258]    Anexo 53 de la Testimonial de Arturo Cortes Alvarado.
[259]    D-CFE-16.

559.    El mismo 17 de septiembre de 2019, CFE emitió los Oficios HECC3-0-0200/2019 y HECC3-0-0202/2019, incluyendo las características y el plan de estiba del buque y el plan de descarga del buque, respectivamente.[260]

560.    Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo los certificados de calidad y peso del carbón embarcado, el puerto de salida, y la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

561.    Por otra parte, la notificación del plan de descarga del buque y las características y el plan de estiba del buque se realizó el 17 de septiembre de 2019, mientras que el buque llegó al puerto el 2 de agosto de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

### (x) HARVEST RAIN

562.    El 26 de agosto de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 26 de agosto del 2019.*"[261]

563.    La información contenida en dicho programa incluye el tipo de carbón y ETA previsto para el 17 de septiembre de 2019.

564.    El 18 de septiembre de 2019, CFE emitió los Oficios HECC3-0-0209/2019 y HECC3-0-0210/2019, incluyendo las características y el plan de estiba del buque y el plan de descarga del buque, respectivamente.[262]

565.    En la misma fecha, CFE emitió el Oficio HECC3-0-0206/2019, incluyendo los certificados de calidad y peso del carbón embarcado en el buque HARVEST RAIN, y el puerto de salida (Ciénaga, Colombia).[263]

566.    De conformidad con la información incluida en el Estado de Hechos, el buque HARVEST RAIN arribó al Puerto de Lázaro Cárdenas el 18 de septiembre de 2019, con 90,055 toneladas de carbón.[264]

---

[260]    D-CFE-55 y D-CFE-56.

[261]    D-CFE-16. El Anexo incluye solo el correo electrónico, sin el archivo con el desglose de los ETA.

[262]    Anexos 18 y 19 de la Testimonial de Genaro Cuevas García.

[263]    Anexo 20 y 20.1 de la Testimonial de Genaro Cuevas García.

[264]    Anexo 22 de la Testimonial de Genaro Cuevas García.

567.   Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

568.   Por otra parte, la notificación del plan de descarga del buque y las características y el plan de estiba del buque se realizó el 18 de septiembre de 2019, mientras que el buque llegó al puerto el mismo día, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

   (xi) W-ARCTURUS

569.   El 26 de agosto de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 26 de agosto del 2019*."[265]

570.   La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 31 de agosto de 2019.

571.   El 12 de septiembre de 2019, CFE emitió los Oficios HECC3-0-0197/2019, HECC3-0-0198/2019 y HECC3-0-0199/2019, incluyendo las características y el plan de estiba del buque, el plan de descarga del buque, los certificados de calidad y peso del carbón embargado en el buque W-ARTICUS, y el puerto de salida (Ciénaga, Colombia) respectivamente.[266]

572.   De conformidad con la información incluida en el Estado de Hechos, el buque W-ARTICUS arribó al Puerto de Lázaro Cárdenas el 31 de agosto de 2019, con 71,750 toneladas de carbón.[267]

573.   Finalmente, el buque W-ARTICUS atracó en la Terminal TPP recién el 14 de septiembre de 2019, y la descarga comenzó el 17 de septiembre de 2019 a las 00h00.[268]

574.   Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

575.   Por otra parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque y los certificados de calidad y peso del carbón embargado en el buque W-ARTICUS y el puerto de salida, se realizó el 12 de septiembre de 2019, mientras que el buque

---

[265]   D-CFE-16. El Anexo incluye solo el correo electrónico, sin el archivo con el desglose de los ETA.
[266]   Anexos 11, 12, 13 y 13.1 de la Testimonial de Genaro Cuevas García, respectivamente.
[267]   Anexo 10 de la Testimonial de Genaro Cuevas García.
[268]   Anexo 10 de la Testimonial de Genaro Cuevas García.

llegó al puerto el 31 de agosto de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

    (xii)      **HARVEST RAIN (segunda vuelta)**

576. El 26 de agosto de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 26 de agosto del 2019.*"[269]

577. La información contenida en dicho programa incluye el tipo de carbón y su ETA previsto para el 17 de septiembre de 2019.

| No.EMB | VENTANA INICIO | VENTANA FINAL | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 02 AL 08 DE JULIO DEL 2019 MANTENIMIENTO A LA TERMINAL DE RECIBO MANEJO DE CARBÓN | | | | | | |
| 38 | 969 | 18-jul-2019 | 24-jul-2019 | 730435290 | 5 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | W-ACE 4v | 24jul2019 12:30 | 24jul2019 19:00 | 26jul2019 23:00 | 76,729 | TRMC |
| 39 | 5 | 25-jun-2019 | | 730435290 | 8 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | ANNA MARIA 2v | 16jun2019 1:30 | 30jul2019 11:00 | 30ago2019 11:00 | 68,870 | TPP |
| 40 | 970 | 25-jul-2019 | 31-jul-2019 | 730435290 | 6 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | GOLDEN CAL/IUS 6v | 29jul2019 6:00 | 29jul2019 15:00 | 31ago2019 15:00 | 138,958 | TRMC |
| 41 | 6 | 25-jul-2019 | 18-jul-2019 | 730435290 | | GLENCORE INTERNATIONAL | TIPO 3 | COLOMBIA | CL TAIZHOU | 14ago2019 9:45 | 14ago2019 12:00 | | 69,308 | TPP |
| 42 | 7 | 30-jul-2019 | | 730435290 | 2 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | NAVIOS ANTARES 2v | 30jul2019 7:10 | 30ago2019 09:22:36 | 03ago2019 15:00 | 108,317 | TPP |
| 43 | 971 | 08-ago-2019 | 14-ago-2019 | 730435290 | 7 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | SATORI 2v | 07ago2019 11:30 | 07ago2019 18:00 | 11ago2019 14:00 | 141,232 | TRMC |
| 44 | 972 | 01-ago-2019 | 07-ago-2019 | 730435290 | 4 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | SB REGGAE 2v | 07ago2019 23:55 | 03ago2019 22:30 | 05ago2019 10:00 | 70,500 | TRMC |
| 45 | 973 | 01-ago-2019 | 07-ago-2019 | 730435290 | 4 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | GRIZZLY 3v | 18ago2019 8:40 | 18ago2019 22:30 | 19ago2019 22:00 | 70,525 | TRMC |
| 46 | 974 | 30-ago-2019 | 26-sep-2019 | 730435290 | 2 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | HARVEST RAIN 2v | 13ago2019 21:54 | 13ago2019 14:30 | 14ago2019 20:00 | 89,655 | TRMC |
| 49 | 976 | 29-ago-2019 | 04-sep-2019 | 730435290 | 2 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | ANNA MARIA 3v | 30ago2019 20:00 | 31ago2019 22:00 | 01sep2019 10:00 | 70,723 | TRMC |
| 50 | 977 | 05-sep-2019 | 11-sep-2019 | 730435290 | 2 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | GOLDEN CIRRUS | 27ago2019 8:00 | 28ago2019 11:30 | 29mayo2019 21:00 | 118,886 | TRMC |
| 53 | 979 | 12-sep-2019 | 9-sep-2019 | 730435290 | 6 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | CL TAIZHOU 2v | 09sep2019 20:00 | 16sep2019 19:00 | 17sep2019 6:00 | 70,535 | TRMC |
| 55 | 11 | 17-sep-2019 | 26-sep-2019 | 730435290 | 2 | | | | TBN | | | | | TBN |
| 56 | 979 | 20-sep-2019 | 26-sep-2019 | 730435290 | 5 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | HARVEST RAIN 2v | 17sep2019 8:00 | 26sep2019 20:00 | 27sep2019 20:00 | 88,000 | TPP |
| 57 | 980 | 20-sep-2019 | 26-sep-2019 | 730435290 | 2 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | W-SMASH 2v | 22sep2019 22:00 | 23sep2019 09:00 | 23sep2019 2:00 | 73,000 | TRMC |
| 58 | 10 | 27-sep-2019 | 06-oct-2019 | 730435290 | 10 | GLENCORE INTERNATIONAL | TIPO 3 | COLOMBIA | CL TAIZHOU 2v | | | | | TRMC |

578. El 19 de septiembre de 2019, CFE emitió los Oficios HECC3-0-0209/2019, HECC3-0-0210/2019 y HECC3-0-0206/2019, incluyendo las características y el plan de estiba del buque, el plan de descarga del buque, los certificados de calidad y peso del carbón embarcado en el buque HARVEST RAIN (segunda vuelta), y el puerto de salida (Ciénaga, Colombia), respectivamente.[270]

579. De conformidad con la información incluida en el Estado de Hechos, el buque W-ARTICUS arribó al Puerto de Lázaro Cárdenas el 18 de septiembre de 2019, con 90,055 toneladas de carbón.[271]

580. Finalmente, el buque HARVEST RAIN (segunda vuelta) atracó en la Terminal TPP el 26 de septiembre de 2019, y la descarga comenzó el 27 de septiembre de 2019 a las 00h00.[272]

---

[269] D-CFE-16 y Anexo 31 de la Testimonial de Genaro Cuevas García.

[270] Anexos 18, 19, 20 y 20.1 de la Testimonial de Genaro Cuevas García, respectivamente.

[271] Anexo 22 de la Testimonial de Genaro Cuevas García.

[272] Anexo 22 de la Testimonial de Genaro Cuevas García.

581.    Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

582.    Por otra parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque y los certificados de calidad y peso del carbón embargado en el buque HARVEST RAIN (segunda vuelta) y el puerto de salida, se realizó el 19 de septiembre de 2019, mientras que el buque llegó al puerto el 18 de septiembre de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

        (xiii)    CL TAIZHOU (segunda vuelta)

583.    El 3 de octubre de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 3 de octubre del 2019*."[273]

584.    La información contenida en dicho programa incluye el tipo de carbón y ETA previsto para el 1 de octubre de 2019.

| No. | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TERMINO | TONELADAS | TERMINAL DE DESCARGA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | INICIO | FINAL | | | | | | | | | | | |
| | | | | | | 02 AL 08 DE JULIO DEL 2019 MANTENIMIENTO A LA TERMINAL DE RECIBO MANEJO DE CARBÓN | | | | | | | | |
| 38 | 969 | 18-jul-2019 | 24-jul-2019 | 700490290 | 5 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | W-ACE 4v | 24jul2019 12:30 | 24jul2019 19:00 | 26jul2019 23:00 | 76,729 | TRMC |
| 39 | 5 | 25-jul-2019 | 08-jul-2019 | 700490290 | 8 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | ANNA MARIA 2v | 16jun2019 1:30 | 30jul2019 8:00 | 03ago2019 11:00 | 68,870 | TPP |
| 40 | 970 | 25-jul-2019 | 31-jul-2019 | 700490290 | 6 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | GOLDEN CALYUS 6v | 29jul2019 8:00 | 29jul2019 15:00 | 02ago2019 1:00 | 138,958 | TRMC |
| 41 | 6 | 09-jul-2019 | 16-jul-2019 | 700490290 | 1 | GLENCORE INTERNATIONAL | TIPO 3 | COLOMBIA | CL TAIZHOU | 13jul2019 15:45 | 14ago2019 0:00 | 17ago2019 12:00 | 69,308 | TPP |
| 42 | 11 | 09-jul-2019 | 06-ago-2019 | 700490290 | 7 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | NAVIOS ANTARES 2v | 30jul2019 2:10 | 30ago2019 22:00 | 03sep2019 16:00 | 108,217 | TPP |
| 43 | 971 | 08-ago-2019 | 14-ago-2019 | 700490290 | 2 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | SATORI 2v | 07ago2019 11:30 | 13ago2019 18:00 | 18ago2019 14:00 | 141,232 | TRMC |
| 44 | 972 | 01-ago-2019 | 07-ago-2019 | 700490290 | 4 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | SBI REGGAE 2v | 07ago2019 23:55 | 13ago2019 22:30 | 15ago2019 19:00 | 70,500 | TRMC |
| 46 | 973 | 01-ago-2019 | 07-ago-2019 | 700490290 | 4 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | GRIZZLY 3v | 07ago2019 15:40 | 14ago2019 22:30 | 19ago2019 2:00 | 70,525 | TRMC |
| 47 | 974 | 20-ago-2019 | 26-ago-2019 | 700490290 | 2 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | HARVEST RAIN 2v | 13ago2019 23:54 | 21ago2019 14:30 | 24ago2019 2:00 | 89,655 | TRMC |
| 49 | 976 | 29-ago-2019 | 04-sep-2019 | 700490290 | 2 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | ANNA MARIA 3v | 30ago2019 20:00 | 31ago2019 22:30 | 03sep2019 21:00 | 70,723 | TRMC |
| 50 | 977 | 05-sep-2019 | 11-sep-2019 | 700490290 | 4 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | GOLDEN CIRRUS | 27ago2019 8:00 | 16sep2019 11:30 | 09sep2019 21:00 | 118,086 | TRMC |
| 53 | 979 | 12-sep-2019 | 15-sep-2019 | 700490290 | 6 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | CL TAIZHOU 2v | 09sep2019 20:00 | 16sep2019 15:00 | 19sep2019 6:00 | 70,535 | TRMC |
| 55 | 11 | | 20-sep-2019 | 700490290 | | | | | TBN | | | | | |
| 56 | 979 | 20-sep-2019 | 26-sep-2019 | 700490290 | 5 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | HARVEST RAIN 3v | 17sep2019 8:30 | 20sep2019 8:03 | 23sep2019 20:00 | 88,000 | TPP |
| 57 | 980 | 20-sep-2019 | 26-sep-2019 | 700490290 | 5 | GLENCORE INTERNATIONAL | TIPO 2 | COLOMBIA | W-SMASH 2v | 22sep2019 14:00 | 23sep2019 14:00 | 26sep2019 2:00 | 73,000 | TRMC |
| 58 | 12 | 27-sep-2019 | 06-oct-2019 | 700490290 | | GLENCORE INTERNATIONAL | TIPO 3 | COLOMBIA | CL TAIZHOU 2v | | | | | TRMC |

585.    El 4 de octubre de 2019, CFE emitió los Oficios HECC3-0-0220/2019 y HECC3-0-0221/2019, incluyendo las características y el plan de estiba del buque y el plan de descarga del buque, respectivamente.[274]

---

[273]    D-CFE-16 y Anexo 31 de la Testimonial de Genaro Cuevas García.

[274]    Anexos 26 y 27 de la Testimonial de Genaro Cuevas García.

586.    El 9 de octubre de 2019, CFE emitió el Oficio HECC3-0-0228/2019, incluyendo los certificados de calidad y peso del carbón embarcado en el buque CL TAIZHOU (segunda vuelta), y el puerto de salida (Ciénaga, Colombia).[275]

587.    De conformidad con la información incluida en el Estado de Hechos, el buque CL TAIZHOU (segunda vuelta) arribó al Puerto de Lázaro Cárdenas el 2 de octubre de 2019, con 73,434 toneladas de carbón.[276]

588.    Finalmente, el buque CL TAIZHOU (segunda vuelta) atracó en la Terminal TPP recién el 13 de octubre de 2019, y la descarga comenzó el 14 de octubre de 2019 a las 08h00.[277]

589.    Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

590.    Por otra parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque, los certificados de calidad y peso del carbón embargado en el buque CL TAIZHOU (segunda vuelta) y el puerto de salida, se realizó entre el 4 y el 9 de octubre de 2019, mientras que el buque llegó al puerto el 2 de octubre de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

        (xiv)    MINERAL NINGBO

591.    El 3 de octubre de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 3 de octubre del 2019.*"[278]

592.    La información contenida en dicho programa incluye el tipo de carbón y ETA previsto para el 27 de octubre de 2019.

| No | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
| | INICIO | FINAL | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 29 DE SEPTIEMBRE AL 05 DE OCTUBRE DEL 2019 MANTENIMIENTO A LA TERMINAL DE RECIBO MANEJO DE CARBÓN | | | | | | | |
| 57 | 06-oct-2019 | 12-oct-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | NAVIOS ANTARES 3V | 02/oct/2019 14:00 | 06/oct/2019 0:00 | 09/oct/2019 12:00 | 80,000 | TRMC |
| 58 | 27-sep-2019 | 06-oct-2019 | 700499290 | 17 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | CL TAIZHOU 2V | 11/oct/2019 14:00 | 13/oct/2019 0:00 | 16/oct/2019 12:00 | 73,434 | TPP |
| 59 | 06-oct-2019 | 12-oct-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GRIZZLY 5V | 11/oct/2019 0:00 | 13/oct/2019 4:00 | 12/oct/2019 16:00 | 71,000 | TRMC |
| 60 | 13-oct-2019 | 19-oct-2019 | 700499290 | 7 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | MINERAL BRUSSEL | 19/oct/2019 5:00 | 13/oct/2019 2:00 | 16/oct/2019 20:00 | 133,670 | TRMC |
| 61 | 20-oct-2019 | 26-oct-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | HARVEST RAIN 4V | 24/oct/2019 0:00 | 20/oct/2019 12:00 | 23/oct/2019 0:00 | 92,500 | TRMC |
| 62 | 21-oct-2019 | 30-oct-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | MINERAL NINGBO 2V | 27/oct/2019 0:00 | 27/oct/2019 14:00 | 31/oct/2019 0:00 | 136,000 | TPP |

[275]    Anexos 28 y 28.1 de la Testimonial de Genaro Cuevas García.
[276]    Anexo 30 de la Testimonial de Genaro Cuevas García.
[277]    Anexo 30 de la Testimonial de Genaro Cuevas García.
[278]    Anexo 40 de la Testimonial de Genaro Cuevas García.

593.     El 25 de octubre de 2019, CFE emitió los Oficios HECC3-0-0240/2019 y HECC3-0-
0241/2019, incluyendo las características y el plan de estiba del buque y el plan de descarga
del buque, respectivamente.[279]

594.     El mismo día, CFE emitió el Oficio HECC3-0-0235/2019, incluyendo los certificados de
calidad y peso del carbón embarcado en el buque MINERAL NINGBO, y el puerto de salida
(Vanino, Rusia).[280]

595.     De conformidad con la información incluida en el Estado de Hechos, el buque MINERAL
NINGBO arribó al Puerto de Lázaro Cárdenas el 21 de octubre de 2019, con 135,845
toneladas de carbón.[281]

596.     Finalmente, el buque MINERAL NINGBO atracó en la Terminal TPP recién el 31 de octubre
de 2019, y la descarga comenzó el 1 de noviembre de 2019 a las 00h00.[282]

597.     Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las
notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del
barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

598.     Por otra parte, la notificación del plan de descarga del buque, las características y el plan de
estiba del buque, los certificados de calidad y peso del carbón embargado en el buque
MINERAL NINGBO y el puerto de salida, se realizó el 25 de octubre de 2019, mientras que
el buque llegó al puerto el 21 de octubre de 2019, incumpliendo, de esta forma, con el plazo
exigido de 72 horas de antelación.

          (xv)     NAVIOS ANTARES (segunda vuelta)

599.     El 22 de octubre de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 22 de
octubre del 2019.*"[283]

600.     La información contenida en dicho programa incluye el tipo de carbón y ETA previsto para
el 2 de noviembre de 2019.

---

[279]    Anexos 34 y 35 de la Testimonial de Genaro Cuevas García.

[280]    Anexos 36 y 36.1 de la Testimonial de Genaro Cuevas García.

[281]    Anexo 39 de la Testimonial de Genaro Cuevas García.

[282]    Anexo 39 de la Testimonial de Genaro Cuevas García.

[283]    Anexo 49 de la Testimonial de Genaro Cuevas García.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETCD / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | INICIO | FINAL | | | | | | | | | | | |
| | | | | | | | 29 DE SEPTIEMBRE AL 05 DE OCTUBRE DEL 2019 MANTENIMIENTO A LA TERMINAL DE RECIBO MANEJO DE CARBÓN | | | | | | | |
| 57 | 983 | 06-oct-2019 | 12-oct-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | NAVIOS ANTARES 3V | 04/oct/2019 0:10 | 06/oct/2019 0:00 | 08/oct/2019 11:00 | 77,007 | TRMC |
| 58 | 984 | 06-oct-2019 | 12-oct-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GRIZZLY 5V | 06/oct/2019 23:30 | 10/oct/2019 11:00 | 12/oct/2019 20:00 | 72,143 | TRMC |
| 59 | 985 | 13-oct-2019 | 19-oct-2019 | 700499290 | 7 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | MINERAL BRUSSEL | 10/oct/2019 8:50 | 13/oct/2019 15:00 | 20/oct/2019 20:00 | 133,676 | TRMC |
| 60 | 19 | 27-sep-2019 | 06-oct-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | CL TAIZHOU 3V | 02/oct/2019 2:00 | 14/oct/2019 8:00 | 16/oct/2019 13:00 | 73,434 | TPP |
| 61 | 986 | 20-oct-2019 | 26-oct-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | HARVEST RAIN 4V | 26/oct/2019 3:00 | 26/oct/2019 9:00 | 28/oct/2019 21:00 | 88,823 | TRMC |
| 62 | 987 | 27-oct-2019 | 02-nov-2019 | 700499290 | 6 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | AIM MARTA | 26/oct/2019 12:00 | 29/oct/2019 7:00 | 02/nov/2019 1:00 | 141,293 | TRMC |
| 63 | 988 | 03-nov-2019 | 09-nov-2019 | 700499290 | 7 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | STAR AUDREY | 03/nov/2019 6:00 | 05/nov/2019 12:00 | 07/nov/2019 6:00 | 136,000 | TRMC |
| 64 | 11 | 21-oct-2019 | 30-oct-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | MINERAL NINGBO 2V | 21/oct/2019 3:00 | 02/nov/2019 9:00 | 05/nov/2019 12:00 | 136,000 | TPP |
| 65 | 989 | 10-nov-2019 | 16-nov-2019 | 700499290 | 11 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | W-ARCTURUS 2V | 24/oct/2019 9:00 | 10/nov/2019 0:00 | 12/nov/2019 12:00 | 72,889 | TRMC |
| 66 | 12 | 05-nov-2019 | 14-nov-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | NAVIOS ANTARES 4V | 02/nov/2019 0:00 | TBD | TBD | 104,175 | TPP |

601.    El 4 de noviembre de 2019, CFE emitió el Oficio HECC3-0-0248/2019, incluyendo los certificados de calidad y peso del carbón embarcado en el buque NAVIOS ANTARES (segunda vuelta), y el puerto de salida (Ciénaga, Colombia).[284]

602.    El 6 de noviembre de 2019, CFE emitió los Oficios HECC3-0-0250/2019 y HECC3-0-0251/2019, incluyendo las características y el plan de estiba del buque y el plan de descarga del buque, respectivamente.[285]

603.    De conformidad con la información incluida en el Estado de Hechos, el buque NAVIOS ANTARES (segunda vuelta) arribó al Puerto de Lázaro Cárdenas el 5 de noviembre de 2019, con 104,175 toneladas de carbón.[286]

604.    Finalmente, el buque NAVIOS ANTARES (segunda vuelta) atracó en la Terminal TPP recién el 13 de noviembre de 2019, y la descarga comenzó el 14 de noviembre de 2019 a las 08h00.[287]

605.    Analizando los requisitos de numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

606.    Por otra parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque, los certificados de calidad y peso del carbón embargado en el buque CL NAVIOS ANTARES y el puerto de salida, se realizó entre el 4 y el 6 de noviembre de 2019, mientras que el buque llegó al puerto el 5 de noviembre de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

---

[284]    Anexos 45 y 45.1 de la Testimonial de Genaro Cuevas García.
[285]    Anexos 43 y 44 de la Testimonial de Genaro Cuevas García.
[286]    Anexo 48 de la Testimonial de Genaro Cuevas García.
[287]    Anexo 48 de la Testimonial de Genaro Cuevas García.

(xvi)    LMZ FRANCISCO

607.    El 2 de noviembre de 2019, CFE envió el "*Programa de Buques CTPPEC actualizado al 2 de noviembre del 2019.*"[288]

608.    La información contenida en dicho programa incluye el tipo de carbón y ETA previsto para el 22 de noviembre de 2019.

| No | EMB | VENTANA | | CONTRATO | PARTIDA | PROVEEDOR | TIPO DE CARBÓN | ORIGEN | BUQUE | ETA / NOR | ETB / INICIO | ETD2 / TÉRMINO | TONELADAS | TERMINAL DE DESCARGA | AGENCIA DE SUPERVISIÓN | AGENCIA ADUANAL | AGENCIA NAVIERA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | INICIO | FINAL | | | | | | | | | | | | | | |
| | | | | | | | 29 DE SEPTIEMBRE AL 05 DE OCTUBRE 2019 MANTENIMIENTO A LA TERMINAL DE RECIBO MANEJO DE CARBÓN | | | | | | | | | | |
| 67 | 993 | 06-oct-2019 | 12-oct-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | NAVIOS ANTARES 2V | 04/oct/2019 4:10 | 05/oct/2019 0:00 | 08/oct/2019 11:00 | 77,002 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 58 | 994 | 06-oct-2019 | 12-oct-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | COLOMBIA | GRIZZLY 5V | 06/oct/2019 23:30 | 10/oct/2019 11:00 | 12/oct/2019 23:00 | 72,143 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 59 | 895 | 13-oct-2019 | 19-oct-2019 | 700499290 | 4 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | MINERAL BRUSSEL | 13/oct/2019 8:50 | 13/oct/2019 15:00 | 11/oct/2019 20:00 | 133,670 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 60 | 96 | 27-sep-2019 | 16-oct-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | EL TALOHIO 2V | 02/oct/2019 2:00 | 14/oct/2019 0:00 | 16/oct/2019 10:00 | 33,434 | TPP | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 61 | 996 | 20-oct-2019 | 26-oct-2019 | 700499290 | 5 | GLENCORE INTERNATIONAL AG | TIPO 3 | RUSIA | HANSE ST RANS 4V | 25/oct/2019 22:06 | 26/oct/2019 13:40 | 20/oct/2019 23:00 | 88,823 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 62 | 982 | 27-oct-2019 | 02-nov-2019 | 700499290 | 6 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | AURA BAVEEA | 26/oct/2019 18:20 | 29/oct/2019 15:30 | 02/nov/2019 11:25 | 141,203 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 63 | 91 | 21-oct-2019 | 30-oct-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | MINERAL NINGBO 2V | 21/oct/2019 6:30 | 01/nov/2019 8:00 | 04/nov/2019 0:00 | 130,243 | TPP | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 64 | 99 | 03-nov-2019 | 09-nov-2019 | 700499290 | 11 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | STAR AUDREY | 03/nov/2019 10:00 | 06/nov/2019 2:00 | 07/nov/2019 19:00 | 133,200 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 65 | 989 | 10-nov-2019 | 16-nov-2019 | 700499290 | 11 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | M ARCTURUS 2V | 24/oct/2019 10:10 | 09/nov/2019 10:00 | 12/nov/2019 12:00 | 72,000 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 66 | 17 | 05-nov-2019 | 14-nov-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | NAVIOS ANTARES 3V | 04/nov/2019 5:30 | 06/nov/2019 0:00 | 09/nov/2019 0:00 | 104,375 | TPP | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 67 | 990 | 10-nov-2019 | 16-nov-2019 | 700499290 | 11 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | EL TALOHIO 4V | 06/nov/2019 0:00 | 12/nov/2019 12:00 | 15/nov/2019 12:00 | 71,500 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 68 | 16 | 17-nov-2019 | 23-nov-2019 | 700499290 | 8 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | EL MANUELIITO 5V | 12/nov/2019 0:00 | 16/nov/2019 0:00 | 19/nov/2019 0:00 | 101,500 | TPP | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 69 | 992 | 24-nov-2019 | 30-nov-2019 | 700499290 | 7 | GLENCORE INTERNATIONAL AG | TIPO 2 | RUSIA | JOE SUREDHIP | 27/nov/2019 23:00 | 25/nov/2019 0:00 | 27/nov/2019 0:00 | 131,743 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 70 | 993 | 01-dic-2019 | 08-dic-2019 | 700499290 | 11 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | SACCOS 3V | 04/dic/2019 0:00 | 04/dic/2019 14:00 | 07/dic/2019 22:00 | 112,120 | TMMC | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |
| 71 | 11 | 29-nov-2019 | 29-nov-2019 | 700499290 | 12 | GLENCORE INTERNATIONAL AG | TIPO 3 | COLOMBIA | LMZ FRANCISCO | 22/nov/2019 0:00 | TBC | | 62,313 | TPP | MARINE INSPECTIONS | GRUPO ALIANZA L | MEXSHIPPING |

609.    El 20 de noviembre de 2019, CFE emitió los Oficios HECC3-0-0264/2019 y HECC3-0-0263/2019, incluyendo las características y el plan de estiba del buque y el plan de descarga del buque, respectivamente.[289]

610.    El 22 de noviembre de 2019, CFE emitió el Oficio HECC3-0-0265/2019, incluyendo los certificados de calidad y peso del carbón embarcado en el buque LMZ FRANCISCO, y el puerto de salida (Ciénaga, Colombia).[290]

611.    De conformidad con la información incluida en el Estado de Hechos, el buque LMZ FRANCISCO arribó al Puerto de Lázaro Cárdenas el 22 de noviembre de 2019, con 61,358 toneladas de carbón.[291]

612.    Finalmente, el buque LMZ FRANCISCO atracó en la Terminal TPP recién el 25 de noviembre de 2019, y la descarga comenzó el mismo día a las 17h00.[292]

---

[288]    Anexo 57 de la Testimonial de Genaro Cuevas García.

[289]    Anexos 52 y 53 de la Testimonial de Genaro Cuevas García.

[290]    Anexos 54 y 54.1 de la Testimonial de Genaro Cuevas García.

[291]    Anexo 56 de la Testimonial de Genaro Cuevas García.

[292]    Anexo 56 de la Testimonial de Genaro Cuevas García.

613.    Analizando los requisitos de los numerales A.14 y A.15 del Anexo 6, vemos que las notificaciones de CFE cumplieron con todos ellos, salvo la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones.

614.    Por otra parte, la notificación del plan de descarga del buque, las características y el plan de estiba del buque, los certificados de calidad y peso del carbón embarcado en el buque LMZ FRANCISCO y el puerto de salida, se realizó entre el 20 y el 22 de noviembre de 2019, mientras que el buque llegó al puerto el 22 de noviembre de 2019, incumpliendo, de esta forma, con el plazo exigido de 72 horas de antelación.

(xvii)  Conclusión sobre las sobreestadías

615.    En definitiva, el Tribunal Arbitral observa que las Demandadas no han respetado el plazo de notificación con 72 horas de antelación previsto en el párrafo 15 del Anexo 6, salvo respecto del buque ANNA MARÍA, primera vuelta.

616.    El incumplimiento de este plazo de notificación no es un incumplimiento menor, puesto que la información requerida es necesaria para organizar diligentemente la descarga del carbón de los buques.

617.    Por otra parte, en ningún caso se presentó copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones, según lo exigido por el numeral A.14(i) del Anexo 6.  Asimismo, respecto del buque HARROW, no hay constancia de que CFE haya notificado los certificados de calidad y peso del carbón embarcado y el puerto de salida, como lo exige el numeral A.15(iv) del Anexo 6.  Dicho ello, tampoco existe constancia de que Greenfield se hubiese quejado por el incumplimiento de CFE de estos requisitos, sino que, por el contrario, firmó el Libre Para Descargar de acuerdo con los *Statement of Facts* de cada buque y procedió a su descarga.

618.    Como hemos visto, el único buque respecto del cual CFE cumplió con el plazo de notificación de 72 horas fue el ANNA MARÍA, primera vuelta.  Como también vimos, el buque ANNA MARIA arribó al Puerto de Lázaro Cárdenas el 22 de mayo de 2019, con 71,500 toneladas de carbón,[293] quedó atracado en la Terminal TPP el mismo día,[294] y comenzó la descarga el mismo 22 de mayo de 2019 a las 8h30.

---

[293]    Anexo 15 de la Testimonial de Arturo Cortes Alvarado.
[294]    Anexo 15 de la Testimonial de Arturo Cortes Alvarado.

619.    Según el numeral A.6 del Anexo 6, el Tiempo de Plancha se computa desde el Libre Para Descargar, para lo cual deben realizarse las siguientes acciones:

(i)   Que el buque se encuentre atracado;

(ii)  Que el buque se encuentre en libre plática;

(iii) Que se haya realizado el calado inicial;

(iv) Que se haya realizado la inspección de bodegas y de la carga;

(v)  Que las bodegas se encuentren abiertas para verificar la carga; y

(vi) Que se firme el recibo del buque entre Greenfield, CFE y el personal encargado del barco.

620.    De conformidad con la capacidad en toneladas de peso muerto del buque ANNA MARIA y de los Tiempos de Plancha establecidos en el numeral A.5 del Anexo 6 del Contrato, TPP disponía de 60 horas para su descarga.

621.    La descarga comenzó el 22 de mayo de 2019 a las 8:30 y terminó el 25 de mayo de 2019 a las 21h00, debido a paros por falla en los equipos o por mantenimiento preventivo en la Terminal TPP durante dos horas y 45 minutos.[295]

622.    Por lo tanto, el tiempo total de descarga fue de 84 horas y 30 minutos, esto es, 24 horas y 30 minutos de sobreestadía, lo que generó un costo total de sobreestadía de USD 15,312. Dicho costo fue notificado por CFE Generación IV a Greenfield el 28 de mayo de 2019.[296] Recordemos que Greenfield no alegó, previo al arbitraje, el incumplimiento de CFE de los requisitos previstos en los numerales A.14 y A.15 del Anexo 6 respecto del buque ANNA MARIA.

623.    CFE bonificó este monto a Glencore, según consta en el Acta Circunstanciada de la Entrega – Recepción de Carbón Mineral Térmico del 27 de mayo de 2021.[297]

b.    *Reprogramación de las ventanas de entrega*

624.    Las Demandantes sostienen que las Demandadas no reprogramaron las ventanas de entrega de carbón, a pesar de sus solicitudes al respecto.[298]

---

[295]    Anexo 15 de la Testimonial de Arturo Cortes Alvarado.
[296]    Anexo D-CFE-23.
[297]    Anexo D-CFE-117.
[298]    Anexo D-GF-81, Anexo D-GF-82 y Anexo D-GF-44.

625.    Como vimos, el Contrato Glencore fue suscrito el 25 de abril de 2019, esto es, el mismo día en que Greenfield le ratificó a CFE que mantenía la FOC para el 21 de mayo de 2019.[299]

626.    En el Contrato Glencore se acordaron varias ventanas de entrega desde mayo a noviembre de 2019, indicándose las toneladas de carbón que se entregarían y la terminal donde se debía realizar la descarga del carbón. [300]

627.    De acuerdo con las ventanas de entrega acordadas en el Contrato Glencore, Glencore nominaba los buques a CFE,[301] y luego CFE notificaba la nominación y el arribo de los buques a Greenfield, en los términos exigidos por los numerales A.14 y A.15 del Anexo 6 del Contrato.

628.    Ahora bien, el numeral 3 de la cláusula CUARTA del Contrato Glencore prevé lo siguiente:

   *"El presente contrato podrá ser modificado por las causas que se mencionan a continuación:*

   - *Modificaciones a la cantidad, monto, plazo o vigencia*
   - *Circunstancias económicas de tipo general*
   - *Cancelaciones de partidas*
   - *Diferimiento de obligaciones contractuales*
   - *Prórroga de obligaciones contractuales*
   - *Suspensión de obligaciones contractuales*
   - *Reposición de los servicios durante la vigencia del contrato*
   - *Terminación anticipada y extinción del contrato por razones diferentes a su cumplimiento*
   - *Cambio de destino*
   - *Modificaciones de ampliación de medios alternativos de solución de controversias*
   - *Discrepancias*

   *El proveedor, deberá formalizar el convenio modificatorio entre el sexto y décimo día hábil posterior a la solicitud por parte del Administrador del Contrato."* [302]

629.    Como vemos, para modificar el Contrato Glencore se requiere de un convenio modificatorio entre CFE y Glencore, lo cual significa que CFE no puede modificar dicho contrato unilateralmente, requiriendo el consentimiento de Glencore.   Así fue reconocido por los

---

[299]    Anexo D-CFE-12 y Anexo D-CFE-13.
[300]    Anexo D-CFE-13,Anexo 1.
[301]    Anexo D-CFE-109 y Anexo D-CFE-114.
[302]    Anexo D-CFE-13.

peritos de Greenfield en la Audiencia, quienes declararon que CFE no tenía discreción para modificar unilateralmente el Contrato Glencore.[303]

630. Por su parte, el numeral 2 de la cláusula NOVENA del Contrato Glencore prevé que: "[*l*]*A EMPRESA CONTRATANTE* [es decir, CFE] *se reserva del derecho de solicitar a EL PROVEEDOR* [es decir, Glencore] *la entrega del carbón contratado en muelle alterno en el Puerto Industrial Lázaro Cárdenas, Michoacán, notificando con al menos 24 horas de anticipación, considerando el tiempo necesario que se requiere para obtener las autorizaciones correspondientes, manteniendo las condiciones establecidas para la descarga señaladas en el contrato, o en su caso, acordando condiciones particulares para la descarga*".[304]

631. Es decir, CFE se reservó el derecho de solicitar a Glencore la entrega del carbón en muelle alterno, esto es, la Terminal TPP o la TMRC, notificando a Glencore con al menos 24 horas de anticipación, "*manteniendo las condiciones establecidas para la descarga señaladas en el contrato*"; esto es, sin que ello implique una modificación al Contrato Glencore. Por lo tanto, el Tribunal Arbitral considera que CFE puede ejercer este derecho sin necesidad de contar para ello con la aprobación previa de Glencore.

632. En este sentido, el buque GRIZZLY fue el primer buque desviado de la TMRC a la Terminal TPP.  En efecto, el buque GRIZZLY estaba programado para descargar en la TMRC, sin embargo, el 27 de mayo de 2019, y a pesar de saber que la FOC no había sido alcanzada, CFE cambió la programación original para desviar dicho buque a la Terminal TPP con el propósito de compensar el exceso de carbón Tipo 2 que existía en la Terminal TPP.[305] Ello generó una acumulación mayor de carbón en la Terminal TPP.

633. Por su parte, el 4 de junio de 2019, Greenfield solicitó a CFE el desvío del buque SARTORI a la TMRC sobre la base de que no se encontraban las condiciones de seguridad para la descarga del buque, dado que la Terminal TPP estaría operativa el 25 de junio de 2019.[306]

---

[303]  Transcripción Audiencia, Día 4, p.92, l.3664-3665

[304]  Anexo D-CFE-13.

[305]  Programa de buques CTPPEC actualizado al 27 de mayo del 2019. En este sentido, antes de transportar el carbón desde la Terminal TPP a la Central, se debía mezclar los dos tipos de carbón que se descargaban, esto es, carbón Tipo 2 y Tipo 3, conforme a los requerimientos de CFE. La mezcla de los tipos de carbón debía ser en una proporción 80% Tipo 2 y 20% Tipo 3, como fue requerido por CFE.

[306]  Anexo D-GF-81.

634. El mismo día, CFE solicitó a Glencore desviar el buque SARTORI y realizar la descarga en la TMRC[307], y, el día siguiente, 5 de junio de 2019, CFE comunicó a Greenfield que realizaría las gestiones necesarias para llevar la descarga del buque Sartori en otra terminal.[308]

635. El 20 de junio de 2019, Greenfield notificó a CFE que las condiciones de seguridad en la Terminal TPP no permitían la descarga de buques, solicitando el desvío de los buques programados a un puerto alterno, dado que la Terminal TPP estaría operativa el 8 de julio de 2019.[309]

636. El 21 de junio de 2019, CFE comunicó a Greenfield que no era posible desviar a un puerto alterno los buques GRIZZLY y ANNA MARIA, segunda vuelta, que ya se encontraban fondeados. CFE informó a Greenfield que dichos buques debían permanecer fondeados hasta que la Terminal TPP estuviera en condiciones de comenzar la descarga. [310]

637. El 2 de julio de 2019, Greenfield notificó nuevamente a CFE que las condiciones de seguridad no permitían la descarga de buques y que la Terminal TPP estaría operativa el 10 de julio de 2019.[311]

638. Sobre el particular, cabe señalar que CFE Generación emitió un dictamen técnico con el objeto de sustentar, motivar y fundamentar la modificación del Contrato Glencore ("**Dictamen Técnico**").  Del Dictamen Técnico se desprende que, el 4 de julio de 2019, mediante oficio HECC0-O-0950/2019, CFE solicitó a Glencore la reprogramación de ciertas ventanas de entrega en la TMRC debido a que las existencias en los patios de almacenamiento de carbón de la Central habían alcanzado el máximo de capacidad debido a la baja demanda de generación del CENACE. [312] En este sentido, el Dictamen Técnico señala que las razones que provocaron el bajo consumo de la Central fueron "*fallas, despacho de generación por el CENACE y la prolongación de los periodos de mantenimiento,*"[313] y retrasos en los trabajos de mantenimiento de la U7 de la Central. [314]

639. Según se desprende de la comunicación de Glencore del 22 de julio de 2019, en una reunión del 9 de julio de 2019, CFE solicitó a Glencore retrasar tres ventanas contractuales debido a

---

[307]    Correo electrónico de CFE a Glencore, Anexo D-CFE-120.

[308]    Anexo D-CFE-27.

[309]    Anexo D-GF-82.

[310]    Anexo D-CFE-33.

[311]    Anexo D-CFE-35.

[312]    Anexo D-TPP-63, página 5. El oficio HECC0-O-0950/2019 no fue presentado por las Partes.

[313]    Anexo D-TPP-63, página 2.

[314]    Anexo D-TPP-63, página 3.

"*un exceso de existencias en sus patios.*"[315]  Sin embargo, "*considerando las restricciones y limitaciones logísticas existentes*", Glencore solo aceptó retrasar dos de las tres ventanas solicitadas por CFE, manteniendo las demás ventanas contractuales y plazos conforme al Contrato Glencore. [316]

640.    Así, el 8 de agosto de 2019, CFE Generación y Glencore suscribieron la Modificación al Contrato Glencore, en virtud de la cual se reprogramaron dos ventanas de entrega que serían descargadas en la TMRC.[317]

641.    El 17 de septiembre de 2019, y considerando la situación de la Terminal TPP, se acordó desviar el buque HARROW a la TMRC.

642.    En base a lo anterior, el Tribunal Arbitral concluye que el desvío de buques a la TMRC era facultad de las Demandadas, sin que fuera necesario para ello contar con la aprobación de Glencore.  Si bien se desviaron dos buques desde la Terminal TPP a la TMRC, dichas acciones fueron insuficientes ya que continuó la acumulación de buques en la Terminal TPP.

643.    Esta conclusión se ve refrendada en el informe individual de la Auditoría de Cumplimiento 2019-6-90UJB-19-0426-2020 de la Auditoría Superior de la Federación ("**Informe de Auditoría**"), el cual concluyó expresamente que "*no se tomaron las medidas necesarias para mitigar la acumulación de carbón mineral, toda vez que la EPS tenía la posibilidad de solicitar al proveedor de carbón mineral la reprogramación de los buques que aún no se habían nominado para ambas terminales (TRMC y TPP), sin consecuencia para esa entidad, ni se realizaron otras acciones para mitigar el problema.*" [318]

644.    El Tribunal Arbitral no puede obviar la relevancia del Informe de Auditoría, por cuanto la Auditoría Superior de la Federación es el órgano técnico especializado de la Cámara de Diputados de los Estados Unidos Mexicanos, dotado de autonomía técnica y de gestión, encargada de fiscalizar el uso de los recursos públicos federales en el Estado.

645.    Así, el Tribunal Arbitral concluye que las Demandadas contribuyeron a las sobreestadías de los buques al no adoptar todas las medidas de mitigación que estaban a su alcance, como era el caso de solicitar el desvío de los buques a la TMRC.

---

[315]    Anexo 15 de la Testimonial de Arturo Cortes Alvarado.
[316]    Anexo 15 de la Testimonial de Arturo Cortes Alvarado.
[317]    Anexo D-CFE-216.
[318]    Anexo D-GF-44, página 16.

c.   *Planeación de la compra de carbón*

646.    Las Demandantes también atribuyen a las Demandadas la responsabilidad por las sobreestadías de los buques debido a la deficiente planeación en la compra de carbón para 2019.

647.    La posición de las Demandantes se ve refrendada por el mismo Informe de Auditoría, el cual concluye expresamente que "[…] *para la integración del PAC 2019, CFE generación IV no consideró las existencias de bienes en los almacenes.*" [319]

648.    El Informe de Auditoría también confirma, al igual que el Dictamen Técnico, que "*las existencias en los patios de almacenamiento de la central alcanzaron el máximo de capacidad por el bajo consumo de carbón mineral de las unidades, como resultado del despacho de generación por el* [CENACE], *fallas presentadas en una unidad y la prolongación de los periodos de mantenimiento de otra unidad.*" [320]

649.    Específicamente, al cierre del mes de julio de 2019, las Demandadas recibieron 1,987,529 toneladas de carbón bajo el Contrato Glencore y, además, tenían una existencia útil de carbón en patios de almacenamiento de 1,878,293 toneladas. [321]

650.    Por otro lado, las Demandadas no consideraron las fallas presentadas y la prolongación de los periodos de mantenimiento. La U7 tenía un mantenimiento previsto del 29 de marzo al 27 de mayo de 2019 [322]; sin embargo, el 25 de marzo de 2019 presentó una salida forzada debido a la ruptura de tubos en recalentador primario del generador de vapor, manteniéndose fuera de servicio desde el 25 de marzo al 26 de junio de 2019, ya que el mantenimiento se prolongó por un mayor tiempo del estimado. Para el segundo semestre de 2019, la U7 no tenía previsto paro por mantenimiento, no obstante, estuvo en mantenimiento imprevisto del 6 al 21 de noviembre y del 6 al 15 de diciembre. [323]

651.    Y, como vimos en la sección anterior, el consumo de carbón de la Central fue menor al pronosticado debido al menor despacho de generación por parte de CENACE. [324]

---

[319]    Anexo D-GF-44, página 7.
[320]    Anexo D-GF-44, páginas 10 y 11.
[321]    Anexo D-GF-155.
[322]    Apéndice JSH-AP-020 – Mantto CFE GII.
[323]    Anexo D-TPP-45, D-TPP-63, D-GF-65.
[324]    Anexo D-GF-155.

652.    Debido a lo anterior, el Informe de Auditoría instruyó el inicio de una investigación por irregularidades de funcionarios de las Demandadas, quienes, en su gestión, no planearon, programaron o implementaron las acciones correctivas para mitigar el impacto de la acumulación de los buques, y así evitar o disminuir el pago de sobreestadías, no obstante tener conocimiento de la disminución de consumo de carbón en la Central, la reprogramación y extensión de los periodos de mantenimiento de la U7, y la acumulación de inventario por el atraso en alcanzar la FOC por parte de Greenfield.[325]

653.    Por lo tanto, el Tribunal Arbitral concluye que las Demandadas contribuyeron a las sobreestadías de los buques debido a una deficiente planeación en la compra de carbón; ello, sin perjuicio de que el retraso de Greenfield en alcanzar la FOC, y las constantes indicaciones erradas sobre cuándo la alcanzaría han contribuido a la deficiente planeación de las Demandadas. En otras palabras, el Tribunal Arbitral considera que ambas Partes (CFE y Greenfield) contribuyeron a la deficiente planeación en la compra de carbón.

### 5.3.4.3  *Conclusión del Tribunal Arbitral*

654.    En relación con las reclamaciones cruzadas respecto de las sobreestadías de los buques, el Tribunal Arbitral considera que, dado que fueron las Demandadas quienes ejecutaron la Garantía Operativa sobre esta base, y conforme al principio general del derecho *onus probandi actori incumbit*, les corresponde a las Demandadas demostrar que tenían derecho a ejecutar la garantía para cobrarse las sobreestadías reclamadas.

655.    Como vimos, la cláusula 10.2(B) del Contrato prevé que para que la indemnización sea procedente, los daños deben ser atribuibles a la culpa, dolo o negligencia de Greenfield, "*siempre y cuando la Comisión no haya contribuido a ello.*"

656.    En este sentido, y dada la literalidad de la cláusula 10.2(B), el Tribunal Arbitral comparte la interpretación de las Demandantes en cuanto a que el texto citado en el párrafo anterior opera como un eximente de responsabilidad en favor de Greenfield. Al respecto, y no obstante la referida literalidad, el Tribunal Arbitral también considera que dicho eximente tendría un límite en el caso en el que el daño sea causado por el dolo de Greenfield, ya que el dolo de un parte no puede excluir la responsabilidad de la misma por los daños que causare.

657.    De todas maneras, el Tribunal Arbitral no encuentra ningún elemento que le permita concluir que Greenfield haya actuado con dolo en el ejercicio de sus derechos o en el cumplimiento de

---

[325]    Anexo D-GF-44, página 17.

sus obligaciones bajo el Contrato. Por lo tanto, si CFE contribuyó al daño sufrido, en este caso, las sobreestadías de los buques, el Contrato exige que Greenfield sea eximido de responsabilidad, en los términos de la cláusula 10.2(B).

658.    Al respecto, el Tribunal Arbitral nota que la solución prevista por el Contrato podría parecer excesiva, sobre todo en un contexto donde ambas Partes contribuyeron a la sobreestadía de los buques. Sin embargo, al ser éste un arbitraje de derecho, el Tribunal Arbitral no puede desviarse de los términos del Contrato acordados libremente entre las Partes.

659.    En las secciones anteriores, el Tribunal Arbitral concluyó que las sobreestadías de los buques fueron generadas por una responsabilidad compartida entre Greenfield y CFE.

660.    En el caso de Greenfield, su responsabilidad deriva del retraso en alcanzar la FOC el 19 de mayo de 2019, aunado a los cambios constantes de Greenfield de la fecha estimada de FOC, lo cual hacía extremadamente difícil la planeación por parte de CFE, contribuyendo así a la sobreestadía de los buques. Asimismo, Greenfield asumió el compromiso de descargar los buques, sin efectuar reserva alguna.

661.    Por su parte, las Demandadas también son responsables por las sobreestadías de los buques al haber incumplido los plazos en 14 de las 15 notificaciones que debía realizar a Greenfield conforme lo requerido por el Anexo 6 del Contrato, por no haber hecho uso de su derecho para solicitar el desvío de los buques a la TMRC, y por la deficiente planificación en la compra de carbón.

662.    Por lo anterior, el Tribunal Arbitral concluye que ambas Partes fueron responsables por las sobreestadías de los buques, y, por lo tanto, las Demandadas no debieron ejecutar la Garantía Operativa, al menos en su totalidad.

663.    En efecto, como vimos en la Sección 5.3.4.1, la sobreestadía relativa al buque ANNA MARIA, primera vuelta, se debió fundamentalmente a paros por falla en los equipos o por mantenimiento preventivo en la Terminal TPP.[326] A su vez, CFE cumplió con las notificaciones requeridas, salvo respecto de la copia del diagrama general del barco, incluyendo de las bodegas, conteniendo sus configuraciones y dimensiones, respecto de la cual no hay constancia de que Greenfield haya objetado previo al arbitraje, ni que haya dificultado o retrasado la descarga del buque.

---

[326]    Anexo 15 de la Testimonial de Arturo Cortes Alvarado.

664. En consecuencia, el Tribunal Arbitral ordenará la devolución de los montos cobrados por CFE, salvo en lo que refiere a la sobreestadía del buque ANNA MARIA, primera vuelta, con los intereses correspondientes, a la luz de lo dispuesto en las cláusulas 10.2(B) y 4.8(b)(iii) del Contrato.

665. En este sentido, la sobreestadía correspondiente al buque ANNA MARIA, primera vuelta, asciende a USD 15,312, por lo que las Demandadas deberán reembolsar a Greenfield el monto de USD 6,896,021.11.

666. Greenfield solicita que se apliquen intereses por el cobro indebido de la Garantía Operativa, entre el 24 de abril de 2021 y el 25 de septiembre de 2023, los cuales cuantifica en USD 537,350.15 (sobre la base del total de la Garantía Operativa, sin tener en cuenta el descuento de la sobreestadía correspondiente al buque ANNA MARIA, primera vuelta).[327]

667. Las Demandadas, por su parte, no se refieren específicamente a la pretensión de Greenfield relativa a los intereses derivados del cobro de la Garantía Operativa, distinto de la solicitud genérica para que se desestimen todas las pretensiones de Greenfield.

668. Sobre el particular, la cláusula 4.8(b)(iii) del Contrato prevé lo siguiente:

> "*En caso de que la Comisión efectúe un cobro indebido de la Garantía Operativa y cobre cualquier monto no debido por el Proveedor a la Comisión bajo el presente Contrato, la Comisión deberá devolver dicho monto al Proveedor dentro de los 5 (cinco) Días Hábiles siguientes de aquel Día en que se determine, mediante sentencia o laudo arbitral firmes, que el monto hecho efectivo fue indebidamente cobrado, más intereses sobre dicho monto, desde el Día en que se cobró indebidamente hasta el Día en que efectivamente se devuelva, a la Tasa de interés de Gastos Financieros.*"

669. Es decir, las Demandadas deberán devolver a Greenfield el monto correspondiente a la indebida ejecución de la Garantía Operativa, más intereses, dentro de los cinco días siguientes a la fecha de recepción del presente Laudo.

670. En cuanto a la tasa de interés aplicable, el Tribunal Arbitral coincide con Greenfield en cuanto a que corresponde aplicar la tasa Libor 6 meses en USD + 300 puntos base de fecha 22 de abril de 2021; es decir, corresponde aplicar una tasa de interés anual del 3.21023%, desde el 24 de abril de 2021 hasta el 25 de septiembre de 2023. En este sentido, el Tribunal Arbitral

---

[327] Ver párrafo 205 del Memorial de Conclusiones de Greenfield.

nota que, en su Memorial de Conclusiones, Greenfield limita reclamación por los intereses correspondientes a este concepto al periodo indicado.

671. En cuanto a la aplicación del IVA, el Tribunal Arbitral considera que corresponde por las razones explicadas en los párrafos 349-352 del presente Laudo.

**5.4** **Sobre las sobreestadías de carbón en la Terminal TPP por un tiempo superior al periodo de libre almacenamiento, por la cantidad de USD 6.919.636, más IVA e intereses**

672. A continuación, el Tribunal Arbitral analizará la reclamación de las Demandantes sobre las sobreestadías de carbón en la Terminal TPP por un tiempo superior al periodo de libre almacenamiento, por la cantidad de USD 6,919,636, más IVA e intereses.

**5.4.1    Posición de Greenfield[328]**

673. Greenfield alega que, por causas atribuibles a CFE, el carbón fue almacenado en el patio de la Terminal TPP por periodos más amplios que aquellos de libre almacenamiento, generándose así una pena convencional a cargo de CFE con base en lo dispuesto en el Anexo 2 del Contrato.

674. Según Greenfield, las Demandadas adeudan USD 6,919,636, conforme se desprende del Dictamen Pericial TPP correspondiente al pago por sobreestadías de carbón por más de 90 días en la Terminal TPP.

675. Greenfield sostiene que, debido a la falta de planeación y programación en la compra y consumo de carbón, cuya responsabilidad era de CFE, se generaron saturaciones de carbón en los patios de la Terminal TPP, superando el periodo de libre almacenamiento, todo lo cual fue confirmado por el Informe de Auditoría.

**5.4.2    Posición de TPP y TMC[329]**

676. TPP y TMC alegan que, durante todo el periodo de construcción y congestionamiento del Sistema de Transporte y Almacenamiento, CFE tuvo pleno conocimiento de que sería improbable que la FOC ocurriera en la fecha inicialmente contemplada.

---

[328]    Sección IV.C del Memorial de Réplica y Sección IV. del Memorial de Conclusiones.

[329]    Sección III.6.3 y IV.4 del Memorial de Demanda, Sección III.3 del Memorial de Réplica y Sección III. del Memorial de Conclusiones.

677. Sostienen TPP y TMC que CFE sabía, o debía saber, que el envío de buques a la Terminal TPP antes de la FOC implicaría importantes complicaciones y riesgos en la prestación de los servicios; sin embargo, aun a sabiendas de que sería sumamente complicado proceder con la descarga y transporte con las condiciones en las que se encontraba el Proyecto, CFE adoptó una postura indiferente, manteniendo el calendario de embarques originalmente proyectado.

678. Sostienen TPP y TMC que, ante la negativa por parte de CFE a reprogramar o desviar las embarcaciones, la única conducta que pudo haber disminuido en cierta medida algunos de los efectos negativos del acumulamiento de un volumen excesivo de carbón en la Terminal TPP hubiera sido el reclamo constante por parte de CFE de una cantidad suficiente de carbón para desahogar la congestión que existía en ese momento. Sin embargo, según TPP y TMC, CFE no reclamó carbón hacia la Central sino hasta agosto de 2019. Previo a la FOC, CFE únicamente reclamó un volumen aproximado de 42,156 toneladas, de manera tal que, para el 16 de agosto de 2019, el volumen de carbón almacenado en la Terminal TPP superaba la capacidad contratada de 300,000 toneladas.

679. Asimismo, TPP y TMC señalan que, durante el mes de noviembre de 2019, la U7 de la Central estuvo en mantenimiento, por lo que se redujo de manera drástica el reclamo de carbón por CFE, lo cual implicó que continuara la acumulación excesiva de carbón. Aunado a lo anterior, TPP y TMC alegan que hubo semanas durante la cuales CFE instruyó específicamente a TPP que se abstuviera de enviar carbón a la Central, pues sería Carbonser quien surtiría el 100% del carbón requerido en dicho periodo. En tal sentido, según TPP y TMC, el comportamiento irracional de CFE en relación con el envío de buques a la Terminal TPP y el reclamo de carbón hacia la Central provocó la saturación de carbón en la Terminal TPP por un largo periodo de tiempo.

### 5.4.3 Posición de las Demandadas[330]

680. Las Demandadas sostienen que el pago por sobreestadías de carbón en los patios de la Terminal TPP es improcedente, toda vez que ello ocurrió por causas imputables a las Demandantes, tales como el retraso de 87 días en alcanzar la FOC, deficiencias en la descarga de los buques y en el manejo del carbón, y la saturación de la Terminal TPP por varios meses como consecuencia de la indisponibilidad del Sistema de Transporte y Almacenamiento.

---

[330] Sección III.R y IV.B del Memorial de Contestación, Sección V del Memorial de Dúplica y Sección III. del Memorial de Conclusiones.

681.    Asimismo, CFE alega que, durante mitad de junio, julio y mitad de agosto de 2019, el carbón que consumió la U7 fue suministrado por la TRCM dada la indisponibilidad del Sistema de Transporte y Almacenamiento por parte de las Demandantes, el cual recién alcanzó la FOC el 16 de agosto de 2019. Ello explica, según CFE, la razón por la cual se generaron almacenamientos de carbón por periodos superiores a 90 días en la Terminal TPP, lo cual implicó que toneladas de carbón permanecieran inmóviles en el patio de la Terminal TPP por causas atribuibles a las Demandantes y no a CFE.

### 5.4.4    Análisis del Tribunal Arbitral

682.    El Tribunal Arbitral considera que existen elementos suficientes para determinar que existió una responsabilidad compartida entre las Partes en la generación de la sobreestadía de carbón en la Terminal TPP.

683.    El Anexo 2 del Contrato y su correlativo Anexo 7 del Contrato O&M, en su parte relevante, establecen una pena convencional por concepto de sobreestadía de carbón en la Terminal TPP por un tiempo superior al de libre almacenamiento:

> *CARGO VARIABLE POR SOBRESTADIA FASE I*
>
> *Se otorgarán 90 Días libres y sin cargo por almacenamiento. Posterior a los 90 Días se aplicará un cargo diario de USD$0.05 (cinco centavos de dólar de los Estados Unidos de América) por tonelada métrica por los siguientes 30 Días, es decir, hasta un máximo de 120 Días, tarifa que se irá incrementando cada 30 Días en esa misma cantidad, es decir que de los 121 a los 150 Días se cobrará una tarifa de USD$0.10 (diez centavos de dólar de los Estados Unidos de América) y así sucesivamente.*
>
> *El referido Cargo Variable por Sobreestadía no será aplicable si la sobreestadía se produce como consecuencia de un incumplimiento en la prestación de los Servicios Portuarios originado por fallas en el Sistema de Transporte y Almacenamiento imputables a la culpa o dolo del Proveedor, siempre y cuando la Comisión no haya contribuido a ello.*

684.    Es decir, una vez descargado el carbón en la Terminal TPP, este cuenta con un periodo de 90 días de libre almacenamiento, de manera tal que, si el carbón permanece más de 90 días, a partir del día 91 se le aplica un cargo diario en los términos del Anexo 2 del Contrato.

685.    El carbón proveniente de nueve buques descargados en la Terminal TPP permaneció en dicha terminal por un periodo superior al de libre almacenamiento, según el siguiente desglose proporcionado por los peritos de las Demandantes:[331]

---

[331]    Anexo D-TPP-45.

| Buque | Recibido | | Fecha Fin de Descarga | Fecha Fin de Almacena-miento | Días de Almacena-miento de Carbón en los Patios de TPP y TMC | Pena Convencional por Sobreestadía calculada por J.S. Held |
|---|---|---|---|---|---|---|
| | Carbón Tipo 2 en tm | Carbón Tipo 3 en tm | | | | |
| W-Ace | 71.500 | | 09.05.19 | 02.06.20 | 390 | 3.521.230 USD |
| Anna Maria | 68.470 | | 25.05.19 | 04.09.19 | 102 | 18.132 USD |
| Grizzly 2V | | 68.007 | 17.07.19 | 03.06.20 | 322 | 1.278.189 USD |
| Anna Maria 2V | 68.870 | | 03.08.19 | 12.10.19 | 70 | - USD |
| AnangelAstronomer 3V | 88.000 | | 27.07.19 | 21.09.19 | 56 | - USD |
| CL Taizhou | | 69.308 | 17.08.19 | 29.12.19 | 134 | 21.330 USD |
| Navios Antares 2V | 108.017 | | 07.09.19 | 02.11.19 | 56 | - USD |
| W-Arcturus | 71.750 | | 20.09.19 | 17.12.19 | 88 | - USD |
| Harvest Rain 3V | 90.055 | | 02.10.19 | 22.05.20 | 233 | 583.990 USD |
| CL Taizhou 3V | | 73.434 | 19.10.19 | 21.05.20 | 215 | 315.725 USD |
| Mineral Ningbo 2V | 135.845 | | 07.11.19 | 12.03.20 | 126 | 86.428 USD |
| Navios Antares 4V | 104.175 | | 18.11.19 | 25.04.20 | 159 | 340.092 USD |
| LMZ Francisco | | 61.358 | 28.11.19 | 17.06.20 | 202 | 754.519 USD |
| Sub-Total | 806.682 | 272.107 | | | | 6.919.636 USD |
| Total | 1.078.789 | | | | | |

686. El Tribunal Arbitral concuerda con las Demandantes en cuanto a que la trazabilidad del carbón para determinar el periodo de almacenamiento en la Terminal TPP se demuestra mediante los informes mensuales de operación y mantenimiento emitidos por TMC, conforme al Contrato O&M ("**Informes Mensuales**").[332]

687. Estos Informes Mensuales indican la cantidad de carbón que se descargó en la Terminal TPP, así como la cantidad de carbón que se envió cada día desde la Terminal TPP a la Central, permitiendo así conocer el tiempo en el que el carbón estuvo almacenado en la Terminal TPP. De esta manera, es posible trazar el carbón, pudiendo establecer el tiempo que el carbón permaneció en la Terminal TPP.

688. A continuación, el Tribunal Arbitral analizará las causas que demuestran, a su juicio, que tanto CFE como Greenfield son responsables de que se haya excedido el periodo de libre almacenamiento de carbón en la Terminal TPP.

**5.4.4.1    *Contribución de las Demandadas a la sobreestadía de carbón en la Terminal TPP***

689. El Tribunal Arbitral considera que la deficiente planeación en la compra de carbón para el año 2019 por parte de CFE contribuyó a las sobreestadías de carbón en la Terminal TPP. En efecto,

---

[332]    Anexo D-TPP-45.

y como hemos visto en la Sección 5.3.4.2(c), CFE compró carbón en exceso, sin considerar fallas, interrupciones, mantenimiento de la U7 y la menor demanda por parte de CENACE.[333]

690. En efecto, y como vimos, el Informe de Auditoría concluyó que, en la compra de carbón para el año 2019, las Demandadas no consideraron las existencias de carbón en los patios de almacenamiento de la Central y que no se tomaron las acciones necesarias para mitigar la acumulación de carbón en la Terminal TPP.[334]

691. Aún más, el Informe de Auditoría sostuvo que, al realizar la Modificación Contrato Glencore, las Demandadas consideraron fundamentalmente reprogramar ventanas de entrega de la TMRC, sin tomar medidas para mitigar la acumulación de carbón en la Terminal TPP; ello, sumado al hecho de que las Demandadas contaban con la posibilidad de solicitar a Glencore la reprogramación de los buques que aún no habían sido nominados a la Terminal TPP[335], contribuyendo de esta forma a que el carbón permaneciera por un mayor periodo al de libre almacenamiento en la Terminal TPP.

692. Como también vimos, según el Informe de Auditoría, CFE no planeó, programó o implementó acciones correctivas para mitigar el impacto de la acumulación del carbón adquirido, a pesar de tener conocimiento de la disminución de consumo de carbón en la Central, la extensión de los periodos de mantenimiento de la U7 y la acumulación de inventario por el atraso en alcanzar la FOC por Greenfield.[336]

693. De acuerdo con el Estudio de Necesidades 70049[337], la Central tenía un consumo pronosticado de 6,765,323 toneladas de carbón para el año 2019, con un consumo para la U7 de 1,965,986:

| CONSUMO PRONOSTICADO DE CARBÓN MINERAL TÉRMICO EXPRESADO EN TONELADAS | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MES | ENERO | FEBRERO | MARZO | ABRIL | MAYO | JUNIO | JULIO | AGOSTO | SEPTIEMBRE | OCTUBRE | NOVIEMBRE | DICIEMBRE | TOTAL |
| UNIDADES 1 a 6 | 383,110 | 372,066 | 419,944 | 359,970 | 415,371 | 406,830 | 456,708 | 469,914 | 396,180 | 398,381 | 362,100 | 358,763 | 4,799,337 |
| UNIDAD 7 | 159,651 | 154,495 | 171,526 | 147,030 | 169,659 | 166,170 | 186,543 | 191,937 | 161,820 | 162,719 | 147,900 | 146,537 | 1,965,986 |
| TOTAL CENTRAL | 542,762 | 526,562 | 591,470 | 507,000 | 585,030 | 573,000 | 643,250 | 661,850 | 558,000 | 561,100 | 510,000 | 505,300 | 6,765,323 |

---

[333] Anexo D-TPP-63.

[334] Anexo D-TPP-63.

[335] Anexo D-GF-44, p. 16.

[336] Anexo D-GF-44, p. 17.

[337] Apéndice JSH-AP-108 – Estudio de Necesidades 70049.

694.    El manejo de CFE contribuyó a que se generara saturación de carbón en la Terminal TPP por varios meses, inclusive cuando el Sistema de Transporte y Almacenamiento ya se encontraba finalizado. En efecto, CFE reclamó volúmenes de carbón inferiores al consumo pronosticado, lo que ocasionó que el carbón en la Terminal TPP permaneciera por tiempos mayores a los de libre almacenamiento:[338]

| MES | ENVIO PATIO CFE | CONSUMO PRONOSTICADO U7 | CONSUMO REAL U7 |
|---|---|---|---|
| AGOSTO | 127.214 | 191.397 | 69.047 |
| SEPTIEMBRE | 220.226 | 161.820 | 137.062 |
| OCTUBRE | 142.725 | 162.719 | 149.545 |
| NOVIEMBRE | 98.204 | 147.900 | 37.732 |
| DICIEMBRE | 75.568 | 146.537 | 96.169 |
| | **663.937** | **810.373** | **489.555** |

695.    Al 31 de diciembre 2019, el carbón total en los patios de la Terminal TPP alcanzó la cantidad de 461,043 toneladas y 127,606 toneladas en los patios de almacenamiento de la Central.[339] Sin embargo, considerados conjuntamente, los patios de ambas terminales tienen una capacidad máxima de almacenamiento de 425,000 toneladas. La sobresaturación de ambos patios comprueba una deficiente programación por parte de CFE en la planeación de insumos y consumos de carbón para el abastecimiento de la U7 y del resto de las unidades, todo lo cual también contribuyó a una sobreestadía de carbón.[340]

696.    La capacidad de almacenamiento de carbón de la Central era de 125,000 toneladas[341], la cual fue rápidamente alcanzada debido a la compra de carbón por CFE y el bajo consumo de carbón por parte de la U7. En particular, la U7 no consumió carbón en las siguientes fechas (i) 17 y 18 de agosto de 2019, (ii) 6 y 7 de octubre de 2019, (iii) 2 de noviembre de 2019, (iv) del 4 al 11 y del 14 al 23 de noviembre de 2019, y (v) 6 al 12 de diciembre de 2019.[342]

697.    Asimismo, la U7 no consumió carbón del 3 al 23 de noviembre y del 7 al 12 de diciembre de 2019, debido a un mantenimiento imprevisto, lo que también contribuyó a la sobreestadía de carbón en la Terminal TPP.[343]

---

[338]    Anexo D-TPP-45, Informe Mensual de Agosto a diciembre.
[339]    Anexo D-TPP-45, Informe Mensual diciembre 2019, p.3.
[340]    Anexo D-TPP-45.
[341]    Letra c, inciso I del Anexo 7 del Contrato.
[342]    Anexo D-TPP-45.
[343]    Anexo D-TPP-45

**5.4.4.2**   *Contribución de Greenfield a la sobreestadía de carbón en el Terminal TPP*

698.    Sin perjuicio de la contribución de las Demandadas a la sobreestadía de carbón en la Terminal TPP, el Tribunal Arbitral considera que Greenfield tuvo un rol preponderante en dicha sobreestadía.

699.    En efecto, como vimos, en la reunión del 25 de abril de 2019, CFE presentó a Greenfield el programa de recepción de buques para el año 2019 y solicitó a Greenfield información respecto de los preparativos para la recepción del primer buque, el cual estaba programado para el 5 de mayo de 2019. Greenfield confirmó a CFE la FOC para el 21 de mayo de 2019, tal cual estaba previsto en el Contrato.[344]

700.    El mismo 25 de abril de 2019, CFE y Glencore suscribieron el Contrato Glencore, el cual preveía varias ventanas de arribo del carbón.[345]

701.    Sin embargo, no solo Greenfield no alcanzó la FOC en la fecha comprometida, sino que, posteriormente, Greenfield modificó en reiteradas oportunidades la fecha estimada para alcanzar la FOC, sin cumplir con ninguna de dichas estimaciones, hasta finalmente alcanzar la FOC el 16 de agosto de 2019.

702.    El Tribunal Arbitral considera que el obrar errático de Greenfield contribuyó necesariamente a la deficiente planificación de compra de carbón por CFE, sin perjuicio de que el obrar de Greenfield no haya sido la única causa de los errores de CFE en la planificación.

703.    Aun así, el Tribunal Arbitral considera que Greenfield debió al menos tener conocimiento al 25 de abril de 2019 de que no alcanzaría la FOC el 21 de mayo de 2019, por lo que debió haber notificado formalmente de ello a CFE. En igual sentido, si Greenfield consideraba que la Terminal TPP no estaba lista para recibir buques debido a que no se encontraba finalizado el Sistema de Transporte y Almacenamiento, debió haberlo notificado a CFE en términos claros; sin embargo, no lo hizo.

704.    Al momento de alcanzar la FOC, el 16 de agosto de 2019, Greenfield tenía almacenadas 428,626 toneladas de carbón[346] en la Terminal TPP, lo cual redundaba en 128,626 toneladas

---

adicionales a la capacidad de almacenamiento de la Terminal TPP de hasta 300,000 toneladas de carbón.

705.    Debido a que el Sistema de Transporte y Almacenamiento no se encontraba terminado y Greenfield aceptó descargar los buques en la Terminal TPP antes de alcanzar la FOC, el carbón descargado permaneció por un periodo mayor al de libre almacenamiento en la Terminal TPP, ya que, al no existir el Sistema y no utilizar tractocamiones según lo previsto en la cláusula 4.3(b) del Contrato, se dificultaba el traslado del carbón desde la Terminal TPP al SIMC en la Central.

706.    Por esta misma razón, como el Sistema de Transporte y Almacenamiento no estaba finalizado, durante los meses de mayo, junio y julio de 2019 fue la TMRC la que debió suministrar carbón a la U7.  Ello generó que el carbón que se había descargado en la Terminal TPP para dichos meses permaneciera inmóvil hasta tanto el Sistema de Transporte y Almacenamiento estuviera disponible, de modo de realizar el transporte al SIMC.

707.    En vista de lo expuesto, el Tribunal Arbitral considera que Greenfield contribuyó a que el carbón descargado en la Terminal TPP permaneciera mayor tiempo que el de libre almacenamiento.

### 5.4.4.3  *Conclusión del Tribunal Arbitral*

708.    Como hemos visto, el Anexo 2 del Contrato prevé lo siguiente respecto del Cargo Variable por Sobreestadía:

> *"El referido Cargo Variable por Sobreestadía no será aplicable si la sobreestadía se produce como consecuencia de un incumplimiento en la prestación de los Servicios Portuarios originado por fallas en el Sistema de Transporte y Almacenamiento imputables a la culpa o dolo del Proveedor, siempre y cuando la Comisión no haya contribuido a ello."*

709.    Es decir, el Cargo Variable por Sobreestadía no aplica si el carbón permanece en la Terminal TPP por un tiempo mayor al de libre almacenamiento cuando ello se produce como consecuencia de un incumplimiento en la prestación de los Servicios Portuarios originado por fallas en el Sistema de Transporte y Almacenamiento.  El Tribunal Arbitral considera que la literalidad del Anexo 2 es clara y no requiere mayores esfuerzos interpretativos.

710.    Si bien el Anexo 2 refiere a "*fallas*" en el Sistema de Transporte y Almacenamiento, el Tribunal Arbitral considera que la indisponibilidad del Sistema de Transporte y Almacenamiento a partir del 21 de mayo de 2019, fecha en la que debió estar operativo, si bien no constituye técnicamente una "falla", es indudable que encuadra en el supuesto previsto en el Anexo 2.

711.    Para Greenfield eximirse de responsabilidad por la sobreestadía de carbón derivada de la indisponibilidad del Sistema de Transporte y Almacenamiento, el Anexo 2 exige que CFE "*haya contribuido a ello*". Ahora bien, en este caso, "*ello*" no refiere a la sobreestadía de carbón propiamente dicha, sino al "*incumplimiento en la prestación de los Servicios Portuarios originado por fallas en el Sistema de Transporte y Almacenamiento.*"

712.    En este sentido, el Tribunal Arbitral considera que no existe constancia de que CFE haya contribuido al retraso en la puesta en operación del Sistema de Transporte y Almacenamiento.

713.    Por lo anterior, si bien tanto Greenfield como CFE contribuyeron a la sobreestadía del carbón en la Terminal TPP, el eximente de responsabilidad previsto en el Anexo 2 no se cumple, a diferencia de lo ocurrido con el eximente de responsabilidad por la sobreestadía de los buques, previsto en la cláusula 10.2(B) del Contrato.

714.    A la luz de lo previsto expresamente en el Anexo 2 del Contrato sobre el Cargo Variable por Sobreestadía, el Tribunal Arbitral concluye que las Demandantes no han satisfecho su carga de probar que la sobreestadía de carbón en la Terminal TPP no se produjo como consecuencia del incumplimiento de Greenfield en la prestación de los Servicios Portuarios originado por la indisponibilidad del Sistema de Transporte y Almacenamiento hasta el 16 de agosto de 2019, ni que CFE haya contribuido a dicho retraso.

715.    Si bien existen causas atribuibles a CFE que contribuyeron a la sobreestadía de carbón en la Terminal TPP, el Tribunal Arbitral concluye que dicha sobreestadía fue causada principalmente por el incumplimiento en la prestación de los Servicios Portuarios originado por la indisponibilidad del Sistema de Transporte y Almacenamiento.

716.    Por lo anterior, el Tribunal Arbitral desestima la reclamación de las Demandantes por sobreestadía de carbón en los términos del Anexo 2.

**5.5     Sobre las costas del arbitraje**

**5.5.1     Posición de Greenfield**

717.     Greenfield requiere que se condene a las Demandadas a soportar los gastos y costos del presente arbitraje, incluidos los honorarios y gastos de gestión del arbitraje, del Tribunal Arbitral y de los asumidos por las Demandantes para asegurar su defensa, de conformidad con el Artículo 28 del Reglamento.

718.     Greenfield cuantifica dichos gastos según el siguiente desglose:

    1.     Cuota Administrativa LCIA: GBP £338,450.

    2.     Honorarios Legales: USD $797,544.

    3.     Honorarios Peritos: USD $322,681.

    4.     Gastos Audiencia: MXN $670,092.

**5.5.2     Posición de TPP y TMC**

719.     TPP y TMC requieren que se condene a las Demandadas a soportar los gastos y costos del presente arbitraje, incluidos los honorarios y gastos de gestión del arbitraje, del Tribunal Arbitral y de los asumidos por las Demandantes para asegurar su defensa, de conformidad con el Artículo 28 del Reglamento.

720.     TPP y TMC cuantifican dichos gastos según el siguiente desglose:

    1.     Bufete Asali, S.C.: USD $500,000 más bono de éxito.[347]

    2.     Alberto Estrella: MXN $249,090.

    3.     J.S. Held: USD $52,777.

    4.     Jorge Oria – Ritch Muller: USD $20,427.

    5.     Javier Arreola – Nader Hayaux Goebel: USD $29,999.

    6.     Estenografía: MXN $118,166.

    7.     Carmen Codes: USD $11,005.

    8.     Presentación Audiencia: MXN $255,000.

---

[347]     Bono de éxito equivalente al 2% del beneficio económico total que TPP y TMC obtengan en el laudo final del arbitraje.

9.  Espacios y banquete audiencia: MXN $106,365.

10. Viáticos Audiencia: MXN $105,105.

### 5.5.3   Posición de las Demandadas

721.   Las Demandadas alegan que las pretensiones solicitadas por las Demandantes no sólo son infundadas, sino que, además, son las Demandantes quienes han incumplido el Contrato, lo cual refleja la mala fe con la que el presente arbitraje ha sido iniciado. Por ello, las Demandadas solicitan que sean las Demandantes quienes asuman la totalidad de los costos del presente arbitraje, de conformidad con el artículo 28 del Reglamento.

722.   Las Demandadas cuantifican dichos gastos según el siguiente desglose:

1.  Cuotas Arbitrales: GBP £327,500.

2.  Honorarios de Abogados: MXN $2,041,577.50.

3.  Honorarios de Expertos: MXN $99,801.34

4.  Gastos Audiencia: MXN $368,700.03.

### 5.5.4   Decisión Tribunal Arbitral

723.   Las reglas sobre la decisión de costos que debe adoptar el Tribunal Arbitral en este Laudo se encuentran recogidas en los Artículos 28.2, 28.3 y 28.4 de las Reglas de la LCIA, las cuales prevén los siguiente:

> *"28.2 El Tribunal Arbitral especificará mediante una orden o un laudo la cuantía de las Costas Arbitrales fijadas por la Corte de la LCIA. El Tribunal Arbitral decidirá la proporción en la que las partes asumirán dichas Costas Arbitrales (a falta de un acuerdo definitivo de las partes sobre la controversia relativa a la responsabilidad sobre dichas costas). Si el Tribunal Arbitral ha decidido que la totalidad o parte de las Costas Arbitrales deben ser asumidas por una parte distinta de la que ya hubiera cubierto dichas costas mediante el pago a la LCIA en virtud del artículo 24, esta última parte tendrá derecho a recuperar la cantidad correspondiente de las Costas Arbitrales de la primera.*

> *28.3 El Tribunal Arbitral estará asimismo facultado para decidir, mediante una orden o laudo, que la totalidad o parte de los gastos legales o de otro tipo en los que incurra una parte (las "Costas Legales") sean pagados por otra parte. El Tribunal Arbitral*

*decidirá el importe de dichas Costas Legales con base en los motivos razonables que considere apropiados. El Tribunal Arbitral no estará obligado a aplicar las tarifas o procedimientos para la evaluación de tales costas empleados por cualquier tribunal estatal u otra autoridad legal.*

*28.4 El Tribunal Arbitral decidirá tanto sobre las Costas Arbitrales como sobre las Costas Legales basándose en el principio general de que las costas deben reflejar el éxito y el fracaso relativo de las partes en el laudo, en el arbitraje o en otras cuestiones, salvo que el Tribunal Arbitral considere, atendiendo a las circunstancias, que la aplicación de dicho principio general sería inapropiada de conformidad con el Acuerdo de Arbitraje o por cualquier otra razón. El Tribunal Arbitral también podrá tener en cuenta la conducta de las partes y la de sus representantes autorizados en el arbitraje, incluida cualquier cooperación para facilitar el procedimiento en cuanto a tiempo y coste y cualquier falta de cooperación que diera lugar a demoras indebidas y gastos innecesarios. Toda decisión del Tribunal Arbitral sobre las costas deberá ser motivada en la orden o el laudo que contenga dicha decisión (a menos que se trate de un Laudo por Consentimiento)."*

724.   Por lo tanto, el Tribunal Arbitral debe decidir la proporción en la que las Partes asumirán las Costas Arbitrales fijadas por la Corte de la LCIA, así como la manera en la que deberán sufragarse las Costas Legales.

725.   En este sentido, las costas netas del arbitraje (excluyendo los costes legales y otros incurridos por las Partes) han sido determinados por la Corte de la LCIA, de conformidad con el artículo 28.1 del Reglamento, en el siguiente importe:

| | |
|---|---|
| Tasa de Registro: | £1,950.00 |
| Tasa de Arbitraje de Emergencia: | £9,000.00 |
| Gastos Administrativos de la LCIA: | £46,848.07 |
| Honorarios y Gastos del Tribunal: | £558,606.65 |
| Costas de Arbitraje Totales: | £616,404.72 |

726.   De estas costas, las Demandantes han pagado £338,450.00, importe que incluye la tasa de registro, la tasa del arbitraje de emergencia y los anticipos de costas pagados, y las Demandadas han pagado £327,500.00, cantidad que incluye los anticipos de costas pagados,

y los intereses devengados. Un total de £665,950.00 se ha recibido de las Partes, del cual £616,404.72 más un IVA de £21,092.80 se ha empleado para las costas del arbitraje.

727.   Al decidir la proporción en la que las Partes asumirán las Costas Arbitrales fijadas por la Corte de la LCIA y las Costas Legales, las Reglas de la LCIA exigen que el Tribunal Arbitral se base en el principio general de que las costas deben reflejar el éxito y el fracaso relativo de las Partes en el arbitraje, a menos que el Tribunal Arbitral considere, atendiendo a las circunstancias, que la aplicación de dicho principio general sería inapropiada. El Tribunal Arbitral también podrá tener en cuenta la conducta de las Partes y la de sus representantes en el arbitraje.

728.   En el presente Laudo Final, el Tribunal Arbitral ha hecho lugar a la reclamación de las Demandantes sobre el pago del Cargo por Servicios Portuarios y sobre la improcedencia de la ejecución de la Garantía Operativa por las Demandadas, salvo respecto del buque ANNA MARIA, primera vuelta.

729.   Por otra parte, el Tribunal Arbitral determinó que TMC no es parte del Contrato y rechazó la reclamación de las Demandantes sobre la sobreestadía de carbón. Asimismo, el Tribunal Arbitral considera que la participación separada de Greenfield, por un lado, y TPP y TMC, por el otro, ha aumentado la complejidad procesal del arbitraje, y ha contribuido a la duplicación de alegaciones que, indudablemente, han requerido más tiempo y recursos de las Demandadas.

730.   Finalmente, el Tribunal considera que todas las Partes, junto con sus representaciones letradas, han realizado un trabajo sumamente profesional en un caso complejo, presentando argumentos y defensas razonables, sin dilatar o entorpecer el procedimiento arbitral.

731.   En vista de lo anterior, el Tribunal Arbitral resuelve que las Demandantes, por un lado, y las Demandadas, por otro lado, sufraguen el 50% de las Costas Arbitrales, y que cada una de las Partes soporte las Costas Legales en las que ha incurrido. De esta forma, y de conformidad con lo previsto por el Artículo 24.3 del Reglamento, el Tribunal ordena que las Demandantes tienen derecho a que se les reembolse el monto de £19,701.24 de los fondos no utilizados por la LCIA y que las Demandadas tienen derecho a que se les reembolse el monto de £8,751.24.

## 6.    DECISIONES

732.   El Tribunal Arbitral DECIDE lo siguiente:

(i)   Determinar que TPP es Parte del Contrato, no así TMC;

(ii) Determinar que TPP y TMC tienen legitimación activa para reclamar en el presente arbitraje sobre la base de lo previsto en la cláusula 4.6(f) del Contrato;

(iii) Ordenar a las Demandadas pagar a TTP, con el consentimiento de Greenfield, los montos correspondientes al Cargo por Servicio Portuario que no alcanzaron la Cantidad Firme Anual en el periodo correspondiente a los años 2019-2020, 2020-2021, 2021-2022 y 2022-2023, conforme al siguiente desglose:

- USD 4,039,727.10, más IVA, correspondiente al primer año operativo del 16 de agosto de 2019 al 15 de agosto de 2020;

- USD $9,632,084.80, más IVA, correspondiente al segundo año operativo del 16 de agosto de 2020 al 15 de agosto de 2021;

- USD $9,603,492.13, más IVA, correspondiente al tercer año operativo del 16 de agosto de 2021 al 15 de agosto de 2022; y

- USD $8,561,715.85, más IVA, correspondiente al cuarto año operativo del 16 de agosto de 2022 al 15 de agosto de 2023.

(iv) Ordenar a las Demandadas a pagar a TTP, con el consentimiento de Greenfield, intereses moratorios sobre los montos indicados en el punto anterior por un total de USD 1,708,496.61, más IVA, según el siguiente desglose:

- USD 398,383.47 más IVA, correspondiente al interés moratorio del primer año operativo del 21 de septiembre del 2020 al 25 de septiembre de 2023;

- USD $610,582.21 más IVA, correspondiente al interés moratorio del segundo año operativo del 21 de septiembre de 2021 al 25 de septiembre de 2023;

- USD $691,581.13 más IVA, correspondiente al interés moratorio del tercer año operativo del 21 de septiembre de 2022 al 25 de septiembre de 2023, y

- USD $7,949.80 más IVA, correspondiente al interés moratorio del cuarto año operativo del 21 de septiembre de 2023 al 25 de septiembre de 2023.

(v) Ordenar a las Demandadas a continuar pagando intereses a TTP, con el consentimiento de Greenfield, según las tasas aplicadas a cada uno de los periodos referidos en el punto anterior, según lo previsto en el párrafo 359 del presente Laudo Final, desde el 25 de septiembre de 2023 hasta la fecha de efectivo pago.

(vi) Determinar que las Demandadas deberán pagar el Cargo por Servicio Portuario a TTP, con el consentimiento de Greenfield, de los años operativos subsecuentes durante la vigencia del Contrato, considerándolo como un cargo mínimo a ser calculado con base en la Cantidad Firme Anual, a la cual se sumará, en su caso, cualesquiera toneladas descargadas en adición a la Cantidad Firme Anual.

(vii) Determinar que las sobreestadías de los buques fueron generadas por una responsabilidad compartida entre Greenfield y las Demandadas, y, por lo tanto, las Demandadas no debieron ejecutar la Garantía Operativa en su totalidad.

(viii) Ordenar a las Demandadas la devolución a Greenfield del monto de USD 6,896,021.11, más IVA, cobrado por la ejecución de la Garantía Operativa, descontado el monto de la sobreestadía correspondiente al buque ANNA MARIA, primera vuelta, a la luz de lo dispuesto en las cláusulas 10.2(B) y 4.8(b)(iii) del Contrato.

(ix) Ordenar a las Demandadas a pagar a Greenfield intereses, más IVA, sobre el monto indicado en el punto anterior a una tasa de interés anual del 3.21023%, desde el 24 de abril de 2021 hasta el 25 de septiembre de 2023.

(x) Determinar que tanto Greenfield como CFE contribuyeron a la sobreestadía de carbón en la Terminal TPP, y que, si bien existen causas atribuibles a CFE que contribuyeron a la sobreestadía de carbón en la Terminal TPP, dicha sobreestadía fue causada principalmente por el incumplimiento en la prestación de los Servicios Portuarios originado por la indisponibilidad del Sistema de Transporte y Almacenamiento.

(xi) Desestimar la reclamación de las Demandantes por sobreestadía de carbón en los términos del Anexo 2 del Contrato.

(xii) Fijar las Costas Arbitrales en £616,404.72, más IVA de £21,092.80;

(xiii) Ordenar que que las Demandantes, por un lado, y las Demandadas, por otro lado, sufraguen el 50% de las Costas Arbitrales, y que cada una de las Partes soporte las Costas Legales en las que ha incurrido.

(xiv) Rechazar todas las demás pretensiones de las Partes.

**Sede del Arbitraje**: Ciudad de México, México.

**Fecha**: 28 de mayo de 2024

_____
David Arias
Árbitro

_____
Oscar Vásquez Del Mercado Cordero
Árbitro

_____
Christian Albanesi
Presidente